**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **United States of America,**<br>Plaintiff,<br>vs.<br>**Gordon Leroy Hall,**<br>Defendant. | **APPEAL**<br>**CR14-00184-PHX-NVW(MHB)**<br>Phoenix, Arizona<br>January 21, 2015<br>9:06 a.m. |

**BEFORE: THE HONORABLE NEIL V. WAKE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY #2**

**(Pages 271 through 589, inclusive.)**

**APPEARANCES:**
**For the Government:**
U.S. ATTORNEY'S OFFICE
By: **Lisa E. Jennis, Esq.**
**Monica Edelstein, Esq.**
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004

**For the Defendant Gordon Leroy Hall**:
STEPHEN C. KUNKLE, PLLC
By: **Stephen C. Kunkle, Esq.**
5150 North 16th Street, Suite A-222
Phoenix, AZ 85020

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

## INDEX


| SUMMARY OF COURT PROCEEDINGS | PAGE: |
|---|---|
| Defendant's Motion for Mistrial | Page 324 |
| Defendant's Motion for Mistrial | Page 465 |
| Instruction Conference | Page 481, 558 |

**INDEX OF WITNESSES**

**T.W. LYONS:**

| | |
|---|---|
| Cross examination (cont'd)by Mr. Kunkle | Page 278 |
| Redirect examination by Ms. Jennis | Page 282 |

**JO LYNN COLEGROVE:**

| | |
|---|---|
| Direct examination by Ms. Edelstein | Page 290 |
| Cross examination by Mr. Kunkle | Page 310 |
| Redirect examination by Ms. Edelstein | Page 323 |
| Recross examination by Mr. Kunkle | Page 329 |

**HAROLD ARGETSINGER:**

| | |
|---|---|
| Direct examination by Ms. Edelstein | Page 331 |
| Cross examination by Mr. Kunkle | Page 346 |

**SPECIAL AGENT KATHLEEN NERI:**

| | |
|---|---|
| Direct examination by Ms. Edelstein | Page 350 |
| Cross examination by Mr. Kunkle | Page 380 |
| Redirect examination by Ms. Edelstein | Page 397 |

**SHANNON TAYLOR HALL:**

| | |
|---|---|
| Direct examination by Ms. Jennis | Page 399 |
| Cross examination by Mr. Kunkle | Page 433 |
| Redirect examination by Ms. Jennis | Page 461 |

**ADAM HARRIS NIXON:**

| | |
|---|---|
| Direct examination by Ms. Jennis | Page 466 |
| Cross examination by Mr. Kunkle | Page 482 |
| Redirect examination by Ms. Jennis | Page 490 |

**BRIGHTON-NICOLE JORGENSEN:**

| | |
|---|---|
| Direct examination by Ms. Edelstein | Page 491 |
| Cross examination by Mr. Kunkle | Page 544 |
| Redirect examination by Ms. Edelstein | Page 556 |

## INDEX OF EXHIBITS



| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| Exhibit No. 8 | Photographs taken at US Post Office | Page 339 |
| Exhibit No. 9 | Money Order, 1996 Forms 1040-V payment Voucher, and affidavits of Service | Page 358 |
| Exhibit No. 10 | Money Order, 1997 Forms 1040-V payment Voucher, and Affidavits of Service | Page 358 |
| Exhibit No. 11 | Email dated December 6, 2012, with Subject "Re: Please look over these docs for dad. I still need to file a UCC will do that when you are done" with attachment(s) | Page 414 |
| Exhibit No. 12 | Email dated January 25, 2013, with Subject "Money Order Spreadsheet" with attachment(s) | Page 422 |
| Exhibit No. 13 | Dell printer | Page 478 |
| Exhibit No. 14 | Check Stock Paper | Page 479 |
| Exhibit No. 19 | Photographs of Gordon Leroy Hall's house on Presidio Circle, Mesa, Arizona | Page 469 |
| Exhibit No. 20 | Photographs of Brandon Adams's house on Sandia Circle, Mesa, Arizona | Page 474 |
| Exhibit No. 29 | Sketch of Sandia Circle Residence | Page 475 |
| Exhibit No. 101 | Registered Mail domestic return receipts (2), Postal Form 3811 (received by Gloria Ross); 1) RE 261 089 801 US; 2) RE 261 089 815 US | Page 347 |

**P R O C E E D I N G S**

(Called to the order of court at 9:06 a.m.)

(Open court, no jury present.)

THE COURT: All right. Please be seated. The record will show the presence of counsel and the defendant in the absence of the jury.

Check and see if he's okay, Mr. Kunkle.

MR. KUNKLE: Your Honor, I think Mr. Hall just dozed off for a minute and didn't mean any disrespect by not standing up.

THE COURT: Not at all. I understand. It's a long day.

All right. Counsel, I have just a few comments and then we can proceed with the witnesses.

First of all, Mr. Kunkle, your request for an immunity instruction, I'm inclined, of course, to do that. I favor the model instruction and I haven't really labored through your proposal yet. To the extent it elaborates on the model instruction, I might be a bit skeptical, but.

MR. KUNKLE: Just so you understand, Your Honor, I didn't elaborate so much as I deleted out the brackets from the model instruction and just changed some language so it conformed to the two witnesses.

THE COURT: All right.

MR. KUNKLE: That's practically it from the Model

4.9. And I didn't have a chance to go over that with the government because it was based on something I learned last night.

THE COURT: All right. And with respect to --

MS. JENNIS: Your Honor, may I make a comment on that?

THE COURT: Yes. Yes.

MS. JENNIS: There's no immunity given to any witness.

THE COURT: Oh. Well, why are we giving the immunity instruction then?

MS. JENNIS: I have no idea.

THE COURT: Why are we giving the immunity instruction if there is no immunity, Mr. Kunkle?

Briefly. Very briefly.

MR. KUNKLE: Your Honor, as an offer to the Court as a proffer, I believe the witnesses will testify that they were made assurances or a promise from the home team, the government, that they would not be prosecuted as long as they were cooperating.

And I believe that promise, while it may not be a formal grant of immunity -- and just as an aside, I also believe two of these witnesses as named in the instruction, you know, the government has indicated to me they are not charged obviously and they're not going to be charged, but

they are going to be testifying to acts and matters that they did that would make them accomplices at a minimum.

And, you know, I just put this out to the Court. I don't know -- prior to them testifying, I don't know if the Court wants to appoint them counsel or not, but.

THE COURT: No. Let me tell you. If there's been any practical benefit offered to the witnesses, I'm disposed to give an instruction about that. It doesn't have to be formal immunity. Let's see what evidence comes out if there has been something offered to them, some inducement, I think an instruction about the caution to be given to that is appropriate. So we'll just have to deal with that after we find out what the evidence is.

And briefly, with respect to the proposed instructions, the disputes you've got on the phrasing of -- I have already done some edits. My secretary is inputting some and I'll just give you a quick preview and then we can look at it a little later.

I don't know we need to talk about the competing language you have offered involving interpreting the *Howick* case. My initial sense of it is I think the government's language fits the *Howick* case better than yours, Mr. Kunkle, but we'll go through it specifically.

And also, I don't tell the jury about statute citations. It's meaningless to them. So I put "reference to

the United States Code." Period.

And with respect to the aiding and abetting, I'm disposed to give that after the two substantive instructions, not before. And I have just edited that generally to refer to "the crimes of making or using."

So we don't need to have that discussion right now. We'll have that edit -- we'll have a chance to look at it.

I think I have no doubt we will get this resolved. We're very close to having this resolved in a way that I think satisfies counsel and me.

So with that, let's bring in the jury, Nick.

MS. EDELSTEIN: Your Honor, would you like the witness on the stand when the jury comes in?

THE COURT: We can -- well, actually, no. I would rather the jury see the witness sworn.

MS. JENNIS: Well, he's already sworn yesterday.

THE COURT: Okay. Fine. He can be on the stand. Good.

THE CLERK: Judge, we're missing a juror.

THE COURT: See if you can contact the juror. And if we can't, we will have selected one of our alternates.

Please be seated.

MS. JENNIS: Your Honor, may we run to the rest room?

THE COURT: Yes. On the record --

MS. JENNIS: Okay. Thank you.

THE COURT: Actually, I tell you what. I think I'm going to leave the bench because I want to take another look at -- I left my secretary with your draft. And as soon as that's ready, if we are still waiting, I'll bring it out and we might talk about it a little bit after she's made the changes.

We'll be in recess for a few minutes.

All right, counsel. We'll be in recess for ten minutes.

(Open court, jury present at 9:33 a.m.)

THE COURT: Good morning. Please be seated. The record will show the presence of counsel, the defendant, and the jury, and you may continue.

**T.W. LYONS, WITNESS, SWORN**

**CROSS EXAMINATION (cont'd)**

BY MR. KUNKLE:

Q Good morning, Mr. Lyons.

A Good morning.

Q Are you feeling okay, sir, to go forward? You're feeling okay to testify this morning?

A Yes, sir. Thank you.

Q I just had a few more questions for you.

A Yes, sir.

Is this on?

THE COURT: It should be on.

THE WITNESS: Thank you.

BY MR. KUNKLE:

Q Okay. Just about that package you were talking about what's been marked in evidence as Exhibit 1, Exhibit 2, when you went to the office that day, those packages were in the mail room waiting for you, correct?

A That is correct.

Q And they were already opened, right?

A That is correct.

Q And then you took them from the mail room and secured them in the office or in the box -- in the SEP room; do you recall?

A I believe I locked them into the -- into a filing cabinet in my office, my cubicle.

Q And just so it's clear, the other packages that you received, Exhibit 6 and 7, you received approximately -- you yourself personally received about six, half-dozen, maybe more of those packages, between August 3, 2011, and December of 2012, correct?

A That is correct.

Q And those packages were all about the same kind of language in the documents over and over, correct?

A Pretty much, yes, sir.

Q And last -- well, actually, I shouldn't say "last."

We discuss yesterday 7212, the statute for impeding the administration of the IRS. Remember I asked you about

that?

A Yes, sir.

Q And you're aware that that has a one-year prison sentence and a $3,000 fine, correct?

A I'm not aware of that, no, sir.

Q And yesterday with Ms. Jennis you testified on direct about what a taxpayer may believe in sending those forms of documents in to you, correct?

A I believe so, yes, sir. I think I know what you're saying. Yes, sir.

Q You've heard of an idea about the social security number being tied to a bank account at the United States Treasury in other tax returns?

Perhaps call it a "redemption theory."

A Okay. The redemption theory? Yes, sir.

Q Yes. And using that term "redemption theory," in short, it's the idea that someone's social security number has been tied to a secret bank account at the United States Treasury, correct?

A I believe that is one of the theories. There's quite a few of them that go around with that, but I think you are essentially correct, yes, sir.

Q There are different variations?

A Different variations of that concept, yes, sir.

Q So when someone is born, their birth certificate is

perhaps collateralized for further debt by the United States Government?

A I'm not that familiar with it to say that it is what you're proposing is the theory, but I think what you're hitting on is the right direction, yes, sir.

Q Well, as we said, there's a lot of these different theories?

A There's a lot of theories, yes, sir.

Q And one of those as well is that an individual's social security number is linked to a secret bank account where the government has money in their name; is that correct?

A I'm not familiar with the secret bank account, but the concept is that there is something tied to the person that they can have access to, yes, sir.

Q And so in one variation of that, people will file for false refunds, correct, that they are entitled to this secret money from the IRS?

A Yes, sir. There are people that have filed for refunds, yes, sir.

Q Based on the idea that their social security number is linked to a secret bank account?

A I'm not sure if that's the -- if you're now mixing apples and oranges as to the theory, but there are people that have filed for tax refunds. I'm just not sure it's part of the redemption theory.

Q And you have heard of "strawman accounts"?
A Yes, sir.
MS. JENNIS: Objection, Your Honor. Relevance.
THE COURT: I'll allow this briefly.
MR. KUNKLE: Okay.
BY MR. KUNKLE:
Q And just to clarify, none of that really exists, correct? These are just what people may believe out there, right?
A Some people do believe it, yes, sir.
Q And from your examination of Exhibit 6 and 7, what those documents are, these are the earlier packages; Nos. 6 and 7 from August of 2011 and December 2012?
A Yes, sir.
Q Those documents coming as they were from Mr. Hall or on behalf of Mr. Hall, have language resembling those theories.
Would that be fair to say?
A I think that would be fair to say, yes, sir.
MR. KUNKLE: I have nothing further, Your Honor.
THE COURT: All right. The government may redirect.

**REDIRECT EXAMINATION**

BY MS. JENNIS:
Q I just want to clarify a few things that you and Mr. Kunkle talked about yesterday.
You talked about when you receive a payoff amount for taxes that's over $100,000, then you have to process it that

same day and it goes to Ogden?
A Yes, ma'am.
Q But you also talked about the Frivolous Filings Unit being in Ogden?
A Yes, ma'am.
Q Can you explain that these are two different things?
A Well, the Remittance Center is certainly different. All paychecks go to the Remittance Center in Ogden, Utah. The Frivolous Filer Unit is a separate division or unit -- I shouldn't call it a "division," but a separate unit that just happens to be located in Salt Lake City -- or I mean Ogden, Utah, yes, ma'am.
Q Okay. So these are two separate units? One --
A They're completely separate. They're not connected at all.
Q So one where you would send payments that you received from taxpayers, correct?
A One you would send -- yes. Yes, ma'am.
Q And one where you would send frivolous filings.
Now, could frivolous filings be a tax return or a frivolous payment for taxes?
A Yes, ma'am. It could be a frivolous tax return or documents or letters and so forth, yes, ma'am.
Q So if someone sends you a real check or money order or some sort of real payment, it's going to go to the Remittance

Center?
A Yes, ma'am. You would not send that to the FRP.
Q And if you determine that it's a nonnegotiable instrument, it's going to go to the Frivolous Filing Center?
A That is correct. Yes, ma'am.
Q Both of which are located in Ogden, Utah?
A Yes, ma'am.
Q All right. I just wanted to clarify that.
Also, Mr. Kunkle asked you a little bit about dates. He asked you about January 29th and if that was a Friday.
And I believe you stated that your first call that you received from Mr. Hall was on a Friday and you weren't in the office?
A That is correct.
Q And that was the --
A January -- I believe that was January 18th. The first call was January 18th, yes, ma'am.
Q And so you returned his call on January 22nd?
A Yes, ma'am.
Q And then he asked you -- and I don't remember why -- but he asked you about January 29th. He asked you what --
A He asked me to compute a payoff for him through January 28th, if my memory is correct, and so I gave him that number, the payoff for January the 28th.
Q Okay. Well, that's a separate issue. But Mr. Kunkle

asked you --
A Oh, I'm sorry.
Q -- what day of the week January 29th was. And I believe you testified that January 22nd was a Tuesday because it was the day after Martin Luther King Day?
A That's correct, yes, ma'am.
Q So January 29th when you received the money orders from Mr. Hall, that would have also been a Tuesday?
A Yes, ma'am.
Q Now, you also discussed the defendant -- Mr. Kunkle, sorry -- asked you about a tax lien on the defendant's home; Mr. Hall's home?
A A Notice of Federal Tax Lien, yes, ma'am.
Q Can you tell us about that?
A A Notice of Federal Tax Lien puts the public on notice, other creditors on notice, of our lien. Basically, essentially establishes our lien priority. It attaches to that property so that someone cannot sell it -- or they can sell it, but it would just mean that the IRS is a lienholder for that particular piece of property.
They certainly have the right to sell their property, but the IRS would be a lienholder on it.
Q So if a person sold their property, the IRS would get part of the proceeds as a lienholder?
A Yes, ma'am.

Q And what property did Mr. Hall have a tax lien on -- or what property of Mr. Hall's did you have a tax lien on?
A The Notice of Federal Tax Lien was attached to the Presidio Circle property.
Q And that's in Mesa?
A Yes, ma'am.
Q And is the tax lien connected to why you thought these money orders might be real --
Well, let me rephrase the question.
Is the tax lien why you thought Mr. Hall was actually going to pay off his taxes?
A I believe what I -- what -- to answer the question, I think the way that I was looking at it, is that I knew he had just purchased that property fairly recently and that I knew he had paid a significant amount of money for that property.
So my presumption was -- and I really did believe this -- that he had the money. And that as this was the very first time he had ever called me and he was -- like I said, he was very cordial on the phone -- so tying the fact that he seemed sincere on the phone that he was going to pay me, he seemed that he possibly had the money to pay me, I was expecting a check to be there.
I had no idea about money orders at that time, but I expected that he would pay me, yes, ma'am.
Q And you just said that this was the first time he called

you. But you also testified yesterday that you received numerous mailings previously from Mr. Hall and that had to do with the setoff bond, correct?
A That's correct.
Q But this was the first time he actually called you on the phone?
A Yes, ma'am.
Q And when he called you on the phone, just to clarify, and he wanted -- what did he want?
A The voice message on the first phone call was a request for a payoff of a certain date. And then he provided his name and his phone number and asked me to call him back.
When I called him back, he changed the date because I'm presuming that I called him back on the 22nd and the 23rd would be too quick. So he changed the date to the 28th and he asked for a payoff effective on the 28th of January of 2013.
Q So initially he wanted the payoff for the 23rd, but since you --
A Yeah. The first one was for the 23rd and the second one was for the 28th, yes, ma'am.
Q And those were for two separate tax years?
A Yes, ma'am. It was for '96 and '97.
Q How did you determine the payoff amount?
A The computer system that I have, the ICS that we referred to, has a computation program built into it. And I simply

just go to the computation program and put the effective date. It will not go backwards in effective dates, but it will go from any day from the present day forward and I can project out any date in the future.

Q So today is like the -- today is January 21st. So you couldn't go into your computer and get a payoff date for January 20th?

A I could go into my computer and probably go to the 20th but I could not go to the 19th. I could go maybe to the 20th, but certainly from the 20th, any day forward from that.

Q And every time you change the day of the payoff, is the amount of taxes owed for a certain tax year going to change?

A Yes, ma'am. Interest is going to be added for -- it's a daily interest, so it would be added daily.

Q And so when you actually spoke to him on the phone, you gave him an exact payoff amount for January 28th, 2013, for tax years 1996 and 1997?

A Yes, ma'am.

Q And those were --

MR. KUNKLE: Objection, Your Honor, as to foundation.

If counsel could just clarify which date she's talking about with the witness when he's testifying this conversation took place.

THE COURT: I thought the question did have the date in it.

MS. JENNIS: I can ask it again though.

THE COURT: Go ahead.

BY MS. JENNIS:

Q When you spoke with Mr. Hall over the phone on Tuesday, January 22nd, 2013, you gave him payoff amounts for January 28th, 2013?

A Yes, ma'am. I gave him three of them. I gave him a total and then I volunteered and I asked him -- I said:

Would you like that payoff broken down by the year?

And he said: Yes, please.

And so I provided him the payoff for 1996 and a separate payoff 1997.

And he said: Thank you very much.

And that was the end of the phone call.

Q And those were -- the amounts that you gave him during that telephone conversation on January 26th were the same amounts as written on the money orders that you received on January 29th, 2013?

A That is correct.

Q And so all those other times that you got the paperwork with the setoff bond, he never called you to ask you anything about a payoff amount?

A No, ma'am.

Q He didn't -- did he communicate with you in any way to get a payoff amount prior to this conversation we talked about in

January 2013?

A No, ma'am.

MS. JENNIS: I have no further questions. Thank you.

THE COURT: All right. Counsel, can Mr.-- or Officer Lyons be excused permanently?

MS. JENNIS: We're fine, Your Honor.

THE COURT: All right. Officer Lyons, I instruct you not to discuss your testimony with anyone except the lawyers in this case until the trial is over and you are excused. Thank you.

The government may call its next witness.

MS. EDELSTEIN: Thank you, Your Honor. The United States will be call JoLynn Colegrove.

THE COURT: Just come up to the front and the clerk will swear you in.

THE CLERK: State your full name for the record and spell your complete name.

THE WITNESS: My name is Jo Lynn Colegrove. First name is J-O. Last name is C-O-L-E-G-R-O-V-E.

**(Witness duly sworn)**

THE COURT: All right. You may proceed.

JO LYNN COLEGROVE, WITNESS, SWORN

**DIRECT EXAMINATION**

BY MS. EDELSTEIN:

Q Good morning, Ms. Colegrove.

A Good morning.
Q Would you please tell the jury where you're employed.
A I work for the Internal Revenue Service.
Q And how long have you been working for the Internal Revenue Service?
A I've been there since June of 2009.
Q Where is your office located?
A It's in Mesa on Southern Avenue here in Arizona.
Q Here in Arizona?
A Uh-huh.
Q And which group are you assigned to?
A I'm with the Collections Group.
Q And have you been with the Collections Group the entire time you have been working at this Mesa location?
A No, I have not. I started working for them in January of 2011.
Q With the Collections Group?
A With the Collections Group. I was with the IRS as a revenue agent.
Q Prior to that time?
A Yes, ma'am.
Q And what is your title, ma'am?
A I'm the secretary for the Group 1200 Collections.
Q And what are your responsibilities as a secretary?
A I take care of the -- sending the cases out and receiving

them in. I process mail. I answer the phone. Assisting taxpayers that come in to meet with our revenue officers.

Q Assisting them to -- when they have appointments and that type of --

A Yes, ma'am.

Q Do you actually do substantive case work for the taxpayers?

A I'm sorry?

Q Do you do substantive case work for the taxpayers? Do you have a set of taxpayers that are clients of yours that you do work for?

A No, ma'am. I do not.

Q You mentioned that you do some processing of the mail; is that right?

A Yes, I did.

Q Would you describe for the jury what your responsibilities are with regard to processing mail?

A Sure. I'm in charge of the mail room overall and we have a group of five secretaries and we each take a week of doing the mail.

The mail person comes to the door and rings the bell and whose ever week it is, they take them into the mail room and sign for whatever mail is coming in that is certified, return receipt, anything that's sent overnight.

Then they sort the mail and put it in each -- each

group's slot because we have exam people there in the building also. So we have several different groups. And you sort the mail and you put it in the mail slot.

And then the secretary for that group goes in and answers -- opens it and gives it to whichever revenue officer it goes to.

Q So you have described essentially two different people that could be going to the mail room on a given day; is that right?

A Yes. They could be at least two because every group has its own -- well, I shouldn't say that -- every group does not have its own secretary, but every person there has someone who takes care of their mail for them.

Q Okay.

A So even though we have people that don't have secretaries, they are assigned to someone.

Q And you are specifically assigned to the Collections Group; is that right?

A Yes.

Q Now, what type of documents are received in the mail room?

A We get everything from returns, letters, checks, money orders, power of attorney paperwork, anything that has to do with their case or that they need to get to the revenue officer as far as bank statements, personal items, anything like that comes through the mail.

Q Now, you said "returns." Just for clarification, does that meaning tax returns?
A Yes, ma'am. Because unfortunately, everyone doesn't file their tax return on time. So whenever they are meeting with the revenue officer or revenue agent, then if they have delinquent returns, they are talking to the people to get them to file their returns.
So sometimes instead of giving them to the actual revenue officer or agent, they just mail them in.
Q Now, are there particular procedures that are in place when a payment check is coming in?
A Okay. Yes. A payment check -- we process the payments right now. People send us checks, money orders, no cash. They come in.
We look at them to see which revenue officer or agent it's going to. We look at the dollar amount because there are standards in place that if it's a certain dollar amount, it has to go to Ogden that day. It has to be processed immediately.
If it's a lower dollar amount, then they can wait until the officer or agent comes in the next day and processes it. But if it's $100,000 or more, it has to be processed and sent that day.
Q So if it's $99,999, it doesn't have to be processed that same night?

A No. It doesn't have to be processed that day, but it has to go like the next day or something.
Q Sure. Now, I just want to clarify something briefly.
You said there may be an individual who actually accepts the mail into the mail room; is that correct? Does that individual open the mail?
A No. No. Usually the person that is the secretary for that group -- or because we have people working out there that is not a complete group, we may have two or three people from different departments working there -- then there is a secretary that's usually assigned to handle their mail for them.
Q So for the Collections Group, you would actually be responsible for opening any mail that's coming to the Collections Group?
A Collections, I have ATAT. I had some -- and some of the POALs, the different groups there in the office. If they don't have a secretary assigned them, if they're on the collections side of the house, then I take care of them because I'm the only collections secretary there.
Q Now, you did mention something that I just want to clarify.
You said no cash in terms of payment?
A Yes.
Q Why is that?

A Well, we don't have any way to process it. And if it comes in through the mail, we can't give them a receipt for it. There are steps in place that they could actually give cash, but it's kind of difficult and most of the revenue officers will ask them is there any way that you can go get a money order or a bank check or something.

Q Okay. Now, do you know an individual by the name of T.W. Lyons?

A Yes, I do. He works in the office there with me. He's one of my -- I call him "my peeps."

Q Do you -- so you work with Mr. Lyons?

A Yes, I do.

Q Are you the secretary assigned to Mr. Lyons' group?

A Yes.

Q And what type of work do you do to assist Mr. Lyons?

A I send a lot of stuff out for him. I process his mail when it comes in. We send a lot of things through Fed Ex and UPS, so since I have the program on my computer that makes it a little easier to print out the labels and stuff, he brings the things to me and I send them out for him.

Q Okay. Now, you said you process his mail. So just so we can be clear for the jury --

A Uh-huh.

Q -- so a letter comes in addressed to -- or a package comes in addressed to T.W. Lyons?

A Uh-huh.
Q When you process it, does that mean you open it for him?
A Yes, ma'am. We open all the mail in the mail room simply because some people don't like us and they might send things that are harmful. So we have biochemical outfits in the mail room and we open it all in there in case someone has sent anything that could be harmful.
So once it's opened in there, then we can take it out into the main area.
Q Okay. Were you working in the mail room at the Mesa/Southern location in January 2013?
A Yes.
Q Do you know an individual named Gloria Ross?
A Yes, ma'am. She was a secretary for one of the exam groups. She no longer works there. She retired.
Q So at the time, January 2013, she could have been on mail duty at that time?
A Yes, ma'am. I looked to see if I still had a roster that went back that far and I did not.
Q But it's possible, given her title as secretary --
A Very possible.
Q -- that she could have been there?
Do you know who Gordon Hall is?
A Not in person, no. I know the name.
Q How do you know the name?

A Through Mr. Lyons.
Q Do you know what the relationship was between Mr. Lyons and Mr. Hall?
A He was a taxpayer that he had is all I can say for certain.
Q So Mr.-- in terms of -- you just described him as a taxpayer. Was he one of the taxpayers assigned to Mr. Lyons?
A Yes, ma'am.
Q So Mr. Lyons was the revenue officer assigned to Mr. Hall's case?
A Yes, ma'am.
Q Okay. And you know that from conversations with Mr. Lyons?
A That and processing stuff that was going out and coming in for him.
Q Now, when you say that, are you meaning that you saw mail from Mr. Hall coming in to Mr. Lyons?
A Quite a bit.
Q Quite a bit? Can you estimate how much you saw?
A It would be a guess, but I would say there for a while he was getting one maybe every week or something from him about every week or so.
And the one thing I do remember that was kind of unique is if he sent one package, he would send more than one usually.

Q It was usually more than one at a time?
A Uh-huh.
Q Would you please take a look at Exhibit 1. It should be in front of you.
A Yes, ma'am.
MS. EDELSTEIN: Your Honor, permission to publish. This is an admitted exhibit.
THE COURT: You may publish to the jury any exhibit that has been admitted without requesting specific permission.
MS. EDELSTEIN: Thank you, Your Honor.
BY MS. EDELSTEIN:
Q What is this document, Ms. Colegrove?
A It's a money order from Mr. Hall.
Q Okay. Now, if you would look to the first page of this, does it appear to be -- or there should be a page in there that appears to be an envelope. Do you see the actual packet?
A Yes, ma'am.
Q Do you recognize this?
A Yes, ma'am. It's got our stamp from the mail room on it.
Q Now, would you indicate on there where you see your stamp, the stamp that you're referring to?
A It's at the bottom lower-right corner underneath Mr. Lyons' address.
Q Okay. And the copy that the jury is looking at, it's a little bit shaded, would you hold it up and point out where

that is?
A Yes. Sorry.
It's the stamp right here (indicating). We stamp every envelope that comes in so that, you know, it's all time sensitive. So we stamp the date and the year and the month that it comes in.
And it also says "Received Internal Revenue Service Western Area SBSE Division Mesa, Arizona." So it has got our address.
Q And you mentioned that that is one of the groups that you work for; is that correct?
A That's our mail room stamp, yes, ma'am.
Q Okay. Did you affix this stamp to this document?
A Yes. More than likely because TW is one of my revenue officers. And when anything comes in, we stamp it.
Q Okay. When you entered the mail room that day, do you see what date it was that you received this package, that IRS received this package?
A It is June -- I'm sorry -- January 29th, 2013.
Q Okay. And when you went to the mail room on January 29, 2013, where would you have found this package?
A In mail slot 5105.
Q And what is that particular mail slot?
A Each person has a mail stop which "5105" is for the ATAT group.

The Collections Group is 5102.

And the exam had their own number.

So the 5105 would have told Ms. Ross which mail slot to put it in and it would have also told me it's Mr. Lyons', even if it didn't have his name on it. "5105" would have told me it was for him and I would have known to open it.

Q So you mentioned that Ms. Ross would have sorted it into this particular box?

A Yes, ma'am.

Q And it was part of your responsibility to check that box?

A Yes, ma'am.

Q Okay. Now, is this pack -- can you tell from the face of it whether it was sent to the IRS by Registered Mail?

A Yes.

Q Do you see --

A It doesn't have the green card on it any longer, but there is a Certified Return Receipt green card that goes here.

And whoever receives the mail from the Post Office because they have to leave right away, so you sign the card, you give the card back to the mail person, and then you put the mail in the slot.

Q And do you see on the upper right-hand corner a Registered Mail tag or label?

A Yes, ma'am.

Q And could you read what that Registered Mail number is for

this packet in Exhibit No. 1?
A Yes, ma'am. It is Romeo Echo 261089815 Uniform Sierra.
Q Okay. Now, would you turn to the second page of this exhibit. I believe what you are going to find is a money order in a plastic sleeve.
A Yes, ma'am.
Q Okay. What does this appear to be?
A A money order to the United States Treasury for $868,397.60.
Q Okay. Now is this greater than the threshold amount that requires processing the same day?
A Yes, ma'am. Anything that is $100,000 or more has to go. So this would have been very important to get out that day.
Q Okay. Now, take a look at Exhibit 2, if you would.
Specifically, if you would look at the package itself in Exhibit 2, do you have that in front of you?
A Yes.
Q Now, would you describe for the jury what you're holding, the package you're holding.
A The envelope that was sent by Mr.-- sent by the presenter from Flagstaff.
Q Okay. And is this also addressed to Mr. T.W. Lyons?
A Yes, ma'am, it is.
Q And did you receive this package in the mail room on January 29th?

A Yes, ma'am.
Q And how do you know that?
A Because of the stamp.
Q Is it a similar stamp to the stamp you examined in Exhibit 1?
A I'm sorry. I must have it mixed up then. There's only -- oh, sorry. Excuse me.
Yes, ma'am. It is dated also the 29th.
Q Okay. And if you would, please, hold it up for the jury. They can slightly see the stamp on this version of it, but if you would just point it out.
And is that also stamped underneath the label for Mr. T.W. Lyons?
A Yes, ma'am, it is.
Q And that is the stamp -- did you affix the stamp to this exhibit?
A Yes, ma'am.
Q Okay.
A It's the same as the first one.
Q And was this package also sent to the IRS Registered Mail?
A Yes, ma'am, it was.
Q Would you read that Registered Mail newspaper?
A Yes, sir. Romeo Echo 261089801 Uniform Sierra.
Q And what does page 2 of Exhibit 2 appear to be?
A The money order for $635,176.26 made out to the United

States Treasury from Mr. Hall.
Q And was that included in that package that you're looking at in Exhibit 2?
A Yes, ma'am.
Q And given that it's over $100,000 was this also a check that needed -- or a document that needed to be -- a payment that needed to be processed the same day?
A Yes, ma'am.
Q Okay. If you would please look at Defense Exhibit 100, it should be in a folder up there for you.
Nick, I need to go to the document camera.
A It's the certified return receipt cards that Ms. Ross would have signed that would have gotten sent back to the Jorgensen presenter as the same address as the envelopes.
Q So when you were describing the front of these two packets in Exhibit 1 and 2, you indicated there was a space for a return receipt.
Are these the two return receipts for those packages?
A Yes, ma'am. They do appear to be.
Q And from the face of this, can you see who signed for the mail, this Registered Mail, that day?
A Ms. Ross would have signed for it that day.
Q And based on the Registered Mail numbers you see listed on Defense Exhibit No. 100, are these the same two packages that you stamped?

A Yes. They have the same registered number on the green card -- or on the copy of the green card as they do on the envelope.
Q Now, when you came to the mail room that day, January 29th, 2013, and you checked the mail slots as you have described, what did you do when you saw the two packets in the mail slot?
A I opened them because it's my responsibility to open the mail and I look in them. I always look in them to see if there is returns or checks.
I saw the two checks that were in here and then I office communicated to Mr. Lyons that they were there so he could come in and process them because they were over $100,000.
Q So you -- when you opened them, you actually looked at the two payments?
A Yes, ma'am.
Q Okay. Now, what did you do with the two packages -- well, let me back up a second.
Do you remember roughly what time you went to the mail room that day?
A I generally go before lunch because the mail comes anywhere -- and he's never at a certain time every day, but he's usually there between 9:30 and 11:30. That's a pretty constant, as I can say, maybe in the whole time I have been

there is maybe three days they weren't there during that time.

So I would have went in there. First, I would have looked at my mail. Stamped it all. Opened it all. And then I would have looked at Mr. Lyons' and 5105's box. I've got two or three others if you need me to go over those as well.

But there's about four different mail slots that I have to check and see if there is any checks or anything and to let the people know.

Q So once you picked up these two packages and opened them, what did you do with them after you opened them?

A I leave them in the mail room because the mail room is a secure area. We have a key pad to get in. So I left them in there so he would be able to get them.

Then I went to my computer and sent him a message letting him know they were there.

Q When you referred to "he," who are you referring to?

A Mr. Lyons.

Q Does Mr. Lyons have a mailbox in the mail room?

A Yes, ma'am.

Q Did you leave them specifically in his mailbox?

A Yes, ma'am.

Q And they would have been opened at the time?

A They would been opened, yes.

Q You said you communicated with Mr. Lyons. Do you recall how you did that?

A Office communicator.
Q What is office communicator?
A It's like our instant messaging used through Microsoft Office and it's basically like calling him almost, except you are talking over the computer, just instant message.
Q Do you recall what you said to Mr. Lyons?

MR. KUNKLE: Objection, Your Honor. Calls for hearsay.

THE COURT: Well, the question calls for a "yes" or "no." Then we'll get to another question.

THE WITNESS: I don't remember the exact words, no.

BY MS. EDELSTEIN:
Q Do you remember the substance of what you said in your message to Mr. Lyons?
A Yes. I would have told him --

MR. KUNKLE: Objection. It calls for hearsay obviously.

THE COURT: Why is this not hearsay -- I'm sorry. Hold on a minute. This is a conversation with Mr. Lyons?

MS. EDELSTEIN: It's not what Mr. Lyons is saying, Your Honor. It's what this witness stated in her communication to Mr. Lyons.

THE COURT: All right. Overruled. You may answer.

THE WITNESS: Thank you.

I would have -- I told him basically that two

large-dollar checks had come in for him and that I had needed to get them out by three o'clock. And he indicated to me that he would be in right away to process them.

BY MS. EDELSTEIN:

Q Did you -- so when you said that he indicated to you that he would be in right away, did you have a phone conversation with him?

A No, ma'am. It was all office -- instant messaging. "TW, I have two large-dollar checks that came in today."

"Okay. I will be in right away to process them."

Q And would you have said the specific amounts or do you think you would have said just "large dollar"?

A I would have told him that they were large dollars. I wouldn't have told him exactly how many because, you know, it's not something I would have needed to tell him.

Q Okay. And had you had a -- had you -- do you know if Mr. Lyons was expecting the checks to come in?

A Oh, yes. He had indicated to me either the day before or two days before that Mr. Hall would be sending him -- I believe he said "two." I can't be certain how many, but he was expecting a large-dollar check from him and he was excited because he thought it might pay off what was owed so he could close the case.

Q Okay. Now, how soon after you went to the mail room and opened those packages did you contact Mr. Lyons?

A When I finished processing the mail that was in the mail room, I came right back and did it right away because he needed -- it was already almost lunch time and he needed to come in right away and process them so we could get them out that afternoon.

Q Do you know if Mr. Lyons was in the office that day?

A He -- I don't believe he was that morning. That's why I would have OC'd him. If he had been in the office, I would have just walked back to his desk and told him they were there.

Q Would you have needed to notify Mr. Lyons that quickly if you did not think that there was payments over $100,000?

A Oh, I would not have. I would have sent an -- generally, if they have checks that are under $100,000, I just send the e-mail out telling them they have mail in the mail room and they need to process it.

Q Did you check your records to see if you had an e-mail in this situation?

A I did. I couldn't find one.

Q You didn't have one?

A No.

Q But you do recall OC'ing Mr. Lyons right away?

A Uh-huh. Yes. And it's something I do all the time. If we have someone that's not in the office and they have a large dollar, so it's nothing new.

MS. EDELSTEIN: No additional questions at this time, Your Honor.

THE COURT: All right. Mr. Kunkle, you may cross-examine.

**CROSS EXAMINATION**

BY MR. KUNKLE:

Q Good morning, Ms. Colegrove. How are you?

A Good morning. I'm fine.

Q Ms. Colegrove, a few questions for you.

In front of you is Exhibit 6. It's Government's Exhibit No. 6 if be can take a look at that.

A I'm sorry. I didn't hear the rest.

Q Exhibit No. 6, Ms. Colegrove.

A Uh-huh.

Q Do you have that in front of you?

I'm sorry. You don't have it, Ms. Colegrove. I thought it was still up there from Mr. Lyons.

You're free to look through that. You have seen that before, correct, Exhibit No. 6?

A I have seen some of it, yes. Yes.

Q Does that look familiar to you?

A Uh-huh.

Q And what do you recognize that to be?

A I recognize the envelope that has our return address in the upper corner. I recognize some of the forms, the 668.

It's just forms I have seen in general.
Q And on through that mailing there's a number of pages there, correct?
A Yes. Quite a few.
Q Does that resemble similar mailings you would have received connected with Mr. Hall's taxpayer file?
A Some of it, yes.
Q Some of it. You remember getting different mailings all the time, correct?
A Uh-huh.
Q Is that -- that's a "yes"?
A Yes.
Q Okay. And you mentioned Mr. Hall was unique.
A I never mentioned he was unique.
Q I believe when you just testified a moment or two ago on direct you said the word "unique." And not to pick, but he was different from most taxpayers, correct?
A We get quite a few mailings from Mr. Hall, yes.
Q Have you seen other mailings like this from other taxpayers?
A Yes.
Q Similar to this?
A Yes.
Q So this isn't anything you haven't seen before, correct?
A I see mailings like this from other taxpayers as regards

to the amount of the money order. We get large dollars maybe two or three times a month, so.

Q My question to you, Ms. Colegrove, is about Exhibit No. 6.

A Okay.

Q Okay. And I'll just put up -- this is page number 6 from Exhibit 6, for the record.

If we could have this published, Mr. Sommers, for the jury. This is in Exhibit No. 6. This is page 6. Do you see that up at the top there. It says Certificate of Administrative Judgment, Private Registered Security Interest?

A Okay.

Q And you have seen similar things like this before, right, in other mailings from Mr. Hall?

A Correct.

Q And you see where it says "Arizona Republic" and "Without the United States. Maricopa County."

A Uh-huh. Yes.

Q And so over the course of time you worked for Mr. Lyons, you just testified on direct, you knew of Mr. Hall?

A Yes.

Q From Mr. Lyons, right?

A Yes.

Q Did you have your own knowledge of Mr. Hall from having reviewed these mailings yourself?

A No.

Q Did you ever look -- did you ever look through these mailings when you would open them up?
A I -- look them up?
Q Well, when you opened up the mail.
A Yes. I opened the mail.
Q So this package here, Exhibit No. 6.
A Uh-huh.
Q Okay. I'm sorry. You have to say "yes."
Did you look through this mailing when you got it from Mr. Hall?
A I would have looked at it enough to see who it goes to to see if there were any checks or returns in it.
As far as reading the actual what they send to the revenue officers and agents, I may skim over it just to see who it goes to, but as far as to read and find out why he's sending this stuff or what he's sending, there's so many cases that I wouldn't have looked to see exactly what it was for, no.
Q Fair enough. So you didn't sit down and read all 61 pages of this document, correct?
A Right. I have no need.
Q Now, let me ask you something. I'm putting up another page of that exhibit. Do you see this one is page 12 of Exhibit 6.
And, again, this one talks about a Notice Of Default

In Dishonor and Consent To Judgment.

You never saw mailings like this from Mr. Hall or are you familiar with seeing mailings like this from Mr. Hall?

A I have seen stuff like this from him but, again, it's stuff we -- the type of things that we get in the office, so I don't bother to read the fine details. I have no need to know.

Q Okay. Now -- and this is page 21 then from Exhibit 6. Okay? And you see this? It says Privately Registered Setoff Bond. Do you see that on the screen?

A Yes.

Q When you see something -- would you have looked through that packet and found something like this?

A I probably did not.

Q Okay. So --

A Once I saw the money order, if it was in this packet and I don't recall all -- again, we get so much.

Q Ms. Colegrove, let me stop you there a minute. I'm asking you about exhibit No. 6.

A I understand you're asking me if I have seen it, if I recall.

Q You don't know.

So if you had seen something like this Privately Registered Setoff Bond for $4 million -- $4,500,000, you would have notified a revenue officer like Mr. Lyons to come in and

process this for payment?
A If it was at the front of the envelope and I would have -- I wouldn't say -- I won't say that I would have called him to come in and process it because I don't know.
I would have told him that he had it if -- but I don't know if I communicated to him that I saw this. This is a year -- two years ago.
Q Let's take a look at page 21. You remembered two years ago about the money orders. I'm asking you about this three years ago. Did you ask him to come in and process this bond?
A I cannot say for certain that I saw this.
Q Take a good look at that, please.
A Sir, I can look at it till the end of the week and I still won't be able to tell you any better if I saw it or not.
Q I'm going to ask you today looking at it, would you call him in to process this bond? Not what you did three years ago.
A If I would have -- if I saw this at the front of an envelope, then, yes, I would have called him and said you have this and it says a bond on it. Is that something you need to come in and process.
I'm a secretary, not a revenue officer. I don't know. But I would have told him -- if I saw it, I would have told him it was there. I don't recall seeing it.
Q Okay. My question to you is this, Ms. Colegrove.

A Okay.
Q Look at this page. Okay? Let's just look at it together.
A Yes, sir.
Q It says a bond number at the top. It says it's registered in California with the UCC number. And it says it's payable through Mr. Hall at a private offset account number?
A Yes. I see all that.
Q And it says it's going to satisfy all liabilities with Mr. Geithner paying. Do you see that? I don't know if the jury can see that. Down there at the bottom. It says: Demand all payments of Mr. Geithner.
A Okay. Yes, I do see that.
Q Taking a look at this today, not what you did three years ago --
A Okay.
Q -- did you notify Mr. Lyons to come in and process this?
A Again, I would have told him he had it. I don't know if he needs to process it. That's his decision to make. I would have just told him it was there.
Q All right. And this might be a good moment to talk about this processing. When you get a check in the mail --
A A check, yes.
Q -- you don't take it to the bank, right?
A No. We don't.
Q Now, you told us when you just testified on direct you

were formerly a revenue agent?
A Yes, I was.
Q And is that the same as a revenue officer?
A No, it is not.
Q What is a revenue agent?
A A revenue agent actually goes out to the taxpayers and audits their returns if there is anything that is unclear or if they left something -- you know, money off of their return that they should have claimed, that kind of thing.
Q And how long were you a revenue agent?
A A year-and-a-half.
Q Okay. And why did you stop being a revenue agent?
A Because I didn't like giving bad news to taxpayers.
Q Fair enough. And most of the time you're giving them bad news, correct?
A Well, it was during a downturn in the economy. I just retired from the military. I was looking for something to do so that's what I did.
Q And so as a revenue agent then, you were familiar with the Internal Revenue Manual, correct?
A Yes.
Q And you're aware there's many specific procedures spelled out, correct?
A Yes.
Q So you know then as a secretary you're not going to

process a payment over $100,000, right?
A Say your question again?
Q Well, let me ask you something.
In your Revenue Manual as a unit secretary on January 29th, 2013, you were not authorized to go and process any checks or take them to the bank?
A I don't process checks anyway. The revenue officers do. I am in charge of sending them out and making sure that they get to Ogden on time. I don't process the checks.
Q Now, processing. You said sending them to Ogden.
So under $100,000 you will send checks to Ogden?
A I send all checks to Ogden. The $100,000 is the time frame. If it's under $100,000, I don't have to get it out that day. If it's over $100,000 or over, it has to go that day.
Q And when you process them, what do you do?
A Okay. Each revenue officer, because we have several that work in the group, each one may have checks that come in or returns that come in that day. So when I sort the mail and I put it in their drop, they come in and get it and they take all their checks and their returns and they put it on the Form 795 which is what goes in -- we call them our teller envelopes.
So each revenue officer that has anything to process that day, they bring me the teller envelope with the 795. I

will verify that everything that is in the envelope matches what is on the 795. And then I do a form to send them all as one to Ogden.

Q So when you're sending this processing, it's not that you're sending it directly to the bank. It only goes to Ogden, correct?

A Yes.

Q And that's for every check or just checks over $100,000?

A They go to two different mail stops, but every check goes to Ogden, yes; checks, money orders.

Q So there was no chance on January 29th, 2013, that you would take a money order from Mr. Hall to the bank?

A I would never.

MS. EDELSTEIN: Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

BY MR. KUNKLE:

Q Would you please take a look at Exhibit 1, Ms. Colegrove.

A Okay.

Q And if you would please, you can hold up the piece that's in the -- the money order. Hold it up. What appears to be the money order. It's in a plastic sheet. You can hold it up for the jury to look at.

A Which one do you want me to hold up?

Q Exhibit 1, please.

A Well, that's the whole folder.
Q There's a piece in there that's in plastic. It's the money order?
A Oh, you want the money order?
Q Yes.
A Yes.
Q The day this came in the mail, did you actually handle that money order?
A Yes.
Q You leafed through that packet, correct?
A I opened the envelope. I looked through to see if there was a money order. And I put it back in.
Q Did you see the other mailing, the other articles that came in that envelope?
A Yes.
Q There was an affidavit --
A Do I remember that I saw them? No.
Q Well, the question is you looked through it and saw the other pieces of paper?
A I was looking for the money order, sir; money order or returns. The other paper that doesn't have anything to do with my portion of the job, that's the revenue officer.
Q My question is: Did you see the other paperwork in that envelope?
A I can say there was other paperwork. I cannot in all

honestly say that I remember each and every form. I was looking for the money order or returns.
Q And that's because Mr. Lyons was expecting those, correct?
A Yes.
Q He had told you to be on the lookout for those?
A Yes. Usually if the revenue officers or agents know -- and most of them do if the taxpayer has indicated that they're going to be sending money -- they know that it's coming. So they let me know so I can keep an eye because they don't always come when they say they're going to.
Q Everybody always says "the check's in the mail," right?
A Yes.
Q Okay. And so with that money order, and if you would take a look then at Exhibit No. 2, there's another money order in there in a plastic sleeve, right?
A Uh-huh. Yes.
Q Okay. You weren't going to take and do anything with those, correct?
A Other than what I did, no.
Q Other than notify Mr. Lyons?
A I would have notified Mr. Lyons. That -- because I can't do anything until he does his part.
Q You didn't take them to the group manager?
A Why would I?
Q I'm asking you if you did?

A No. I did not.
Q You didn't take them to another revenue officer?
A No. I did not.
Q Were you aware of the fact you could have taken them to another revenue officer?
MS. EDELSTEIN: Objection, Your Honor. Relevance.
THE COURT: Sustained.
BY MR. KUNKLE:
Q You didn't take these and hand to another revenue officer?
A Sir, I went in the mail room. I opened the envelopes. I saw there was the large-dollar money order. I put it in Mr. Lyons' mail slot. I went back and I notified him.
That's -- I wouldn't have done anything else anything any different than I do when I got the $2 million check in. I did not do anything any different than I do any other time. I open the mail. I look to see if there's returns or checks or money orders. I put it in their slot and then I notify them.
Q And that's just you following the procedures, right?
A That's what I do every single day.
MR. KUNKLE: May we be heard briefly at sidebar, Your Honor?
THE COURT: No.
BY MR. KUNKLE:
Q Okay. Then, Ms. Colegrove, finally then, you weren't going to do any processing, fill out the Form 795, or start

doing a Fed Ex label to Ogden, were you?

MS. EDELSTEIN: Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

THE WITNESS: Yeah. I don't understand what you're trying to ask me.

THE COURT: That's all right. I sustained the objection.

MR. KUNKLE: I have no further questions.

THE COURT: All right. Any redirect?

MS. EDELSTEIN: Very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MS. EDELSTEIN:

Q Ms. Colegrove, during the time that you worked for Mr. Lyons, worked with Mr. Lyons, did he ever tell you that you should expect to see a payment in the form of a Privately Setoff Bond in the amount of a couple million dollars that you should look out for?

A I don't recall. It's possible, but I don't recall that he did.

Q You specifically recalled that he told you that the IRS was likely to receive payment from Mr. Gordon Hall within that time frame; is that correct?

A Yes. He did let me know that. And I want to say it was the day before he was expecting it and it didn't show up. So

he told me he would be working from home the next day and if they showed up to let him know.

It's pretty standard procedure. It's what I do all the time.

MS. EDELSTEIN: Thank you.

MR. KUNKLE: May I have a sidebar briefly? I do have a motion.

THE COURT: You may come up.

(At sidebar on the record.)

**DEFENDANT'S MOTION FOR MISTRIAL**

THE COURT: All right. Go ahead.

MR. KUNKLE: She -- Your Honor, I move for a mistrial.

THE COURT: Over what?

MR. KUNKLE: Because Mr. Lyons testified the only reason he came in was because there was a chance someone might process the check.

THE COURT: What does this have to do with questions of this witness?

MR. KUNKLE: Because when they argued why he had to come in, the importance of dealing with this that day, it wasn't just about the time constraints and the amount of money. He indicated there was a chance someone else might process it. I think it's valid for me to ask this witness --

THE COURT: This strikes me as utterly trivial.

How does this fit into this case?

MR. KUNKLE: Because one -- one of the issues --

THE COURT: Wait a minute. Hold on.

MR. KUNKLE: One of the issues is the intent to defraud when a recipient gets this. She indicates she sends a message to him. He has to come in right away. And she testifies that there's a check here. You have to come in and process it. You know, so how long she looked at it and is she going to process it, that's all relevant to this jury --

THE COURT: You asked this over and over.

MR. KUNKLE: I didn't ask the question.

THE COURT: What question?

MR. KUNKLE: I asked the question: Was there a chance she was going to go process that?

Because the implication from Mr. Lyons' testimony was that someone in that office might process it, another revenue officer or a group manager. I think it's --

THE COURT: How does that connect with this? I'm just --

MR. KUNKLE: Whether this --

THE COURT: I'm not trying to quarrel with you.

MR. KUNKLE: I know.

THE COURT: I'm lost. This strikes me as completely trivial. So connect this up. I'm a pretty mechanical guy. Walk me through how you get from some question, something that

could arguably matter for this charge.

MR. KUNKLE: Because it goes to her looking at the check and understanding whether it was real or not.

THE COURT: She's a secretary. She's the secretary. Who cares what she thinks?

I'm sorry. I'm being animated.

MR. KUNKLE: I'm animated too. But the point is I think it's a valid question whether she looked at it and believed it was a check and was she going to take the chance and process it.

THE COURT: Why does any of that matter?

MR. KUNKLE: Because Lyons testified that that's why he came in to deal with it because there was a chance that someone might process it.

MS. EDELSTEIN: But, Your Honor --

THE COURT: One counsel at a time.

MR. KUNKLE: He testified there was a chance that somebody could come in and process it.

THE COURT: So what? So what? How does that matter for this charge? He is a guy who is working at home and he gets a big -- how does this matter.

Now, listen, I'm cutting you all the slack possible, but we're really wasting time here, so.

MR. KUNKLE: Because the issue of whether the intention to defraud doesn't just come. She's a --

THE COURT: She's a secretary. How does what -- all right. I'm sorry. Go ahead.

MS. EDELSTEIN: Your Honor, the government's position is that --

THE COURT: Before you start, what's the basis for a motion for mistrial?

MR. KUNKLE: My ability to cross-examine a witness as being -- I can't ask a question and get an answer.

THE COURT: What's the question you want to ask that I didn't allow that hadn't already been asked and answered?

MR. KUNKLE: I had not asked that question if there was a chance someone was going to process that check.

THE COURT: What question?

MR. KUNKLE: If she was going to process that check or if anyone else, and specifically, the question was I asked if there was a chance she would take it to another revenue officer or another group manager to process.

THE COURT: She answered that. She says that's what she does.

MR. KUNKLE: I asked the question. She said what she does. I asked a question: Is there a chance she's going to take it to a revenue officer or group manager that day to process?

MS. EDELSTEIN: Your Honor, the government wouldn't have an objection to allowing Mr. Kunkle to recall in his case

if he feels it's important, but the government's position is that what she did with the check once it was received is completely and wholly irrelevant to the charge at issue.

THE COURT: I agree with that. I'm going to deny the motion for mistrial. I'll allow you to ask some more questions.

You know, Mr. Kunkle, I know you are in a tough spot and I empathize with that and you do have a story to tell. It may not fly, but.

MR. KUNKLE: I'm trying.

THE COURT: But the story is there. I just can't take a joke.

MR. KUNKLE: I understand.

THE COURT: But you've got to judge for yourself whether you are achieving anything but just replowing the same questions over and over. I don't mean to be mean. I'm actually trying to be constructive.

MR. KUNKLE: No. I appreciate the Court's instruction, but I don't think that those questions where you sustained an objection to, I had never asked that before and I never got an answer before.

Because I would ask a question and she would chose the give to answer she wanted to give. That's not answering the question.

THE COURT: I'm not going to fight about it. I'll

allow you to ask those questions.

Now, let's go back.

MS. EDELSTEIN: May I ask the questions be directed to the point of the question he's asking and not ask it three times?

THE COURT: Yes. We're done with repetitive questions, so let's go back.

MR. KUNKLE: I'm done. I won't avail myself of that opportunity.

THE COURT: All right.

(End of discussion at sidebar.)

THE COURT: Mr. Kunkle, I will allow you to reopen and ask a few additional questions.

MR. KUNKLE: Your Honor, I'll let the record stand as it is.

THE COURT: No. I'm inviting you to ask questions and I'm withdrawing my previously-sustained objections to questions, so you may ask questions to which those objections had been sustained.

**RECROSS EXAMINATION**

BY MR. KUNKLE:

Q Ms. Colegrove, I just want to ask you a couple very specific questions.

A Okay.

Q Was there any chance that you would take those money

orders from Exhibit 1 or Exhibit 2 on January 29th, 2013, to another individual in that office to process?

A Are you asking me would there have been any chance?

Q Yes.

A The only way I would have done that is if Mr. Lyons could not have came in.

MR. KUNKLE: All right. I have no further questions, Your Honor.

THE COURT: All right. Any followup redirect on that?

MS. EDELSTEIN: No, Your Honor. Thank you.

THE COURT: All right. And, counsel, may this witness be excused permanently as well?

MR. KUNKLE: Yes, sir.

THE COURT: All right. Very well.

Ms. Colegrove, I instruct you not to discuss your testimony with anyone other than the lawyers in this case until the trial is over and you are excused. Thank you.

THE WITNESS: Thank you.

THE COURT: The government may call its next witness.

MS. EDELSTEIN: Thank you, Your Honor. The United States called Harold Argetsinger.

THE CLERK: State your full name for the record and spell your last name.

THE WITNESS: Harold Argetsinger.

A-R-G-E-T-S-I-N-G-E-R.

(Witness duly sworn)

THE COURT: All right. You may proceed.

MS. EDELSTEIN: Thank you.

**HAROLD ARGETSINGER, WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. EDELSTEIN:

Q Mr. Argetsinger, where are you currently employed?
A I work for the United States Postal Inspection Service here in Phoenix.
Q And how long have you been in that position?
A For three years.
Q I'm sorry?
A Three years.
Q And where is your office located?
A Here in Phoenix downtown.
Q Now, what is your title with the Postal Inspector Service?
A I am a Postal Inspector.
Q And what duties do you have in that position?
A I investigate crimes involving the United States mail.
Q And it's actually in the criminal context; is that correct?
A Correct. I'm a federal agent.
Q And you are a federal agent?
A Yes, ma'am.

Q And what types of cases do you investigate?
A Currently, I'm assigned to the Prohibited Mail Narcotics team. I'm also charged with investigating money laundering.
Q And would you describe for the jury the types of training you received for your current position.
A Sure. I attended the Federal Law Enforcement Training Academy in Glynco, Georgia, as well as on-the-job training for drug recognition, as well as money laundering investigations to the Department of Justice.
Q Do you have any prior law enforcement experience prior to your current position?
A Yes, ma'am, I do. I was a deputy sheriff here with the Maricopa County Sheriff's Office for approximately eight years and then I spent three years as a diplomatic security agent with the U.S. State Department.
Q And these were prior to your current position; is that right?
A Yes, ma'am.
Q Were you contacted by investigators with respect to the case of Gordon Hall?
A Yes, ma'am, I was.
Q Who contacted you?
A Special Agent Kathleen Neri of the IRS.
Q And did she provide you any information that she needed your assistance with?

A Yes, ma'am, she did.
Q What did she provide to you?
A Specifically, she was requesting information related to two mail pieces.
Q Okay. And do you remember specifically what information regarding those mail pieces she provided you?
A She provided me two Registered Mail numbers specific to those pieces to determine when and where they were mailed.
Q Would you please take a look at Exhibits 1 and 2. They should be in front of you on the desk. And if you would just look at the face of the packages for Exhibits 1, do you see that there?
A Yes, ma'am, I do.
Q Do you see on this package, on the face of this package, information that Agent Neri provided to you?
A Yes, I do.
Q What did she provide to you, specifically?
A It's a unique number, Registered Mail piece number, that's specific to each Registered Mail piece.
MS. EDELSTEIN: Nick, may we have the computer system please? Thank you.
BY MS. EDELSTEIN:
Q So you are looking at -- the specific numbers she provided you, was it that number at the top-right corner that says "RE"?

A Yes, ma'am.
Q Now, would you please read off that number?
A Sure. It's RE 261 089 815 US.
Q Okay. Now, if you look at Exhibit 2, do you see a second Registered Mail number?
A Yes, I do.
Q And was that also a Registered Mail number that Special Agent Neri provided to you?
A Yes, it is.
Q And what is that number?
A That is RE 261 089 801 US.
Q Now, what is the similarity between those two Registered Mail numbers?
A Well, if you notice, the Registered Mail piece numbers are almost identical up until you look at the last three digits.
Q What does that tell you?
A It tells me that these were purchased in sequence. So when a customer purchases a product, whether it's Express Mail, Registered Mail, or Flat Mail piece, when you grab the Registered Mail numbers or identifier, it shows that they were purchased in proximity to one another. If you look they are 14 apart.
Q So close in time, potentially, or prepurchased close in time?
A Correct.

Q Okay. Not specific to these -- and these were the two numbers that Special Agent Neri provided to you?
A Yes, ma'am.
Q In what form did she provide you those numbers?
A I received them in an e-mail originally from Agent Neri.
Q Okay. The exhibits that you are looking at, No. 1 and 2, did you actually receive these exhibits prior to your involvement in this case?
A I just received the Registered Mail numbers and that's all that I had at the time.
Q Generally, with those two Registered Mail numbers in your position that you're in, what are you able to determine once you have those Registered Mail numbers?
A Well, we can use our internal tracking system, what's referred to as PTS, and that system allows us to identify where that mail piece entered what we call the "mail stream."
And the reason that is important for us is to determine, especially in instances where anthrax or other white powder substances were mailed. We want to be able to track where that mail piece entered the mail stream.
Q When you described a system called PTS. Would you tell the jury what does that stand for?
A Yes, ma'am. It stands for Product Tracking System.
Q Did you enter the two Registered Mail numbers from Exhibits 1 and 2 into the Product Tracking System in this

case?
A Yes, I did.
Q And what were you able to determine?
A I was able to determine that the mail pieces were mailed at the same location on the same date almost nearly at the same time.
Q Would you tell the jury what date you determined that these mail pieces were mailed from -- on?
A Yes, ma'am. They were mailed on January 28th at our processing and delivery center which is located in the area of 40th Street and Van Buren.
Q And that's here in Phoenix?
A Yes, ma'am.
Q Were you able to determine roughly the time that these were mailed?
A Yes, I was.
Q Do you know -- do you recall what that is?
A I would have to refer to the exhibits to get the exact time of the mailing.
Q Well, we can touch back on that.
A Okay.
Q But from the system itself, you were able to determine the exact date and location; is that correct?
A Yes, ma'am.
Q As well as the time?

A Correct.

Q Okay. And you described the facility. Is that a Post Office?

A It is.

Q Okay. And is there anything unique about this particular Post Office here in Phoenix?

A Yes. As I mentioned, it's our processing and delivery center, so it's where the mail goes to be sorted. So it's a larger facility and it remains open later than most of the post offices.

Q Do you know roughly how late?

A It will stay open, depending on the hours, they do change, but 8:00 p.m., 7:00 p.m., or past, depending on the time of year.

Q From the Product Tracking System were you able to determine just from the registration, the Registered Mail numbers, what type of package was being sent?

A Yes. PTS will give you the weight and the dimensions of the product purchased or mailed. And so I was able to determine based on that it was a flat or what we refer to as a "flat" based on the weight and the dimensions.

Q So based on the information you got from the system, you did not believe it to be a box or any type of a large package; is that right?

A Correct. That's correct.

Q Would you describe what you're looking at in Exhibits 1 and 2, the two packages that you looked at there, are those flats?
A Yes, ma'am. They're manila envelopes with the Registered Mail number as well as what we call the PBI strip or the purchased stamp or the metered postage strip. And they are flat in nature, hence the name "flats."
Q Based on the information you got from the PTS system about when and where these two particular packages were sent, what did you do next. What was your next step?
A We also have another internal database that allows us to -- not all of our facilities have them -- but to research surveillance video from that Post Office based on that date and time.
Q If you would please take a look at Exhibit 8, it should be in a folder in front of you. Can you identify this exhibit?
A These are the photographs that I obtained.
Q Okay. How many pages are there this Exhibit 8?
A I see five.
Q And you said you obtained these five pages?
A Yes, ma'am.
Q From where did you obtain these pages?
A From our internal security camera system.
Q And what's that system called?
A It's called "ISIP."

Q And is that the acronym ICIP?
A It's actually Integrated Security Investigative Platform which is basically our surveillance and video camera systems.
Q Do the pictures contained in Exhibit 8 accurately reflect the images you obtained from the camera system?
A Yes, ma'am.
Q Are the documents in Exhibit 8, the photos, true and accurate copies of the photos you obtained from the ISIP system?
A Yes, ma'am. They are.

MS. EDELSTEIN: At this time, Your Honor, the government moves to admit Exhibit 8.

MR. KUNKLE: No objection.

THE COURT: All right. Exhibit 8 is admitted.

(Exhibit No. 8 admitted in evidence.)

THE COURT: Let's take a short break now.

Let me tell the jury, I have kind of figured out to take a break of 20 minutes on the theory that when I try to take a shorter break it never works. People have to get out, go to the rest room, make a phone call to their family.

I need to have you get back in the jury room, to come back here, and I could just never get it done in less than 20 minutes, so we were off to a little late start, but we will take a break until seven minutes after 11:00.

And also, today, I have a judge's meeting at lunch

time and I will -- I might show up a little late and leave a little early, but I will need to recess by maybe ten after 12:00 at the latest.

So, all right. We'll be in recess until seven minutes after 11:00.

(Recess taken at 10:47 a.m.; resumed at 11:07 a.m.)

THE COURT: Please be seated. The record will show the presence of counsel, the defendant, and the jury.

Please continue.

BY MS. EDELSTEIN:

Q Thank you. Just before we took a break we just turned to Exhibit 8. Would you please refer to that now.

You said the photos you described where you were able to retrieve from the internal system; is that correct?

A Correct.

Q Okay. Now, Exhibit 8 has -- you stated five pages, five photos?

A Yes.

Q I would like, if you would, if you would please turn to the page 3 first.

A Okay. I'm there.

Q Okay. Now, at the time Special Agent Neri contacted you, this was sometime after the mailing; isn't that correct?

A Correct.

Q Okay. Do you see a number listed at the bottom of this

picture?
A Yes, I do.
Q A date?
A Yes.
Q Do you recognize what that date is?
A Yes. It's February 6th, 2013.
Q Okay. Is that date significant to you in your recollection?
A That was the date that PTS, the Product Tracking System, listed as the date of the mailing.
Q The date of the mailing or the date that you accessed the system?
A Oh, I'm sorry. The date that I actually accessed the system.
Q Okay. So this is not the actual date of the mailing itself; is that right?
A Right. Correct.
Q Okay. Is there -- it's pretty illegible, but do you see another number, a small number in the upper left-hand corner of this picture?
A Yes, I do.
Q And what would that number reference?
A That would be the actual date on the camera system of the mailing.
Q Okay. And in these particular exhibits it's cut off; is

that correct?
A Correct.
Q But based on your review of the internal system, this particular mailing item -- these two mailing -- these two Registered Mail numbers were mailed on what date?
A It's difficult to see the date there. I would have to refer to the actual other documents to see the date.
Q If you want to look at Exhibit 1 and 2?
A Correct. It was January 28th, 2013.
Q Okay. Now, if you would turn to page 1 of Exhibit 8, what are we looking at?
A You can see there is other customers in line. But the actual -- based on the time and date of the mailing and that it was a flat rate mail piece, that represents the actual mailing or the purchase.
Q So the system is able to pinpoint exactly which counter these particular packages were mailed from?
A Correct. There's unique identifiers associated with each clerk that handles the transactions.
Q Now, does each Post Office have this type of camera system set up?
A Not every Post Office has this setup, no.
Q In this particular instance, this particular Post Office on Van Buren did, however?
A Correct.

Q Okay. Now is it just one camera that would be trained at the counter?
A No, ma'am. There are several.
Q Okay. Now, turning to page 2, is this also a view from the same camera?
A Yes, it is.
Q And can you see the type of packages being mailed in this picture?
A Yes. You can see that there are two flat rate pieces in the mailer's hands.
Q And is that consistent with the information in the internal system?
A Yes, it is.
Q And does that tie directly to these two Registered Mail numbers in Exhibits 1 and 2?
A Yes, ma'am.
Q If you would turn to page 3, what are we looking at in this picture?
A You are actually seeing the transaction take place and the purchase being made as well as the clerk entering the information into the system.
Q And so at the time of the Registered Mailing, the clerk would enter specific information into the computer?
A Correct.
Q Do you know what type of information is captured at that

time?
A That information would be what's on the flat mail piece which would be the PBI strip which is the transaction or the actual metered postage; the date/timestamp across the top of the piece.
Q Now, if you would take a look at Exhibit 1, the package itself, just for clarification purposes, is it possible that the registered -- what is the Registered Mail slip that green -- the upper left-hand corner label with the Registered Mail number, when is that affixed to the package?
A The Registered Mail number is actually placed on it once the item is purchased or the transaction is completed.
Q So that would have occurred at the counter?
A Correct.
Q Okay. As well as the label to the right of it with the bar code and the U.S. Postal Service stamp?
A Correct.
Q So that unique identifier, that Registered Mail number, wouldn't have been placed on this package until the time of mailing?
A Correct.
Q Okay. Turning back again to page 3 of Exhibit 8, at which point would that be affixed on there? At this stage? Is that what we're looking at here?
A Yes. That's correct.

Q Now, turning to the next page of this exhibit, what's occurring here?
A I'm sorry. Could you repeat the question?
Q What is occurring in this picture?
A It appears as though the transaction is being completed, that the items are being paid for, purchased and weighted on the scale at the counter with the clerk.
Q And based on your review of these pictures, turning to the next picture, is this all of the same transaction?
A Yes, it is.
Q And are these different cameras?
A There are different camera angles, yes.
Q Okay. Now, based on your review of these exhibits, could you identify the person that's sending this to be a male or female?
A That was a male subject.
Q And that male figure that we see in this picture is consistent with all the other pictures that you took down from that date and time?
A Yes, ma'am.
Q Just for clarification, if you would look at page 3, you mentioned that the date listed at the bottom of this is the time -- or this is the date that you actually received this information off the internal system.
Is that time next to it, the 7:42:03, also the time

at which you would have accessed the system?
A Yes, ma'am.
Q It has nothing to do with the referencing of the mailing time or date; is that right?
A That's correct. Those are internal tracking numbers for us.
MS. EDELSTEIN: Thank you very much. No further questions.
THE COURT: All right. Mr. Kunkle, you may cross-examine.
MR. KUNKLE: Thank you.

**CROSS EXAMINATION**

BY MR. KUNKLE:
Q Good morning, Inspector. And I apologize. Argetsinger.
Am I saying that right?
A That's perfect.
Q Okay. In front of you are two other folders, one labeled Defense No. 100 and then there is -- and I will get to the second one in a moment.
If you would take a look at that please. Now, in front of you, Exhibit 100, that's a postal form 3811; is that correct?
A That's correct.
Q And what is that for the jury to understand?
A That's the form that the mailer or the sender completes.

Q And if you have Exhibit 1 in front of you, there's an envelope, correct? That's what actually gets affixed to the front of the envelope as it goes through the mail?

A That's correct.

Q Now, if you take a look at Defense Exhibit No. 101, please, if it's up there in a folder in front of you, and I ask if you recognize that.

A Yes.

Q And what is that that you're looking at in 101? Do you recognize that?

A Yes. That's also a part of that Form 3806 which is an official use form but it also captures the transaction, date, time, and postage.

Q And with respect to Defendant's No. 101, that's a postal form you recognize, right?

A Correct.

Q And at the top there you can see it says "registered number." There's a number there printed out, right?

A Correct.

Q And that number has significance here because it matches the other Registered Mail, correct?

A Correct.

MR. KUNKLE: I would move Defendant's 101 into evidence at this time, Your Honor.

MS. EDELSTEIN: No objection.

THE COURT: Exhibit 101 is admitted.

(Exhibit No. 101 admitted in evidence.)

BY MR. KUNKLE:

Q I'm going to publish this.

Now, just so the jury understands, this is just part of the same transaction registering mail and mailing it, correct?

A Correct.

Q The first one we looked at was Defendant's 100. That shows the signature of the person who received the mail; on 100 it's Gloria Ross, correct?

A Correct.

Q And all that means is that that individual signed for the mail, correct?

A That's correct.

Q So this receipt that's on the screen now in front of the jury, if we can all see, do you see at the top there's some handwritten notes at the top. 1996. 1997.

A Yes, I do.

Q That's not part of the Postal Service receipt, correct?

A No. Correct.

Q That was something that was written on by someone else?

A Correct.

Q But the other parts are the actual receipts, right?

A Yes.

Q And there's a number here, correct, that's the number we were referencing before on each of these?
A Yes.
Q And that's the same Registered Mail number, right?
A Correct.
Q And this is the receipt then that goes back to the individual or to the address, more correctly to say?
A Correct.
Q For the Registered Mail, right?
A Correct.
Q And so just real quick, can an individual purchase Registered Mail packages, the receipts, the cards, in advance? Or are they even sold or do you just pick them up at the Post Office? Do you know?
A The forms themselves you can obtain from the Post Office.
The Form 3806 is actually handled by the carrier or when the mail piece is delivered. But the actual strips themselves, the Registered Mail piece number, those are unique and those are handled at the time of purchase at the counter.
Q And when you say -- you're talking about the glue on -- the adhesive labels that go to the envelope. You have to get at the Post Office, correct?
A Yes, sir. That's to prohibit anonymous mailings, especially in a post-9/11.
Q Okay. And so that's only going to be done at the Post

Office, right?
A Correct.
Q But these other slips of paper can be picked up in advance and filled out and so forth, right?
A Yes.

MR. KUNKLE: I have no further questions, Your Honor.

THE COURT: All right. Any redirect?

MS. EDELSTEIN: None, Your Honor. Thank you.

THE COURT: May this witness also be excused?

MR. KUNKLE: Yes, sir.

THE COURT: All right. Mr. Argetsinger.

THE WITNESS: Yes, sir?

THE COURT: I instruct you not to discuss your testimony with anyone except the lawyers in this case until the trial is over; and with that you are excused. Thank you.

The government may call its next witness.

MS. EDELSTEIN: Your Honor, the United States calls Special Agent Kathleen Neri.

THE CLERK: State your full name for the record and spell your last name.

THE WITNESS: Kathleen Neri. N-E-R-I.

(Witness duly sworn)

THE COURT: All right you may proceed.

**SPECIAL AGENT KATHLEEN NERI, WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. EDELSTEIN:
Q Good morning.
A Good morning.
Q Special Agent Neri, where do you work?
A I work for the IRS, Internal Revenue Service, in the Criminal Investigation Division.
Q Is that located here in Phoenix?
A Correct.
Q And how long have you been in that position?
A I have been with the IRS CI, a little over five years.
Q What did you do before you became -- and you described yourself as a special agent; is that right?
A Correct. I'm a special agent which is a federal law enforcement officer.
Q What types of cases do you investigate?
A I investigate -- the statutes that the IRS has jurisdiction over include money laundering statutes, Bank Secrecy Act, of course, the tax laws and violations of those.
We only are responsible for criminal investigations.
Q And that's specifically so the CI or Criminal Investigations Division; is that right?
A Correct.
Q There is also a civil examination side of the Internal Revenue Service?
A Yes. There's many different divisions of IRS. IRS

Criminal Investigation is the only one that investigates on the criminal level.

Q What did you do before you were a Special Agent with IRS?

A Prior to being employed with the IRS, I was a forensic accountant. I was a manager of the Forensic Accounting Investigative Division here in Phoenix for a regional CPA firm called Eide Bailly.

Q And how long were you in that position?

A Just shy of five year.

Q What training did you have to become a special agent with the Internal Revenue Service?

A Once you are hired on as a special agent, you attend the Federal Law Enforcement Training Center in Glynco, Georgia, where you attend a three-month training that's called Criminal Investigation Training Program. Most of the agencies that are federal agents attend that same program.

In addition to the three months that we do of the Criminal Investigative Training Program, we also have additional training, three months training, that is IRS-specific for IRS criminal investigators.

Q And do you have continuing, ongoing training responsibilities in your capacity as a special agent?

A I do. We have ongoing training that we attend; money laundering conferences, tax -- different training on tax evasion or other violations, Bank Secrecy Act.

In addition to that, I have a couple certifications that require continuing education credits every year.
Q What are those certifications?
A I am a CFE which is a Certified Fraud Examiner. I'm also a Certified Forensic Interviewer.
Q And you said that there are continuing training programs involved with that?
A Correct. I believe for each of them on the topics either related to fraud or interviewing, I have to do approximately 20 hours a year for the CFE certification to maintain it.
And for my Certified Forensic Interviewer it's 20 hours in interviewing every three years. So continuing education over those three years.
Q Are you familiar with an individual named Gordon Leroy Hall?
A Yes.
Q And how do you know that individual?
A I obtained a referral regarding a case -- I have an open case against Gordon Hall in the Criminal Investigation Division.
Q And do you recall when you were initially assigned to that case?
A I know I numbered the case in late February, I believe, of 2013.
Q 2013?

A Correct.

Q Now, you said "numbered the case." Would you describe for the jury what that means?

A Once -- we might, you know, get information from different sources regarding possible criminal violations.

MR. KUNKLE: Objection, Your Honor.

THE COURT: What's the objection?

MR. KUNKLE: Information and the other hearsay she may be relating.

THE COURT: Well, I understood the question and the answer to be about her work in general rather than this case; is that correct?

MS. EDELSTEIN: Well, just what that phrase means: "I numbered a case."

THE COURT: All right. Overruled. You may answer.

THE WITNESS: Okay. Basically, "numbered a case" means I opened a case. So we have an internal tracking system for the different investigations.

So when you open a case in that system, it's assigned a number, your case number. So we refer to it as "numbering a case," but it's really just opening a case.

BY MS. EDELSTEIN:

Q During the course of your investigation, did you participate in search warrants related to the case of Gordon Hall?

A Yes, I did.
Q Of what specific locations?
A We conducted a search warrant of Gordon Hall's residence on Presidio Circle, as well as a search warrant at his business location. It was located on Greenfield Road in Mesa, Arizona. The residence, as well, was located in Mesa.
Q Were other search warrants done in this case?
A There was. There was another search warrant conducted at Brandon Adams' residence -- or rental residence, I should say, in Mesa. However, I was not present for that search warrant.
Q And based on your investigation, who is Brandon Adams?
A Brandon Adams was an associate of Gordon Hall. They, for back of a better word, were in business together. They were partners, I'll say.
Q Now, you mentioned you were not present at the search warrant of Mr. Adams' rental residence. Were you present at the other two search warrants, the Presidio Circle, the home residence of Mr. Hall, and the business location?
A Yes, I was.
Q Did you review all the documents and evidence from each location after the search warrants?
A Yes, I did.
Q Did that include the Brandon Adams' rental residence?
A Yes.
Q You are familiar with all the documents and evidence

retrieved from those three places?
A Yes.
Q Would you please take a look at Exhibit 9.
Actually, if you would, look at 9 and 10 simultaneously in front of you.
What are these?
A These were folders that we obtained. They're manila folders with documents inside that we obtained during our search warrant.
Q Did you obtain these packets during the course of your investigation?
A I did.
Q And now these two specific packets that you have in front of you, Exhibits 9 and 10, what were the circumstances of you obtaining these documents?
A We conducted a search warrant of the business location of Gordon Hall's business. During that time that we were there at the business location, unrelated to our investigation, they had moved some of the documents and computers to the Presidio Circle residence.
Q I'm going to interrupt you there.
A Sure.
Q You said "they." Who are you referring to?
A Oh, I'm sorry. Employees of Gordon Hall's company.
Q And so prior to the execution of the search warrant at the

business location, employees had moved certain items; is that correct?

A Correct. They were -- they were asked to vacate the office. So the night before the search warrant, unrelated -- they had removed some of the documents from the business location.

Q And how did you find out about that?

A I believe we spoke with a couple individuals. But I personally received a phone call from Shannon Hall that informed me that the documents that were removed from the business were at the residence, the Presidio Circle residence, and said we could come pick them up.

Q Now, the search warrant at the residence, did that occur prior to the search warrant of the business?

A Yes. Yes. We did the -- approximately, I think it was a week prior to the business location search warrant was the search warrant at the residence.

Q You mentioned that you received a phone call from Shannon Hall. Based on your investigation, who is Shannon Hall?

A Shannon Hall is Gordon Hall's daughter.

Q And what did you specifically do after you received the phone call?

A After I spoke to Shannon Hall, myself, as well as a couple other agents, went over to the Presidio Circle residence and obtained the documents and computers that were moved there

that were from the business.
Q At that time did you secure Exhibits 9 and 10?
A Yes.
Q Are the two exhibits, Exhibits 9 and 10 that you have before you, the same packages you obtain from the residence?
A Yes.
Q Are they in substantially the same condition as when you seized them?
A Yes. They are.

MS. EDELSTEIN: Your Honor, at this time the government would move to admit Exhibits 9 and 10.

MR. KUNKLE: No objection, Your Honor.

THE COURT: Exhibits 9 and 10 are admitted.

(Exhibit Nos. 9 and 10 admitted in evidence.)

BY MS. MS. EDELSTEIN:
Q Would you please take a look at Exhibit 9.
A Uh-huh.
Q And can you describe for the jury what it is?

They're looking at a copy on the screen, but will you describe for them what it is in front of you that is Exhibit 9?
A It's a manila envelope. It states "Gordon Hall's money order for tax year 1996" and down below it has a date 1/28/-- or I'm sorry -- just '13.
Q So the exhibit itself is a package, a manila package?

A And inside the manila envelope is different documents; multiple documents.
Q Multiple pages of documents?
A Uh-huh.
Q At any point in your investigation did you find out whose handwriting it was that's on the front of Exhibit 9?
A Yes. It's Brighton Jorgensen's.
Q If you would open the package, what is contained on page 2 of this document?
A This is a copy of the money order that shows the drawees of Gordon Leroy Hall.
Q Is it -- now, you said it's a copy. Does it -- why do you say it's a copy?
A Well, you can tell it's a copy because the printing is only on two-thirds of the paper and so you can see the separation.
Q Is that a sheet of card stock paper you're holding?
A Yeah. It's like heavier-weight paper. It's not quite as heavy as card stock per se, but it's heavier in weight.
Q Are you familiar with Exhibits 1 and 2 in this case; is that right?
A Yes, I am.
Q Is this a copy of the document -- one of the documents contained in Exhibit 1?
A Yes. It's a color copy of the money order contained in

Exhibit 1.

Q Looking at the face of this page, page 2 of Exhibit 9, who is this money order written out to?

A The United States Treasury.

Q And can you tell from the face of this on whose behalf this money order is written on behalf of?

A It says "For the Benefit of Gordon Hall" and has a social security number and the tax period.

Q Is there an amount?

A Yes. It's $868,397.60.

Q If you would turn to page 4 of this exhibit, do you recognize this document?

A This is what we call a 1040-V with the IRS.

Q In your experience -- in your experience as a special agent, when do taxpayers generally submit forms 1040-V?

A This is basically a payment voucher, so most often you use it when you're submitting a payment for your tax liability.

So you'll submit a 1040-V with whatever your check is at the end of the year when you file your taxes or if you pay it later.

Q Would you turn to page 5 of this packet. What is this?

A This is the bottom portion of a sheet of paper that it's perforated at the top. So it's like the third section. It's the paystub, I would refer to it as, from the money order in Exhibit 1.

Q So this is specifically the bottom portion of the money order that we saw in Exhibit 1?
A Correct.
Q And what does it indicate to you based on this perforation here?
A That it was originally attached to the first two.
Exhibit 1, you'll see, is only two-thirds of a sheet of paper and this was originally attached to make a full 8-and-a-half-by-11 sheet of paper.
Q And would you describe the consistency of the paper that you're holding up for the jury?
A It's -- what I would call check stock paper. It's what you would typically like your payroll check comes on. That type of paper.
Q Okay. Now if you would just leaf through pages 6 through 8 contained in this packet --
A Uh-huh.
Q -- what do those appear to be?
A They are just additional copies of the same things we discussed.
Q So there appears to be another set of copies; is that right?
A Correct.
Q Turn to page 9, please.
A Okay.

Q What is this?
A This is a form called an Affidavit Of Service.
Q And are you familiar with this based on your investigation?
A I am.
Q Okay. And is this Affidavit of Service, is it filled out, meaning, is there information included on this sheet?
A Yes. It's completed. You can see where they have filled in the blank spots with the Registered Mail number as well as signatures on the sheet.
Q Do you recognize that Registered Mail number?
A Yes. It's the Registered Mail number that ties out to the envelope that the money order was sent to the IRS in.
Q Now, is this Affidavit of Service dated?
A It is dated the 28th of January, 2013.
Q Is it signed and fingerprinted?
A It is. It is signed by Brighton-Nicole Jorgensen.
Q During the course of your investigation, did you find who actually signed and added the fingerprint to this document?
A Brighton-Nicole Jorgensen did sign that document.
Q Okay. Now, what is included on the bottom portion of this document?
A It's a notary with the -- you can't see it on the copy, but there's actually an upraised like notary seal on the document.

Q Okay. And do you see a name listed for the notary?
A Yes. Nicole Perry.
Q During the course of your investigation did you find out who Nicole Perry was?
A Yes.
Q Who is Nicole Perry?
A She was an employee at Gordon Hall's company.
Q Okay. Now, you're familiar with Exhibit 1; is that correct?
A Correct.
Q Was there an Affidavit of Service similar to this one included with Exhibit 1?
A There was.
Q Was it signed by Brighton-Nicole Jorgensen and notarized by Nicole Perry?
A No. It was not.
Q Take a look at Exhibit 10. And would you describe for the jury what Exhibit 10 is.
A It's again another manila folder that says "Gordon Hall's Money Order for tax year 1997" and it has the date 1/28/13. And within it is multiple documents.
Q Is it similar to the package that we just reviewed that said "tax year 1996"?
A Yes. It's the same documents, just different information on the documents.

Q Is the handwriting different on the two packets or the same?
A They're the same.
Q And who did you identify that handwriting to belong to?
A Brighton Jorgensen.
Q And turning to page 2. What is this?
A This, again, is a color copy of the money order that ties out -- it's a copy of the money order that was in Exhibit 2 for Gordon Hall that was sent into the IRS.
Q And it is a copy versus an actual money order?
A Yes. Again, you can tell it's a color copy but it only takes up two-thirds of the paper.
Q And what's the amount on this one?
A $635,176.36.
Q And that's the same figure that's on the actual money order in Exhibit 2?
A Correct.
Q Okay. Turn to page 5, please. What is this?
A Again, this is a Form 1040-V. It's a payment voucher for when you send in your tax payments to the IRS.
Q And does this correspond to that 1997 year?
A It does. And if you look in box 1, the amount entered in box 1 ties out to the amount on the money order.
Q This is also included in the packet that you have there for Exhibit 10; is that right?

A That's correct.
Q Please turn to page 4. Do you recognize this?
A This, again, is an Affidavit of Service.
Q Similar to the one we previously looked at?
A Correct.
Q Now, if you look at the Registered Mail number, is that specific to the package we examined in Exhibit 2?
A Yes. This Registered Mail number ties out to the Registered Mail label on the Exhibit 2.
Q And do you see the same signatures, fingerprint, and notary stamps that you saw on the previous Affidavit of Service?
A Yes. Brighton Jorgensen also signed this as well as Nicole Perry notarized it.
Q Now, in your review of Exhibit 2, was the Affidavit of Service that was included in that package filled out the way this one is?
A No. The Affidavit of Service in Exhibit 2 that was mailed to the IRS was not signed or notarized.
Q Now, pages 6 through 8 of this exhibit, do those appear to simply be a copy of the documents that we've already reviewed?
A Again, they're duplicates of the same money order. And there is, again, the check stub, for lack of a better word, the third section of this sheet of paper, the check stock paper.

Q That corresponds to the money order that the IRS received?
A Correct.
Q Okay. Now, these two packages were found -- were -- based on your investigation, at one time held in the offices; is that correct, of Gordon Hall?
A Correct.
Q Based on your investigation, were the money orders that are Exhibits 1 and 2 in this case, were those the first money orders received by the IRS on behalf of Gordon Hall?
A Yes.
Q Were they the first money orders received from Gordon Hall's company?
A To the IRS?
Q Yes.
A They were the first ones, yes.
Q Were other money orders received by the IRS that were prepared by Gordon Hall's company based on your investigation?

MR. KUNKLE: Objection, Your Honor. May we be heard at sidebar?

THE COURT: I'll hear you at sidebar.

(At sidebar on the record.)

THE COURT: All right. Go ahead.

MR. KUNKLE: I'm just wondering how far the government is intending to go down the lane of how many other clients and how many other money orders and how far afield

we're going to go. Because we've already got an idea this was a business and a company.

And so, you know, if the Court's view is that once these other two money orders get to the IRS with Witness Colegrove is that we're done. I mean, I don't understand why the government is going to go into how many other money orders and I ask that that question and answer be stricken from the record.

THE COURT: I thought your objection might be foundation for how she would know.

Before you respond, there's another thing since we're at sidebar. I read that *Howick* case as leaving a reasonably broad inquiry of the circumstances of the document. And so I was giving you a hard time about repetitive questions.

But I want to be clear that I don't intend to be setting an unduly narrow boundary about what's relevant about the nature of the document and the circumstances that bear on that broad discussion that we all read in that *Howick* case. So I didn't want to leave you with the wrong impression about that.

I think your comment here somewhat bears upon that too, so I'll hear your response.

MS. EDELSTEIN: Yes, Your Honor. To the extent that the defense has opened the door to the fact that this was a joke, I mean, that this defendant was thumbing his nose at the

Internal Revenue Service, the door is now opened to the fact this was an ongoing business activity.

THE COURT: Well --

MS. EDELSTEIN: It's not these two individual money orders in a nutshell anymore, Your Honor. It's the broader motivation, intent, knowledge of this defendant.

THE COURT: I'm going to tell you how I'm reading that case and it's sort of what I thought before I read the case. That it looks --

It's an objective standard the court said is not very demanding; that this be similar to of a family like a financial instrument and has to be a federal financial instrument. That's written in the statute too, but which this does on its face purport to be.

The subjective component is the requirement of the intent to defraud.

So that cuts across and it narrows it in another important way.

But the inquiry about whether this is a document of the generic type that would be like a -- I'm not using the exact words from the case -- of a financial instrument -- that does strike me as a broad inquiry; broad for both of you.

So, to the extent that --

Well, actually, the issue of the subjective requirement of intent to defraud, it seems to me that these

other transactions or documents of the business would bear directly on that.

MS. EDELSTEIN: Exactly, Your Honor.

THE COURT: That the presentation that he's just one of those guys who just makes a point of his objection to the IRS and everything and we all know those are real people.

And so that would arguably cut against taking these documents seriously.

It seems to me the fact that he was engaged in the business of taking money from other people for doing this, not exactly this document but similar types of documents, would go to the intent to defraud element.

So it seems to me that -- the fact that he was doing this and other is directly relevant of that, and therefore, admissible.

Now, I want to think through. You're always worried about unfair prejudice that goes beyond the legitimate probative value and I will hear you on that.

MR. KUNKLE: My concern, Your Honor, is if -- this is the twist.

You know, it's like if the jury hears evidence that he's done this -- this is a business, if you will, and I have to agree the evidence likely would show if it was produced by the government that he was taking money from clients to prepare these things and the whole amount.

The theory itself that there's this presenter and there is an affidavit that comes with it, as you have seen, my only concern regarding the elements is that if the jury hears that evidence and they believe that Mr. Hall really didn't intend for this to work, then he's a con man to his clients.

If they really believe it's going to work, then, of course, knowing it doesn't work, then they may believe he's perhaps crazy, which they may believe.

I'm just concerned how much we're going to get into the protester movement, the sovereign movement, and how far we're going to go with that and how this does take a hold on people.

Because certainly, you know, I'm familiar with the *Powell* case in the Ninth Circuit that, you know, what the law is and what people purport to claim the law is.

And so, you know, consistent with that *Powell* case where this intersects with this, it becomes somewhat of a box that you end up being in that how do you demonstrate, you know, what these people's intentions or beliefs are without getting into the whole --

THE COURT: Right.

MS. EDELSTEIN: Your Honor, can I make a record to the extent that I can proffer that the witnesses, the business employees, his daughter, as well as Ms. Jorgensen, they're not going to get into the nitty-gritty of the process themselves

as well as the thinking behind them and that.

Mr. Kunkle essentially opened the door in his defense with regard that this was a one off thumbing his nose at the Internal Revenue Service with these two money orders.

THE COURT: Well, what he said is that he was thumbing his nose in a way that could be completely obvious to them and, you know --

MS. EDELSTEIN: Right.

THE COURT: And, you know, Mr. Kunkle, it is not my job to offer editorial comments. But I don't know that you have a better approach. So that's probably the approach I would take if I were in your shoes.

MS. EDELSTEIN: To the extent that is an issue, Your Honor, the government should be entitled to present not the extent of the philosophy. Certainly that's outside of the scope of this case, but the procedures and steps that Mr. Hall engaged in, including doing this was for a for-profit business.

THE COURT: Well, like I said --

MR. KUNKLE: Part of that comes the whole protest movement, the whole sovereignty movement that we are allowed to explain why people may hold these misguided beliefs.

THE COURT: Well, let me take it a step at a time.

It seems to me that part of the problem is -- and all of us are disadvantaged because we're lawyers because we can

look at this, not just this money old, but the related documents, and they're just transparently not real to us.

But I don't read that *Howick* case as stating the sophisticated lawyer's eye as the standard here.

And I -- so I think you have a real argument here. And the government is entitled to come back and say he wasn't doing this for laughs to have them laughing too. He was doing this -- he was taking other people's money to do very similar things.

So it seems to me that's directly probative of the government's case as to intent to defraud, which is related to --

MR. KUNKLE: Defraud whom? His clients? Or defraud the government?

THE COURT: Defraud the government in the hope that they might be delayed or might even cash it.

Hey, I have had one of these cases from this office where they prosecuted somebody who turned in these tax refund claims that were totally unreal and the IRS paid the refunds.

MR. KUNKLE: I tried a case in front of Judge Campbell --

THE COURT: So stuff happens with the IRS.

Hope springs eternal.

So coming back to the inquiry, it does seem to me that it is directly probative of the government's case that he

wasn't doing this as a kind of a buffo-cartoon behavior that the IRS had to have known.

You have got your arguments too that, you know, he didn't -- whatever you can argue what his actual intent.

Now, I think the issue that he did this and took money from other people for doing very similar things is directly probative and relevant. I want to think through just for a minute to set appropriate boundaries.

How far do you want to go? I mean, part of the thing is I'm looking to give the defendant a fair trial, the fairest possible trial here.

If you want to take -- I think they can go where they -- what I have just said in light of what you have presented. And like I have already said, I don't think there is anything you can be criticized for making that argument. It's the best argument you've got.

But how far do you want to go in response to that? Do you want to get into broader stuff about tax-protest stuff?

I'm not speaking for you, but I'm ready to set boundaries here to limit this to what is directly probative for the government without going further. But you are the lawyer. You get to decide your strategy and then I have to rule on what the boundary would be under 403.

MR. KUNKLE: If I understand the government's position, they're going to show that there was other clients

of Mr. Hall, if you will, who were paying him to generate these money orders and he intended this to work and pay the IRS or screw with them. I mean, the "impede" issue obviously comes up.

I just think that one of the things I'm hoping we don't get into and the government would agree is that we don't get into the amounts of money taken from clients.

THE COURT: Agreed?

MS. EDELSTEIN: Agreed.

MR. KUNKLE: And, you know, I guess as part of the relevant, how many clients they thought this would work for. I think the money thing is what concerns me because, like I said, I don't want the issue to become a distraction.

THE COURT: I agree and I'm glad the government agrees and the balance of unfair prejudice shifts if we get into victimization of those people. Other than the fact that he prepared similar documents, he did it at his business, he took money, which undercuts the --

MS. EDELSTEIN: The joke?

THE COURT: The joke part of it.

MR. KUNKLE: Understood. And I think the amounts of money and, you know, so forth, I don't think that's really relevant.

MS. EDELSTEIN: I don't intend to get into that, Your Honor.

MR. KUNKLE: And I think it's also going to be somewhat -- we'll have to probably get into the idea of these seminars and these call-ins. But I'm not anticipating getting too widely into that. Just, you know, touch on that that they espoused this doctrine. Because even in the house they had a studio where they filmed something and took these clients.

THE COURT: Okay. Now, I think the government has a sense of caution about this. If they go too far, make your objection.

MR. KUNKLE: The last thing, can we ask if we can turn off the Elmo? That light is really crazy.

MS. EDELSTEIN: It's just a bulb. I'll turn it off.

THE COURT: All right.

(End of discussion at sidebar.)

THE COURT: All right. Please continue.

BY MS. EDELSTEIN:

Q Thank you, Your Honor.

Were the -- based on your investigation, you stated that the two money orders that we looked at in Exhibits 1 and 2 were the first money orders received by the IRS?

A That is correct.

Q With respect to Gordon Hall's companies; is that right?

A Correct.

Q Were there other money orders received by the IRS that were prepared by Gordon Hall's company after the IRS received

the money orders in Exhibit 1 and 2?
A Yes. There was numerous money orders that were prepared by Gordon Hall's company that were received by the IRS, either via revenue officers or processing centers across the nation for different taxpayers.
Q Based on your investigation, how many additional money orders are you aware of?
A There was at least -- during our investigation we found at least 124 money orders.
Q Now, were these all on behalf of Gordon Hall's tax liability?
A No. They were for different taxpayers.
Q And where were these taxpayers located?
A Across the nation. I mean, in -- I couldn't tell you specifically, but I know there was different ones back East, some in Washington State.
Q Not necessarily from Arizona?
A No. I'm actually not sure -- I don't recall if any of the other taxpayers were actually here in Arizona. I think they actually might have been elsewhere in different states.
Q Okay. Now, how do you know that these -- some of these additional money orders were actually received by the IRS?
A Because most of the money orders that -- during my investigation that I obtained, I obtained through revenue officers across the nation.

And they -- I reached out to the different revenue officers and they provided those original money orders, very similar to Exhibit 1 and 2, but that they had received on behalf of their taxpayer that they were assigned to.
Q Did you find other similar money orders that were -- based on your investigation that were not received by the IRS?
A During the search warrants of both the business and the Presidio Circle residence, we found multiple money orders identical to the ones in Exhibit 1 or 2 except for the amounts and taxpayer that were completed, filled out, but they were in stacks or they hadn't been sent to the IRS yet.
Q Okay. And do you recall roughly how many you found that had not actually been sent to the IRS yet?
A I believe we found a little over 40 during the search warrant that were completed money orders that had yet to be mailed.
Q Now, with respect to these -- you described that there was probably about 124 total, either received by the IRS or that were found during the course of the search warrant, what was the total amount listed on these money orders?
A Well, the aggregate total of all the 120-plus money orders was, I remember, just shy of $93 million; all of them together equaled approximately $93 million.
Q Now, based on this figure you have of 124 additional money orders, aside from Exhibits 1 and 2, how do you know that

these money orders were prepared by Gordon Hall's company?
A Well, multiple reasons.
One, they all looked the same. All the money orders are printed out on the same paper except for, you know, the taxpayer information, different amounts is different. But in addition to that, when we did the search warrants at the multiple locations, we found client folders and documents that are -- were identical to what we just discussed. Those folders that references the other taxpayers that had copies of the money orders that were sent out on behalf of the other taxpayers.
Q So to be clear, were the packets that you found during the course of the search warrant similar to the two packets that we reviewed in Exhibits 9 and 10?
A Yes, very similar, for different clients and had different names on them, but different taxpayers clients.
Q And those packets also contained copies of money orders prepared by the business?
A Correct. And I believe all the money orders were sent out Registered Mail from Phoenix, from the Phoenix location.
Q And similar to the two money orders in Exhibits 1 and 2?
A Correct.
Q So for these additional money orders, were you also able to locate completed Affidavits of Service like we have reviewed for Exhibits 1 and 2?

A Yes. In the different client folders or taxpayer folders there would be a filled out Affidavit of Service similar to the ones that we saw that referenced what the Registered Mail number was, which money order got sent with it, and who was, quote, the presenter, and it was notarized at the bottom.

Q Now, you mentioned a presenter.

We saw for the two exhibits, Exhibits 9 and 10 for Gordon Hall's money orders, that it appeared to be Nicole -- I'm sorry -- Brighton-Nicole Jorgensen; is that correct?

A Correct.

Q For these additional money orders that you were able to find in your investigation, who were the presenters listed on there?

A Usually it came to a couple other people. It was either Brighton Jorgensen, Shannon Hall, or Chris Conover.

Q And based on your investigation, those three individuals you just named, who are they?

A They were all employees of Gordon Hall's company.

Q Based on your investigation, was Gordon Hall's company receiving payment for producing these additional money orders?

A Yes, from their clients, yes.

Q And based on your investigation, were the clients paying Gordon Hall's company to produce and mail these money orders?

A Yes, they were. There was an initial fee and then there was a fee incurred for obviously the shipping of them, as well

as I think they charged them a monthly fee regarding the services that Gordon Hall's company provided to different taxpayers and individuals across the nation.

MS. EDELSTEIN: A brief indulgence, Your Honor?

THE COURT: Yes.

MS. EDELSTEIN: No additional questions at this time, Your Honor.

THE COURT: All right. Mr. Kunkle, you may cross-examine.

**CROSS EXAMINATION**

BY MR. KUNKLE:

Q Good morning, Agent Neri. How are you?
A Okay.
Q Agent Neri, as a criminal investigator of the tax laws, you're familiar with statute 7212, correct?
A Correct.
Q It's called "Impeding the IRS"?
A Yes.
Q That's punishable by one year in prison?

MS. EDELSTEIN: Objection, Your Honor. Relevance.

THE COURT: I'm having a hard time seeing the relevance, so sustained.

MR. KUNKLE: It may be subject to recall, Your Honor.

THE COURT: All right.

BY MR. KUNKLE:

Q You were assigned this case concerning Mr. Hall, correct?
A Correct.
Q For lack of a better term, Mr. Hall is known in the parlance at the Criminal Investigation Division as a promoter, correct?
A Correct.
Q And so you're talking about a business, right?
A Uh-huh.
Q Is that a "yes"?
A I'm sorry. Yes.
Q That's okay.
And this business revolved around the idea that people could pay their taxes somehow, right?
A Correct. It was a little broader than that, but that's one aspect of their business.
Q One part of it was taking care of mortgage foreclosures, correct?
A Yeah. They're -- the simplification of it is Gordon Hall's company helped people eliminate their debt, their debt liability; whether that's taxes or something else.
Q Or a mortgage?
A Correct.
Q And you're familiar with these activities because you have been involved in other investigations like this, correct?
A Correct.

Q And there's numbers of people around the United States who also promote these ideas, correct?
A The debt elimination?
Q Yes.
A Correct.
Q And sometimes the IRS will get returns not necessarily from Mr. Hall's clients, but other people where the IRS will pay a refund based on a return that's submitted that's an improper return, correct?
A Well, usually, the debt elimination scheme is like you already have a tax liability that you are taking --
Q Agent Neri, I'm just asking you about the tax returns that people will submit for a refund, right?
A Yeah, but usually -- well, you -- I think we're talking about two different things.
If we're talking about fraudulent tax returns versus like you're trying to eliminate a tax liability, so I'm not sure if I follow.
Q Well, you heard earlier I asked Revenue Officer Lyons about the Redemption Theory, right?
A Correct.
Q You're familiar with that from your training, right?
A Uh-huh.
Q Do you want to tell the jury what you understand that to be?

A The general theory behind it is that there's a secret account that's tied to your secret -- or your social security number and that you can obtain funds from that account using your social security number.

Q And at people's birth or when they are assigned a social security number, they are tied to the debt of the government?

A In so many ways -- I think you stated it a little more clearer earlier when you said I think that they argue birth certificate or social security number is used as collateral.

Q "They" meaning?

A "They" meaning the government uses that as collateral to obtain debt.

Q So in other words, one premise of this protest, if you will, is that people don't consent to necessarily being tied to their portion of the national debt.

Would that make sense, Investigator Neri?

A Yes, but I think some of their argument is -- and I am not an expert, so let me just say that. But my understanding is some other argument is if you, you know, obtain a birth certificate or obtain a driver's license, then you are conceding that.

And if you choose not to obtain a driver's license or a birth certificate or whatever, then you wouldn't be locked into that. That's my understanding.

Q And this goes so far in some nature that people believe

they form their own court system, correct?

A I don't know that -- I don't know that the redemption scheme is tied to any court system.

Q Many of these different theories somewhat run together, correct?

Being outside the jurisdiction of the United States is one premise of these protesters, correct?

A Well, I mean, some -- you could say some protesters don't believe they're part of the United States and they might also believe in the redemption scheme. But that's not necessarily like that's -- one has to go with the other.

Q Correct, but they oftentimes run together, right?

A Some people believe -- yea, I mean, some people believe in multiple conspiracy theories or theories.

Q Many of these theories, if you will, whether it's a strawman theory or redemption theory or being outside the jurisdiction of the United States, in essence, don't recognize the authority of the government, correct?

A Correct. There's some that don't recognize.

Q And one of my questions earlier was that they believe they have their own court system, some people, they will adjudicate their matters in their own court system outside of this court system or the state court system, correct?

MS. EDELSTEIN: Objection, Your Honor, as to the relevance of this line of questioning.

THE COURT: Well, I'll allow this briefly.

THE WITNESS: Some groups, organizations, you know, individuals, outlyers just won't recognize the federal government; sometimes they set up their own government; sometimes, you know.

BY MR. KUNKLE:

Q And a lot of this took off with the Internet, correct?

A Well, I think it's been around forever, the theories behind it.

Q But the Internet helped explode it even further, correct, the last 20 years?

A I assume so, but I don't have any personal statistics or anything, but I would assume it's more readily available, if that's your question.

Q You have been on YouTube and seen the videos that people post to YouTube or a promoter, if you will, correct?

A Correct.

Q In this case, Mr. Hall had conference calls on the Internet, correct?

A He had a -- I think a Monday night talk show, if you want to say that was on the Internet.

Q Where people could --

MS. EDELSTEIN: Objection, Your Honor, as to the foundation.

THE COURT: Well, overruled.

BY MR. KUNKLE:

Q You're aware of other individuals around the United States doing this, correct?

A Promoting similar theories?

Q Redemption theories, strawman accounts?

A Yes, other people in --

Q Within Arizona that weren't Mr. Hall, correct?

A I'm assuming there is other in Arizona, yes.

Q Now, when you became a fraud examiner or when you've had experience in accounting, you are familiar with the Uniform Commercial Code too, correct?

A I have -- my knowledge of the Uniform Commercial Code is only in the context of the redemption scheme and it's very limited.

Q Share with the jury your limited knowledge, if you would, about that.

A Really, my only knowledge or limited knowledge of that is something to the effect that they can use a debt or put a debt, I think, on the UCC-1 form, I believe it is and, again, that same redemption thing.

And I know that the Uniform Commercial Code is what the UCC stands for. Their argument is that that applies unilaterally across all commerce is the idea, I believe.

Q Well, one of the other premises here is that everything is based in a contract, correct? Many things or I should say

almost everything they believe is based on a contract, right?
A I'm not an expert in that, like, subject matter. And you're getting a little more particular where I couldn't honestly say that they think everything is based on a contract. I know they rely on the UCC a lot, but, I mean, I couldn't do --
Q Well, in this case, Agent Neri --
A Uh-huh.
Q -- there's this idea of this presenter. You have seen that on the documents, correct?
A Correct.
Q This is the individual presents the documents for someone to accept them, right?
A My understanding of the presenter in this case is that it's the person who mailed -- or I guess -- well, it was always a -- mailed out the documents.
Q And if someone is presented with these documents and they don't respond within a certain time, then they're defaulted, correct?
A I don't know if they are defaulted or that -- usually, in this there is some, like you have X-amount of days to respond.
No response is acceptance is what my understanding was.
Q Correct. If you don't respond, you default, you have accepted what I have offered for you to take in exchange for

my debt, right?

A I believe that's their premise, yes.

Q And so when -- in the mortgage side of this which you learned about from this investigation, if someone was unhappy with their mortgage company, they would send in this Private Setoff Bond to say:

There, I want to discharge my mortgage. If you don't respond in 30 days, I'm out of my mortgage or presumably I'm out of my mortgage.

That's the belief that they would hold, correct?

MS. EDELSTEIN: Objection as to foundation. The witness has not stated that she's aware of that.

THE COURT: Well, I have been maybe a little too liberal. I think we will require some more foundation for the questions you asked.

However, before that we are going to take a break for lunch. So let us recess until 1:15.

And, counsel, I would like you to be back a few minutes early. Just few things I want to talk with you before we bring the jury back.

So we will be in recess until 1:15 and please remember all the admonitions.

(Recess taken at 12:06 p.m.; resumed at 1:16 p.m.)

(Open court, no jury present.)

THE COURT: Please be seated.

The record will show the presence of counsel and the defendant in the absence of the jury.

Surely, I will have to you a redraft of the jury instructions. We'll just have to deal with them at the end of the day.

I wanted to check again with the government about where you think you stand with your timing of the witnesses this afternoon.

MS. EDELSTEIN: Yes, Your Honor.

We have three additional witnesses after Special Agent Neri. The longest of those three, Your Honor, will be our last witness of the day. Potentially, I'm estimating with direct and cross, probably about an hour and 15 minutes.

The other two, special agent -- or special agent -- or Adam Nixon's testimony should be relatively short. And then the other individual is Shannon Hall and that probably, I think, Your Honor, with cross-examination will also likely be about an hour.

THE COURT: Okay. We will take the rest of the afternoon. Possibly we will not finish with all of them today and we'll just have to -- after 5:00 we'll take a short recess and then we can go through my revision of the proposed instructions and see if we can get them finalized.

All right. With that, if there is nothing else from either of you, we will bring in the jury.

(Open court, jury present at 1:18 p.m.)

THE COURT: All right. Please be seated.

And the record will show the presence of the jury. And, Mr. Kunkle, you may continue.

MR. KUNKLE: Thank you, Your Honor.

**CROSS EXAMINATION (cont'd)**

BY MR. KUNKLE:

Q Good afternoon again, Agent Neri.

A Good afternoon.

Q Agent Neri, before we broke, we were discussing the various theories and beliefs, if you will, correct?

A Correct.

Q You mentioned the word "conspiracy theories" which is just globally taken to mean what people may believe in, whether it's true or not, right?

A Correct.

Q I asked you about the Uniform Commercial Code.

In some of these other beliefs that, you know, maybe the premise that the belief is founded on and some of them, like we said, intersect and run together, but one belief is that the government is actually a corporation, correct; the United States government is a corporation?

A I'm not sure if my understanding is that if the United States is a corporation, but that individuals in the United States are corporations like --

Q Well, there's is actually two beliefs. And you hit it on the head. Some is that some people believe they are a corporate individual or that they are a natural person and then there is another corporate person, correct?

MS. EDELSTEIN: Objection, Your Honor, as to relevance in this case.

THE COURT: Well, I have allowed some background here, but I really didn't intend to take much time on it, Mr. Kunkle, unless you want to talk me into it at sidebar.

MR. KUNKLE: I could try. I'll try to keep this brief, Your Honor.

THE COURT: All right. Overruled for now.

BY MR. KUNKLE:

Q Okay. And, Agent Neri, so one of the other beliefs is that the United States government went bankrupt and was given over as a corporate entity owned by international entities.

You have heard of that, correct?

A I actually haven't heard that one.

Q Okay. And the idea that debts are just being paid by fiat money. You have heard of that one?

A No.

Q Okay. In Exhibit No. 6, and I direct your attention to page 21, that's the Privately Registered Setoff Bond that came in the mailing to the IRS, okay?

A Uh-huh.

Q And right here where it says, "Whereas, fiat money exists in circulation for the discharge of debts."

Do you see that line right there at the top?

A Yes.

Q Okay. That's part of the belief that the government went bankrupt and was sold to foreign entities. You've heard of that. Does that sound more familiar?

A I haven't heard that theory, but I'll take your word for it. I know there's variation of different theories.

Q And the IRS is not a government agency, you've heard of that?

A A lot of beliefs are more that there is -- that the federal government has no jurisdiction is kind of the blanket belief.

Q And you see this line right here?

"Sui juris." Do you know what that means?

A I know it's Latin.

Q Very good. Do you know what it means? And I'm not sure I would not have to consult a Black's Law Dictionary myself. It's been a while, but I believe that means it's someone's entity unto themselves, a sovereign themselves, correct?

A I don't know what that particular statement means, but.

Q And down here at the bottom you see this idea of nondomestic mail, correct?

A Correct.

Q And are you familiar with what that means?
A This falls just sort of under the theory that they're not part of the United States.
Q Now, in the course of this case, as we discussed, you became aware that Mr. Hall was doing what would purport to be a seminar, correct?
A I believe he was conducting seminars across the nation and in private as well.
Q And at the home at Presidio Circle in Mesa there was equipment there in one part of the house, correct, that looked like it was for a production of a show perhaps.
Do you recall seeing that?
A There was like a green screen.
Q Correct.
A Yeah.
Q And like with a camera that you could set up and lighting?
A There might have been a camera. I don't recall specifically, but I do recall a green screen.
Q And you had mentioned that numerous individuals in the course of your investigation became known to you who you referred to as "clients" of this business, correct?
A Correct.
Q And really, this business was promoting these ideas, right, or many of these ideas?
A The debt elimination scheme, yes.

Q And including the debt to the IRS, right?
A Yeah. It was multiple debts, including IRS debt, correct.
Q To your knowledge, and you had mentioned there were a number of money orders that had been sent into the IRS, correct?
A Correct.
Q Did any of those get processed through and paid upon?
A I know one money order was processed.
Q And the IRS is not infallible, correct?
A No.
Q Now, in this case as the case agent, you interviewed a number of different people, right?
A Correct.
Q And when you do an interview, you take your notes, correct?
A Correct. We keep notes during the time of the interview of what the individuals say.
Q So when you speak to a potential witness, you take notes.
You don't share those notes with that witness, right?
A No.
Q And then you write up a report, correct?
A Correct. We summarize our notes. Usually, we do it in a short time after the interview. We will use our notes and our memory and memorialize the conversation in what we call a Memorandum of Interview.

Q And then that interview is later used when you talk to a witness again, correct?
A It can be if clarification or -- I don't necessarily always -- I don't necessarily bring a Memorandum of Interview with me to the next time. I talk to the individual, if I talk to them more than once, but you can.
Q Do you -- I'm sorry. I didn't mean to interrupt you.
Do you show them that report and ask them if that's what they said?
A No. I don't think I have ever shown anybody a -- an individual that I interviewed a report. I don't believe so.
Q And prior to getting ready to go to trial with Ms. Jennis and Ms. Edelstein over here at the government's table, you sit down and talk to these witnesses again then, don't you?
A Usually they're talking to them. I'm just there.
Q Okay. And that process is getting ready for trial and you ask people further questions to clarify things, correct?
A Correct. Again, usually it's the attorneys asking the questions of the individuals as they're preparing them for their testimony.
Q And in this case did you ever interview Ms. Colegrove and do a report?
A Not during my investigation, no.
Q Mr. Lyons?
A Well, I spoke with Mr. Lyons, but -- I received a

referral.

He's an IRS employee, so it's not quite handled the same as, you know, a witness like say one of the employees of that. And we received what we call a "fraud referral."

Q And you mentioned the employees.

In the course of your investigation, you learned that Shannon Hall, Mr. Hall's daughter, worked for him, correct?

A Correct.

Q And Brighton-Nicole Jorgensen worked for Mr. Hall?

A Correct.

Q Benton Tyler Thomas Hall, his son, worked there as well?

A Correct.

Q You mentioned Brandon Adams was an associate?

A Correct.

Q And Brandon Adams was the gentleman living on Sandia Drive in Mesa?

A Correct.

Q And Chris Conover, does that name ring a bell?

A He was an employee at the company as well.

Q And there was another young lady named Nancy Perry?

A Nicole Perry.

Q I'm sorry. I stand corrected.

Nicole Perry, right?

A Correct.

Q She worked there as well?

And another individual named Mota. I forget her first name. I believe Mary Mota is her name?

A Correct.

Q So you recall hearing those names in the course of talking to people, correct?

A Correct.

Q Did I leave anybody off the list that you were aware of?

A Not that I can think of offhand.

MR. KUNKLE: Your Honor, I have no further questions at this time of Agent Neri.

THE COURT: All right. Does the government have any redirect?

MS. EDELSTEIN: Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MS. EDELSTEIN:

Q Special Agent Neri, you just mentioned that in the course of your investigation you determined that one of the money orders was processed?

A Correct.

Q Okay. When you say "processed," what do you mean by that?

A I mean that it was processed through a banking system.

Q Okay. And was it a similar money order to the money orders we saw in Exhibit 1 and 2?

A Yes.

Q Okay. So when you say it was processed through a banking

system, was the amount listed on that money order actually paid out?

A It -- can I explain a little of how I know, because then it might be a little clearer?

Q How do you know?

A I know at least one of them were processed, because during the course of the investigation when we did the search warrants, and I believe it was at the residence, amongst many of the many, many documents that we took, we found a document that was from the IRS that was NSF, a nonsufficient funds notice back that was sent back to the Presidio Circle residence that had a copy of the money order saying basically this money order was processed and found that it was not authorized and nonsufficient funds and it had some other information.

So that's why I know at least one of them was processed.

Q So by "processed," you don't mean the Treasury actually, for that particular taxpayer, paid off a debt on behalf of that taxpayer?

A No. I'm unaware of that.

Q There was, in fact -- it was determined based on the processing that there was no fund, no account?

A Correct, that there was -- not authorized -- there's -- no payment was received based off that.

Q And that particular document, the nonsufficient funds document, was found where?
A I believe it was found at the Presidio Circle residence during that search warrant.
Q During the course of the search warrant?
A Correct.
MS. EDELSTEIN: Thank you. No further questions.
THE COURT: All right. May this witness be excused, counsel?
MR. KUNKLE: Yes, Your Honor.
THE COURT: Well, actually, she's not really excused. You can step down, Ms. Neri. Thank you.
THE WITNESS: Thank you.
THE COURT: All right. The government may call its next witness.
MS. JENNIS: Yes, Your Honor, the United States calls Shannon Hall to the stand.
THE CLERK: State your full name.
THE WITNESS: Shannon Taylor Hall.
THE CLERK: Spell your last name.
THE WITNESS: H-A-L-L.
(Witness duly sworn).
THE COURT: All right. Please proceed.
MS. JENNIS: Thank you, Your Honor.

**SHANNON TAYLOR HALL, WITNESS, SWORN**

DIRECT EXAMINATION

BY MS. JENNIS:

Q Good afternoon, Ms. Hall.
Are you related to Gordon Leroy Hall?
A I am, yes.
Q How are you related?
A He is my father.
Q Okay. Do you see your dad in the courtroom today?
A I do.
Q And can you describe something that he's wearing?
A Orange.
Q And can you point to him?
A (Witness indicating.)

MS. JENNIS: May the record reflect?

MR. KUNKLE: Your Honor, this is Mr. Hall sitting beside me.

THE COURT: All right. The record will reflect that the witness has identified the defendant.

BY MS. JENNIS:

Q And how old are you?
A Twenty-nine.
Q Okay. What year were you born?
A 1985.
Q And where were you born?
A Phoenix.

Q Did you grow up in Phoenix?
A No.
Q Where did you grow up?
A Mesa.
Q Mesa, Arizona?
A Yes.
Q Okay. And do you recall where you were living in 1996?
A Mesa.
Q Mesa.
And who were you living with?
A My father, my mother, and brothers and sisters.
Q And how many brothers and sisters do you have?
A I have two brothers and three sisters.
Q So there are six of you?
A Yes -- well, there's four now, but, yes.
Q And where do you fall in the lineup?
A The third.
Q Now, what do you currently do for a living?
A I'm a manager over at a day spa.
Q And how -- do you work full weeks there or how does that work?
A No, just Monday through Fridays, 9:00 to 2:00.
Q And do you have any felony convictions?
A I do.
Q Do you have three felony convictions for Forgery from

2009?
A I do.
Q And do you have a 2009 conviction for Possession of Drug Paraphernalia?
A Yes.
Q And do you have a 2010 Dangerous Drug violation?
A I do, yes.
Q Were all these rolled into one case?
A Yes.
Q And did you go to jail for these crimes?
A Yes.
Q And when did you get out of jail?
A October 31st, 2011.
Q Okay. And when you got out of jail on October 31, 2011, where did you live?
A I moved into 3546 East Presidio Circle.
Q And is that in Mesa?
A Mesa.
Q All right. But who did you live with?
A Oh, my dad, my brother, and my two sisters.
Q Okay. So let's give your siblings some names.
Which brother -- I think you said -- which brother did you live with?
A Benton Hall.
Q And this was 2011. How old was Benton at the time?

A Gee, I want to say maybe 19, 18, 19.
Q So how much younger is Benton than you?
A I think he's about -- let's see. He was born in --
Q Is he about six years younger than you?
A Yeah.
Q Okay. So he's six years younger than you. And, I'm sorry, you lived with you said another sister?
A Two sisters.
Q Okay. And who were the two sisters, what are their names?
A Ashley Hall.
Q And is she older or younger?
A She's younger.
Q A lot younger?
A About three years younger.
Q Okay. And what's your other sister's name?
A Alexandra Hall.
Q And how old is she?
A She is 20.
Q She's 20 now?
A Yes.
Q Okay. So she would have been about 18 then -- or 2011, so --
A Seventeen.
Q Seventeen?
A Sixteen, 17.

Q Now, is she the youngest?
A Yes.
Q And your dad lived there too?
A Yes.
Q And were the same people who were living there in October of 2011 living there in March of 2013?
A No.
Q How was it different?
A Ashley moved out and Yiwen moved in.
Q Who is Yiwen?
A Yiwen is my dad's fiance.
Q And do you recall approximately when she moved into the -- I assume we're still talking about the Presidio residence?
A Yes. We're still talking about that. But, no, I do not recall.
Q But sometime after October 31st, 2011?
A Yes.
Q And so when you moved in with your dad in October of 2011, what did you do for a living?
A I started working for my dad.
Q And can you tell the jury what that meant working for your dad?
A At first, I just -- whatever he asked me to do, which is actually basically sitting and watching people on the computers work to learn how.

Q Well, let me ask you this way.
Did your dad have a business at that time?
A He did.
Q Okay. And what was it run out of?
A The home.
Q And actually, let me go back to a question I asked earlier. I asked you where you were living in 1996 and you said Mesa, right?
A Yes.
Q And what was your -- and you said you were living with your dad, right?
A Yes.
Q And what was he doing for a living back then?
A He was an entrepreneur.
Q How would you describe what he was doing for a living in 2011?
A Well, he was still an entrepreneur, I guess.
Q Can you be more specific and tell the jury what his business was about?
A Helping people with their problems they had.
Q Well, what kind of problems?
A Well, IRS debt, mortgage-like cases, criminal cases.
Q So when you say --
A Civil cases.
Q Uh-huh. How was he helping people with IRS debt?

A Basically, getting -- paying off the debt.
Q He was helping these people pay off their debt?
A With the paperwork, yes.
Q Would you call these people his clients?
A Yes.
Q And what do you mean when he was helping them with their mortgages?
A Well, like if someone was about to lose their house, with the processes of the paperwork to help save their house.
Q So he was helping them pay their mortgages?
A I don't know if that's how to word it. I don't know, like pay off the mortgage.
Q And you were working at the business at this time, right?
A Yes.
Q But this was in the early days?
A Yes.
Q That you -- when you were first working for him?
A Yes.
Q Okay. Were you still working for him in March of 2013?
A No.
Q When did you stop working for him?
A I stopped working February 4th of 2013.
Q Were there other employees working at the business back in 2011 when you started?
A Yes.

Q Do you recall who were those people?
A Benton Hall and Erin Gingrich.
Q Was Erin still working there in 2013?
A No.
Q And how old is Erin? Do you remember?
A She is 39 now, I believe, so.
Q And when did she leave the business?
A I don't recall. It was a little bit after we moved into the office building, so.
Q Okay. Well, now you're talking about an office building.
When you first -- in October of 2011, where was your father's business run out of?
A At the home.
Q At the home on Presidio Circle?
A Yes.
Q At what point did you move the business to another location?
A I don't recall the exact date, but sometime in 2012.
Q Okay. And where was that business location?
A I don't know the exact address, but it was on Greenfield between McKellips and Brown in Mesa.
Q Okay. And when you moved to the other location, did the employees work out of the office on Greenfield then?
A Yes.
Q Did your dad work out of that office?

A No.
Q Where did he work?
A At the house, the home.
Q Now, as you started to work, be more involved in the business, how did your role change? Did you have additional duties? What did you do?
A I did. I kept track of hours. I kept track of the other employees and their work.
Q You kept track of hours. Whose hours?
A The employees' hours; when they would come in, when they would leave.
Q Kind of like an office manager?
A Yeah. Yes.
Q Did you -- were you involved in -- well, did you get paid to do this?
A Yes.
Q And what were you paid?
A From the beginning or at the end?
Q Describe to the jury what your starting salary was and how it changed over time?
A My starting salary was, I believe, fifty a week. I kind of had to work up to -- you know, from my issues from my past, I had to prove myself. And I had just been released from prison, so every -- I would get a raise or whatnot every so -- every, let's say, every two or three months it would go up.

The ending salary was, I believe, $500 a week.
Q So you went from starting salary about $50 a week and end was about $500 a week?
A At the end, yes.
Q Okay. And how were you paid?
A Cash.
Q And did this occur throughout the week or was it one day a week?
A One day a week every Friday.
Q And do you know if the other employees of your dad's company were paid?
A They were.
Q Okay. Do you know if they were also paid in cash?
A Yes.
Q And did the activities that your father's business conducted, did they change over time from when you first started to when you left in February of 2013?
A Yes, the paperwork changed.
Q Can you explain to the jury how it changed?
A It changed from a way we used to do our processes to a new -- newer process, I guess. I don't really know how to explain it.
Q Well, what brought about this newer process?
A Another person had brought it in, the new process; Brandon.

Q Who is Brandon?
A Brandon was one of my dad's people that he used to consult with.
Q Is this Brandon Adams?
A Yes.
Q Okay. And how did -- what were the changes that Brandon brought to the business?
A Pretty much all the new paperwork.
Q Okay. So let's talk about when Brandon got involved.
Do you recall approximately when that was?
A No, I do not.
Q Well, did you get trained on how to do the new paperwork?
A After an amount of time, yes.
Q And who did the training?
A Brandon.
Q And do you recall about when that occurred?
A Geez, I want to say between maybe September of 2012 to somewhere in -- somewhere at the end of the year of 2012.
Q Somewhere around the end of the year 2012?
A Yes.
Q And how did Brandon conduct the training?
A At the home with a screen projector. And he had, you know, on his computer he had everything that he could access with a little --
Q Pointer?

A Yes.
Q Okay. So you're at the Presidio Circle residence, correct?
A Yes.
Q And Brandon conducts training?
A Yes.
Q And who -- to whom does he conduct the training? Who is there?
A Everybody that worked at the office at that time.
Q Who worked at the office at that time?
A Benton, Mary, myself, there was Christopher, and Niki -- Nicole.
Q How about Brighton?
A And Brighton.
Q And do you know the ages of the other employees?
A I don't.
Q Okay. Were they older than you?
A All younger -- younger.
Q They were all younger than you?
A Yes.
Q How about Brandon?
A Brandon was older.
Q I'm sorry?
A Older.
Q He's older than you, like what? Was he in his 30s?

A Yeah, late 30s.
Q Okay. And was your father present at that training?
A He was. I mean, he -- he was on the phone, but he was there. I don't think he was paying attention, but he was there.
Q And so what was this new process that Brandon brought to -- to you and the other employees and your dad?
A Basically, I guess, I don't really know how to explain it.
I guess a better way of simplifying what the old process was we were doing, I guess.
Q Well, the old process, I believe you said, involved helping people with their taxes and with their mortgages?
A Right. That was the same concept with the new processes, just different paperwork. Things were worded differently.
Q Well, let's do this. Let me ask you about --
In front of you you should have some exhibits. And if you could, if you could take out Exhibit No. 11. Let's look at that e-mail. Do you have that? Can you see that in front of you? Can you take a look at that exhibit?
Do you recognize it?
A I do.
Q Okay. And what is that?
A This would have been the new process that we were using.
Q Okay. But in general, what is this Exhibit 11?
A Can I explain?

Q Well, is it a letter? Is it --
A It's like the first step of the process.
Q Is Exhibit No. 11 an e-mail?
A Yes.
Q Okay. And who is that e-mail from?
A Benton Hall.
Q And do you recognize the e-mail address?
A I do.
Q Is that Benton -- this is your brother, right?
A Right. Correct.
Q Is that Benton Hall's e-mail address?
A Yes.
Q And is the e-mail -- who is the e-mail to?
A Myself.
Q And is that your e-mail address?
A Yes.
Q Okay. And is this an accurate copy of the e-mail that you received from your brother?
A Is it -- can you say that again?
Q Is this an accurate copy? Does it look like the e-mail that you received from your brother, other than --
A Well, I think it is -- he did this first and then he went over it and then kind of --
Q Let's back up and listen to my question.
The exhibit that you are looking at, does it look

like the e-mail that you received from your brother?
A Yes. Yes.
Q Okay. Thank you. And on what date did you receive this e-mail?
A Thursday, December 6th, of 2012.
MS. JENNIS: At this point the United States would request that Exhibit No. 11 be moved into evidence, Your Honor.
MR. KUNKLE: No objection, Your Honor.
THE COURT: Exhibit 11 is admitted.
(Exhibit No. 11 admitted in evidence.)
BY MS. JENNIS:
Q Okay. Now, if you could, look at the front page of that e-mail. And you see that it says on top -- and you have the original in your hand. And then on the screen there's -- the jury and everyone else in the room can see the top of that e-mail.
A Uh-huh.
Q Can you explain what -- this looks like an e-mail that perhaps you had sent -- and I believe you said this earlier -- that you had sent to your brother and he was responding?
A Correct.
Q Why did you send this e-mail to your brother?
A To go over it to make sure everything was correct; there were no errors.

Q Okay. And what kind of things were attached to your original e-mail?
A The -- probably the same exact thing. He just went over it.
Q Okay. So this was your brother sending it back to you, the documents that he had reviewed?
A No. This is -- well, let me see.
This is what I had sent back to him -- was sent to him to look over. There's that "RE" part, so I sent these to him, I think, and then when he was done looking over them, then would file a UCC.
Q Right. So he sent them back to you?
A Right.
Q All right. So let's look at page -- Exhibit No. 11, page 2. See it says Notice of Claim? Did can you see that on top?
A Yes.
Q Okay. And is this something that you would usually prepare?
A Yes.
Q And how did you prepare these types of documents? Did you write all this stuff in the documents?
A No. There was already the template set up.
Q So is that what your work involved? Filling in templates?
A Yeah. The wording would change, but, yes.
Q Okay. When you say "wording," what kind of wording?

A Depending on if it's a different tax years for different people, different amounts, different names.
Q So you notice on page 2 of Exhibit 11 it says regarding tax periods ending in 1996 and '97.
So if the tax period was different, you would -- that would be something you would fill in?
A Correct.
Q And then afterwards it talks about a taxpayer Gordon Hall and it lists your dad's social security number?
A Correct.
Q If it was for a different client, would you -- it would have their name in it?
A Correct.
Q And these are things that you would fill in on that fillable --
A Well, yes, or we just used one from -- they were all the same for the taxes, so just like I said. We would just change out the names, the dates, the tax periods.
Q Well, how did you get this information?
A Brandon Adams.
Q Let's back up.
How did you get the information about the tax period and about the taxpayer and their social security number?
A From the clients.
Q Okay. So you would talk to clients?

A Yes.

Q Okay. So let's -- tell the jury about what you would talk to the clients about.

A I would get on the phone with them and they would basically give me the rundown on their issue, the tax years.

They would actually send us over stuff regarding their tax years. Anything that they had received they would -- I would ask for their social, address, full name, and also for permission to sign their documents with their name.

Q So you would communicate with the clients and they would provide you with the information you needed in order to prepare a document, for example, like the one detailed in Exhibit No. 11?

A Correct.

Q Okay. Now, if you look through Exhibit No. 11, I don't see that there is any signatures on any of these pages. Why is that?

A Probably because it did not go out. If there's no signatures on it, then it didn't go out.

Q So before something is mailed, you send it -- you make sure it's signed?

A Yes.

Q And who signs these documents?

A Well, the clients gave us permission to sign their names to the documents.

Q Now, if you could, take a look at page -- and I know you might not have page numbers in front of you, but page 11 of Exhibit No. 11. It's kind of near the end and it looks like what's on the screen with a title Privately Registered Setoff Bond.
A Uh-huh.
Q Have you seen this before?
A I have.
Q Is this something that was often used in resolving a client's case?
A Yes.
Q And what's the purpose of this setoff bond?
A The payoff instrument.
Q To pay off what?
A Well, the debt, if they had the debt.
Q So this bond was the instrument to pay off someone's debt?
A Yes.
Q And was their debt the $4.4 million?
A No. No. We normally tripled it.
Q So the client would provide you with the debt amount and then you would triple it?
A Correct.
Q And this was back in December of 2012?
A Yes.
Q Well, at some point did this all change?

A It did, yes.
Q And what did it change to?
A Money orders instead of --
Q Instead of the Privately Registered Setoff Bond?
A Correct.
Q And how did it change to money orders? What brought about the change?
A Brandon.
Q So how would you describe the relationship between Brandon Adams and your dad?
A They were basically both knowledgeable about this kind of work and so they both helped each other out.
Q When you say "this kind of work," do you mean the work to help eliminate a person's debt?
A To help people in general, yes.
Q Okay. And how did it change when Brandon came along?
A Can you --
Q What did the bond change to?
A Money orders.
Q Okay. And did some of the paperwork also change?
A It did, yes.
Q And what about the paperwork was different?
A Pretty much almost everything. I would have to see it.
Q And are you aware why you changed the paperwork from the setoff bonds to the money orders?

A No. No. At that point, no, I didn't really know why instead of, I guess, paying off the IRS agent instead of Pamela LaRue. Brandon said this is the way to go. This is how it's done.
Q Okay. And did you see any of these money orders?
A I did.
Q Okay. And who created the money orders, do you know?
A Well, I know they were sent from Brandon Adams. I do not know who created them.
Q All right. And do you know how Brandon Adams got the information to put in the money orders?
A Yes.
Q How did he do that?
A Well, he -- we would have -- he sent us over a spreadsheet of what he wanted; basically, names and the amounts and that we then sent it to Brandon. And so --
Q So it was the employee's job in the office to fill in the spreadsheet?
A Yes.
Q And what type of information was in that spreadsheet?
A Do you have one you could show me?
Q Actually, why don't you take a look at Exhibit No. 12.
Could you tell me if Exhibit No. 12 looks familiar to you?
A It does, yes.

Q Okay. And what is Exhibit No. 12?

A This is basically what it would look like, the spreadsheet he sent us, but we would only -- the account numbers is basically their social -- social security number. I do not know where he would get the other routing and checking numbers from.

Q Okay. Let's back up a little bit.

Is Exhibit No. 12 an e-mail?

A Yes.

Q And are you familiar with Brandon Alexander Adams' e-mail address?

A Yes. Yes.

Q And is that his e-mail address?

A Yes.

Q And who was that e-mail sent to?

A Benton Hall and Shannon Hall.

Q And, again, is that your e-mail address associated?

A Yes.

Q Yes.

Try to let me finish, if possible, for the court reporter's sake.

So that is your e-mail address?

A Yes.

Q And when did you receive this e-mail?

A Friday, January 25th, of 2013.

Q So is this an accurate depiction of the e-mail that you received other than the -- some of the language on the first page?

A Yes.

MS. JENNIS: I would move -- I would ask to move Exhibit No. 12 into evidence, Your Honor.

MR. KUNKLE: No objection.

THE COURT: Exhibit 12 is admitted.

(Exhibit No. 12 admitted in evidence.)

BY MS. JENNIS:

Q Okay. So let's look at Exhibit No. 12. And if you could, can you turn to the second -- and maybe you even need to look at -- well, let's start with the second page.

I think you were describing it a little earlier, but here on the second page, is this the spreadsheet you were talking about?

A Yes.

Q All right. And it talks about -- let's see, check numbers. Do you know what that is?

A No.

Q So that's not something that you inputted into this?

A No.

Q That's something that was --

Do you know who inputted that information into it?

A No.

Q How about -- I believe you already mentioned this, but how about the routing numbers? Were you involved in inputting that information?
A No.
Q How about the account numbers?
A Yes.
Q And what did you say that account numbers usually related to?
A The social security number.
Q So that there is your dad's social security number?
A I believe so. I would have to have his social security card in front of me, but.
Q But the account number there, would that match the maker's -- would that be the maker's social security number or would --
A Yes.
Q Okay. And here it says: Payee United States Treasury.
Is that something that you would input into this spreadsheet?
A I don't recall putting that in there, no.
Q Okay. Well, what else did you -- what else would you be putting into the spreadsheet on page 2 of Exhibit --
A More or less the third page.
The second one I -- the third page I remember. I don't really remember this second page.

Q That's okay. Well, let's just finish the second page.
On the right-hand side it talks about the drawer. Can you see that? It has your dad's name on it.
A Yes.
Q So is that something that you would put in?
A Yes.
Q Okay. Now, when I say "you would put in," were the other employees in the office doing work similar to yours?
A Yes.
Q So you weren't the only one contacting clients?
A No.
Q Okay. Was everybody contacting clients?
A Everyone but Brighton.
Q Everyone but Brighton?
A Yes.
Q And was the other employees' jobs different from yours?
A No.
Q And how many clients, do you recall, did your dad's business have?
A Maybe a little more than a hundred, less than 200.
I don't -- I can't say for sure.
Q Okay. Well, let's go back to Exhibit 12, page 3. Here we have the drawee, the date, the amount, the amount word, and the memorandum.
Can you explain those sections to the jury and tell

us if you had any involvement in inputting that information into the spreadsheet?

A To this specific spreadsheet?

Q Yes.

A Okay. Basically, the drawee would be the IRS agent that is working on whoever we were dealing with, The specific IRS agent.

The date would be the date it would be going out.

The amount would be the exact amount for the taxes owed.

Amount word is basically just spelling it out, what was owed, three -- actually, spelling the whole amount out in word.

And the memo would just be the person's full name and their social security number and then for the tax periods that was owed.

Q So would this mean that a money order would be created from the information in the spreadsheet?

A Correct.

Q Okay. And, again, you didn't create these?

A Not this one, no.

Q Did you ever see the money order that went with the information provided in this spreadsheet?

A I did.

Q When did that occur?

A I don't recall an exact date.
Q Can you describe the circumstances around when you got to see the money order that went with this spreadsheet?
A It was just sent in the mail, picked it up, and I had to bring it back to get signed.
Q Okay. Let's be a little more specific.
You received it in the mail at what location?
A The Mesa Presidio Circle.
Q So at the residence it was received?
A Right.
Q Again, try to let me finish, just so the court reporter can't write both of our conversations down at the same time.
So you got the mail. It was sent to the Presidio location, correct?
A Correct.
Q And do you recall who it would be sent to?
A I don't recall if there was a name on there or whose it was. I don't.
Q Did you open mail that wasn't sent to your name?
A Yes.
Q So you opened mail for the business?
A Yes.
Q All right. So if it had your dad's name on it, you would have opened it?
A Yes.

Q And what did you do with it after you opened it?
A Had my dad sign the papers.
Q The papers. So the money order and then the associated papers?
A Correct.
Q And so Brandon sent you more than just money orders or did he send money orders and papers?
A Just money orders.
Q Okay. So the papers, they were printed out or created by whom?
A By somebody at the office.
Q So the office staff would create the paperwork?
A Correct.
Q And Brandon would create the money orders?
A Correct.
Q And then you would put them together?
A Correct.
Q And what if -- did you do this for people other than your father?
A Just one.
Q So this was the only one you did as the one --
A No. One other than my father.
Q Oh, you did do it for another person. And was that person -- did that person sign the money order?
A It was actually sent to him to sign himself, yes, and he

sent it back to us.
Q So in that case you received the money order and then you mailed it to the client?
A Right.
Q You didn't sign those on their behalf?
A No.
Q So after your dad signed the money order, what happened next?
A I believe I gave it to my brother.
Q And then what was your brother supposed to do with it, do you know?
A I guess put it together and mail it out, maybe go over it.
Q So after you mailed out a money order -- and I know you didn't do a lot of them -- would you keep a copy of the money order and the paperwork?
A We kept copies of everything that went out, yes.
Q Okay. So even when you mailed out setoff bonds as shown in Exhibit No. 11, you would keep copies of everything?
A For ourself, yes.
Q And where did you keep those copies?
A At the office.
Q And before you moved into the office, where did you keep the copies?
A At the Presidio house.
Q Okay. Can you take a look at -- I think you have in front

of you -- actually, before we go there, let's just look at Exhibit 1 -- you should have Exhibits 1 and 2 in front of you.

You showed us the spreadsheet that was in Exhibit 12. In front of you is Exhibit 1 and there should be a money order in a plastic kind of folder there.

Can you tell me, is that the kind of money order -- is that the money order that was created by Brandon?

A Sent by Brandon, yes.

Q Or sent by Brandon, that's right. You don't know if he created it, but you received -- that's what you got in the mail?

A Correct.

Q Do you know where Brandon was living at that time?

A At this time I believe he was living -- I think he was in the middle of moving from New Mexico to Arizona, so he was -- I'm not really sure where -- which house he was at. I believe Mexico, maybe.

Q So when you first met him he lived in New Mexico?

A New Mexico, yes.

Q And at some point did he move from there?

A Yes.

Q Where did he move to, do you know?

A Arizona.

Q And so look at this money order in front of you. Do you recognize the signature there?

A I do.
Q Whose signature is that?
A My dad's.
Q And did your dad ever -- to your knowledge did your dad have someone else sign for him?
A No.
Q Can you look at Exhibit No. 2 and that also should have a plastic sleeve with a money order in it.
Can you take a look at that money order and is that -- do you recognize that signature?
A Yes.
Q Can you tell the jury who that signature belongs to?
A My dad.
Q And do you see the paperwork that's attached to it? Let's look at Exhibit 2, page 4, on the top it says Form 1040-V.
Do you recognize that form?
A Yes.
Q And can you tell the jury, if you know, did you -- you and the other employees create this form too?
A Yes.
Q So this was part of the spreadsheet?
A Not -- well, yes -- well, not part of the spreadsheet, but part of what would go into the mailing.
Q Okay. So the spreadsheet was for the money orders?
A Right.

Q And the fillable information was for the documents that went with the money orders?

A Right.

Q How about page 5 of Exhibit No. 2? Do you recognize that? It says Affidavit of Service on top.

A Yes.

Q Is that something also that the employees in the office would create?

A Yes.

Q Now, as you can see, none of this is filled out. It doesn't have the signature of the notary on it and the payment voucher. Well, actually, the payment voucher is filled out but in the Affidavit of Service, it doesn't have a signature on there.

At some point did someone sign that?

A At some point, yes, they would have.

Q Would that happen before the money order was mailed out or would it happen after?

A I believe after.

Q Now, if you could take a look at Exhibit No. 8, do you recognize -- and you can take a look through it, Exhibit No. 8 is, I think, five pages.

Do you recognize -- and I think on page 1, 2, and 5 of the exhibit you can see a face. Do you recognize the person in that photograph?

A I do.
Q Who is it?
A Benton Hall.
Q So that's your little brother?
A Yes.
Q And do you recognize the location that he's at?
A I do.
Q Where is it?
A 52nd and Van Buren here.
Q It's the Post Office?
A Yes.
Q And do you go -- have you been to that Post Office before?
A I have.
Q And why is that?
A To mail mailings.
Q Was that part of your job?
A Yes.
Q Okay. So explain to the jury how mailings and going to the Post Office were part of your job?
A Well, I mean, if Benton couldn't make it to the Post Office or whoever was the presenter would take it by Registered Mail and send it out.
Q And when you go to mail something Registered Mail, how did you pay for that mail to go out?
A I paid cash. I don't know what anyone else paid.

Q Did you use your own money or did you use the company's money?

A Company's money. Or if it was my own, it would be reimbursed.

Q Now, you're testifying here today because you're here under subpoena?

A Yes.

Q Is that right? There have been no promises made to you, have there?

A No.

MS. JENNIS: Thank you. I have no further questions.

THE COURT: All right.

Mr. Kunkle, you may cross-examine.

**CROSS EXAMINATION**

BY MR. KUNKLE:

Q Good afternoon, Ms. Hall. How are you today?

A Good.

Q You don't want to be here today, right?

Are you okay? Do you need some water?

A No. I don't want to be here.

Q I know you don't want to be here.

Now, let me ask you something. Ms. Jennis just asked you about promising you something. What were you told about that?

A What was that?

Q You were just asked by Ms. Jennis: Anybody promise you anything to be here?

Do you understand the question?

A Yes, I do.

Q You came here because you were subpoenaed. They told you you had to come, right?

A Correct.

Q You don't want to be here testifying against your dad, right?

A No.

Q You've been somewhat cooperative, would we say, with the government over here to my left?

A Yes.

Q They told you if you continued to cooperate, you wouldn't be charged, right?

A I don't really recall that, but along the lines, you know, since I'm cooperating.

Q Well, tell us what you do remember.

A Geez, it was like two years ago, I think, when we sat down, but, you know, under my assumption if I cooperated, then, you know, there could be charges brought up but there could not have been charges brought up.

But if I cooperated, then --

Q Now, this isn't something you just arrived at on your own, is it?

A No.
Q Okay. I mean you have been to prison before, right?
A I have, yes.
Q And things have changed drastically for you since you were a kid, right?
A Yes.
Q So let's go back to March 14th, 2013. Were you living at Presidio at that time?
A March when?
Q 14th, 2013?
A I was, yes.
Q Just to give you an idea if you remember the date, that's the date there was a search warrant done, right?
A Yep.
Q You remember that?
A I do.
Q And you were asked earlier about February 4th, 2013, right?
A Right.
Q And that's the day your son was born, right?
A The day before my son was born.
Q And so that was when you stopped working at your dad's house, right?
A I stopped working, yes.
Q And you recognized your brother Benton from the pictures

in Exhibit 8, right?
A Yes.
Q Your brother Benton got charged with crimes related to this, didn't he?
A Yes.
Q He got charged, right?
A Yes.
Q Brandon Adams got charged, right?
A Yes.
Q You did not get charged, correct?
A Correct.
Q And so one of your understandings with the agents -- and just tell us if this refreshes your memory --
After that search warrant, you went to the FBI headquarters up on North 7th Street up by Deer Valley Road, right?
A Yes.
Q You weren't under arrest, right?
A No.
Q And when you started talking to them, I mean, you just talked to them, right?
A Yes.
Q Did you want to talk to them at that time?
A Well, I mean, I didn't want to -- I mean, I didn't mind. I wasn't trying to not cooperate.

Q And so did you feel you needed to cooperate at a certain point?
A Yeah, I did.
Q And why did you feel that?
A Because I had a son I raise on my own and while I can't afford to be put in prison as well.
Q Did somebody mention you might go to prison for this?
A Well, no, but I -- under the assumptions I had done paperwork and I had done, you know, so I wasn't -- I didn't know if that was going to come back to get me in well. I have a son that I take care of on my own.
Q Right. You're a single mom, correct?
A Yes.
Q But you're testifying here today. You know, you're basically as you're testifying admitting what you have done, you're admitting you were involved in this, correct?
A Yes.
Q I mean, you took these money orders to your dad when he signed them, right?
A One of them.
Q Do you know who did the other one?
A No.
Q And your brother Benton, well, his picture is here because he's the guy who mailed them, right?
A Well, I don't -- well, if he mailed these ones, then, yes.

Q And you mailed the other ones, right?
A No. I've never mailed any.
Q We've spoken before, correct?
A Correct.
Q And so do you --
A Not about these money orders.
Q Not about the money orders. About other things, but even just recently we spoke.
And do you remember when somebody told you you wouldn't be charged with anything?
A No. I don't remember when.
Q You've met with Ms. Jennis and Ms. Edelstein before, correct?
A Correct.
Q And you meet with Agent Neri?
A Yes.
Q Agent Nixon from the FBI?
Was it during one of those sessions that you met with them when they told you you wouldn't be charged as long as you cooperated?
A Well, I don't know if it was those exact words. I mean, I could have taken it the wrong way, but.
Q Well, what do you remember them telling you? Tell me.
A You know -- and this might have been I may be confusing it with the South Carolina case too, so.

Q Okay.
A I don't know.
Q Okay.
A There was something else going on, so I don't really know.
Q All right. Well, let me ask you something.
You've only met with these agents over here and Agent Neri and Agent Nixon, right. You saw Agent Nixon here today?
A I believe there was one. I don't know when I met with Agent Neri down at the headquarters. I don't know if there was somebody else -- there was another gal there that is not here, right?
Q You met with them in April right after the search warrant, correct?
A Right. There was somebody else there.
Q Iris Bohanon, perhaps, an investigator from the IRS?
A I can't remember the name. I don't know. I just know there was one other person.
Q Was it that first time you met with them that they told you you wouldn't be charged if you cooperated?
THE COURT: Counsel, you have not established that she was told that. We should find that out.
BY MR. KUNKLE:
Q Let me ask you something, Ms. Hall.
You said it was your understanding of it.
A Right.

Q What did they tell, you if you remember?
A Well, as long as I cooperated and, you know, from my understanding that I wouldn't, you know -- if I did what I needed and cooperated, then there could be charges, there could not be, so.
Q Did they tell you what you could be charged with?
A No.
Q Did they tell you you could be charged with making fictitious instruments or passing fictitious instruments?
A No.
Q Did they tell you you could be charged like your brother could be charged?
A No.
Q Or like your dad is charged?
A No.
Q Do you know what your dad is charged with here?
A No.
Q He's charged with presenting those and making those two money orders and sending them to the IRS.
Did you not know that?
A Well, he didn't make them though.
Q They're saying he was part of making them. He aided and abetted that. Did you not know that?
A Well, I mean, he didn't -- no, because I don't know. He didn't make the money orders. He just signed it.

Q And was that -- did you ever talk about your brother Benton being charged if you --
A No. Nobody has talked to me about anything with this case.
Q Did you know that your brother Benton got charged with making these fictitious -- alleged fictitious instruments, these money orders?
A No. I know he is being charged with something down here but nobody told me exactly what.
Q Did they ever ask you if you wanted a lawyer?
A No.
Q Did they ever ask you if you didn't want to cooperate?
A I don't think -- I don't know. I don't recall.
Q And when that search warrant happened at that home --
A Yes.
Q -- you were kind of upset, right?
A Well, yes. I mean, woken up at six in the morning with guns drawn with a month-and-a-half old baby, yes.
Q That day -- you saw your brother get arrested that day, correct?
A Yes.
Q And you knew your dad had been arrested that day, correct?
A Yes.
Q Did anyone ever tell you you would be looking at possibly 25 years for your role in participating and in making and

mailing these money orders?
A No.
MS. JENNIS: Objection, Your Honor.
THE COURT: Sustained.
THE WITNESS: No.
BY MR. KUNKLE:
Q They never told you?
THE COURT: The answer is stricken.
Counsel, I want to be heard at sidebar about that.
MR. KUNKLE: Please.
(At sidebar on the record.)
THE COURT: You know, I have to accept your strategic judgments here. You just told the jury what he is exposed to.
MR. KUNKLE: That's right.
THE COURT: That's your strategic judgment? You view it as beneficial?
MR. KUNKLE: I understand, because I think if she's facing the charges for her role, I mean, quite frankly, she should have probably been provided with an attorney at some point before she testified today unless the government is going to sit here and say she's not going to be charged.
And if I want to correct the record, they didn't make her a promise when she met with the agents at the time she was interviewed.
THE COURT: You have not established she was ever

told any of that. You just assumed she was told and asked her when she was told.

MS. JENNIS: We told you explicitly that she was never promised not to be charged. We told you explicitly that.

MR. KUNKLE: That's not the basis, Your Honor, for asking a question. I did speak with Ms. Hall and she said that she was told that she -- what she related to me is that she was told if she cooperated, she would not be charged.

THE COURT: I'm not questioning that, but she's not testified to that.

MR. KUNKLE: Your Honor, she just did. She said it was my understanding that they told me that if I cooperate --

THE COURT: She said that her understanding was that, but she hasn't said that they told her that.

MR. KUNKLE: She said so long as I cooperated I would not be charged are the exact words that just came out of her mouth five minutes ago.

MS. JENNIS: You are confusing the South Carolina and this case.

THE COURT: And the other thing, have you all talked with her about not talking about the other charges in South Carolina?

MS. JENNIS: Yes. We talked to her about not to mention that her father was going to prison, not to mention

the felony, not to mention a gun, and not to talk about the South Carolina case.

THE COURT: All right. Now --

MR. KUNKLE: Your Honor, with all due respect, Your Honor, her words were such that she understood she was made a promise by them.

What her understanding of what their words would mean, she's not going to repeat word-for-word what the agents told her. She said: My understanding was so long as I cooperated, I would not be charged.

THE COURT: I did not hear her say that she was told that. People understand lots of things. But it's different from whether she --

And, you know, if, in fact, she was told that, she can tell us in response to direct questions and give us answers. I didn't understand she had said repeatedly -- she had said repeatedly that she understood this. You asked what she was told and she kept saying she understood instead of what she was told.

MS. JENNIS: She also said she assumed.

THE COURT: And she assumed.

So, now, back to this issue, what brought us up here is this question about whether the government offered her to get a lawyer.

I'm assuming the government hasn't been concerned

about this because you haven't intended to charge her; is that correct?

MS. JENNIS: My understanding is that she was read her rights at the time of the search warrant. These are non-custodial rights that are generally given at an encounter at the service, Judge. They do advise her that she has a right --

THE COURT: Now let's come back, Mr. Kunkle. What's the relevance and admissibility as to whether she's read her rights when she's a witness, not a defendant?

MR. KUNKLE: I don't --

THE COURT: -- I mean the right to counsel. That's the question you asked.

MR. KUNKLE: Well, because she's testifying here today under oath and incriminating herself, Your Honor.

THE COURT: I haven't really -- I rather doubt she has incriminated herself yet.

MR. KUNKLE: Well, she's indicated she worked at the office. She took client information, helped with the money orders. She just said she helped mail money orders.

Benton Hall's picture is up here as being an aider and abettor in this indictment for mailing money orders, Your Honor.

MS. JENNIS: For mailing.

THE COURT: What is the relevance as to whether the

government told her she could have a lawyer? What's the relevance of that, whether they told her she could have a lawyer. What's the relevance of that?

MR. KUNKLE: She's answered -- she --

THE COURT: For impeachment or for anything.

I'm a mechanical guy. Walk me through this. That question gets us something that is either impeachment or probative of some element of the offense.

MR. KUNKLE: That she understands what's going on. But, I'm sorry. She should have probably been provided counsel in this case. And whether or not she had a lawyer --

THE COURT: And the government hasn't -- well, no. There's nothing to suggest the government has the interest in prosecuting her now or earlier. Maybe they do, but I haven't seen anything.

So the question is do I let you ask this question about whether -- if you want -- what's the government position on that? The pending question was: Did the government tell her he could have a lawyer.

MS. JENNIS: The United States actually did, but she was -- it's irrelevant, because what's relevant is whether she received the benefit from testifying.

And giving her a lawyer is -- she doesn't have one. I mean, if she had a lawyer, you can argue that.

MR. KUNKLE: Considering the promises she's been

made.

MS. JENNIS: We haven't.

MR. KUNKLE: You don't need a lawyer. You have --

THE COURT: I've yet to hear what promises were made to her. And this cat's out of the bag about being asked about a lawyer, and so I'm going to let her answer that question.

But you think she was told that. She's not affirming it. We'll let her answer. All right.

(End of discussion at sidebar.)

THE COURT: All right. Mr. Kunkle, would you ask the question again, please, sir?

BY MR. KUNKLE:

Q Ms. Hall, I believe the question I was asking you was:

Did the government ever tell you or ask you if you needed a lawyer?

A I don't recall.

Q And when you're telling us what you understood, that understanding in your mind, it didn't just come out of nowhere. There were words being spoken to you by the government's agents, were there not?

A Well, I mean, I would have -- yes.

Q What did they say to you?

A Well, I mean, if I cooperated, that there -- they didn't say whether there would be charges brought on or were; but if I cooperated, it would be in my favor to do so.

Q And from that you took to mean if you cooperated, you would not be charged?
A I took it that way, yes.
Q Did they ever say you would be charged?
A No.
Q Did they ever say you could be charged?
A I don't recall that. I don't recall.
Q And so they never explained to you --
MS. JENNIS: Objection, Your Honor. Asked and answered.
THE COURT: Sustained.
BY MR. KUNKLE:
Q So as you sit up there today, you pretty much feel safe that you're not going to be charged, correct?
A No, not -- no.
Q Oh. So you still think you could be charged?
A At this point, yes.
Q Did you meet with the government in the last week or so?
A I did.
THE COURT: And, Ms. Hall, would you please try to speak into the microphone.
THE WITNESS: Oh.
I did.
BY MR. KUNKLE:
Q They came to your house, correct?

A Correct.
Q And what did they come to your house for?
A To go over my testimony.
Q And when they did that, who came?
A Kathleen Neri.
Q Agent Neri?
A Yes.
Q Who else?
A All three and Adams Nixon.
Q So Agent Nixon from the FBI came to your home?
A Yes.
Q And when was this? Just last week?
A Correct.
Q And they said they wanted to go over your testimony?
A Right.
Q And at that time did you have a conversation with any of those four people, Ms. Edelstein, Ms. Jennis, Agent Neri, Agent Nixon about your testifying and whether you would be charged or not? Did that ever come up?
A No.
Q So at that time that issue was gone and you were done with that, right?
A Well -- correct.
Q Now, you met originally then with Agent Neri and Agent Nixon among other people on April 23, 2013, right?

A Correct, and one other person.
Q And it was perhaps maybe Iris Bohanon from the IRS?
If you don't know her name, that's okay.
And you talked to them at length that day, right?
A Yes. I would say for about an hour, maybe longer.
Q Did you see them taking notes?
A I don't recall.
Q Did they ever show you any reports that they wrote from the time you talked to them?
A No.
Q When you met with the government last week, did they show you any reports?
A No.
Q Have you ever seen any reports at all of what you supposedly told them?
A No.
Q So when they came to prepare your testimony last week, did you see them with any paperwork that they were asking you about?
A Yes.
Q Did you get a chance to look at that paperwork?
A Yes.
Q And what did you get a chance to look at?
A At everything we just took a look at right now.
Q The exhibits?

A Yes.
Q But they never showed you a report that said Memorandum of Interview or anything like that?
A No.
Q They never asked you to look at anything such as an FBI report and asked you if that's exactly what you said?
A No.
Q Do you remember the session last week and how it went with them? I mean, is that all you talked about?
A Yeah. My just going over my testimony.
Q Was that the only time you met with them to go over your testimony?
A Yes.
MS. JENNIS: Objection. Asked and answered, Your Honor.
THE COURT: Well, the answer may stand.
BY MR. KUNKLE:
Q When you first started working for your dad, you knew that he was doing seminars, right?
A Yes.
Q Did you ever attend one of those seminars?
A One.
Q What do you remember hearing at that seminar, among other -- I'm not asking you for everything, but what stood out in your mind that you heard at that seminar?

A Oh, gosh. I honestly don't recall at this point.
Q Do you remember hearing from your dad things like "don't be a debtor"? Things like that?
A Yeah. Always.
Q Always.
He wrote you letters when you were in prison and said: Don't be a debtor. Come out and be free, right?
A Correct.
Q And did you understand everything your dad was talking about in terms of debt and elimination of debt?
A Not everything, no.
Q Tell us what you did understand?
A When I was in prison or --
Q No. I'm sorry. Not when you were in prison. But as you sit here today, tell us what you understood about how this debt elimination worked?
A Basically, there are ways to pay off your debts other than moneys, I guess. I'm confused about the whole thing now. I have had -- I don't know.
Q What are you confused about, Ms. Hall?
A Just -- I mean, everybody has said something, one thing. I mean, I'm just confused about the whole being a debtor basically.
Q Did you ever get any understanding of what it meant -- how it was connected to a social security number?

A No, not that I recall. I mean, I could have, but it was two years ago and a lot has happened in two years.

Q You used to prepare paperwork called a A1-A and an A1-B, a Notice of Claim. Does that sound familiar?

A Yes.

Q If we could have Exhibit 7, Mr. Sommers.

Ms. Hall, while you're looking at that, I want to ask you a couple questions about the e-mail.

Did you give any copies of your e-mail to the government?

A Did I give my copies to them?

Q Yes.

A No.

Q So when you first saw that e-mail again, they showed that to you, correct?

A Yes.

Q Okay. With all the attachments that you just looked at in Exhibit 11, right?

A Yes.

Q Now, in Exhibit 7 there's some different documents there like Notices of Claim and Administrative Judgments and so forth, correct?

A Yes.

Q And you would help fill those in, correct?

A Correct.

Q And then you would be part of mailing that out, correct?
A If my name was on them as the presenter, then, yes.
Q And you wouldn't have done any of that if you thought you could get in trouble, correct?
A Correct.
Q And, in fact, after this search warrant was done, you were somewhat perturbed or angry that you could have gotten in trouble for this, correct, because you didn't know?
A Can you repeat that?
Q Well, sometime when you met with the agents, you conveyed to them you didn't think your dad would put you in a position where you could get in trouble for this, did you?
A No, I didn't.
Q I mean --
THE COURT: I'm sorry. The answer is not clear to me. Could you answer the question again, please?
THE WITNESS: Oh, no. I did not think I could get in trouble.
BY MR. KUNKLE:
Q For what you were doing?
A Correct.
Q Just as you sit here today, looking back on what you were doing and your brother Benton was doing, Brighton was doing, did you think what you were doing was illegal at that time?
A No.

Q Did it work?
A I haven't seen it go through all the way. We never got to that point; so, no.
Q So when you would mail in one of these Privately Registered Setoff Bonds, perhaps to the IRS, did you ever do that?
A Did I ever mail them out?
Q Yes.
A Yes.
Q Did you ever see if anybody got their tax debt discharged?
A Well, no, because the whole process was not finished completely.
Q And the process involved this separate Administrative Judgment, correct?
A Correct. And then it --
Q And there was a court, right, that Brandon Adams had a court that he ran?
A He did.
Q It was called the International Court of Claims?
A Correct.
Q And that was a court that Brandon Adams had sent up with your brother Benton became an adjudicator?
A Yes.
Q You recall that, right?
A I do.

Q And whatever was a debt between you and the IRS could be settled in this court by an adjudication with Benton or Brandon Adams, correct?
A I was never really fully explained the International Court of Claims deal, so I don't -- I could not tell you. I don't know.
Q When your dad did these seminars, did people come to the home at Presidio Circle for those seminars?
A Seminars? No.
Q Was in an emersion program at one point in time when ten or fifteen people came to the house for a long weekend?
A Not ten or fifteen, but there was emersion programs.
Q Tell us about what, if you will. What do you remember about the emersion program?
A Well, maybe one person at a time or there could be two people, but they would come and just sit and listen. And I don't really -- I was normally at the office, so I don't really know what would go on at the house with them.
Just they would sit and listen to my dad on phone calls and then some would come to the office and those would be the ones if they had a problem, they would sit down with one of the people that worked there, myself, and we'd start their process.
Q And the process would be creating these templates and getting this information?

A Correct. Correct.

Q The Notice of Claim?

A Correct.

Q And then presenting it?

A Correct.

Q And if they didn't respond back within 30 days, it was defaulted or they were in dishonor, correct? Does that sound familiar?

A A little bit. There was more in between that time frame, but, yes.

Q Explain to me what you understood to be more between that time frame?

A Well, we had the Notice of Claim. And then we would wait a certain amount of time.

And then the second step.

And then there would be the third step.

Q If I may stop you there, what was the second step, if you remember?

A It was the A1-B process. But I think with these Notice of Claims I'm not -- I know on our old ones before these ones, there was A1-A, A1-B, and then so forth on the Notice of Claim.

And then there would be like the Notice of Tender for Setoff and I can't recall the third one. And then there was -- there was certain times in between where amount of days

we would wait till we would send out, you know, the next step and then the next step.

And it just kept changing to -- and Brandon came in with this new process and --

Q What was the new process that Brandon came up with, if you remember?

A The one that's in Exhibit 7.

Q And "Exhibit 7" meaning the -- what in Exhibit 7 was the new process that Brandon brought?

A The Notice of Claim. Then came the money orders.

Q Now, with respect to those money orders, the information -- before you got money orders, you would talk to the individual clients to make these money orders?

A Well, I didn't make them. These were clients that we already had their information.

Q Do you remember the name Karen Street?

A I do.

Q Was she one of the clients?

A She was.

Q And you worked on their paperwork or her paperwork?

A I sent out some of her paperwork, yes. I don't believe I worked on her actual paperwork that was for her house, but I did send in and work on some of her court paperwork, yes.

Q One question after. Was there a belief that this was all outside the jurisdiction of the United States when you were

working on this with the company?
A Can you repeat that?
Q Let me ask you differently.
From what you understood, there was a belief that this was somehow outside the jurisdiction. It was a private administrative proceeding.
Did you ever hear that?
A Yes. Well, private. I don't know if it was out -- I don't ever remember recalling outside of the jurisdiction, because I don't really know what that means.
Q Do you see that big seal up there behind the judge that says District of Arizona, United States?
A Yes.
Q You know what the United States is?
A I do.
Q So this Court of Claims that Mr. Adams came up with, was that part of the United States system?
A I have no idea because I was not filled in on any of that really.
Q Did you ever hear them talk about it?
A I did, yes.
Q And what did you hear?
A Just them trying to get it put together, but it was going to be the adjudicator -- and whatever that meant, I don't know. And that's about as far as it went as far as I knew.

Q You were in charge of supervising other employees, correct?
A Correct.
Q Making sure that they worked the hours they said they worked and everything else, right?
A Yes.
Q Did you ever hear the name Jack Smith?
A Yes.
Q And who was Jack Smith?
A Jack Smith was someone we all consulted with and my dad talked with to get advice from or to help word documents differently. I guess kind of a -- I don't really know how to explain it.
Q What did your brother Benton do?
A Benton was -- Benton pretty much checked the paperwork after we would put it together. It would go to him to be looked at for final reviews.
Q And so when you were e-mailing him -- this is Exhibit 11. When you would e-mail him to check everybody's documents, is that what his role was in this, among other things?
A Yes, among other things, yes.
Q Do you remember what other things he did?
A Well, he did a lot of things. I couldn't really -- I mean -- he ran errands. He did everything. He pretty much oversaw everybody at the office to make sure I was doing my

job and my job was to make sure everyone was doing their jobs.
Q Did you believe in any of this, Ms. Hall?
A I did.
Q You did? What did you believe?
A Well, I believed it would -- it was working the way it was explained and some of the things that I witnessed and saw that it worked.
Q And what did you witness?
A Well, not witness, but, you know, or heard about in some of the other people's cases. And it just -- it's kind of like right here.
Q I'm sorry?
A I saw things that didn't work and I saw people's cases when they went to court that it did work, so.
Q Your dad told you there was nothing wrong with it, right?
A Correct. I mean, I don't know if he ever said those exact words, but, you know, the way he explained it was that there was -- wasn't doing anything wrong.

MR. KUNKLE: I have nothing further, Your Honor.

THE COURT: All right. Any redirect?

MS. JENNIS: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. JENNIS:
Q Ms. Hall, Mr. Kunkle asked you a little bit about your dad's beliefs in the government.

Did your dad drive a car?
A Yes.
Q To your knowledge, did he have a driver's license?
A Yes.
Q Okay. Can you tell us a little bit more about the hierarchy of the office?
A What do you mean?
Q Well, who was in charge?
A Of the office or?
Q Who was in charge of your dad's business?
A My dad.
Q Okay. And then who would be kind of underneath him?
A Benton.
Q Your brother?
A Uh-huh.
Q And how about underneath Benton?
A Well, then came me.
Q And then the other employees?
A Correct.
Q So you were underneath both your dad and your brother Benton?
A Yes.
Q And how about where would Brandon Adams fit in?
A Probably right beside my dad.
Q Maybe like a partner with your dad?

A Yeah.
Q Something like that?
Who trained you to do your job?
A Well, Benton and Erin and my dad.
Q And when you -- you mentioned that you and the other employees were paid in cash. Do you know if the clients paid for the work you did?
A I have no idea. I didn't deal with that.
Q Well, you might not know how much they paid, but do you know if they did pay?
A Well, I couldn't say they did pay because I -- I mean, I don't know what my dad had worked out with them. I couldn't say.
Q So any arrangements they had were with your father?
A Correct.
Q Okay. They didn't have any arrangements with you?
A No.
Q You talked a little bit about -- Mr. Kunkle was asking you about all these different steps and how there was a long process?
A Uh-huh.
Q With the money orders there was no other step, there was just the money order?
A You know, I had my baby the day before. It was never fully -- so I don't really know, because a lot happened right

before I had my son. And so I don't know if whatever else went out with those.

Q Do you know if any other of the office staff was charged?

A I don't know, no.

Q And you actually had an opportunity to speak with Mr. Kunkle over the telephone?

A I did.

Q And when you met with my office and the agents, we told you that it was very important to tell the truth?

A Correct.

Q And when you met with us, we never told you what to say, did we?

A No.

MS. JENNIS: I don't have any further questions. Thank you.

THE COURT: All right. Counsel, may Miss. Hall be excused?

MS. JENNIS: Yes. Yes, Your Honor.

MR. KUNKLE: Yes, Your Honor. I have a motion, please.

THE COURT: All right. Before we excuse her or after?

MR. KUNKLE: After we excuse her.

THE COURT: All right.

Ms. Hall, I instruct you not to discuss your

testimony with anyone except the lawyers in this case until the trial is over. With that you are excused.

Thank you. You may come up to sidebar.

(At sidebar on the record.)

**DEFENDANT'S MOTION FOR MISTRIAL**

THE COURT: All right. Go ahead, Mr. Kunkle.

MR. KUNKLE: Your Honor, I move for a mistrial. Ms. Jennis' last two questions there put the imprimatur of the government behind like as if what she's saying today is the truth. And, you know --

THE COURT: That's clearly appropriate redirect after you -- you opened the door to that and suggested that there may well be some impeachment or suggestion of something other than true. So --

MR. KUNKLE: I did not suggest in my cross-examination she was told to lie by the government. I was told that she was given promises and there's a distinct difference.

THE COURT: This is entirely appropriate.

Do you want to say anything?

MS. JENNIS: It's appropriate, Judge. She was told to tell the truth. He went on and on how many times she met with us and that she could be facing charges.

THE COURT: Okay.

MR. KUNKLE: That's different from --

THE COURT: No basis whatsoever for a mistrial. Entirely appropriate questions.

Denied.

(End of discussion at sidebar.)

THE COURT: All right. The government may call its next witness.

MS. JENNIS: Yes, Your Honor. We would call Agent Nixon to the stand.

THE CLERK: State your full name for the record and spell your last name.

THE WITNESS: Adam Harris Nixon. N-I-X-O-N.

(Witness duly sworn.)

THE COURT: All right. We'll continue until about ten minutes after 3:00 and take the break then.

So, please proceed.

**AGENT ADAM HARRIS NIXON, WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. JENNIS:

Q Good afternoon, Agent Nixon. Can you tell the jury what do you for a living?

A Yes. I'm a special agent with the Federal Bureau of Investigation.

Q How long have you been with the FBI?

A Approximately, five years.

Q And where are you currently -- where have you been

assigned since you have worked there?
A Since coming out of the Academy I have just been in our Phoenix Office.
Q And what type of cases have you worked since becoming a special agent?
A I started off working gang and drug investigations and then moved on from there to doing sovereign citizen extremism and militia extremism.
Q And what did you do before you joined the FBI?
A I was an Army officer for about four years.
Q For four years. And are you familiar with a gentleman named Gordon Leroy Hall?
A Yes, I am.
Q And how did you become familiar with him?
A We initiated an investigation at the FBI after we received information from other divisions of the FBI. They had passed information to us that they had learned in their investigations.
Q And have you ever come in contact with Mr. Hall before?
A No, I have not.
Q So you have not met him before?
A Not before our investigation, no.
Q How about after the investigation?
A In person, no.
I'm familiar only with through my investigation of

the case.
Q Well, are you familiar through your investigation where Mr. Hall was living in March of 2013?
A Yes.
Q And how do you know where he was living?
A We conducted surveillance of his residence and we conducted open source database --
MR. KUNKLE: Objection, Your Honor, to the witness using "we."
What he did, I think, is most appropriate.
THE COURT: Hold on.
Well, Agent, please answer with respect to what you know from your own activities.
THE WITNESS: Yes, Your Honor.
I received information from individuals in my office that had conducted surveillance at his residence. I conducted surveillance there on an occasion myself. And I received information of open source database checks that showed that Mr. Hall resided at 3546 Presidio Circle, Mesa, Arizona.
BY MS. JENNIS:
Q And can you describe the community that the Presidio address is in?
A Yes. It's a gated community on the north side of Mesa. There are several very nice houses in the community. It's a -- the house backs up to a ridge that overlooks an orchard.

Q And were you ever involved in a search warrant of the Presidio residence?
A Yes, I was.
Q And when did that occur?
A That was on March 14th of 2013.
Q And can the witness be shown -- or actually, I'm sorry.
Right in front of you should be Exhibit No. -- let's see -- Exhibit No. 19. If you could take a look at that and that should be a one-page exhibit.
Do you recognize that exhibit?
A Yes.
Q Well, you should just look at the first page.
A Okay. This is a picture of a residence that we did a search warrant that this residence belonged to Brandon Adams.
Q Okay. Would you take a look at -- well, actually, this should be Exhibit No. -- are you still looking at 19?
A It might be placed in the folders incorrectly.
Q Do you have a folder 18 in front of you?
A I have 19 and 20, but the folders were backwards.
So now I'm looking at 19.
Q And do you recognize the photograph in 19?
A Yes. This one is a picture of the front of the residence on Presidio Circle that we did the search warrant.
MS. JENNIS: I would ask now that Exhibit 19 be entered into evidence.

MR. KUNKLE: No objection, Your Honor.

THE COURT: Exhibit 19 is admitted.

(Exhibit No. 19 admitted in evidence.)

MS. JENNIS: So when you -- can we just publish that picture, Your Honor? Thank you.

BY MS. JENNIS:

Q So you were involved in a search warrant on March 14, 2013, of this residence. And when you were involved in that search warrant, did you determine that this is where Gordon Hall lived at the time?

A Yes, I did.

Q In the neighborhood that you just described, the gated neighborhood in Mesa?

A Yes.

Q And when you did the search warrant, were any documents or other items found in the house related to Gordon Hall's business?

A Yes. We seized a number of items of evidence from the house, including documents and other items.

Q And can you describe where in the house --

Well, first thing, can you tell the jury a little bit about this house and the size and how many floors it has?

A It was a large residence approximately 9,000 square feet. It had a main floor, a second story above, and a basement below. Also, it had an attached RV garage that was on the

premises with a small apartment above.
Q There was an apartment above the garage?
A Above the RV garage, correct.
Q When you say "RV garage," is that the kind of garage that just fits one RV in it?
A It had two doors. One of the doors was for an RV and the other door was for regular-sized vehicles. I can't remember if it was a single- or double-car door on that one.
Q And did you determine who lived in the residence above the RV garage?
A Yes. That was Gordon's son Benton Hall.
Q Now, can you tell the jury a little bit about where the documents were found or other items found that are related to the business that Gordon Hall was engaged in?
A Yes. There were documents in a number of places in the house. The majority of them were found in a space that was -- looked to be Gordon's office. It was on the main floor of the residence.
We also found documents in the dining room, in the kitchen, there were documents in Benton's apartment area, and then in the master bedroom as well.
Q So there were documents in several of the areas all over the house?
A That's correct.
Q And did you get a chance to seize those items?

A Yes, we did.
Q And you reviewed them?
A Yes.
Q Did you -- could you take a look -- and I'm sorry. I don't believe that you have this in front of you, but I can publish it for the jury. Exhibit Nos 11 and 12. I want to put on -- I'll just put on the screen Exhibit No. 11. You're looking at page 1.

As you can see, that's an e-mail from Benton Hall to Shannon Hall. Do you recall -- have you seen this document before?
A Yes, I have.
Q Do you recall where it came from?
A We received this from a search warrant that we -- that we submitted to Google and this was part of the return.
Q All right. And I'm now going to show you what is Exhibit No. 12. It's page 1. If you could take a look at your screen. Do you recognize this exhibit?
A Yes, I do.
Q And do you -- is this one of the -- do you know where this exhibit came from?
A This was also received in that same search warrant.
Q Okay. Now, if you could, could you take a look at Exhibit No. -- I believe now 20. You might have been looking at that before, but now we have Exhibit No. 20 which I think is more

than one page, correct?
A Yes. That's correct.
Q It is four pages, in fact. Do you recognize that exhibit?
A Yes. Now I am looking at the picture of the residence of Brandon Adams.
Q Okay. Were you involved in a search warrant executed at Brandon Adams' residence?
A Yes, I was.
Q Now, did Brandon Adams own this residence?
A No. This was a rental house. And the house, we learned from interviews, was actually rented by Mr. Hall for Mr. Adams.
Q By which Mr. Hall?
A By Benton Hall.
Q Okay. And what is the -- what is the address -- were you ever involved in a search warrant executed at the residence depicted in Exhibit No. 20?
A Yes. We conducted a search warrant on this property on May 4th of 2013.
Q And what is the address of that property?
A If I can recall, it's 7158 Sandia Circle. I think it's East Sandia Circle.
Q And is that in Mesa, Arizona?
A Yes. It's also Mesa.
Q Take a look at Exhibit 20. What is that?

A It's a single-floor residence. It has a --
Q Well, what is Exhibit 20? Are they pictures?
A They are pictures, yes.
Q Are they true and accurate pictures of that residence as you saw it on May 4th, 2014 -- 2013?
A Yes, they are.

MS. JENNIS: I would move now for Exhibit No. 20 to be admitted into evidence.

MR. KUNKLE: No objection, Your Honor.

THE COURT: Exhibit 20 is admitted.

(Exhibit No. 20 admitted in evidence.)

BY MS. JENNIS:

Q All right. So we're looking at page 1 of Exhibit No. 20.
Can you just tell the jury about this residence.
A So page one shows the front of the residence, the entryway into the house. It's a stone facade on the front. It was also a fairly large, nice-sized residence. It was pretty empty when we searched it. It didn't have a whole lot of furniture in it and --
Q And this is the residence where you executed a search warrant in May of 2013?
A That's correct.
Q Okay. And when you executed that search warrant, did you find anything?
A We did. We found several items of evidence that we seized

from the property; mainly --
Q I'm sorry?
A Go ahead.
Q Could you take a look at Exhibit No. 29. Do you have that in front of you?
A Yes, I do.
Q Would this exhibit -- or first, what is this exhibit?
A This is a sketch done of the residence that's done typically when we do search warrants.
Q And does this sketch -- does it fairly and accurately show the inside of the house on Sandia Circle as it appeared on May 4th, 2013?
A It does, to the best of my ability. I'm not an artist or anything, but.
Q So you drew this sketch?
A Yes, I did.
Q And would this sketch help you describe to the jury where items were seized from?
A Yes.
MS. JENNIS: I would now move to admit Exhibit No. 29, Your Honor.
MR. KUNKLE: No objection, Your Honor.
THE COURT: Exhibit No. 29 is admitted.
(Exhibit No. 29 admitted in evidence.)
BY MS. JENNIS:

Q Okay. Well, if you could, could you explain to the jury a little bit about this sketch because you're not -- it's not accurate or to scale. It is accurate, but it is not to scale, right?

A To scale, correct.

So the bottom of the page represents the entryway into the house. That was that main picture that we saw going in through the courtyard.

After you entered the front door there, there's an open dining room and that's designated room Delta Delta in the center there.

And then off to the left along that hallway, there's a room that's Alpha Alpha and that was an office space. There was a desk, some computers and things in there.

And then, like I said, most of the house was unfurnished. If you go back, Hotel Hotel was the kitchen area.

Are the master bedroom was over in the corner there with Lima Lima.

Q Okay. I want to top you a second.

"Lima Lima." So when you said -- I don't know. Did you mean room KK when you were talking previously?

A Yes.

Q I'm sorry. And so what did you call it?

A So the dining room is DD.

Q Yes?
A The kitchen is HH.
The office area is AA.
The master bedroom was LL.
The garage area was what is designated as KK.
Q Okay. And going back and looking at Exhibit No. 20, on page 2 of Exhibit No. 20, can you tell us what room that is?
A So that's the office room in the sketch was AA and that's looking from the doorway into the office.
Q And in the -- on the left-hand side of that exhibit it appears to be a printer?
A That's correct.
Q And through your investigation what did you determine that printer to be?
A We had been told that --
MR. KUNKLE: Objection, Your Honor. Hearsay.
THE COURT: Overruled.
THE WITNESS: Through our investigation and our interviews we were told that Mr. Adams had a printer that was used to print money orders.
THE COURT: All right. I'm going to sustain that objection. The answer stricken. You can --
MS. JENNIS: Okay.
MR. KUNKLE: Your Honor, could you instruct the jury?
THE COURT: Pardon?

MR. KUNKLE: Could you please instruct the jury to disregard?

THE COURT: And I instruct the jury to disregard that question and answer. You may continue.

BY MS. JENNIS:

Q Did you seize any items from this room?

A Yes. Among the items seized was that printer.

Q Okay. Have you had the opportunity to look at what is marked as Exhibit No. 13 -- that weighs a lot -- previously?

A Yes.

Q Okay. And what is Exhibit No. 13?

A It's that Dell printer.

MS. JENNIS: That you seized from there.

I would now move for Exhibit No. 13 to be entered into evidence.

MR. KUNKLE: No objection.

THE COURT: Exhibit 13 is admitted.

(Exhibit No. 13 admitted in evidence.)

MS. JENNIS: And we can bring that out later.

BY MS. JENNIS:

Q How about looking back to Exhibit No. 20 on page 3. What is that a picture of?

A It's a closeup of the same printer.

Q And how about page 4 of Exhibit 20?

A Page 4 is a picture of two boxes that were found in that

closet of that office space. One of the boxes contained blank stock for certificates; and then the other box contained blank stop for making checks, check stock.

Q One was -- so which box is which, do you recall?

A The box that's on the bottom of that picture, the white box, was the one that had the check stock in it.

Q And the -- I'm sorry. What was the top box again?

A It had blank certificates like you would print out for a Certificate of Achievement or something.

Q Oh, I see. I see.

Did you seize either one of those boxes?

A Yes. We actually seized both of them.

Q Okay. And can you take a look at in front of you? I believe there should be Exhibit No. 14.

Do you recognize Exhibit No. 14?

A Yes. That's the box that has the check stock in it.

Q The box that was depicted in Exhibit No. 20 on page 4?

A That's correct.

MS. JENNIS: I would now move for Exhibit 14 to be admitted into evidence, Your Honor.

MR. KUNKLE: No objection, Your Honor.

THE COURT: Exhibit No. 14 is admitted.

(Exhibit No. 14 admitted in evidence.)

BY MS. JENNIS:

Q Could you take a look at Exhibit 14 for a second, sir?

Is it in the same condition as when you seized it on May 4, 2013?

A Yes.

Q Okay. And can you open it up and tell the jury what's inside.

A It's about several pages, about a ream of blank stock. It looks to be, you know, like the kind that you would print checks on.

Q Okay. And is it -- does it have the same amount in it as when you seized it in May of 2013?

A Yes, it does.

Q And could you do me a favor? Could you tell the jury how large this house was Brandon Adams was renting?

MR. KUNKLE: Objection, Your Honor. Relevance. The size of the house.

THE COURT: Overruled. You can answer that and then we'll take a break.

THE WITNESS: I don't know the exact square footage. I would have to guess on the size, but it was a decently-sized house; three bedroom or so. I would have to look at the sketch to see exactly how many bedrooms, but it was a very comfortable residence.

THE COURT: All right. We'll take a break until 3:30. And I remind the jury of the admonitions.

Do not discuss the case. Do not do any research.

And keep your minds open.

(Open court; no jury present at 3:09 p.m.)

**INSTRUCTION CONFERENCE**

THE COURT: All right. You can step down. Please be seated. The record will show the absence of the jury.

I will hand out my current draft of the instructions and we'll talk about it at the end of the day so you all can take a look at it.

And as you can see, I have left unresolved some of this language disagreements on the substantive offenses.

I think with respect to the 4.9 instruction to be cautious about people -- witnesses who are accomplices or received benefit, I'm thinking the way to deal with that is rather than to come out and say these people did that, to give an abstract instruction that if someone is an accomplice or if they have been given a benefit, then you should be cautious with their instruction.

I remember I did that once with a dispute over whether adverse inference for destroying evidence should be given. And instead of saying "evidence was destroyed," I just gave it in the abstract and I was affirmed on appeal for doing it that way.

So I'm kind of inclined to leave that to the jury to decide whether that's the situation but tell them what would apply if it is.

So we will be in recess till 3:30.

(Recess taken at 3:10 p.m.; resumed at 3:32 p.m.)

THE COURT: Please be seated. The record will show the presence of counsel, the defendant, and the jury.

You may continue.

MS. JENNIS: Your Honor, I have no further questions.

THE COURT: All right. And, Mr. Kunkle, you may cross-examine.

**CROSS EXAMINATION**

BY MR. KUNKLE:

Q Good afternoon, Agent Nixon. How are you?

A Doing well. Thank you.

Q Agent Nixon, you are one of the case agents in this case; is that correct?

A That's correct.

Q You are familiar with a young woman named Shannon Hall, correct?

A Correct.

Q You met with her on April 23, 2013; is that correct?

A The date sounds correct, yes.

Q And it was about nine -- well, approximately about a week-and-a-half after the search warrant was done at the Presidio Circle address, correct?

A Correct.

Q When you met with her that day, with you that day was

Agent Neri, correct?
A Yes.
Q And another woman named Iris Bohanon from the IRS?
A Yes. I believe she was there as well.
Q Prior to speaking with Ms. Hall about anything, do you recall what you told her about this case? I mean, did you tell her why she should speak to you?
A I don't recall. I believe we probably did tell her the nature of the case and what we were going to talk about. That would be something that we would do.
Q She met you at the FBI headquarters up on North 7th Street, right?
A Yes.
Q She came in there voluntarily, right?
A Uh-huh.
Q Did you tell her that she could be charged with a crime?
A I don't remember if I did or not. I did -- I believe I would have informed her that what she had been doing was illegal, yes, but I don't remember if I had told her or not that she could be charged or would be charged.
Q Did you tell her she should cooperate?
A I didn't tell her that she should.
I said -- well, I don't believe so, no; but I would have told her that it might have been in her best interests to. I don't recall.

Q Would the words, "It's in your best interests to cooperate with us," does that sound about what you might have told her?
A That might have been it, but.
Q Do you consider that to be a threat, Agent Nixon?
A No. I do not.
Q Do you consider that to be a promise that if she does cooperate, her best interests would be fulfilled?
A No.
Q Well, let me ask you the question. Her best interests would be -- with respect to this case, not to be charged, correct?
A Yes, it would be.
Q Yes, because she could be facing a lot of time in prison if she were charged, right?
MS. JENNIS: Objection, Your Honor.
THE COURT: It really is speculative.
MR. KUNKLE: I'm just asking him what he understood his words to mean, Your Honor.
THE COURT: All right. Overruled. He can answer.
BY MR. KUNKLE:
Q You just told us that her best interests were not to be charged, right?
A If I was in her shoes, I would not want to be charged. Like I said, I don't recall if I had told her that or not, but --

Q Let me ask you this. Did Agent Neri say something like that to her while you were sitting there with Agent Neri and Ms. Hall?

MS. JENNIS: Objection, Your Honor. Calls for hearsay.

THE COURT: Overruled. You may answer.

THE WITNESS: Again, I don't remember. The stuff that was in the interview I wrote down, but, I mean, that's almost two years ago now.

We had -- we talked to her, you know, very friendly. We weren't trying to get her to do anything, but we wanted to give her the information so that she could make a decision, but I don't recall what exactly was said.

BY MR. KUNKLE:

Q What information did you give her to help her make her decision?

A We told her the nature of the case and why we were talking to her. She asked why we had done a search warrant on the house and why her brother and her dad were in jail.

Q And so you told her she could be charged possibly with passing or making or uttering fictitious instruments, correct?

A I told her the information that we had showed that she had been involved. I didn't say that she could or would be charged, but we did talk to her about the evidence that we had at the time.

Q And to date, just so it's clear, she's not been charged, correct?
A That's correct.
Q Now, Agent Nixon, you're familiar with the idea of sovereign citizens, correct?
A Yes, I am.
Q And, in essence, they believe they do not lie within the jurisdiction of the United States, correct?
A That is correct.
Q And they believe the government is a commercial entity?
A Yes.
Q And in some instances they form their own government, correct?
A Sometimes. There's a broad spectrum of ideologies that people fall under in that sovereign citizen beliefs and some of them will take bits and pieces of it.
Q And they form their own jurisdiction essentially, right?
A Sometimes.
Q You have heard of them having their own courts to adjudicate claims, right?
A Sometimes, yes.
Q And in this case through your investigation, you learned that Mr. Adams had started an International Court of Claims, correct?
A That's correct.

Q And Benton Tyler Thomas Hall, Mr. Hall's son, was one of the adjudicators of that court?

A Correct.

Q For whatever the merit to that court may be, but you have heard of that, correct?

A I have heard of that, yes.

Q And some of the ideas that they have and you are familiar with some of the ideology of it is tied to the nature of the United States government's debt, correct? Some of them?

A My understanding from when I was explained what that court was by Mr. Adams, was that it was a -- they were to resolve -- it is like third-party remedy is what his words were on how to resolve it.

I don't recall the court being involved with moneys for the government, but I think that was a side thing that they had going on. But it was -- he described it as just an adjudication for third-party claims that they could receive a judgment on.

Q You've heard about secret bank accounts for citizens tied to their social security numbers, correct?

A I have heard of that theory, yes.

Q And the theory is that the government keeps a secret account that collects credits in someone's social security number, a secret account at the United States Treasury. Does that sound about right?

A Somewhat. I'm not very familiar with all of the beliefs behind it, but it's pretty close, yeah.
Q And there's some way they can access that account to pay off debt on their behalf?
A Yes.
Q And that the human population is a collateral that the government uses, the United States government uses, the human population, to accrue debts in people's names, correct? You've heard of that?
A I have heard that argument before as well, yes.
Q So that people feel that because they are tied to the debt as a citizen or that they're not a citizen of the United States but -- withdrawn. Strike that.
I must admit, you have only heard of these things yourself, as I have, but does what I'm asking you make sense in your mind? Does that explain it? Maybe you want to explain it better to this jury.
A Well, what you're asking makes sense. The argument and theory itself, to me, makes no sense whatsoever. But the way that you have explained it, the term a "strawman account," yes.
Q A strawman account.
And have you heard of the idea that there's a legal individual and then there is the real individual. But in other words, they refer to themselves in a third person as if

they were a creditor of themselves or they speak for the collateral that is themselves.

Does that sound familiar to you?

MS. JENNIS: Objection, Your Honor. Relevance.

THE COURT: Well, we've already heard testimony about this, so overruled, but I will set limits on this.

MR. KUNKLE: Okay. Very well.

BY MR. KUNKLE:

Q Do you understand the question?

A I do. I understand it that they segregate it into their business entity or commercial entity and then their real identity, yes.

Q And their real -- and just -- you may or may not have heard of this that there is a belief that the way a name is spelled in all capital letters as opposed to small case letters has some significance in identifying those entities?

A Yes.

Q And you've heard of individuals referring to themselves as they are an entity is a trust perhaps or a corporate entity that the government deals with, and then there's the real person over here, that they are like some kind of divided identity.

Does that make any sense to you? Have you heard of that?

A Again, I have heard of it, yes.

Q And, again, I shouldn't use the phraseology that it makes sense to you, because you have told us it doesn't make sense to you, but you have heard of that?

A I have heard of that.

Q In terms of that strawman account, do you know how that's exactly used yourself? Is it used in other context for mortgage, mortgage elimination, debt, things like that?

MS. JENNIS: Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

MR. KUNKLE: Okay. Your Honor, I don't have any further questions for Agent Nixon?

THE COURT: All right. Any redirect from the government?

MS. JENNIS: Just a couple questions, Your Honor.

**REDIRECT EXAMINATION**

BY MS. JENNIS:

Q Agent Nixon, the courts that Mr. Kunkle asked you about, these courts of claim, they're not real, are they?

A No. They're not.

Q Okay. And so there are no secret bank accounts, are there?

A No. There are no secret bank accounts.

Q And he asked you about some strawman information. That's not real either?

A No. Those theories are not founded on any basis of fact.
Q In fact, are these just stories that people make up to get out of debt?
A Yes.

MS. JENNIS: Thank you.

THE COURT: All right. And, counsel, may this witness be permanently excused?

MS. JENNIS: Yes, Your Honor.

MR. KUNKLE: Yes, sir.

THE COURT: All right. Agent, I instruct you not to discuss your testimony with anyone except the lawyers in this case until the trial is over and you are excused. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: The government may call its next witness.

MS. EDELSTEIN: Thank you, Your Honor. The United States calls Brighton Jorgensen.

THE CLERK: State your full name for the record and spell your first and last name.

THE WITNESS: Brighton Nicole Jorgensen. B-R-I-G-H-T-O-N. Jorgensen. J-O-R-G-E-N-S-E-N.

(Witness duly sworn)

THE COURT: All right. You may proceed.

MS. EDELSTEIN: Thank you.

**BRIGHTON-NICOLE JORGENSEN, WITNESS, SWORN**

**DIRECT EXAMINATION**

BY MS. EDELSTEIN:

Q Good afternoon, Ms. Jorgensen.

Are you here today because you were served with a subpoena to appear?

A Yes.

Q If you would please scoot up and talk directly into the microphone.

A Yes.

Q Thank you.

Do I currently live in Phoenix?

A Yes.

Q You work here in Phoenix?

A Yes.

Q Where are you from originally?

A Flagstaff.

MR. KUNKLE: Your Honor, I'm sorry. I'm having a hard time hearing the witness.

THE COURT: Yes. Actually pull the mic a little closer or lean a little closer. All right.

THE WITNESS: Is that better?

MS. EDELSTEIN: Yes.

THE WITNESS: Okay.

THE COURT: Actually, I think if you pull it down and closer to your mouth, that will be better.

All right. Thank you.

BY MS. EDELSTEIN:
Q Ms. Jorgensen, where did you go to high school?
A Coconino High School.
Q Is that in Flagstaff?
A Yes.
Q And what year did you graduate?
A 2012.
Q Do you know an individual by the name of Gordon Hall?
A Yes.
Q Do you see Mr. Hall in the courtroom today?
A Yes.
Q Would you identify him by describing where he is sitting?
A On the left side of the room in orange.

MS. EDELSTEIN: Your Honor, may the record reflect an identification of Mr. Hall.

THE COURT: The record will so reflect.

BY MS. EDELSTEIN:
Q When did you first meet Mr. Gordon Hall?
A Summer 2010 -- 2009 maybe.
Q Were you still in high school at the time?
A Yes.
Q Okay. Is Mr. Hall a friend of your family's?
A Yes.
Q Is he a friend of your parents?
A Yes.

Q Is that how you met Mr. Hall?
A Yes.
Q Okay. And were the Hall family -- was the Hall family and your family, were they family friends?
A Yes.
Q Did you visit each other during the time you were in high school?
A Yes.
Q How frequently?
A They came to our house on Christmas and we went to their house Thanksgiving.
Q So you spent holidays together?
A I mean those two holidays and we would come down and see them.
Q And when you say "see them," who was it that you would be visiting with?
A I primarily visited with Benton, but we would come down and see the family.
Q Benton Hall?
A Yes.
Q Okay. And during the time you would come down to visit, where were the Halls living here in Phoenix or in Arizona?
A Presidio Circle.
Q Has Mr. Hall lived in Presidio Circle for as long as you have known him?

A Yes.
Q Did you ultimately move down here to Phoenix?
A Yes.
Q Do you recall when that was?
A 2012.
Q Do you remember what time of year it was?
A July.
Q So would this be after you graduated from high school?
A Yes.
Q Okay. And why did you move down to Phoenix?
A To get to warmer weather.
Q And when you got here in July of 2012, what did you do?
A I worked at a restaurant and --
Q So you began working down here?
A Yes.
Q What part of town were you working in?
A Scottsdale.
Q At some point did you begin working for Gordon Hall and his company?
A Yes.
Q Do you recall when that was?
A November -- November.
Q Would it be November of that same year 2012?
A Yes.
Q And why do you think it was November?

A Well, it was around Thanksgiving.
Q So you remember that you probably began working for his company sometime around Thanksgiving 2012, several months after you moved to Phoenix?
A Yes.
Q Now, what was Gordon Hall's company called when you started working there?
A It was a contracting firm, I think -- I don't recall exactly.
Q Okay. Where was the business located?
A In Mesa.
Q Do you recall the street it was located on?
A Greenfield.
Q Greenfield Street.
And now, was that a private residence or was it an office building?
A It was an office building.
Q And was there a sign out front for the business, the name of the business?
A No. They -- they were a shared building.
Q Okay. And how would you describe the building? Was it a nice office space?
A Yes.
Q Okay. And roughly how big was it?
A I don't know. It was enough space for -- I don't know. I

don't know how to answer that.
Q You would describe it as a nice office building?
A Yes.
Q And you worked in that building?
A Yes.
Q Did you ever work -- when you were working for Gordon Hall's business, did you ever work anywhere other than that office space on Greenfield Street?
A At the house, but.
Q Did you work -- the house. Are you referring to the Presidio Circle house?
A Yes.
Q Would you work there on a daily basis or the office?
A Office.
Q Okay. So why would you need to go to the house?
A My dog was there. I left my dog at the house during the day so that she wasn't alone in an apartment.
Q So what's the proximity of the Presidio house and the business location?
A A few minute drive, not very far; five minutes.
Q So they're pretty close together?
A Yeah.
Q And if you can describe for the jury, what was it that the business did, Gordon Hall's business?
A It was paperwork. Documentation for people. Different

things that went out in the mail. I mean, I -- it was a long time ago.
Q Did the business have clients?
A Yes.
Q Okay. And did the business provide a service to these clients?
A Yes.
Q What was that service?
A It was setting off different issues if it was like IRS or if it was something criminal.
Q Okay. So -- well, let's break that down.
So a client would come to Gordon Hall's business if they had a problem. You just described it as a problem. What sorts of problems?
A There were different problems. I mean, everybody has different issues. I mean, it wasn't all the same thing. Sometimes it was a credit card bill that, you know, was not paid or taxes, mortgages on homes.
Q So you're talking about debts?
A Yes.
Q So if a client had a debt that they needed assistance with, they could come to Gordon Hall's business; is that right?
A Yes.
Q Okay. Now, you don't recall the specific name of the

business; is that right?
A Correct.
Q But the business itself, was its purpose consistent the entire time you were working there?
A Yes.
Q Okay. And it all had to do with helping clients with debt issues?
A Yes -- well, contracting claimants, just different things. I mean, there was other things as well, but --
Q Well, what other things?
A Like getting a sex offender charge removed or brought down because it was somebody peeing in the woods.
Q Okay. So you're talking about a criminal case; is that right?
A Yes.
Q Were there -- did clients come to the business with IRS issues?
A Yes.
Q Did clients come to the business with criminal case issues?
A Yes.
Q How about civil cases?
A Yes.
Q Okay. During the time you were working there, primarily what was the issue for most of the clients that you saw?

A I mean, there were a few child support ones. There were ones for, you know, criminal, but there were other ones. A lot of it was debts.
Q Okay. By "debts," are you talking about any specific kind of debt? Could it be IRS debt? Is that one of the major issues that clients had?
A Yes. That or like bill -- like credit card debt, just asset difference, I guess.
Q Now, when you started working for Gordon Hall's business, how many other employees were working there?
A Five.
Q Can you name them?
A Mary Mota, Christopher Conover, Shannon Hall, Benton Hall, and Gordon.
Q Gordon Hall?
A Yes.
Q How about Nicole Perry?
A Oh, yes, Niki. Sorry.
Q She was also working there at the time?
A Yes.
Q Okay. Now, you just said also that Gordon Hall was working at the business; is that correct?
A Yes.
Q Okay. What was Shannon Hall's role at the business when you started working there?

A She was like the presenter.
Q What do you mean by "presenter"?
A She made sure that the stuff went to the Post Office and she helped out around the office.
Q Okay. What about Mary Mota?
A Everybody had similar roles. It was like data entry.
Q Data entry by hand?
A Yes.
Q On what?
A On the computer.
Q Okay. So it was data compilation --
What types of stuff was compiled on the computer?
A There were different documents and like different mailings that went out and it was just putting in the correct information for who the specific client was.
Q Okay. Now, did Shannon Hall do any of that?
A Yes.
Q Did Mary Mota do any of that?
A Yes.
Q Okay. How about Benton Hall?
A Yes.
Q Did Benton Hall have any other responsibilities at the business other than this data entry on the computers?
A Well, I mean, it was all basically the same. There were more like verbiage things that were tweaked depending on what

the issue was or what needed to be involved.
Q So as to the specific documents, Benton had a role in changing language on those documents?
A Yes.
Q What about Nicole Perry? What did she do?
A Just like the document entry or whatever you were saying, data entry.
Q Okay. This was all entered on computers, right?
A Uh-huh.
Q Okay. Now, what was Gordon Hall's role at the company?
A He talked to a lot of the clients. Delegated -- didn't necessarily delegate, but just let us know what was going on with what and who needed what.
Q Okay. So was he operating the business as far as you could tell?
A Yes.
Q Okay. Did you recognize him to be, say, the boss of the business?
A Yes.
Q Okay. Was there an individual working at the business named Brandon Adams at the time you worked there?
A Yes.
Q Was he physically at the office location?
A Sometimes.
Q Okay. But where -- so when you say "sometimes," what do

you mean by that?
A Well, right when he came to Arizona, it was when the search warrant was executed and people were arrested and so --
Q Okay. But not in the context of that date, but when you first started working at the business, how did you know who Brandon Adams was?
A I went to a seminar that they have Community Leadership Foundation, New Mexico.
Q So it was in New Mexico?
A That's where I met Brandon Adams.
Q Okay. Now, at the time that you started working for Gordon Hall's company around November 2012, Brandon Adams wasn't physically in Arizona; is that right?
MR. KUNKLE: Objection. Leading. If we can have some direct examination?
THE COURT: Well, let me take a minute to tell the jury. I know you sit through these trials and we talk about these things and it must be frustrating to you. So let me take a minute just to explain some of these rules of evidence.
The objection here is the question as leading.
A leading question is a question that suggests what the answer should be.
So if you ask: What color was the light when your vehicle entered the intersection?
That's an open question, that's not leading.

But if you say: Wasn't the light red when your vehicle entered the intersection?

That's a leading question.

The Court has discretion to allow leading questions for certain background things to speed up getting to the important things.

But leading questions in general are not allowed except for cross-examination and certain other circumstances. That's what we are doing here.

And in my discretion, I will allow that question as a background question, so you may answer the question or you may reask it.

BY MS. EDELSTEIN:

Q Thank you, Your Honor.

Where was Brandon Adams living when you began working for Gordon Hall?

A In New Mexico.

Q What were your primary responsibilities when you started working for Gordon Hall's company?

A I went over to organize.

Q What do you mean by that?

A I was organizing the mailings or the documents as organizing them and getting everything straightened out and that's the original purpose of me starting there.

Q Okay. So in November of 2012, you began -- you went to

the office to organize files?
A Yes.
Q Okay. And were you filing documents in filing cabinets?
A Yes.
Q Okay. What else were you doing?
A I was also uploading them to a cloud. I was helping try to get rid of -- I don't know -- the clutter and having to go back and touch something if you could just access it on your computer.
Q So you are describing a process of getting the documents to electronic form?
A Yes.
Q Okay. Are you a notary?
A Yes.
Q When did you become a notary?
A November or December of 2012.
Q After you started working for Gordon Hall?
A Yes.
Q Why did you become a notary?
A For my job. To help.
Q Was it your idea to become a notary?
A No.
Q Who asked you to become a notary?
A Benton Hall.
Q Did he tell you why?

A To help notarize documents. I mean, it was a job.
Q Okay. But specifically, as to going out and becoming a notary, did you have to do certain things to make that happen?
A Just the paperwork that everybody else does.
Q Okay. And you did that after Benton Hall asked you to become a notary, correct?
A Correct.
Q So what did you do after you did become a notary?
A I would notarize signatures from -- if it had gotten in the mail or not. But it was only -- I mean, I primarily didn't do that. Primarily, Niki -- or Nicole Perry notarized the documents.
Q She was also a notary in the office?
A Yes.
Q Okay. With respect to your duties as a notary, did you ever use that outside of the office?
A I think maybe twice.
Q Primarily, you used it for your work at the office; is that right?
A Yes.
Q Okay. Did Gordon Hall's company submit documents to the IRS on behalf of clients?
A Yes.
Q And what type of documents did the business use when you first started working for the company in November 2012?

A The surety and indemnity bond.

Q Are you familiar with the phrase "Privately Registered Setoff Bond"?

A Yes.

Q Okay. What is that document?

A It was -- it was a document and I believe if it's the document that I'm thinking about, it was filed with the UCC Code.

Q That was a notation listed on the document?

A Yes.

Q Was this a type of document that the company sent to the IRS?

A Yes.

Q Okay. And that was when you began working there; is that correct?

A Yes.

Q Are you familiar with a document called a Notice of Claim?

A Yes.

Q What is that document?

A It was the first document that went out in the series of mailings, basically trying to settle whatever had been existing claim was.

Q So in the series of documents that the company would send out on behalf of clients, generally a Notice of Claim was the first?

A Yes.

Q Okay. Now, are you familiar with the document called an Affidavit of Service?

A Yes.

Q What is an Affidavit of Service?

A Basically, showing at the end of every mailing there would be an Affidavit of Service with a jurat on it. I mean, basically stating that the person that had mailed it out being that presenter had deposited it to the Post Office and then that was what would be notarized.

Q So it was a document used with mailings?

A Yes.

Q Every mailing?

A Yes.

Q Okay. Now, these documents you've just described, were these the type of documents that the business generated?

A Yes.

Q Okay. Now, you talked about data entry before when you were describing the roles of the different employees.

How does that data entry relate to these documents you just described?

If you were asked to enter information and create a promissory -- or a setoff bond, what was your job to do to create that document?

A Input the names and the social security numbers and the

addresses.
Q All right. And did you do that?
A Yes.
Q Did other office staff do that as well?
A Yes.
Q And where did the office staff get the individual client's names, social security numbers, other information?
A From the clients.
Q Okay. Did you have to say you were going to create -- you were going to enter that information in the document. Would you get it from the client every time you created a document?
A Yes.
Q Okay. So you would call a client up every time for a social security number?

MR. KUNKLE: Objection, Your Honor. Leading.

THE WITNESS: You kept a record --

THE COURT: Overruled. You can answer -- you may answer.

THE WITNESS: You kept a record of it once you had it, but it was all at the discretion -- it was at the discretion of the client.

BY MS. EDELSTEIN:
Q Okay.
A I couldn't just grab a computer and start typing stuff up because it's not for me.

Q Okay. So did you ever create a document that you weren't told to create?

A No.

Q Okay. Who told you to make the document?

A The client requested it and then we expedited it as a company.

Q So who would the -- would the client call you and request the document?

A Sometimes.

Q Okay. Now, going back to the --

Well, let's just take, for an example, a Notice of Claim document. You said it was the first in a series; is that right?

A Yes.

Q Now, you just described that a client might call up and say that they wanted to -- what would they say to start the process?

A They would talk to -- I didn't talk to new people, so I can't exactly answer your question.

Q You never spoke to a client about starting a new process?

A No, because it didn't go through me.

Q Who did it go through?

A Gordon Hall or Benton Hall -- or I'm saying Gordon Hall or -- I don't know.

Q Explain if you would, would Gordon Hall type up these

notices of claim?
A No. We did.
Q When you say "we," who are you talking about?
A Office staff.
Q Okay. How would an office staff member such as yourself create this document once they were told to create it in the steps?
A Input the data. Have the information. And if need be, go on PACER and look up the docket sheet. Figure out what exactly is going on. Input the data and then that was pretty much it.
Q Was it a form that you entered the information into?
A They were templates where documents with verbiage in there.
Q Okay. Now, describe for the jury what these templates were.
A They were basically the same document. The verbiage was changed depending on what was needed by the client and then it was sent off. I mean, it had different parts to it. It had what the issue was and it had --
Q Well, let me ask you. Was there a template for a Privately Registered Setoff Bond?
A There were different -- yes. There were different documents throughout it. But I mean it was different parts.
Q Okay. Listen to the question.

Was there a template for a Privately Setoff -- Privately Registered Setoff Bond?
A Yes.
Q Okay. Was there a template for a Notice of Claim?
A Yes.
Q Was there a template for an Affidavit of Service?
A Yes.
Q Did you create those templates?
A No.
Q Who created those templates?
A I know that they came from Brandon Adams and Gordon Hall.
But with my experience and the dance of where it was coming where, I would say -- and we went over it one night at the house, it was all coming from Brandon's new idea, so --
Q Are you talking about with respect to the money orders?
A The whole thing.
Q Okay. So let's go back just to be clear.
The templates for the documents that I just mentioned, the Privately Registered Setoff Bond, the Notice of Claims, the Affidavit of Service, where did those three templates come from as far as you know?
A As far as I know, they were in the office and I would get them sent to me. And once I had them, I had them.
Q Were they in paper form in the office?
A The printed versions already were. But there were Word

documents that were editable on the computer.
Q So there were Word documents on the computer?
A Yes.
Q Okay. And when you got to the office in November 2012, were the template already on the computers?
A Yes.
Q Once the templates were printed out with the client information, what happened next?
A A set got mailed out and then a set remained in the office.
Q Were the documents printed on standard paper?
A Most of them -- the bonds were printed on thicker paper.
Q Bond paper?
A Yes.
Q How much bond paper did the business go through when you were working there?
A Like a box every two weeks maybe.
Q Do you know how many pages are in a box?
A No.
Q Can you guess?
THE COURT: Don't guess.
BY MS. EDELSTEIN:
Q Can you estimate?
A I don't know. The box was about this big (indicating) so whatever that may be.

Q Okay. Were these -- once the client's information had been entered into these templates and templates had been printed, did the clients sign these documents?
A Yes.
Q Every time?
A Yes.
Q Did you see the client sign the documents?
A No.
Q Who would have taken the documents to the client to sign?
A They were mailed.
Q Okay. Did employees at the business have authorization to sign for clients in certain circumstances?
A Yes.
Q Did you ever have authority to sign on behalf of a client?
A Maybe once or twice.
Q And you got that authorization from the client?
A Yes.
Q Okay. Now, you described these bonds, is that right, that were printed using the template?
Do you recall from your time working on these particular templates how much was entered on these bonds, the average figure listed on these bonds?
A From what I can recall, it's about a hundred thousand maybe. I don't --
Q Did they vary, the figures?

A Yes.
Q Were they as high as 4.5 million at times?
A I would guess if that's what was trying to be set off, if that was the amount of debt in exchange.
Q So if the -- where did the company get the information about how much debt was owed by a client?
A I don't recall.
Q Now, you described that the documents were mailed; is that correct?
A Yes.
Q Okay. Was there a certain way they were mailed?
A Certified and Registered Mail.
Q Okay. Was a specific Post Office used by the business?
A There was a Post Office down the street one way. And if it was really late, there's a Post Office off of Van Buren that stays open pretty late.
Q And that Post Office on Van Buren was also utilized?
A I believe so.
Q And you said -- were all of the packets from the business, were they always mailed Registered or Certified Mail?
A I believe so.
Q Okay. And how many did you see mailed out daily on a daily basis?
A It depends on the day. I mean, there is days when there would be like four or five.

Q A day?
A Yeah. But then there were days when there was a lot more. It just depended on what needed to go out.
Q Now, in these packets it just wouldn't be a single document; is that correct?
A Well, it was a packet. It was one document -- well, it was one package and it had different documents that were all on the Affidavit of Service.
Q Okay. So there would be -- the Affidavit of Service would list the contents of the packet?
A Correct.
Q And some examples of things that could be in there are, for example, the Notice of Claim you described; is that right?
How about the setoff bonds?
A Yes.
Q Okay. Now, the Registered Mail slips, were those kept in the office? Were extras of those kept in the office?
A Like ones that have already been filled out or ones that are blank?
Q Both. Were plain Registered Mail slips kept in the office?
A Yes.
Q Were filled out Registered Mail slips kept in the office?
A Yes.
Q Okay. Now, why were filled-out Registered Mail slips kept

in the office?
A Well, the receipt that comes back with -- or the receipt that comes back with Certified Mail you keep it with the mailing.
Q Okay. So to be clear, when some package was mailed out and a receipt was obtained, that would be stored in the office?
A Correct.
Q Now, with respect to a mailing that had not been done yet, was Post Office Registered Mail labels, blank ones kept in the office for use at a later mailing?
A Yes.
Q And you had access to those in the office to use?
Did the person that filled out the Registered Mail labels that were used by the business, was that always the person that mailed the actual package at the Post Office?
A For the most part, yes.
Q Were there times where the person that filled out the label was not the person that actually mailed it?
A Yes.
Q Now, you described earlier that several members of the office staff worked as presenters; is that correct, or were presenters?
A Yes.
Q Will you describe for the jury what that means,

"presenter"?

A The third-party person to mail the documents.

Q So the presenter is the person that mailed the documents?

A Yes.

Q Would they have to sign any specific document?

A The Affidavit of Service.

Q So a presenter was responsible for signing an Affidavit of Service? And you actually acted as a presenter from time to time?

Is that a "yes"?

A Yes. Sorry.

Q Was an Affidavit of Service always filled out for every mailing?

A Yes.

Q Each and every one?

A If it was mailed out.

Q Okay. So if a document or something that was printed in the office was not actually mailed out, you wouldn't expect to see an Affidavit of Service; is that right?

A Yes.

Q Now, the Affidavit of Service that was put in the mailing packet, was that filled out at the time it was mailed?

A No.

Q Why not?

A Because it shows proof that it was taken to the Post

Office and it's already sealed by the time it gets there. So it would be in the following mailing as an copy.

Q So the actual Affidavit of Service in the mailing packet would not be filled out?

A Yes.

Q It would not be signed; is that right?

A Correct.

Q When was the Affidavit of Service signed after something was mailed?

A The following morning.

Q Okay. And was that filled-out Affidavit of Service filed in the office?

A Yes.

Q Now, you described that there were multiple steps in terms of these mailings; is that right?

A Yes.

Q So for one client who needed a debt setoff, it wouldn't be just one package; is that right?

A Correct.

Q How many packets were mailed out usually -- how many steps in the process when you started?

A I don't recall. Multiple steps.

Q More than one?

A Yes.

Q And with each time a mailing was done or a step was done,

would there be an Affidavit of Service?
A Yes.
Q Okay. How many clients do you believe Gordon Hall's company had?
A I don't know. Over a hundred, maybe. I don't really know. I mean, I can tell you there was a filing cabinet full.
Q Well, would you describe for the jury that filing cabinet?
A It was a standard-wide filing cabinet with --
MS. EDELSTEIN: May the record reflect the witness is holding out her arms about arm length?
THE COURT: The record will so reflect.
THE WITNESS: But three or four drawers, just a filing cabinet.
BY MS. EDELSTEIN:
Q And did each of the files in there represent a client's paperwork?
A Yes.
Q And was it full?
A Yes.
Q Were there files that didn't fit in the filing cabinet?
A Yes. I moved the files to a different filing area in order to alphabetize them.
Q And there were a lot of files?
A Yes.
Q How did the clients pay for the services provided?

A By check or money order payment.
Q Did you see those checks?
A Maybe in passing, but I did not examine them.
Q Were you responsible for collecting those checks?
A At one point if I was going to the house, I would see if there was any mail and I would take it back to the office. But not just checks, just mail in general. So if there was checks involved, it was part of the mail.
Q So if a check did arrive in the mail, by virtue of you picking up the mail, you would have delivered a check; is that right?
A Correct.
Q So you wouldn't actually call a client and say "You need to pay X amount"; is that right?
A I sent out e-mails and I called on Benton's behalf when he requested it. But other than that, I didn't.
Q Did you -- now, you said you did it on Benton's behalf. Did Benton tell you how much the client owed?
A It was noted on his iPad.
Q So he would somehow communicate with you what to send in the e-mail?
A Well, yeah. I would see the iPad and see the amount on there.
Q Were the clients charged for each document that was prepared as far as you know?

A Yes.
Q Were the clients charged for the mailing?
A It was just a -- yes. Yes.
Q And who do you believe negotiated with the clients as to the fees?
A Gordon Hall or Benton Hall.
Q Okay. Now, Gordon Hall or Benton Hall.
Okay. And how do you know that?
A I -- I know that they talked about the money, so I would assume -- not necessarily assume, I guess that's not a good word.
THE COURT: Try to speak up a little bit. All right?
THE WITNESS: I would say it was communicated before the mailings went out, so.
BY MS. EDELSTEIN:
Q Did you ever overhear conversations about fees?
A Yes, in passing.
Q But you were not part of those conversations; is that right?
A I don't believe so.
Q At some point did the business start using money orders?
A Yes.
Q Okay. Now, do you recall when that was?
A January, maybe. January.
Q Of what year?

A Or December of 2012 or January -- I don't recall an exact date.
Q So maybe the end of 2012 into 2013?
Now, how did you become aware that the business was going to start using money orders?
A We had a -- we were instructed that that's what was going to happen. We had a Webinar with Brandon Adams.
Q You had a Webinar with Brandon Adams.
Okay. And where did you watch this Webinar?
A At the office.
Q Okay. And it was conducted by Brandon Adams?
A Yes.
Q Did all the employees watch this Webinar?
A Yes.
Q Now, who instructed you that the change was going to be to money orders?
A It was just a topic that -- I can't recall who exactly said it first.
Q Okay. Were you trained on how to prepare these money orders?
A Yes.
Q Who trained you?
A Brandon Adams.
Q And when did he train you?
A When he trained everybody else.

Q Where was that?
A I believe at the office.
Q Was there a specific training session held?
A There was one in the office and one at the house.
Q Do you remember when the one at the house would have occurred?
A Around the same time.
Q And are we talking about --
A They first came out.
Q The Presidio Circle house?
A Yes.
Q Gordon Hall's residence?
A Yes.
Q Okay. And who conducted that training?
A Brandon.
Q Just Brandon Adams?
A Mostly Brandon, yes.
Q Who else?
A Actually, it was Brandon, so.
Q Nobody else spoke at that training?
A I mean, we all speak, but not in a leadership manner.
Q Okay. Was Gordon Hall present at that training?
A Yes.
Q Okay. Who were these money orders going to be sent to by the business?

A I don't recall who exactly it got sent to. The original and all that stuff. But it got sent out just like every other mailing.
Q Okay. Was it sent to the -- were money orders sent to the IRS?
A Yes.
Q And why were the money orders sent to the IRS? What was the purpose as far as you understood?
A Setting off the debt they had with the IRS.
Q Is it setting off the debt who had with the IRS?
A The client.
Q Were you ever told why the business was going to use money orders?
A Because it would -- I mean, it was just a new thing. I mean, I wouldn't say that there was an exact reason.
Changing to something else means something else that somebody knew maybe better or maybe worked better.
Q Do you know whose idea it was to switch over to using money orders?
A I believe it was Brandon Adams.
Q And what makes you say that?
A Because the checks came from him.
Q Okay. And by "checks," you mean the money orders?
A Yes.
Q So if the money orders came from him, would you describe

for the jury how these money orders came from him? What was the process to get a money order from Brandon Adams?
A There was a spreadsheet that was filled out with a client's name and social and it was printed in New Mexico and sent here in the mail.
Q Okay. So you said quite a bit there. So let's kind of break it down step-by-step.
Would you take a look at Exhibit 12. It should be in front of you. There should be a folder in front of you that says Exhibit 12.
A brief indulgence, Your Honor.
A No. But 9, 10, 19, 20, and 30.
Q It's coming to you right now.
If you would turn to page 2 of this exhibit, is that the spreadsheet you just described?
Nick, may we go to the computer system, please?
A Yes.
Q Okay. Now, this is the spreadsheet information that would be sent to Brandon Adams?
A Yes.
Q Who compiled this spreadsheet?
A I mean I might have touched it once, but I don't really remember it. But I knew that Niki -- or not Niki but Mary Mota and Chris.
Q Office staff members?

A Yes.
Q Okay. Now, as far as you can recall, the first money orders that the business used, who were they for?
A Gordon Hall.
Q Gordon Hall and. Who were they going to be sent to?
A The IRS.
Q Now, does this spreadsheet pertain specifically to Gordon Hall?
A Yes.
Q Okay. And this was the type of information -- this was the information that was sent to Brandon Adams as far as you know?
A Yes.
Q Now, was anything else sent to Brandon Adams besides the information that's listed on this spreadsheet?
A No.
Q And then what would happen after Brandon Adams received this information?
A It would be printed onto a piece of paper and it became a money order.
Q And is it your testimony that Brandon Adams printed the money orders?
A Yes.
Q How do you know that?
A Well, he would say that he sent them.

And in other cases he would talk about having to get some printed out, so.

Q Okay. Turn, if you would, to Exhibit 1 that also should be in front of you. And if you would turn to the -- in that package, if you would turn to the actual money order in Exhibit 1.

A Yes.

Q Do you recognize this?

A Yes.

Q Is there a signature on this money order?

A Yes.

Q Do you recognize that signature?

A It's Gordon Hall's signature.

Q Did you see him sign this document?

A Yes.

Q And what were the circumstances of Mr. Hall signing this money order?

A Like --

Q Did you hand him this money order to sign?

A Maybe. It was two years ago.

Q You did see him sign this document?

A I believe so, yes.

Q Okay. Now, if you can see, there appears to be on the date there appears --

A The correction on the date?

Q I'm sorry?
A The correction on the date?
Q Yes.
Why is there a correction on the date?
A Because it was printed incorrectly.
Q Okay. Who -- whose initials appear by that correction?
A Gordon Hall's.
Q Did you see Gordon Hall put his initials next to that correction?
A Yes.
Q And down at the bottom it looks like there appears to be another correction, correct, under Record of Payment?
A Uh-huh.
Q Are those Gordon Hall's initials?
A Yes.
Q Did you see him put his initials on that correction?
A Yes.
Q Now, if you're looking at the face of this money order, what information from this would the office have provided to Brandon Adams to print this?
A The name, the address.
Q The name and address of the drawer?
A Yes. The name and address of the drawer.
Q Okay. What else?
A The "for the benefit of," the information of what needs to

be down there, the tax period and the social.
Q So you are talking about the "memo" line?
A Yes.
Q Now, in your experience, is the social security number that's entered on this memo line, is it the actual social security for the person listed there?
A To my knowledge.
Q Okay. And does this appear to be Gordon Hall's social security number?
A Yes.
Q Have you ever -- were you aware of any circumstances where the social security number that was listed on the money order did not correspond to the person listed?
A Only in error, so, no.
Q It was supposed to be the accurate social security number?
A Yes.
Q Okay. Do you know where the amount that's listed on this money order came from?
A I'm guessing the amount was on the spreadsheet as well.
Q So the office staff would have been responsible for entering that information?
A Yes.
Q And, generally, where did the amounts come from that were listed?
A I don't recall.

Q Could they have come from the client?
A Well, yes.
Q Or the individual whose money order it was?
A Yes.
Q Okay. Would you take a look at page 4.
Do you know what this document is?
A Yes.
Q What is it?
A It's a tax document.
Q Do you know who created it?
A I believe I did.
Q I'm sorry?
A I said I believe I may have filled it out.
Q Okay. And was this one of the documents that you had on the computer that you could fill out?
A Yes.
Q Okay. And where did you get the information that was listed on this document?
A From the information sheet for -- depending on the client.
Q So the specific spreadsheet. Turn to page 5, please.
Do you recognize this?
A Yes.
Q What is this?
A An Affidavit of Service.
Q Now, do you see your name listed on this Affidavit of

Service?

A Yes.

Q And why are you listed on this document?

A Because I was the presenter.

Q Okay. So you were the person that witnessed the signatures placed on this document; is that what this means?

A Yes.

Q Okay. And would you have, in fact, filled out this Affidavit of Service that went into the packet?

A I'm sorry. What was that?

Q Would you have filled out this Affidavit of Service before it went into the packet?

A No -- well, what's listed in the mailing would be on there, yes; but, no, it would not have been signed.

Q It wouldn't have been signed, but the other information we see -- can you go to the broader document.

So you would have entered the information on top of where it was going to be mailed to: T.W. Lyons. Is that right?

A Yes.

Q Would you have entered the contents of the package?

A Yes.

Q Would you have also entered that "payment for tax period 1996" on the "regarding" line?

A Yes.

Q And the total number of pages?
A Yes.
Q Okay. Now, would you please turn your attention to Exhibit 2. That should also be in front of you.
Do you see a money order contained in this package?
A Yes.
Q And is it signed?
A Yes.
Q Do you recognize that signature?
A Yes.
Q Whose is it?
A Gordon Hall's.
Q Did you see him sign this?
A Yes.
Q Now, there appears to also be two corrections on this money order; is that right?
A Yes.
Q Were the -- when you said you saw Gordon Hall sign the money order in Exhibit 1, and now you have just said you saw him sign the money order in Exhibit 2, were these done at the same time?
A Yes.
Q And were the corrections made at the same time?
A Yes.
Q And in this package that you're looking at, does that also

contain the Affidavit of Service and the IRS Form 1040-V that you filled out?
A Yes.
Q Turn your attention to Exhibit 9, please.
Do you see the envelope?
A Yes.
Q Okay. Now, is Exhibit 9 a package of documents?
A It was the copy that was in the office.
Q So this is an example of a copy that would be maintained for the mailing that was sent out; is that right?
Do you recognize the handwriting on the front of this envelope?
A It's my handwriting.
Q And did you put a date on it?
A Yes.
Q Does this correspond to the money order in Exhibit 1?
A I would believe so. I don't have a --
Q You can open the packet.
A Yes.
Q Now, I want to just turn to the last page of Exhibit 9. It's an Affidavit of Service.
A Yes.
Q Now, in this copy that's kept in the office, the Affidavit of Service appears to be signed; is that right?
A Correct.

Q Do you see your signature on this document?
A Yes.
Q Is that your fingerprint next to it?
A Yes.
Q Why does the office maintain a signed and fingerprinted copy of this?
A I don't know.
Q Were you instructed that this was the procedure to follow?
A Yes.
Q Did you follow the procedure when you were asked to?
A Yes.
Q Okay. Now, it appears that this document is also notarized. Do you see that there?
A Yes.
Q Do you recognize the signature of the notary?
A Niki Perry.
Q For -- this all corresponds to the money order that you previously looked at in Exhibit 1; is that right?
A Yes.
Q And there appears -- the top portion of it where T.W. Lyons' name is it appears that a Registered Mail number is placed there, right?
A Yes.
Q How would you have known to put that particular mail number on there?

A Because it was all logged as soon as it got put into the Post Office -- like when it got taken to the Post Office, the Registered Mailing numbers were listed and then it gets put onto the document.
Q So you would have used the receipt you got from the Registered Mail from the Post Office to enter this document.
Was this Affidavit of Service stored in the files of the business?
A Yes.
Q Please turn to Exhibit 10.
Does this appear to be the package that would correspond to the money order in Exhibit 2?
A Yes.
Q And did you fill out the documentation including Affidavit of Service in this packet as you did with Exhibit 9?
A Yes.
Q And turning to the last page, do you recognize your signature on that document?
A On the Affidavit of Service?
Q On the Affidavit of Service, yes.
Let me give you a page number. Page 4.
A Yes.
Q And that is your signature and fingerprint?
A Yes.
Q Now, Ms. Jorgensen, did you ever see the money orders

being printed, the documents themselves?
A Once in New Mexico.
Q In New Mexico. And do you recall when that was?
A Early in the year in 2013 when we went out to New Mexico -- "We" meaning Benton Hall and myself -- to move Brandon Adams and his family to Arizona.
Q So at some point in 2013 Mr. Adams was going to move to Arizona?
A Yes.
Q Okay. And you and Benton Hall went to assist him with that?
A Yes.
Q Where did you see the money orders being printed?
A In his office space in his own home.
Q And who was actually doing the printing?
A Brandon Adams.
Q And did you see the printer that was being used?
A Yes.
Q Okay. I'll direct your attention to this side of the courtroom. There's a printer sitting on this desk over here. Do you see that?
A Yes.
Q Do you recognize that printer?
A Yes.
Q What is that printer?

A It's Micro ink printer.
Q I'm sorry. I didn't hear you.
A It's a Micro ink printer.
Q What do you mean by a Micro ink printer?
A It's the printer that was used to print the money orders.
Q Now, you said that that was in Brandon Adams' house that you saw the printer printing off the money orders; is that right?
A Yes.
Q Okay. Were any of these money orders ever printed at the office location on Greenfield Street?
A I believe so.
Q Did you ever witness that?
A I can't recall to say "yes" or "no" because I don't remember clearly.
Q Do you ever recall seeing anyone other than Brandon Adams printing money orders?
A No.
Q Now, you said that you were in New Mexico to help Mr. Adams move; is that right?
A Correct.
Q Would you turn to Exhibit 20. Do you see that?
Do you recognize this residence in Exhibit 20?
A That is the house that Brandon Adams moved into.
Q Okay. Did he own this house as far as you knew?

A No.
Q Who owned this house?
A It was rented.
Q Who rented it?
A Brandon Hall.
Q For Mr. Adams to live in?
A Yes.
Q Okay. Now, would you turn to the second page of this exhibit. Do you see this?
A Yes.
Q Do you recognize where this is?
A It is the office space that is within that home that Brandon Alexander Adams rented.
Q Okay. And when you were in the home, you said you assisted him to move. Did you see the money orders being printed on this printer in this office?
A Yes.
Q Okay. During the -- your time working for Gordon Hall's business, how many money orders do you think the company mailed out for clients?
A I don't recall. I know we got an envelope from Brandon like once a week, maybe twice, and it had -- I don't know, like three or four in it. Sometimes more. Sometimes less.
Q So there would be three or four money orders in a package that was received once or twice a week; is that right?

A Oh, actually, no. I take -- take that back.
Maybe closer to nine.
Q Nine money orders?
A Money orders.
Q A week?
A Yes.
Q Did that number change after he moved down to Arizona?
A Yes. He was not -- he was no longer mailing them.
Q How many -- did the number of money orders weekly change from nine -- was it more or less after he moved here?
A It was less, simply because everything stopped then, so.
Q And what do you mean everything stopped then?
A The search warrant and the arrests and that all started pretty much as soon as we got Brandon out here, so.
Q So shortly after Mr. Adams moved to Arizona, the search warrants were executed?
A Yes.
Q Okay. Would you turn to Exhibit 8.
Do you recognize the individual in this picture?
A Yes. It's Benton Hall.
Q How certain are you?
A A hundred percent certain.
Q Okay. Would you take a look at Defense Exhibit 103. It should be up there. It may not be. So I don't know that I requested it, so it will be brought up to you in just one

second. I'm sorry. 101. Sorry.

A Am I to keep both of them open at the same time?

Q You can. Let me just briefly switch to the document camera.

Now, this is Defense Exhibit 101. Do you see some handwriting on this mailing receipt?

A Yes.

Q Do you recognize the handwriting?

A Yes.

Q Whose handwriting is this?

A That is Benton Hall's handwriting.

Q So you did not fill out this lower portion of this document; is that correct?

A Correct.

Q Okay. When you were working for Gordon Hall's company, how often were you paid?

A Weekly.

Q And how were you paid?

A Cash.

Q Who paid you?

A Benton paid everybody, but the money came from Gordon Hall.

Q How do you know that?

A Because they would go to the bank together and he would get the money from his father and then pay the employees.

Q In cash?
A In cash.
Q Were the other employees also paid in cash as far as you know?
A Yes.
Q Ms. Jorgensen, are you still owed money for work you did while working for the company?
MR. KUNKLE: Objection, Your Honor. Relevance.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MS. EDELSTEIN:
Q Would you accept one of Gordon Hall's money orders as payment for the amount you are owed?
A No.
Q Why?
A I would prefer it cash because I know that it's going to be a payment.
Q Okay. Would you have accepted one of those money orders as payment while you were working for the business?
A No.
Q Why?
A Because I was getting paid cash.
Q I'm sorry?
A I wasn't going to change the way I was being paid. And the money orders were drawn off the Treasury -- or they had

something with the Treasury and my relation was with them as an employer and nothing else.
Q Would you have accepted a money order in lieu of cash in a week that you were not there?
A No.
Q You wouldn't have accepted that as payment?
A No.
Q You would have insisted on being paid in cash?
A Correct.
Q During the entire time you were working for Gordon Hall's business, how often was a client's debt settled?
A None. Never.
Q None that you're aware of?
A None that I'm aware of.
MS. EDELSTEIN: Brief indulgence, Your Honor.
BY MS. EDELSTEIN:
Q Now, with the setoff bonds that you described before, you said that there was a multiple-step process in the mailing; is that right?
A Yes.
Q Was there a multiple-step process for the money orders?
A Yes.
Q Okay. How many steps were involved in the money orders?
A I don't recall.
Q Was it as many steps as the setoff bond?

A I would think so, yes.
Q So there would be multiple mailings of the money orders as there was with the setoff bond?
A Yes.
Q And did you ever -- were you ever involved in these multiple mailings for the money orders?
A By what -- in what way are you asking?
Q With respect to the setoff bonds, you said that there were a series of mailings; is that right?
A Yes.
Q For the money orders, was there also a series of mailings?
A Yes.
Q Okay. Were you ever involved in the series of mailings for the money orders?
A As in the later mailings for the initial money order sent?
Q Yes.
A Yes.
Q What was contained in the later mailings for the money orders?
A I don't recall.
Q Okay. Was it an additional money order?
A I don't recall.

MS. EDELSTEIN: No additional questions, Your Honor.

THE COURT: All right. You may cross examine.

**CROSS EXAMINATION**

BY MR. KUNKLE:
Q Good afternoon, Ms. Jorgensen. How are you?
A I'm here.
Q You're shrugging your shoulders and saying you're here.
You don't want to be here, do you?
A No.
Q Why not?
A Because I would rather be at work.
Q Okay. Fair enough.
Did you want to testify against Mr. Hall?
A No.
Q When you met with the agents, did that ever come up in any discussions about your involvement in this?
A By what exactly are you asking?
Q Well, what I'm asking you is did they ever discuss with you that you could be charged with a crime?
A Asking if I would be charged with a crime?
Q Yes.
A No.
Q That never came up in any discussions?
A I mean, I have asked to know what's going on. But my -- from my understanding is purely a witness.
Q And you are not going to be charged with anything, correct, as far as you know?
A As far as I know, no.

Q When you met with the agents, Agent Neri and Agent Nixon, your mother was with you, correct?

A Correct.

Q And she's here in the audience today, right? She's in the front row over there?

A Yes.

Q You met Gordon Hall after your mother -- and I think it was your step-father attended a seminar, correct, of Brandon Adams?

A I don't recall when they met. I recall when I met them.

Q Okay.

A So I can't say if it was before or after anything.

Q Let's start backwards.

You were asked if you would take one of these money orders and you said "no."

A Correct? No.

Q You wouldn't.

It's drawn or the Treasury, right?

A Yes. Yes.

Q Did you understand these things to work?

A No.

Q Why not?

A Because I'm a person of proof.

Q Well, what does that mean you are a person of proof?

A I wouldn't say that I knew something worked unless I tried

it and it worked.
Q Okay. I'm having a hard time hearing you.
Okay. Let me just ask you something just real quick.
You looked at those money orders, correct?
A Correct.
Q You read through them?
A Yes.
Q And just to back up one more moment, you used a phrase about those money orders being mailed to the IRS. You said it was "to set off a debt."
Do you recall using that phrase in your testimony?
A Yes.
Q What did you mean by that?
A It was the phrase that I received when I asked questions.
I mean it was the same response that I got.
To elaborate that?
Q Yea. Please elaborate. What does that mean to you to set off a debt?
A Well, there's a debt. In this instance there is money that's owed in taxes.
I don't know how the monetary amount equals out to setoff whatever it does, but to settle an agreement of disagreements. I mean there's a debt that needs to be paid. Some action needs to be taken. And that action was to set off that debt.

Q Using what to set off that debt?
A That money order.
Q Okay. And how would that work as you understood it?
A I was doing a job that I was asked to do. I was working and I was doing what I was told.
Q Okay. So you never had it fully explained to you?
A It's been two years and I do my best to forget everything, so I'm trying to pull it back into my brain.
Q Did you understand that that setoff would come from an account at the Treasury connected to someone's social security number?

Does that sound familiar to you?
A Yes. I had heard that.
Q Who had you heard that from?
A Brandon Adams.
Q And Brandon Adams, I believe at one point you told the agents he was in it just for the money, right?
A Unless --

MS. EDELSTEIN: Objection. Calls for speculation, Your Honor.

THE COURT: Well, I'll allow the question. I'm wondering if we need more foundation for it.

Overruled. You can answer the question if you know.

THE WITNESS: Will you repeat the question, please?

BY MR. KUNKLE:

Q My question to you is: Do you recall telling the agents that you believed Brandon Adams was involved in this just for the money.
A Yes.
Q And that Jack Smith, he believed in it, the process, correct?
A Yes.
Q And that Gordon Hall and Benton Hall believed in the process, correct?
A Correct.
Q And this process was this idea that you could set off a debt based on this secret account that you had with the United States Treasury, correct?
A Correct.
Q And that secret account was the government held that in someone's name connected to their social security number.
Does that sound familiar?
A Yes.
Q I know you want to forget this and it's two years ago but that all sounds about what you heard, correct?
A Correct.
Q And you mentioned a Webinar that you watched.
A It was like a conference.
Do I need to elaborate a Webinar?
Q No. I think everybody knows what a Webinar is. But I

mean what do you remember at the Webinar that you heard? It was just a presentation about how this would work, right?

A Yes. It was a different flow of things because Brandon Adams was changing up the process, adding different steps with different instruments such as the money order, I believe.

Q Prior to that, the process, you had mentioned, involved a Notice of Claim and an offer to settle the debt, correct, and maybe even a Privately Registered Setoff Bond?

Does that also sound familiar?

A Yes.

Q And to your knowledge, that never worked, right?

A I'm not going to say that it never worked, but I'm not going to say that it did, because I can't testify with a hundred percent to anything.

Because maybe in 300 years from now maybe it will work, but I don't know.

Q Well, the idea that the process changed was because they were perhaps fumbling around to find a new way to make this work. Would that sound fair?

A Yeah. It was a different approach, I would take it, just like the A1-A process that was original before the Notice of Claim and the different mailings and that.

Q So A1-A was different from A1-B in terms of processes?

A Yes. I mean, I would -- whatever the different things were, I knew there was something called A1-A and it was a

different process before I started because I was moving the files. So I'm like, "What's this? It's different." And then filed it.

Q And to your knowledge, the idea that this had to keep changing was because none of this was really working for many of these people, correct?

A Correct.

Q And this company, just so we're all clear, was called Creditor in Commerce.

Does that sound familiar?

A Yes. There were different names.

Benton went by Air Avas Consulting and then there was the Commerce Coach. That was on the e-mails. I don't know if that was an association through a business name. There were just multiple, so I couldn't discern a certain one.

Q Master in Commerce, does that ring a bell?

You are shaking your head "yes"?

A Yes.

Q And was that Mr. Adams' outfit connected with the --

A Yes. Master in Commerce, MIC, that is Brandon Adams.

Q And did he promote that through the -- was it the Center for New Leadership? Was that one you mentioned in New Mexico?

A Yes.

Q And who was involved in that Center For New Leadership in New Mexico? CNFLM or something like that?

A Yea. CLFNM. That was Celestina's -- Celestina Adams. I don't know if she has his last name or hers -- Garcia maybe is her last name. I'm not sure. Brandon's wife.

It was her -- it had a different meaning for the both of them, I would say. She was in it for self-progress and the actual CLFNM itself -- I went to it. I attended the first one.

And like I said, that's where I met Brandon Adams. And it wasn't about bonds or money orders or any of that. It was about personal growth.

Q From there though, when you later -- did you later attend anything with Master in Commerce or Credit in Commerce?

A No.

Q Did you ever see any of the materials or teaching materials?

A Unless those terms were incorporated into where I worked, I don't know if I touched them or not.

Q And when you say you worked there, did you ever participate in any of the conference calls on Monday nights or anything like that?

A I listened to them.

Q You listened to them. How many times?

A Maybe -- I mean, I heard it a lot at my home because my parents listened to it.

But aside from that, going out of my way to sit on

the phone for quite a while, unless I was at the Halls' home residence or that -- I mean I wouldn't listen to it.

So I -- I mean maybe three, four times, aside, like in my own choosing, maybe once.

Q And when you listened to those calls, that material, did it make sense to you?

A Well, of course it makes sense.

Q Tell us why it made sense to you.

A I would say that no matter what, if I stood here and I said that, you know, flowers grow in pots, but they grow in pots because I tell them to. I mean, you don't know why flowers grow in pots. They just grow in pots.

But if I say that and it makes sense because I can explain this, that, and the other to give proof to what I'm saying, then you would believe what I'm saying.

I don't know if that's making sense.

It gives rise when it's rolled so sweetly off the tongue. If you're a good talker, people listen. If you are a good salesperson, people buy your cars.

Q You said you heard it at home too, correct?

A Correct.

Q Your mother and step-father, did they engage in this process as well?

A Possibly. I don't remember if it was a "yes" or "no" on that one. Maybe -- yes. Yes.

Q They did? Did they go through the Notice of Claim and the tender of settlement and all these --

A It was the A1-A process maybe.

Q Okay. I say you looking at your mom.

If you don't remember, that's fine.

A I don't know what exactly it was. I know that the interest of that was around so -- I mean, I don't recall what exactly happened. I know that they were family friends and I enjoyed spending time with them and they are genuinely nice people. I that's what I can testify on that point.

I hung out with them to hang out with them as people. I chose to spend my time with them to hang out with them as people and family friends.

THE COURT: Mr. Kunkle, about how long do you have?

MR. KUNKLE: Just a few more minutes. I know the jury is looking at the clock.

THE COURT: May I impose on the jury to stay a little late so that we can finish with the witness and she will not have to come back tomorrow.

All right. Go ahead, Mr. Kunkle.

BY MR. KUNKLE:

Q And just so it's clear, Ms. Jorgensen, when you learned this, you learned this after you started working there or did you learn some of it before you started working with Mr. Hall?

A After I started working there.

Q And as you look back on it now, does it make any sense to you?
A I suppose in its own way. I don't know how else to convey my point to you.
Q Well, try.
Please explain to these folks over here to my left. Tell them why it makes sense. Why it stills makes sense to you in some way.
A You didn't know that two plus two equaled four until somebody told you but that is a fact. Now everybody else knows that. But if somebody hauled off and said this crazy number, plus this, subtract that, multiply it by this, and divide it by that, then add, you know, variables in there, there's a mathematical way to deduct what that number may be.
But in logic, you have to find reasoning from somebody else and have trust; and I trusted them. So I didn't see why I should not trust them. But I didn't necessarily fully believe. It was a job to me.
Q By the way, you mentioned you wouldn't take those money orders. Have you ever taken out a money orders at a Western Union or Safeway or anything like that yourself?
A Yes. I used to pay my rent with it.
Q When you do that, do you sign your own money order as the person who can pay the money order?
A Yes.

Q Okay. You sign as the person who's taking it out.
You're not saying "sign it" and saying Timothy Geithner will pay my rent, right?
A No.
Q You're laughing because you know that's somewhat of a preposterous notion, correct?
Is that "yes"?
A Yes.
MR. KUNKLE: All right. I have nothing further, Your Honor.
THE COURT: All right. Any redirect?
MS. EDELSTEIN: Very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MS. EDELSTEIN:
Q Ms. Jorgensen, as far as you are aware, were any of the office staff in this case charged with a crime?
A I don't believe so.
Q Was it your understanding that the money orders would pay a client's tax debt? Was that their purpose?
A Yes.
Q Was it your understanding that the money orders in Exhibits 1 and 2 that you looked at were meant to pay off Gordon Hall's tax debt?
A Yes.
Q You stated today that even though looking back, it's hard

to conceive of, but even today, some part of this makes sense; is that correct? Some part of the process makes sense; is that what you just testified to?
A Yes.
Q Even knowing that, would you accept -- would you accept one of these money orders in payment?
A No.

MS. EDELSTEIN: No further questions, Your Honor.

THE COURT: All right, counsel. May Ms. Jorgensen be excused permanently?

MS. EDELSTEIN: Yes, Your Honor.

MR. KUNKLE: Yes, Your Honor.

THE COURT: All right. Ms. Jorgensen, I instruct you not to discuss your testimony with anyone except the lawyers in this case until the trial is over. With that you are excused.

Thank you. You may step down.

Now, we will be in recess till nine o'clock in the morning. And, again, I remind the jury of the admonitions.

Do not discuss the case with anyone. Do not allow anyone to discuss it with you. Do not do any independent research or investigation and keep your minds open.

With that we will be in recess until nine o'clock.

All rise for the jury.

(Open court, no jury present at 5:00 p.m.)

**INSTRUCTION CONFERENCE**

THE COURT: All right. Please be seated.

The record will show the absence of the jury.

Counsel, I want to take a short break and then discuss the jury instructions but first let me discuss our discussion.

Before we finalize the jury instructions, I will remind you all you will have your opportunity to make objections to any instructions or failure to give instructions. That will be your opportunity to do that and that will be the time in which you must do it in order to preserve any objection for appellate review.

The discussion I want to have about instructions is not that. I don't view anything we say in this discussion as preserving the record for anything.

And the reason is I want an open discussion to understand the instructions, see what we can do to improve them, but I will remind you to make your formal objections if you have any before we finalize them tomorrow.

Now, with that we're running late. I don't really view it as necessary to keep the court reporter here for this discussion because it's not going to preserve any record or anything unless somebody would like to of it.

Do either of you want to have the court reporter here for the discussion I want to have on the instructions?

MS. EDELSTEIN: No, Your Honor.

MR. KUNKLE: Your Honor, I think under the circumstances, I hate to impose on the court reporter.

THE COURT: Actually, I think I understand why you're saying that and so we'll do that.

So I'm going to ask. We'll take a break so everybody, especially the court reporter, can take a little rest, and then we will come back in ten minutes and have this discussion.

Also, Cullen, do you have that page? I have done a replacement page 10 where I have taken a crack at that instruction as I indicated about accomplices and agreements not to prosecute.

So take a look at that and we'll be in recess for ten minutes.

(Recess taken at 5:03 p.m.; resumed at 5:15 p.m.)

(Open court, no jury present.)

THE COURT: Please be seated. Have you all had a chance to look at this? Are we ready to talk about it?

MS. EDELSTEIN: Yes, Your Honor.

MR. KUNKLE: Yes, sir.

THE COURT: Well, I'll tell you what. Why don't we just take it from the beginning.

The things that are of interest to me are the substantive instructions. I think the rest are pretty cut and

dried. They are things you already agreed to.

Let's just -- let's see. Well, looking at the bottom of page 2, it ends with a question mark. It should be a period. We'll date it tomorrow.

So any comments or questions on page 2?

MS. EDELSTEIN: Just what you already saw, Your Honor.

THE COURT: All right. Then now page 3, I think the only thing -- well; first of all, I think you all generally did a good job on writing this instruction from scratch. I have bolded the language Mr. Kunkle has requested that is in dispute.

And frankly, you know, we need to have language here that correctly comports with the *Howick* case but is understandable to real people.

I mean, that's a great opinion for lawyers to read because the court did a great job of exploring the issue, but we can't write a jury instruction that has five or six restatements of the same idea from different perspectives.

So the first sentence which is the government's sentence looks fine to me. So, Mr. Kunkle, tell me why we need and what we need from your bolded second sentence in the middle of page 3.

And by the way, you can see I actually edited your language. In the second sentence you had the "document must

hold itself out."

And I added "credibly" just for purposes of discussion. I'm not sure that's right or a good idea, but.

MR. KUNKLE: Your Honor, just -- I'm trying to recollect what I had sent to Ms. Edelstein last evening by e-mail, but the point is, that sentence in bold in this -- and I would ask that, you know, for purposes of the record in the event that the Court does not give this instruction, that this be marked. Obviously, we'll talk about it on the record.

THE COURT: Can you speak into the microphone?

MR. KUNKLE: Oh, I'm sorry. I thought I was.

Your Honor, I would ask that this document be marked as an exhibit, you know, obviously for today for purposes of appeal in the event I'm overruled.

But that sentence, Your Honor -- that actually is two sentences. I'm sorry to interrupt you, sir.

THE COURT: I can file something with the Clerk's Office so that will have that convenient record.

MR. KUNKLE: All right. The two sentences there in bold, Your Honor, comes straight from the opinion in *Howick*.

And why I believe they are important is because, one, without that, it becomes too subjective of what a document purports to be.

And the law is that this has to have some objective component and fashioned to the document itself. And that's

what *Howick* says. I mean, the line is right there in the opinion I'm reading: "To trigger liability, the document need only credibly hold itself out as a negotiable instrument."

MS. EDELSTEIN: Mr. Kunkle, where are you reading from?

MR. KUNKLE: I'm sorry, Ms. Edelstein. It's in the *Howick* opinion. I believe it's page 1068 near the bottom of the page.

THE COURT: What headnote is it? What headnote number?

MR. KUNKLE: Your Honor, my opinion doesn't have headnotes printed in it. I think it's page 1068.

THE COURT: I'm reading a Lexis version, so I don't have the same pagination.

MR. KUNKLE: There's the one paragraph that starts, "The standard we announce today" and the next paragraph says "Thus, those who regard fictitious obligations in general when they discuss people of a rather credulous nature."

THE COURT: Yea.

MR. KUNKLE: And the being able to detect bogus obligation by noticing variations between the phony document and the real McCoy.

And at the end of that paragraph the Ninth Circuit writes, "To trigger liability, the document need only credibly hold itself out as a negotiable instrument."

And I just -- and that's where that language comes from.

THE COURT: Well, let me tell you. Here's the problem is all this language is good, but the matter is having it not misleadingly incomplete.

If I look at the last page of the opinion, about five paragraphs up, there's a passage that struck me as getting to the gist of it. Well, it's -- it says:

Accordingly, Congress provided protection from fraud to a particularly vulnerable class of victims. In keeping with that objective, we conclude that the statute criminalizes even bogus obligations that a prudent person might, upon consideration, be unlikely to accept as genuine, so long as those documents bear a family resemblance to actual financial obligations. To trigger liability, in other words, the document need only credibly hold itself out as a negotiable instrument.

Now, let me tell you for better or for worse, having labored through this opinion, I have this sense of an epiphany. I think I understand what they're saying here.

And that is -- so you're all in trouble. But they're talking here about it -- on its face this document, it looks like the stuff we see as a money order; and in form, it looks like it.

If you have even a modest amount of sophistication,

you might wonder about an order drawn on the Secretary of Treasury. But on the other hand, the Secretary -- the Treasury Department issues paper all the time.

So when I look at the fact of the evidence of this case, I don't have any difficulty concluding that these two checks, these money orders, fall within jury submissible scope of this statute.

The question is we want to instruct them so they can apply this statute; understand it correctly and apply it.

So the fact that I think it's sufficient, you know, doesn't end the inquiry. And, in fact, in some ways this -- and, again, we've heard a lot of evidence about all the other paper, the ancillary paper that went with this program.

That's not the corpus delicti of this crime. It's only these two money orders. That information is relevant and admissible to put context and shed light for what these two were and whether they are proof of intent to deceive is met. But it's only these two documents that need to satisfy that requirement.

So I'm not -- I'm not saying no. I'm just sort of emoting with you all about this and let's figure out how to make it work.

MR. KUNKLE: The other -- and not to further complicate matters, Your Honor, and I just wanted to point this out, I also believe that we need to give a definition

from this Court of what a "negotiable instrument" means.

Because, you know, we all have belief we know what it means, but "negotiable" means it can be used in commerce. It can be deposited. It can be relied upon, much like a check or a real money order.

And so I think for the jury's sake, and because I think the document has to stand on its own, we have to also define what "negotiable" means in commerce.

THE COURT: Well, under the Uniform Commercial Code, "negotiable" means that it's transferable -- could be transferred to a holder in due course, I think. I'm going way back, but that's not what we're talking about here.

MS. EDELSTEIN: You Honor, I think that adds a great deal of confusion. The government does not have to prove that this was a negotiable instrument, only look it looks like a financial instrument.

THE COURT: He wants a definition. But, you know, my sense of it is that "negotiable instrument," in common parlance, means anything that you can transfer. The Uniform Commercial Code has a different definition which I think clearly is not what we're talking about here.

And I also think this document unquestionably meets any statutory understanding of what this statute means.

I think trying to define "negotiable instrument" beyond the common sense understanding is "something that

people can sign off on to someone else who may or may not take it" would only make things considerably worse.

And I think we can -- this clearly was, on its face, purports to be negotiable. That's the whole point of it. So, again, I apologize for not being very articulate, but we have to be very careful to have a definition here that does not -- that captures the gist of this without going to confusion.

Now, maybe let me -- I understand your point. Maybe I should ask Ms. Edelstein to tell us what's wrong with this language.

MS. EDELSTEIN: Your Honor, well, one, that sentiment of what he's asking to be added is essentially already laid out in the preceding sentence, and then further down in the last line starting at 23 of the following paragraph.

The item need only credibly appear to be in a class of or bear a family resemblance to financial instruments. That's drawn directly from the *Howick* opinion, the case itself, Your Honor. That's literally the way that the court lays it out in terms of the liability here.

On top of that, the first line:

A fictitious financial instrument and the fact of the instrument's nonexistence is presumably unknown and not revealed to the intended recipient.

If you look at the previous line, starting line 15:

A fictitious instrument is a bogus document created

to --

THE COURT: Slow down.

MS. EDELSTEIN: Sorry.

A fictitious instrument is a bogus document created to appear to be a financial instrument although no such genuine financial instrument exists. And the fact of the instrument -- it should actually be possessive, Your Honor. An apostrophe needs to be inserted there -- nonexistence is unknown to the intended recipient.

So it's essentially duplicating the exact same statements in the portion of the instruction starting at 15, and then again at 23, both of which were drawn directly from the *Howick* opinion.

THE COURT: And that's where I added the word "credibly." I think it's not spelled right, but --

MS. EDELSTEIN: "Credibly." Yes, it would be a "Y."

THE COURT: Got it.

MS. EDELSTEIN: So the government's position is it's redundant, Your Honor, and not exactly easy to understand phrased in that way.

THE COURT: And to the extent it's not redundant it's too narrow. I don't think it has to hold itself out as a negotiable instrument in the UCC sense. It has to credibly appear to be in a class of documents.

MS. EDELSTEIN: That's right. And the filing that I

have submitted to Your Honor this morning, that was part of the government's objection is it's slightly off in the sense that this case doesn't hold that the statute or -- sorry -- I'm tired as well -- that the financial instrument must hold itself out. It just has to have a credible appearance to resemble, not that it must be credible.

THE COURT: And there's also a passage here -- where is it? There's other language that we cannot incorporate at all, but it really gives me an understanding. They talk about whether the document is, quote, free of disqualifying marks.

If you have a picture of dog smoking a cigarette, it's probably not currency or a bond or something. And they say the standard is not a stringent one.

MR. KUNKLE: Your Honor, I'm sorry. I think I can head this off in the pass right now, Your Honor.

THE COURT: Go ahead.

MR. KUNKLE: I'm rereading the *Salman* opinion while we're sitting here, not to suggest I'm not listening to Your Honor or Ms. Edelstein, because I know this is important.

And, again, I apologize for not having a headnote available to copy and reading from is not one.

But the language in *Salman* -- and that's S-A-L-M-A-N. It's 531 F.3d, Your Honor, 1007.

THE COURT: Which case is that?

MR. KUNKLE: *United States v. Albert Salman*. It's a

later case. 531 F.3d, 1007. It's 2008.

THE COURT: Is that a Ninth Circuit case?

MR. KUNKLE: Yes, sir. Yes, sir.

MS. EDELSTEIN: Could you restate that, please?

MR. KUNKLE: I'm sorry. I have a copy here if counsel needs it from the government. It's 531 F.3d, 1007.

And I just point that out because in that case it appears Mr. Salman used a sight draft.

THE COURT: A what?

MR. KUNKLE: A sight draft in order to pay someone else, Your Honor. I'm sorry.

THE COURT: I'm not familiar with that term. Is that like a bearer instrument or --

MR. KUNKLE: I'm trying to find the language in here where it discusses what a sight draft is.

I think there's a footnote at the end. There's -- it's:

"A draft is simply an order to pay, and by putting the word 'sight' in front of it just implies that you are to pay the item on sight."

This is the language that the expert used in that case, a gentleman named Mr. Reusser.

THE COURT: To me that sounds like a bearer document.

MR. KUNKLE: And he says: They're usually nonnegotiable sight drafts but, "They're prearranged

situations where two parties - two or more parties have agreed to make payment between themselves, and it could have conditions attached to it, or it could have other items which would not meet the terms of negotiability."

But aside from that, they kind of talk about the *Howick* case in this *Salman* case. And the expert there, a former bank examiner with the Office of the Comptroller of the Currency of the Department of the Treasury testified at the Salman trial that sight drafts are commonly nonnegotiable and that labeling a sight draft nonnegotiable does not render it invalid.

Okay. And what the circuit court goes on to say is that: A sight draft, unlike a Federal Reserve note, is not necessarily a member of a negotiable class of financial instruments, and a fictitious sight draft cannot be disqualified from being an unlawful fictitious obligation under 514 merely on the basis that it is a nonnegotiable instrument.

And what they are saying in *Howick* is they analyzed the Federal Reserve notes in *Howick* to be sufficiently credible to constitute fictitious obligations. They use that term "credible" and I think that's one of the terms we need to consider.

But then they do go on to say they discuss that negotiable requirement in *Howick* because that reflected the

type of fictitious instrument in *Howick*.

And I realize I kind of was looking at this after we started discussing "negotiability," but -- well, I'll share the case.

THE COURT: Well, thank you for -- and I have not read that case, but it sounds like it's confirming my intuition that technical negotiability as opposed to the practicality of people transferring and accepting it is not the criterion here. So I'm disposed to, based on that, to decline the second of your two sentences.

Now, let's talk about the other one.

MS. EDELSTEIN: Your Honor --

THE COURT: I have an idea. You know, we have the language here. This is the government's language that I tweaked that the item need only credibly appear to be in a class of or bear a family resemblance to financial instruments.

And, of course, as the court said in *Howick*, the requirement of intent to defraud is another limitation that cuts in here in an important way.

In light of that, I mean, I'm thinking perhaps the language without the additions is more than adequate to capture what we're looking at here. It's going to exclude the -- what the court describes as documents that have disqualifying marks. It's no Monopoly money. And counsel

will be able to argue -- well, I don't --

Mr. Kunkle, I need to hear you pitch your argument to the extent you have one.

MR. KUNKLE: I was just sharing with -- Your Honor,k I'm sorry. I was just sharing with Ms. Edelstein the fact that in *the* Salman opinion the holding is that they held that the plain language of (a)(2) -- 514(a)(2) prohibits the passing -- and it says right there in English -- whether negotiable or nonnegotiable.

You see, and again, because it is Mr. Salman's argument was that I put "nonnegotiable" right on it. You know, but it was a sight draft. So it's --

And I will be honest with you, at this time of the afternoon, things are a little scrambled for me too. But it doesn't appear to be from the statute. And I understand the Court's statements earlier to mean this too.

"Negotiability" is maybe one factor that the jury can consider, but it's not required, if I'm understanding this correctly from *Salman* and *Howick*, because the guidance that's given from these two opinions is kind of seemingly contradictory when you read each opinion separately.

THE COURT: All right. We're talking anything further, Ms. Edelstein, about his first sentence? I am sort of inclined to agree that the other language here does cover the points --

MS. EDELSTEIN: Your Honor --

THE COURT: -- that Mr. Kunkle is articulating.

MS. EDELSTEIN: Other than just the modification to make it possessory and the fact of the instrument's nonexistence.

THE COURT: I saw that where was that?

MS. EDELSTEIN: Line 17, the first word.

THE COURT: Yes. I saw that.

MS. EDELSTEIN: Other than that, and also, Your Honor, we noted as we were reading through that this portion, this 15 through what is now 20, but I understand that the Court is going to cut it down, we believe that that instruction, "a fictitious instrument is a bogus document," that line should also be included for the second substantive count for Count 4.

THE COURT: I wondered why you didn't have exactly the same language.

MS. EDELSTEIN: I think I omitted it by mistake, Your Honor. It should be there.

MR. KUNKLE: Ms. Edelstein was talking rather quickly.

THE COURT: There's a sentence or two that's in the first one that's not in the second one. And she's saying let's repeat them in the second instruction as well.

MR. KUNKLE: Okay. I know what she's talking about.

THE COURT: I had the same question.

So I think we'll -- whatever we say we needed, we will say it the same for both instructions.

MR. KUNKLE: Your Honor, I think based on the defense theory of the case, as much as we can distill this, is that -- and why I wanted that language in there about negotiability is because this does on its face appear to be what could be a negotiable instrument.

So the language of the document has to kind of purport to be a negotiable instrument in this instance, not with the sight drafts of Mr. Salman's but in this instance.

If he had sent them a million dollar bill that had a dog smoking in the portrait, we would all say ha-ha, and, you know, this is what *Howick* spoke to.

But where it looks real but it's a ten million dollar bill or whatever it may be or a million -- and in this case it could have been, you know, an $868,000 bill, you know, to pay off the exact number of the debt.

I think that that's why this is vital to our theory is that because there's language on the face of these two documents it says right there, you know, get Timothy Geithner to pay himself, you know, anybody looking at that would say this doesn't make any sense.

THE COURT: But not -- I thought about that too and --

MR. KUNKLE: And our argument is that this is just designed to impede and -- for lack of a better word -- screw with the IRS.

THE COURT: I think you can make that argument, but I was wondering -- I think this is what you're saying. I was wondering, does that on the face of it, is Timothy Geithner sort of paying Timothy Geithner. But it actually doesn't say paying Timothy Geithner. It says pay the IRS.

And, in fact, there are numerous federal instruments that can be used to pay a federal debt. So I thought, you know, you can make that argument. It's a jury trial. You have a right to it. But I don't think that's really coming within the statute. That's not a disqualification and so --

MS. EDELSTEIN: I mean to the extent --

THE COURT: You're not stopped from making that argument.

MS. EDELSTEIN: And, Your Honor, to the extent that the Court when it gives its examples, it gives the classic example of the dog smoking a cigarette which is clearly not.

But if you would read next example the Court cites, which the Court finds falls within it, it is simply something that has an official-sounding title to it.

If I can quote it exactly, which is the United States Bank Certificate but it has a portrait of President Monroe, the case finds that that would fall into the body of documents

we're talking about here. It need not be so authentic looking that nobody could have a doubt. It just needs to have some indicia.

THE COURT: I understand and that's part of the reason why I have no difficulty concluding that these documents satisfy -- or are jury submissible under this statute.

The question is do we say more? I'm not -- I guess I'm arguing the case for economy on the theory that what we have here is right. And the question is: Is it incomplete? Does it lack some general guidance? And, as you all may know, I don't believe in jury instructions that get very complicated with a lot of minutia.

The Ninth Circuit model instructions are written in an abstract form and I think they are great and that's the way to instruct the jury.

But now that said, are you suggesting something, Ms. Edelstein?

MS. EDELSTEIN: Your Honor, I would give the instruction as written without the addition by Mr. Kunkle.

THE COURT: Yeah. Mr. Kunkle, any last word on that?

MR. KUNKLE: Your Honor, I think at this point, because a money order is a negotiable instrument, I think that without that language saying -- you know, and it's different from the *Salman* case where they are talking about

nonnegotiable instruments.

THE COURT: What language?

MR. KUNKLE: The language that's in this -- on page 3 I'm looking at that's in bold on lines 18, 19, and 20, where it reads: "A fictitious instrument, and the fact of the instrument's nonexistence, is presumably unknown, and not revealed to, the intended recipient."

And that it must -- and that the document must credibly hold itself out to be a negotiable instrument.

And I think that's right out of the *Howick* case, that language, and I think that language needs to be in there in this case because we're talking about negotiable instruments and it's also, you know, because of who is being allegedly the recipient of this is the IRS.

I mean, the reel problem with this case, Judge, is this is a statute, like Mr. Salman argued, that is designed to protect the credulous person. This is a government agency we're talking about. And I mean I'll raise this tomorrow in a Rule 29 motion, but I believe that because this is the government that's allegedly being defrauded by its own paper, there needs to be a little bit something more in terms of materiality here to show some sort of reliance on that form paper. I believe that there has to be something more than just "you intend to do this and that." There has to be some kind of result.

THE COURT: You know, but actually when we look at the language of the statute, it doesn't say "negotiable." It says the actual language is, quote, you know, "a fictitious instrument, document, or other item appearing, representing, purporting or contriving through scheme or artifice to be an actual security or other financial instrument issued on the authority of any number of things.

It just says "security or financial instrument." It doesn't say "negotiable" in any sense that the lawyers talk about.

Now, I think there is a nonuniform commercial code sense of "negotiable" that doesn't mean anything. It just means anything. You could purport to transfer. You can transfer anything. That sense of "negotiable" seems to me to be satisfied by anything.

And I'm just worried about -- no. I'm worried about confusion.

Also, Mr. Kunkle, I'm disposed to put language in here that you request out of caution provided it doesn't look confusing. So --

MR. KUNKLE: If it helps the Court, Your Honor, I'm not confused. I think that, you know --

THE COURT: I'm worried about them.

MR. KUNKLE: Well, but -- and I think that sentence makes sense because it's-- the fact of it is presumably

unknown and not revealed to them. And right on the face of this document is --

THE COURT: Let me come back to the language that is not in dispute that everybody is accepting says -- as we have edited it -- "must appear to be a financial instrument and the item need only credibly appear to be of a class."

Now, that word "credibly," I think, covers the dog smoking a cigarette, the Monopoly money. It amply enables you to argue against those ridiculous cases.

This is not a ridiculous case. This document -- this is not, in my view, not a borderline document under the scope of the statute.

But I'm thinking that that word "credibly" appears enables all the argument you want to make, Mr. Kunkle. And once I say -- it certainly would encompass that there is a situation where you pass something to somebody and you reveal it's a joke, that's not credibly an instrument.

And presumably -- this comes back to another issue, Mr. Kunkle. The way I'm reading this case, this is an objective standard. It's an objective standard of credible appearance. It's --

I don't read it as a subjective standard that this particular person has a level of sophistication they spot it immediately. That's how I'm reading that statute.

MR. KUNKLE: Well, Your Honor --

THE COURT: Am I wrong about that, Ms. Edelstein?

MS. EDELSTEIN: Your Honor, the way I read the case and the statutes, Your Honor, it doesn't even -- it doesn't require any type of understanding by the recipient. The "intent" element goes to the intent in passing it or making it versus the intent to convince the person receiving it that it is what it purports to be.

THE COURT: Otherwise, it could be a crime when you pass it to nine people but not a crime when you pass it to the tenth person who has particular knowledge.

MS. EDELSTEIN: That's correct, Your Honor.

THE COURT: Well, I tell you what. Here's is what --

MR. KUNKLE: Your Honor, if I may, if there's not an objective element to this -- and that is why I wanted the wanted the language about "the document must credibly hold itself out to be a negotiable instrument" because that's what we're talking about; in this case a money order would be a negotiable instrument.

If there wasn't anything else, you could have a parade of people come in from the IRS and say, yeah, we were going to process that.

To someone else they would look at this and say it's completely bogus. I'm not taking this because I know that a money order doesn't look like this. It doesn't have the person telling, you know, someone else to pay it. This is

what's missing.

And so without that objective standard, I don't think the law is ever set out to penalize anybody because a victim said, well, this harmed me and you better believe me. I'm harmed. Self-defense has an objective standard. We don't tell a jury in a self-defense case that you acted in self-defense because you believed that person had it coming to him when you reacted in self-defense.

We employ an objective, reasonable, prudent standard for assessing when someone acts under law.

Otherwise, you can imagine the situations where any particular case somebody could come in and say, well, I thought that was fraud and it could be the Monopoly money.

Under the government's theory, then you could be penalized for passing Monopoly money and that's not the way the law is supposed to work. There has to be an objective standard. It has to fasten itself back to the document.

THE COURT: All right. I don't think I'm disagreeing with that. I think it is an objective standard but --

By the way, you know, I'm going back 42 years, but when I took a course in Uniform Commercial Code, my recollection isn't -- I don't know if this is instruments in general or checks, but a check made by the maker to the maker is a bearer instrument. Anybody can cash it. And now my memory could be wrong, but that's what seems to come back from

42 years ago.

This sort of isn't -- it isn't the maker endorsing. It's the maker -- well, the maker making it to the Internal Revenue Service which is a federal agency different from -- well, all the more reason not to go there.

Here is what I think I will do. I'm going to reread this case and look at that *Salman* case which I had not read. But it sounds from the way you summarize it it's not going to change things.

I'm disposed for now -- and I will let this ruin my evening -- to go with the government's language deleting your additional language.

But I will reread this. And I think I am comfortable saying it doesn't have to be a negotiable instrument in a technical sense. And then in a layman's sense of a negotiable anything that can be signed, even though it doesn't carry the special legal consequences of what's an uniform -- negotiable instrument under the Uniform Commercial Code -- it doesn't help you to say that.

Let me -- I will think it through and I'm inclined to be cautious. For now I'm going to -- I'm going to go the government's way on the grounds that everything you're arguing for, Mr. Kunkle, I think is encompassed by this language. And it doesn't prevent you from making the arguments you want to make to the jury.

Let's -- and then we will conform the second one.

Now, the aiding and abetting, you can see I took what you did and I rendered it abstract. And I don't know if you all had a chance to look at it, but your language was cast in the terms of the facts of this case and I have tried to make it abstract.

Have you all -- what do you think, Ms. Edelstein?

MS. EDELSTEIN: Your Honor, I think it actually reads much cleaner. It makes it -- with the bulkiness of the statutes put in there and the definitions each time, especially in light of the fact it will be given after the substantive instructions, I think that this rewriting of it is adequate and certainly addresses the aiding and abetting statute itself.

THE COURT: Mr. Kunkle, what do you think?

MR. KUNKLE: I'm just looking through it again, Your Honor.

THE COURT: Take your time and look at it.

And did we give them new, complete drafts of everything? The instructions through page 12? All right.

MR. KUNKLE: Actually, Your Honor, the aiding and abetting instruction, as you rewrote it, is almost exactly -- well, it is pretty much close to 5.1 Aiding and Abetting from the Model 9 and it cleans up the language we submitted earlier in the Joint Proposed which was filed by the government on.

And I understand the Court. You're not ruling yet on the two other substantive instructions.

THE COURT: No. I'm leaning against you, but I want to reread the cases and think if I can craft something that may be -- like I said, I think the language, the way it is now, the government's language, although it is concise, it captures everything. I don't think it excludes anything that you have been trying to present and will argue, Mr. Kunkle, but I will look at it some more and then I will let you know first thing in the morning -- well, let you know in the morning if I have any different thought.

So, all right. And I'm hearing, at least for now, satisfaction with the rewrite on the Aiding and Abetting on page 5.

I guess the next thing I note is on page 7 on "What Is Not Evidence." The language about limited purpose admissions. I don't recall any limited purpose admissions we have had yet.

MR. KUNKLE: I don't think anything.

THE COURT: If we don't, then I'm inclined to take that sentence out. It's an abstract and doesn't help with this case.

And then on -- you know, my -- oh, one other thing.

Mr. Kunkle, the defendant doesn't have to decide whether he is going to testify until the government rests its

case but, you know, I trust you are conferring with him and he'll have to make his decision at that time.

And we will wrap this up very shortly. And, Mr. Hall, if you do think you might want to testify or make that decision, I strongly urge you to talk with Mr. Kunkle about what it is you want to cover so he can prepare what questions to ask you.

Now, the other changes I made to the top of page 10, I have relabeled this. "Testimony of certain witnesses" where I have made this -- stated these principles of heightened scrutiny without purporting to instruct the jury that they fit the facts of this case. And both size can argue that they do or do not fit the testimony of witnesses in this case.

So what do you think of that, Ms. Edelstein?

MS. EDELSTEIN: Your Honor, the modification the government would suggest is to eliminate the portion of line 7 onto line 8 where it says "or if a witness's testimony was given in exchange for a promise by the government that was the -- that the witness will not be prosecuted."

I think the state of the record is at this point there is no evidence that any such promise was given. No witness has testified that there was a statement by anybody in the government that said: You will not be prosecuted.

THE COURT: All right.

MS. EDELSTEIN: And I think the gist of it would come

through by rewriting it to say: If a witness admits or was alleged to be an accomplice to the crime charged, in evaluating the testimony of such a witness, you should consider the extent to which the testimony may have been influenced by this factor.

THE COURT: All right. And your response, Mr. Kunkle?

His response is that the promise was in body language.

MR. KUNKLE: Are you taking that from my body language and signs?

Actually, I personally disagree with the government what the record reflects and what was maybe promised or not promised to a witness.

I think when someone looks at the transcript down the road and the instruction under 4.9, Your Honor, the Model Instruction of the Ninth Circuit, it speaks of testimony given in exchange for a promise.

Well, what's a promise, you know?

THE COURT: Do you want this language in?

MR. KUNKLE: Yes, I do.

THE COURT: Here is my thought.

Ms. Edelstein, on the one hand I think you're right. I don't think we had evidence of a promise. However, it's a criminal case. The defendant has wide range to argue. And I

am not seeing any prejudice to the government in including this language.

I don't think -- it's not persuasive to me, but Mr. Kunkle would then be free to argue that. You can get up and say, hey, she just -- she had her hopes and expectations and there was nobody -- she never said they ever told her that.

If we don't have this language and the Court of Appeals looks and says, well, you know, maybe you could see it that way, I might have to try this case again.

If I put this language in here, I'm not seeing how it prejudices the government in this trial. So I'm inclined to leave it in for that.

If I thought that this language would be -- would harm the government in any way, I would think twice about putting it in. So, all right, with the defendant wanting that language, I'm disposed now to leave it in.

And I think that's the last thing that I thought to talk about.

Anything else either of you would like to talk about? And I think we need to hurry, because I'm keeping -- I assume I'm keeping the bus waiting.

So anything else?

MS. EDELSTEIN: Nothing further, Your Honor.

THE COURT: All right. Mr. Kunkle?

MR. KUNKLE: Nothing further.

THE COURT: All right. Thank you all. And thank you for your patience. We will be adjourned until -- be here a little before nine o'clock in the morning.

(Proceedings adjourned at 5:58 p.m.)

* * *

C E R T I F I C A T E

I, ELIZABETH A. LEMKE, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 9th day of September, 2015.

s/Elizabeth A. Lemke
ELIZABETH A. LEMKE, RDR, CRR, CPE