**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_________________

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **CR 14-0184-1-PHX-NVW** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 20, 2015 |
| **Gordon Leroy Hall,** | ) | 8:56 a.m. |
| | ) | |
| Defendant. | ) | |
| _____________________________ | ) | |

**BEFORE: THE HONORABLE NEIL V. WAKE, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**(*Jury Trial - Day 1*)**
**(Pages 1 through 270, inclusive.)**

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**APPEARANCES:**

For the Plaintiff:

U.S. ATTORNEY'S OFFICE
By: **Lisa Jennis, Esq.**
By: **Monica B. Edelstein, Esq.**
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004

For the Defendant:

STEPHEN C. KUNKLE PLLC
By: **Stephen C. Kunkle, Esq.**
5150 N. 16th Street, Suite A222
Phoenix, Arizona 85016

**I N D E X**


| **WITNESS:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| T.W. Lyons | | | | |
| By Ms. Jennis | 165 | | | |
| By Mr. Kunkle | | 189 | | |


**INDEX OF EXHIBITS**


| **EXHIBIT** | | **IDENT** | **RECEIVED** |
|---|---|---|---|
| 1 | Certified Money Order; 1996 Form 1040-V voucher; Affidavit of Service | 169 | 171 |
| 2 | Certified Money Order; 1996 Form 1040-V voucher; Affidavit of Service | 181 | 171 |
| 3 | Hall Tax Year 1996 IRS transcript | 182 | 171 |
| 4 | Hall Tax Year 1997 IRS transcript | 183 | 171 |
| 5 | Hall Notice of Assessment/90-day Letter | 183 | 171 |
| 6 | Package received on or about 8/3/11 by Western Area SB/SE IRS unit | 183 | 171 |
| 7 | Package received on or about 12/7/12 by Western Area SB/SE IRS unit | 188 | 171 |
| 100 | Registered Mail receipts | 240 | 240 |

P R O C E E D I N G S

THE COURTROOM DEPUTY: Criminal Case 2014-184-01, United States of America versus Gordon Leroy Hall. This is the time set for jury trial.

Counsel, please announce for the record. 08:56:56

MS. JENNIS: Good morning, Your Honor. Lisa Jennis and Monica Edelstein for the United States. And we will be joined by IRS Special Agent Kathleen Neri.

MR. KUNKLE: Good morning, Your Honor. Stephen Kunkle on behalf of Mr. Hall. Mr. Hall is present, seated, and the 08:56:57 record should reflect I have had a conversation with Mr. Hall. He is seated in his chair, unrestrained, legs crossed. I think we're going to be okay.

THE COURT: Let me state I have had a discussion with the marshals before we began. The marshals have recommended 08:56:57 that the leg restraints be placed on the defendant. They will not be visible to the jury. I have instructed them to do that. The Court almost always follows the recommendations of the marshal's office concerning security.

We have the issue of Mr. Hall electing to be present 08:56:57 in the prison garb rather than civilian garb. I will pose a question to the jury about whether they can be fair and impartial to the jury in light of the fact that he elects to be here in that attire, which is his choice now.

MR. KUNKLE: Just so the record is clear, I'm standing 08:56:57

here at counsel table behind the table now. Mr. Hall has leg restraints on, hasn't made any effort to get out of his seat. Front row of jurors will be sitting here behind him three feet away. As I said, he hasn't done anything yet at this point in the trial. I know the Court is maybe aware of the marshals 08:56:58 providing court with a history. I think at this point Mr. Hall should be allowed the opportunity to appear without leg restraints on him.

THE COURT: Mr. Hall, if I have leg restraints removed at least during the period that the members of the jury panel 08:56:58 will be sitting behind you, will you be following the Court's instructions and engaging in no disruption? Yes or no?

MR. KUNKLE: Your Honor, he has assured me he will. I will answer.

THE COURT: That's fine. 08:56:58

MR. KUNKLE: He has assured me he will. And again, he knows. He's listening to me. If I say yes, he will obey, he understands, I believe, that if he misbehaves, we have had a discussion. The marshals are right here. He understands they have tasers. He understands there's more of them than him. I 08:56:58 think he should be allowed the opportunity at this point, since we are just standing in this proceeding before Your Honor, prior proceedings aside, to be able to sit here during jury selection especially if the jurors are five feet away. Again, it's on him if he acts up. 08:56:58

THE COURT: Mr. Hall, is Mr. Kunkle's description of your commitment as to how you will comport yourself, not do any disruption, is that correct? Is that your commitment?

THE DEFENDANT: I am here by special appearance reserving all rights without prejudice as the beneficiary for the discharge in the matter of the United States of America versus Gordon Leroy Hall. I give notice that pursuant to the Trade of the Enemy Act as appendix to Title 50 of the United States Code, Sections 1 through 44 and also 12 U.S.C. 95(a) that the debt has been discharged and the public set off in private which is also encoded in Section 7(e) of the Trading With the Enemy Act. 08:56:58 08:56:58

THE COURT: All right. I have made this statement before, and I'm going to make it now. I'm not going to repeat it. The defendant's remarks are nonresponsive to the Court's inquiry. They reflect bad faith, intentional decision by the defendant to not respond. They do not reflect any lack of ability to understand these proceedings, rather they reflect obstruction. 08:56:59

I'm not going to make that finding every time the defendant makes such remarks, but I stand by those findings as I previously made. I want to ask, with the jury coming in to sit here, I am concerned they will be seeing the restraints. 08:56:59

THE MARSHAL: Judge, we can have him sit as close to that table as possible so the legs are not seen. We have one 08:56:59

of our guys right behind him. He's in a jumpsuit as it is.

THE COURT: I know. But the problem is even though he's in a jumpsuit the jury will know he's in detention. The fact he's in restraints raises a different higher level of potential of threat. And I want to minimize that to the extent 08:57:13 I can consistent with Mr. Hall's insistence that he wear the prison garb.

Let me ask -- go sit back -- the other marshal, I want you to stand behind where the jury would be sitting. I want you to tell me if you can see the leg braces. I think it's 08:57:32 rather obvious that you can.

THE MARSHAL: They can be seen.

MR. KUNKLE: Your Honor, just so the record is clear, you have heard what the marshals said. I'm standing right here. As people are going to walk in, he's sitting there, the 08:57:46 leg restraints will show. Yes, he's wearing orange. That's his choice. I think it's pretty clear that may be part of the protest. But until he stands up or does something physical to disrupt these proceedings, I believe the law is pretty clear he cannot have the restraints on. It's too prejudicial. 08:58:02

THE COURT: I'm going to then ask the marshals to remove the leg restraints at this time. We may, after the jury selection, be in a position to put them back on when the jury will be in the box and will not be able to see them. And if there's any disruption I am directing the marshals now to 08:58:18

exercise their judgment, to exercise all safety in the event there's any disruption. And I will support whatever choices the marshals make in the circumstances. I may also give you specific direction.

Now, all right. Counsel, I do want to discuss briefly Mr. Kunkle's motion to sever. And I have received and read the government's response. First of all, it does appear to me, Ms. Jennis, I need you to correct me if I'm missing anything, but the gun charges have no evidentiary connection with the other charges in the case, the proof in the case, correct? 08:58:38 09:00:03

MS. JENNIS: The only connection is that they were found at the defendant's residence where also he conducted some of his business.

THE COURT: All right. I understand the challenges Mr. Kunkle is facing in this matter, and although in a normal situation this is a motion I would deem to be untimely, because of the Court's independent obligation to see of that any unfair prejudice to the defendant is mitigated as it can, I'm looking seriously at this. So I'm taking it, Ms. Jennis, that the evidence of the false document count is probably nothing short of overwhelming. Correct? 09:00:28 09:00:52

MS. JENNIS: Yes. I believe so, Your Honor.

THE COURT: I have inquired to the jury office as to how soon we could have a second jury here for a second trial, and they can have another jury to us -- well, I'm at a judge's 09:01:34

training program Monday, Tuesday, Wednesday of next week. But they could have a second jury to us here by Thursday. We could do a second trial on Thursday and Friday. Are counsel available at that time? That would be for the gun charge if I grant the motion to sever? 09:01:45

MR. KUNKLE: Your Honor, first, and I think my motion speaks for itself, I will make myself available. I have already spoken with everybody I need to speak to. I think I made clear last week to the Court I'm trying to wrap up certain things, start new things. It doesn't matter if I push that 09:02:02 date back. I already suggested this remedy to Ms. Jennis, the government. It actually makes this trial shorter, takes some witnesses out, changes a few things in terms of proof, what evidence comes in. The other trial will be just as -- even shorter yet. It's a minor witness case. There are some 09:02:20 downsides to it but I think the prejudice is inherent in trying them together to Mr. Hall's manifest here.

THE COURT: I can't think of any prejudice to Mr. Hall in granting your motion to sever.

MR. KUNKLE: Well, the reason being, Your Honor, in a 09:02:36 trial on the four counts of fictitious instruments, the jury would never hear he's a convicted felon, regardless of how he's dressed. That's irrelevant to that, whatever they may speculate about his dress and attire. The other count, obviously, they hear about the conviction. 09:02:52

THE COURT: I understand that prejudice. But there's no prejudice in granting your motion to sever.

MR. KUNKLE: Oh. I was talking in terms of the Court denying it. In granting it, no, there's no prejudice. That remedies the situation. And, yes, I agree it was untimely but I believe at this point it's a simple matter. There's no jury been sworn, selected, voir dire. It's a matter of pulling out two witness names and taking out a question or two about the firearms. We don't even discuss those. It eliminates some witnesses for the government. And I'm available a week later to try the second case. 09:03:03 09:03:23

THE COURT: The other question is whether the government's firearms witnesses would be available next week, say Thursday and Friday.

MS. JENNIS: Whether our -- I don't actually know if our Nexus expert would be available. Counsel is available. We could always have someone in our office be made available. I haven't actually asked the person who wrote the report if he's available to testify. I know that next week is difficult for law enforcement agencies due to the Super Bowl and they -- 09:03:34 09:03:52

THE COURT: When is the Super Bowl?

MS. JENNIS: It's the following Sunday. So --

THE COURT: So this would be the Thursday and Friday before the Super Bowl?

MS. JENNIS: Right. So that might be -- that's 09:04:05

presents a lot of difficulties especially if jurors are not local getting here. So it would probably be better to do it the week after just for logistics.

THE COURT: We have been asked by the clerk's office not to schedule jury trials then because they are charging $1,000 a night for hotel rooms then. 09:04:19

MS. JENNIS: Right. So if we happen to have someone on the jury not in town that would present difficulties, and also I'm aware that law enforcement agencies, no one is allowed to take leave because they are working. So I do think having a trial next week would be very, very difficult. 09:04:37

THE COURT: I agree. I was just looking at when I could do it. And that's the earliest I could do it.

MR. KUNKLE: Your Honor, just so the Court's aware, I have already discussed this with my new spot. If I have to come back and try this case, it's just a couple days off for me. That's fine. 09:04:51

THE COURT: I very much appreciate your effort, Mr. Kunkle. There is another possibility, and that is if we have to have two trials, another possibility is we finish tomorrow if we're only trying -- would we finish tomorrow, Ms. Jennis? 09:05:05

MS. JENNIS: As I have mentioned previously, Your Honor, unfortunately our expert could not be here to testify until Thursday morning. His plane lands at 4:35. It's a non-stop from the east coast on Wednesday. So unless the Court 09:05:21

wants to keep everything open I don't think he's available. So it doesn't really shorten the trial for that.

THE COURT: If we don't put in -- here's the other possibility. The jury office tells me they could have a second jury here Thursday, in two days. They would have to telephone 150 people to find out who could come in, but they could do it. I thought, that's not worth it. 09:05:42

But one scenario would be we could start a second jury on Thursday afternoon. Would we be finished in a day and if we pick a jury in a couple hours, how long would it -- we would have the jury coming back on Monday to deliberate, but that's fine. 09:06:04

MS. JENNIS: I don't know how long it would take, and I don't know if my witness is available that day. I think if Mr. Kunkle was willing, we could -- I don't know what the Speedy Trial Act date is. We could just do it sometime in February. 09:06:17

THE COURT: I think his motion to sever would extend that, wouldn't it?

MS. JENNIS: Usually, that does add excludable time. 09:06:31

MR. KUNKLE: And, Your Honor, again, there's the issue of my availability, counsel availability for the government. I think under 3161, I think because the untimeliness of the motion, I think it, you know, I'm just speculating on speedy trial grounds, I would think because this has been to benefit 09:06:51

the defendant -- and I'm using language from state court, obviously -- but because this is untimely that speedy trial issue would be eviscerated. Because literally speaking, I would have to go look at my schedule. But I could be available to do it whenever the Court finds. 09:07:08

THE COURT: I'm not worried about the speedy trial because part of your motion will be a continuance of the severed trial.

MR. KUNKLE: True. Yes. And I would move that orally or follow up later today, Your Honor, if there's a severance. 09:07:16

MS. JENNIS: And again, by doing it late, by extending it and having the agent testify, then you get into the same problem with the Super Bowl, Your Honor, next Sunday. And they are on duty. It would be the United States' preference to do it sometime in February would be great. 09:07:36

THE COURT: Okay. If I do this I'm looking for the way to do it that is the least inconvenient for everyone, especially the government, because the burden of it falls on the government's witnesses.

I intend to try this case once or twice severed trials 09:07:56 but I don't intend to do this trial a second time after we have done it the first time. So it's a matter of assessing the degrees of risk, which is the same thing as assessing the degrees of unfairness to the defendant.

Eliminating the evidence of a felony conviction is 09:08:17

always something that, in theory, helps. In this case, with my understanding, which Ms. Jennis confirms, that the evidence on the financial instrument case being overwhelming, it may well be -- of course I say that without having heard the evidence. I rely on the government. They always tell me that, don't they? 09:08:42

MR. KUNKLE: They always think they are going to win, Judge. We all do. But I would beg to differ on the overwhelming. But I think trying them together is obviously what the Court's troubled with and obviously is why they should 09:08:57 be severed. And I will endeavor to do what's possible to ameliorate any discomfiture to the government in terms of witnesses and rescheduling.

THE COURT: What are the witnesses, Ms. Jennis, you are going to call in the firearm case? 09:09:11

MS. JENNIS: Three witnesses, Your Honor. Adam Nixon, Robert Tobias, and Greg Cowan. I might call somebody else. I mean, just -- but those are the three that I can -- they are all special agents.

THE COURT: What are they going to testify to, each of 09:09:27 them?

MS. JENNIS: You know, they would testify to where the firearms were found, that they traveled at interstate commerce. I don't even know if we would have a stipulation at this point whether -- the United States is willing to stipulate, of 09:09:45

course, to the nature of his felony conviction. I might have some other people testify, too, Your Honor, but they wouldn't be law enforcement agents. I would have to rethink the trial, Your Honor.

THE COURT: And you have got your Interstate 09:10:02
connection guy who can testify about that?

MS. JENNIS: His name is Greg Cowan. He's on the witness list as the last person right now. I did not ask him his availability beyond Wednesday because I knew that day he would be testifying. 09:10:19

THE COURT: Right. Honestly, I think the risk of unfairness to the defendant of trying these together is diminished by what I expect to be overwhelming evidence of guilt. And I say that just based on my own background doing civil litigation in commercial matters. I mean, there is 09:10:54
nothing there to back up that piece of paper. So I think any jury is going to see that.

On the other hand, the Court and counsel are confronted with special challenges in this case. And I am disposed to do everything reasonable to mitigate the 09:11:16
self-inflicted harm that Mr. Hall is causing. I cannot end it, but this is one that's not in his -- of his doing, and I, therefore, I am disposed to grant the motion to sever to leave this record without any arguable basis of error much less reversible error. And right now, I think we have a perfect 09:11:49

record in that regard, and I intend to keep it that way.

So now Mr. Kunkel.

MR. KUNKLE: Yes, sir.

THE COURT: When are you going to be going to your new job? They will let you come back to try this, correct? 09:12:05

MR. KUNKLE: Oh, yeah. It's a day off, actually, for me. And I would continue my appointment, obviously, through the panel.

THE COURT: You will make good money on it.

MR. KUNKLE: I was supposed to start today. So that 09:12:17 should tell the Court something. I'm here today. I have already spoken to them. They fully understand. It's Mr. Peterson, Your Honor. I don't know if you remember Mr. Bruce Peterson. He used to be on the panel years ago. He's the boss. I explained to him. He said, things happen. So that's 09:12:32 not an issue with me taking the time off at the County and coming back to do this case. Like I said, the second trial is a two, three-day trial at best. And after this trial concludes obviously I will work with Ms. Jennis, because we were discussing interstate nexus and certain possible stipulations 09:12:51 there. So I make myself available to the Court scheduling wise to get that done.

THE COURT: All right. Very well. In light of your availability, then I will grant the motion for severance of Count 5. And I will tell you what, rather than keep the jury 09:13:06

waiting, we'll talk a little later about setting a firm date for that.

Actually, I will need to have -- Ms. Jennis, you need to check with your witnesses so you can let me know what times they can be available. The sooner the better. This looks like probably a two-day trial. Need the jury ready for three. I mean the gun trial is probably a two-day trial. 09:13:22

MS. JENNIS: I agree.

THE COURT: So now with respect to the other matters, I have got your additional questions, Ms. Jennis, they are fine. There's no objection from Mr. Kunkle. I have inserted them. Is there any other comments any of you would like to raise about the voir dire as I sent them to you? 09:13:41

MS. JENNIS: I think there's a firearms question that may not be necessary to ask in light of your ruling. 09:13:58

THE COURT: I will delete that as well as the reference in the statement of the case to the firearm.

Therefore, it is ordered that the defendant's motion for severance of Count 5 is granted. And as I said, we'll set a firm date for that after we have further information about the availability of witnesses. 09:14:12

Anything else before we call in the jury, counsel?

Mr. Kunkle.

MR. KUNKLE: The only thing, Your Honor, is Ms. Jennis mentioned with the voir dire, there's witness names that the 09:14:23

Court would not have to read.

THE COURT: Actually, good point.

MR. KUNKLE: Just the changes to be made in the voir dire, I don't know if the Court wants to change those.

THE COURT: Those ones I will just delete as we go. Tell me the ones to delete again. 09:14:35

MS. JENNIS: I had sent it in my e-mail. I didn't know if maybe that was already revised.

THE COURT: I don't know, so just tell me right now.

MS. JENNIS: It was -- let's see. I don't know if I have the originals in front of me. It was Christy Morgan. 09:14:47

Here we go. Actually, this is the list. The list that Mr. Kunkle is showing me right now is all the people that the United States is calling. Oh. I see what you are saying. I apologize, Your Honor. 09:15:14

Let me think for a second and just make sure that we're not going to be calling Robert Tobias for any other reason. I don't believe we are. I just wanted to make sure in my own mind, Your Honor. Robert Tobias and Greg Cowan from ATF, they will no longer be necessary to testify. So that would bring the count to eight witnesses for the United States plus the defendant. 09:15:37

THE COURT: And this Christy Morgan is out, too. Anything else?

MR. KUNKLE: Just I trust Your Honor will skip through 09:16:00

it in voir dire questions.

THE COURT: Yes. I will eliminate everything concerning the firearm charge.

Anything else, Ms. Jennis, before we bring in the jury? 09:16:14

MS. JENNIS: I don't believe so, Your Honor.

THE COURT: Very well then. We'll take a recess. Nick, bring up the jury.

(Recess from 9:16 a.m. until 9:32 a.m.)

(Jury in at 9:32 a.m.) 09:16:20

THE COURT: Well, good morning, Ladies and Gentlemen. This is the time set for trial in the case of United States of America versus Gordon Leroy Hall.

Is the government ready?

MS. JENNIS: Yes, Your Honor. 09:32:19

THE COURT: And is the defendant ready?

MR. KUNKLE: Yes, sir.

THE COURT: All right. And now, Ladies and Gentlemen, I am Neil Wake, United States District Judge. And I will be the judge in this trial. 09:32:30

First, do any of you have any difficulty hearing? Because if you do, we have some amplified earphones we can give you.

If at any time any of you think you are having difficulty hearing, just raise your hand and tell us and we 09:32:44

will give you the earphones. The acoustics in this room are not all that great. So let us know if you have a question.

Now, the Court will ask you a series of questions to determine whether you can sit as fair and impartial jurors in this trial. I hope you understand that these questions are not intended to embarrass you or to pry into your personal affairs. In order to protect the privacy of jurors, we do not use the names of jurors during jury selection. This proceeding will be typed up and made a part of the permanent public record of the court, accessible to anyone. The lawyers, the parties, and I have a list of your names and juror numbers, so we know your names. But we will address you only by your number to protect your privacy from anyone who may read the transcript of this proceeding in the future.

Now, if your answer to any question is yes, please raise your hand, and I will ask you for your number so that additional questions can be asked. I will ask further questions beginning with the people sitting in the jury box and then with the people sitting in the back of the courtroom.

When you answer a question, please always begin by stating your juror number. If your answer to a question is no, you need do nothing. I will assume by your silence that your answer is no. And remember if in response to any question you would feel more comfortable speaking in more privacy, tell me and I will do that at a time when we take a break and the other

09:33:10 09:33:31 09:33:48 09:34:07 09:34:31

jury panel members are out of the courtroom. The lawyers and the parties will always be here and the Court staff, so if there's any question you would like to answer in that way just let me know and we will do that.

Now, I try to project the times we need as to when we should take a break, but if I miscalculate and any time you need to take a break, just raise your hand and tell me and we'll take a break at that time. 09:34:47

Now, again, the case which will be tried today is entitled United States of America versus Gordon Leroy Hall. The United States of America, through John S. Leonardo, the United States Attorney for the District of Arizona and his assistants, Lisa Jennis and Monica Edelstein, bring this action. 09:35:12

The defendant, Gordon Leroy Hall, has been charged by the United States of America with two counts of aiding and abetting making of false instruments, in violation of the United States Code, and two counts of aiding and abetting using fictitious instruments, in violation of the United States Code. 09:35:33

The fictitious instruments alleged are two false money orders that were submitted to the Internal Revenue Service in order to pay off an outstanding tax liability. The defendant denies these charges and has entered a plea of not guilty. 09:35:59

Now, as I said, the United States is represented by Lisa Jennis and Monica Edelstein. Counsel, would you please 09:36:26

stand? And counsel are both assistant United States attorneys. The United States Attorney is John S. Leonardo.

Do any of you know counsel or the United States Attorney or any of the employees in his office on any basis; social, professional, or otherwise? If so, please raise your 09:36:46 hand.

All right. I see no hands.

And Ms. Jennis, would you please introduce your investigator.

MS. JENNIS: Yes. This is Kathleen Neri, and she's 09:36:56 with the Internal Revenue Service.

THE COURT: And do any of you know the investigator or any of the employees of her office on any days basis; social, professional, or otherwise?

All right. I see no hands. 09:37:13

Please be seated.

Now, the defendant is represented by Stephen Kunkle. Mr. Kunkle, would you please stand?

Do any of you know Mr. Kunkle or any employees of his office on any basis; social, professional, or otherwise? 09:37:28

All right. I see no hands.

And Mr. Kunkle, would you please introduce your client.

MR. KUNKLE: Ladies and Gentlemen, this is Mr. Hall.

THE COURT: Do any of you know Mr. Hall on any basis; 09:37:45

social, professional, or otherwise?

All right. Juror Number 6.

MR. KUNKLE: Your Honor, is that something we could maybe address later?

THE COURT: We'll do that, Juror Number 6, when we take a break. I will ask you more questions about that, about how you know or may know the defendant. 09:38:01

MR. KUNKLE: There's another hand in the back.

THE COURT: Would you stand up please, Mr. Hall?

All right. Okay. I see no further hands. 09:38:20

Now, let me introduce our court staff. Down to my left is Nicholas Sommers, is our courtroom deputy clerk. He enters the Court's rulings and other matters of the record and assists, generally, in the proceedings and will assist the jury. 09:38:42

To my right, Laurie Adams, is our court reporter. She takes down everything that is said in the trial and types it up for the permanent record of the court.

To my left is Cullen Macbeth, my law clerk. He will serve as bailiff during the trial and will also assist the jury if the courtroom clerk is not available. 09:39:00

Now, the purpose of jury selection is to select jurors who, using their common sense, will base their ultimate decision on the evidence that comes before this Court and will set aside any prejudice, bias, or sympathy when we have -- 09:39:20

either for the government or for the defendant.

During this process, this Court and the attorneys will have an opportunity to ask you several questions. Our goal when asking these questions is not to intrude into your private lives but rather to pick a fair and impartial jury. Now, having stated that, it is very important that each of you answer each question honestly and in a forthright manner. 09:39:37

Now, is there anyone here who cannot promise and assure this Court that during the process of jury selection he or she will answer each question honestly, openly, and in a forthright manner? If you cannot make that commitment and promise, raise your hand and we'll discuss it further. 09:39:59

All right. I see no hands. So I take it everyone does make that commitment.

Now, as I said before, if we touch on something that's more personal you would rather not talk about in front of such a large crowd, we will discuss such matters with you and the others are not present in the courtroom. 09:40:16

Now, have any of you heard or seen anything about this case from any source whatsoever? 09:40:33

All right. I see no hands.

Now, it's obvious that Mr. Hall is present here today wearing detention garb. He has a right to be present at this trial wearing civilian garb, but he is wearing detention garb.

As members of -- if you are selected to serve as 09:40:59

jurors, as I said before, your job will be to decide whether the government has proved its charges against the defendant beyond a reasonable doubt. I'm going to jump a little ahead here and tell you that proof beyond a reasonable doubt means evidence that leaves you firmly convinced that the defendant is guilty, which means that the government has proved every element of the charge it raises. 09:41:22

Now, I guess this is a good time to give you -- it's my speech. I apologize. It's a speech. But this is the right time to say it. I believe we have the best criminal justice system in the world. And one of the reasons, perhaps the most important reason, we have the best criminal justice system in the world is that we take a jury and we place the jury to stand between the government and the person accused of a crime. And we have the jury determine whether the government has proved every element of its charge against the defendant. And in most of the advanced countries of the world, government officials do everything. A government official will investigate whether a crime may have been committed. A government official will decide wether to bring charges. And other government officials determine whether the defendant is guilty. It's judges in most parts of the country, judge or multiple judges decide those questions. 09:41:48 09:42:14 09:42:36

Here we take people out of our community and we -- people who reflect the breadth and depth of our community with 09:42:53

the diversity that we have, the divergent life experiences we have and we ask you, as I said, to stand between the government and the person charged with a crime to determine whether the government has proved his case beyond a reasonable doubt.

You know, you don't actually decide whether a defendant is innocent. That's not your job. Your job is only to decide whether the government has proved its case beyond a reasonable doubt. And if the quality of the government's proof, the persuasive force of that evidence falls short of proof beyond a reasonable doubt the defendant is found not guilty. 09:43:13 09:43:31

Now to do that, as a jury, you are charged with looking at the evidence, whether testimony of a witness or written documents or whatever evidence is admitted in court and you determine what the persuasive force of that evidence is, what it should be. You we want you to look at that evidence and to give it the force it deserves, not any more force than it deserves, not any less force than it deserves, without sympathy or bias for one party or the other. You are charged with looking at that persuasive force of the evidence and deciding whether it persuades you beyond a reasonable doubt. 09:43:47 09:44:09

Now, one thing that has nothing to do with the persuasive force of the evidence is the attire that Mr. Hall is wearing here today. It has nothing to do with whether the government has proved its case or not. And so I am going to 09:44:32

ask you whether the fact that Mr. -- I'm going to ask this question a few times in maybe slightly overlapping ways. But I ask you whether any of you would be unable to be a fair and impartial juror evaluating that evidence for its persuasive force alone because of the fact that Mr. Hall is wearing detention garb here today, if you would be -- oh my gosh. Yes. I will. Thank you. The clerk has reminded me I forgot something very important. I will get to it in just a second. 09:44:59

I'm going to ask you whether the attire that Mr. Hall is wearing would interfere with your ability to be a fair and impartial juror. But before you answer that question, I forgot to swear you in. So all of your answers have to be under oath. So at this time I ask the panel members to stand and be sworn. 09:45:25

The clerk will swear you.

(The jury was sworn.) 09:45:46

THE COURT: All right. Thank you. Please be seated. Here it is right in my list. I just forgot to ask you.

Now, come back to my question. Would any of you be -- would your -- for any of you, would your ability to be a fair and impartial juror be affected by the fact that Mr. Hall is wearing detention garb? If so, raise your hand and we'll discuss it further. 09:46:14

All right. I see no hands.

Now, follow-up question on the same point. I instruct you that you should give no thought or speculation to the 09:46:41

reason that Mr. Hall is wearing detention garb or may be detained. That also has nothing to do with the evidence in this case. So for any of you, are any of you unable to commit that you will give no thought and no speculation to the reason why Mr. Hall may or may not be detained? If you are unable to give that commitment, raise your hand and we'll discuss it further. 09:47:04

All right. I see no hands, and I take it everyone does give that commitment.

All right. Now, Ladies and Gentlemen, on the back of your number sheet, or your pages, you will see a list of questions. I'm going to, starting with Juror Number 1, I'm going to ask each of you to please stand and answer the question, the questions listed there. 09:47:18

And the last question asks about your prior jury service. Now, with respect to civil cases, please tell me the number of civil injuries on which you have served, and with respect to criminal cases please indicate the nature of the crime involved and the result of the case, guilty or not guilty or a hung jury for each of the criminal cases you have served. And also please tell me if you have served on a Grand Jury. 09:47:35 09:48:00

Let us begin with Juror Number 1.

PANEL MEMBER: Okay. I'm married. I have two children, one 17 year old. I work at Arizona Environmental Progress, and it's office work. My husband works at a solar 09:48:17

company. And I have never served on a jury before.

THE COURT: And what are -- you do office work at the company?

PANEL MEMBER: At -- yes.

THE COURT: Very well. Thank you. 09:48:35

Juror Number 2.

PANEL MEMBER: I am Juror Number 2. I'm married. One child, 16. I don't feel to tell where I work, but I'm a server. And I don't want to give out where my husband works either. 09:48:57

THE COURT: Just tell us the nature of the work he does. We don't really care about the particular employer for anyone.

PANEL MEMBER: Maintenance.

And I have never done jury service. 09:49:05

PANEL MEMBER (3): Juror Number 3. I am married, no kids. I'm a former teacher, and I just do volunteer work in the schools, working on my recertification. And I also work -- I have a home-based business. My husband is a systems engineer and owns his own business doing that. 09:49:30

I served on a DUI case maybe two and-a--half years ago and he was not guilty, found not guilty.

PANEL MEMBER (4): I'm Juror Number 4. I'm married. I have four children. I have an eight year old daughter, six year old son, two twins that are one. 09:49:51

I work for Palo Verde. I'm a system engineer there. My spouse is a homemaker and I have not served.

PANEL MEMBER (5): I'm Juror Number 5. I'm married. I have two children, both over the age of 18. I work for Southwest Food Service Excellence. I'm a kitchen manager for an elementary school. My husband is a machinist. 09:50:18

And I have never served on a jury.

PANEL MEMBER: I'm Juror Number 6. I'm married. I have three children. I am an attorney by trade, career, I guess. I'm involved in mortgage banking. I'm involved in real estate. I have my own companies. My wife is my partner. 09:50:45

I have been on prior jury service. It was a DUI case and the defendant was found not guilty.

PANEL MEMBER (7): Juror Number 7. I am married. Two children. One five, one eight. I am an electrical engineer for a local power company. My wife is a contractor for the same power company. 09:51:10

Served on a jury in the mid '90s, criminal, DUI case. Found guilty.

PANEL MEMBER: Juror Number 8. Married. No children. 09:51:29 I work as an administrative assistant at Wells Fargo Bank for a department that is responsible for putting strategies in place for financial crimes. My husband is in the field of overhaul and repair in aerospace.

And I have not served as a juror on a trial. 09:51:56

PANEL MEMBER (9): I am Juror Number 9. I am married. I have three kids, ages six, seven, and 11. I am a respiratory therapist at a local hospital. My husband is a police officer and on the SWAT team at a city police department.

And I have no prior jury service. 09:52:30

PANEL MEMBER: Juror Number 10. Married. No kids at home. Small company, paint and shrink wrap. My wife works for an escrow outfit. And I have no prior service.

PANEL MEMBER (11): Juror Number 11. I'm married. No kids. I'm a curator of art. My husband is a professor. 09:52:59

I have had jury service 30 years ago. It was a stabbing. I don't know if that's criminal or civil. And he was guilty.

THE COURT: What field does your husband teach in?

PANEL MEMBER (11): Ceramics. 09:53:22

PANEL MEMBER (12): I'm Juror Number 12. I am married. I have three children. I work for the Arizona Department of Corrections. My spouse works for Hallmark cards. And I have no prior jury service.

THE COURT: What is your position at DPS? 09:53:38

PANEL MEMBER: I work for Arizona Department of Corrections.

THE COURT: What work -- what job do you do?

PANEL MEMBER: I'm security. I'm a captain at the Cheyenne unit. 09:53:50

THE COURT: All right.

PANEL MEMBER (13): I am Juror Number 13. I'm single. No kids. I work at Home Depot. I do merchandising. And I have never served on a jury before.

PANEL MEMBER (14): I'm Juror 14. I'm married. I have two stepchildren, all grown up. I don't work now. I'm retired. I worked at a private boarding school as a head master secretary. My husband is a CPA for a large firm in Phoenix. 09:54:07

I worked -- or I was on a DUI case probably 15 or 16 years ago and he was guilty. 09:54:30

PANEL MEMBER (15): Juror 15. Yes, I am married. Four children, one 12-year-old. Work in a receiving department at AeroTurbine. Spouse works for a cellular company.

And I have not served. 09:54:57

PANEL MEMBER (16): 16. Married with kids, 7 and 9. I work in management at Southern Wine & Spirits, an alcohol distribution company. And my wife is the managing editor of a newspaper in Phoenix.

THE COURT: Go down to number 17. Yeah. 09:55:25

PANEL MEMBER (17): Juror Number 17. I am married. I have one child age 6. I am a corporate controller for a local property management firm. My husband is a firefighter for the City of Phoenix. And I have never served on a jury before.

PANEL MEMBER (18): I'm Juror Number 18. I am 09:55:49

married. I have five children. My younger three are 17, 15, and 11. I am a bookkeeper and payroll person for a carpet cleaning company in Gilbert. My husband is currently an unemployed software engineer.

And I have never served on a jury. 09:56:15

PANEL MEMBER (19): Juror Number 19. I am single. I have one 14 year old. I am a project manager for a hospitality company.

And I served on a jury two or three years ago, DUI case, and they pled out in the middle of trial. 09:56:33

PANEL MEMBER (20): Number 20. I'm married. I have three children, one under 18. She's 16. I work for a micro electronic firm in the valley, field service engineer. My spouse works for the State of Arizona. She works for the Department of Emergency Management. She administrates the 09:56:56 financial area.

No prior jury service.

PANEL MEMBER (21): Juror Number 21. Married. My grand kids are closer to 18 than my kids are. My wife and I are both retired. 09:57:17

And I have been called for jury service a couple times but was released before I was empaneled or whatever that word is.

THE COURT: What kind of work did you do before you retired? 09:57:30

PANEL MEMBER (21): We owned a company called Scientific Laser Connection. We built educational training modules for middle school and high school electronics. My wife was a dog groomer. She retired last year.

PANEL MEMBER (22): Number 22. I'm single. No children. And I'm unemployed at the moment. 09:57:45

And I never served before, jury.

PANEL MEMBER (23): Juror Number 23. I'm single. Got an adult daughter. I'm retired from the Air Force. Right now I do asset protection at Macy's. 09:58:10

And I did sit on a court martial when I was in the military.

PANEL MEMBER (24): I'm Juror 24. I'm married. I have eight adult children. I'm retired but the caregiver for my youngest son who has a chronic illness. My husband is a retired copper miner. 09:58:30

And I have never served on a jury.

PANEL MEMBER (25): Juror Number 25. I am single. I have two kids, four and five. I am a cook. And I have not served as a juror before. 09:58:54

PANEL MEMBER (26): I'm Juror 26. I am married. No children. Employment, currently unemployed just for the last couple of weeks. My spouse is a surgical tech so he works in the operating room.

And about 26 months ago, a criminal jury, Maricopa 09:59:11

County, somebody was accused of hitting a Phoenix police officer and it wound up being a hung jury.

THE COURT: When you are working, what kind of work do you do?

PANEL MEMBER (26): Sales. 09:59:28

PANEL MEMBER (27): I'm Juror Number 27. I'm married. Have three children. Only one of them is under 18. He is 10. I'm a registered nurse at a skilled nursing facility. And my husband work for Cox Communications.

And I have no prior jury service. 09:59:44

PANEL MEMBER (28): I'm Juror Number 28. I have two children, 10 and 8. I'm a mortgage broker. My wife works in a doctor's office. And I have never served.

THE COURT: And what is her work in the doctor's office? 10:00:00

PANEL MEMBER (28): She works in the office.

THE COURT: All right.

PANEL MEMBER (29): Hi. I'm Juror Number 29. I'm married. I have a one-year-old boy. I work as an electrician at Klein's Electric. My wife is a nurse at YMC. 10:00:13

And I have never served.

PANEL MEMBER (30): I'm Juror Number 30. I'm divorced. No children. I'm retired from banking in California and Idaho. And I have never served on a jury.

THE COURT: What kind of work did you do in banking? 10:00:33

PANEL MEMBER (30): Various things. I was a branch operation supervisor and loan accounting.

PANEL MEMBER (31): Juror Number 31. Married. No children. I work with the Maricopa County Sheriff's Office, systems administrator. My wife is a registered nurse. 10:00:56

And I have never served on a jury before.

PANEL MEMBER (32): I am Juror Number 32. I am married. I have three children, ages 14, 12, and 9. I work as a substitute teacher in the Kyrene School District. And I work part-time for the Chandler Children's Choir doing marketing. 10:01:20

My spouse works for SAP, and I have never actually served on a jury before.

THE COURT: What kind of work does your husband do?

PANEL MEMBER (32): He is -- SAP is a software company so he does sales and marketing. 10:01:35

THE COURT: All right.

PANEL MEMBER (33): I'm Juror Number 33. I'm married. I have one adult child. I have been employed by a major airline here in Phoenix. It's been 30 years, so I have done a lot of things mostly customer service operations. And I do now 10:02:12 currently work on the ramp. My spouse is retired. He was a medical assistant.

And I have never served on a jury.

PANEL MEMBER (34): I'm Juror Number 34. I'm married. I have no children living at home. I work for the Department 10:02:31

of Homeland Security as a transportation security officer. My spouse is employed as a CEO of a company that manufacturers cementitious products such as grout.

And I have served on a jury. It's been about 14 years so I'm vague. I believe it was criminal and we found him guilty. 10:02:52

PANEL MEMBER (35): Juror 35. I'm married. I have three children, the youngest 16. I am a Mesa public schools teacher. My husband is also a teacher.

And I have never served on a jury. 10:03:13

PANEL MEMBER (36): Juror 36. I'm married. Three children, all grown, out of the house. I'm retired. I worked for Pinal County in maintenance. Right now I work part-time at Sky Dive Arizona in Eloy, and I work maintenance also. My wife is retired from the State. 10:03:37

PANEL MEMBER (37): Juror Number 37. I'm married. I have two children, all above 18 years old. I work in the hospital nearby downtown Phoenix area working with research of Alzheimer's. My wife works as a teacher.

I have no prior jury service. 10:04:04

PANEL MEMBER (38): Juror 38. I am not married so I have no children. I work at Amazon in the fulfillment center.

And I have never had any prior jury service.

PANEL MEMBER (39): Juror 39. I am married. I have one son, age 5. I am a publicist for a local PR firm. My 10:04:27

husband is an aerospace engineer for Honeywell.

And I have no prior jury service.

PANEL MEMBER (40): Juror Number 40. Single. Two kids. One is eight. I'm a CPA, work for a home builder.

I had two previous juries, both criminal. One for drugs, one for assault. Both of them were hung. 10:04:50

PANEL MEMBER (41): Number 41. I am married. We have two grown children. I'm currently director of IT at a small construction company. My wife is retired. She was an RN with Triwest Healthcare Alliance doing data abstraction. 10:05:16

I served on a jury five or six years ago. It was criminal, illegal immigration, and he was found guilty.

PANEL MEMBER (42): Juror Number 42. I am married. I have a one-year-old. I'm self-employed. I have a DJ company. My spouse is an elementary school teacher. 10:05:37

And no prior jury service.

PANEL MEMBER (43): Juror Number 43. I'm married. I have two children both older than age 18. I work at American Express as a technology manager. My spouse is retired. She worked at Avaya where she was a systems engineer. 10:05:59

I do have prior jury service. It was in the late 1980s where I was a juror on a criminal trial where we found the defendant guilty of sexual assault.

PANEL MEMBER (44): Juror Number 44. I'm single. I have one child, age 11. I work at Florence Correctional Center 10:06:21

as a nurse.

And I have no prior jury service.

PANEL MEMBER (45): Juror Number 45. Single. No children. I work environmental compliance with a water utility company. 10:06:43

And no prior service.

PANEL MEMBER (46): Juror Number 46. I'm single. I have a 16-year-old son. I'm a project manager at U-Haul International.

And no prior jury service. 10:06:55

PANEL MEMBER (47): I'm Juror 47. Married. Two children, one three and one five. I work at Apple Multiple Customer Service Teams. My husband sells payroll benefits and health benefits.

And no prior jury service. 10:07:14

PANEL MEMBER (48): I'm Juror 48. I'm married. One child, one year old. I work for a financial institution in the operations center. My husband works for the City of Chandler. And I have no prior jury service.

PANEL MEMBER (49): Juror 49. Married. Three adult 10:07:36 children. Retired airline pilot. And currently I'm coaching girls volleyball.

My spouse is a retired airline flight attendant and she is currently also working as a merchandise assistant with Macy's. No prior jury. 10:08:05

THE COURT: I have got to ask, what airline did you fly for?

PANEL MEMBER (49): Started off with Hughes Air West, Republic, Northwest, and I get my pension checks from Delta.

THE COURT: My older brother's retired from Southwest. 10:08:18

PANEL MEMBER (49): Okay.

THE COURT: And my mother was a pilot back in the '40s. But I can't walk and chew gum at the same time much less fly an airplane.

PANEL MEMBER (50): Juror Number 50. Married. No 10:08:33 children. I'm a condominium developer. My wife is a medical assistant.

No prior jury service.

PANEL MEMBER (51): Hi. I'm Juror Number 51. I'm married. I have two children, one of whom is nine year old. I 10:08:53 work for UltraStar Multi-Tainment Center doing sales and social media marketing. My husband is employed at a local HVAC company.

I have never sat on a jury before.

THE COURT: All right. Now, for those of you who have 10:09:09 had prior jury experiences, would anything about that experience lead you to feel that you have any prejudices for either the defense or the prosecution?

I see no hands.

And again, for those of you who have prior jury 10:09:30

experience, was there anything about that that would make it uncomfortable for you to sit as a juror again?

I see no hands.

Now, I expect the trial today will proceed at the following times: Today and tomorrow. Well, and we will go until Thursday morning, too. And the hours that we will proceed are from 9:00 in the morning until 5:00. And I take a one-hour lunch break. The jurors tell me that one hour is enough. A little bit worried about not quite having that much time to get some sandwiches or lunch around here if you want to get something and not bring something with you. And we take a break in the morning and a break in the afternoon of 20 minutes. 10:09:53 10:10:19

I usually break for lunch around 12:15. It kind of evens out a little bit the length of the morning and the afternoon. 10:10:33

Now, is there anything about the -- well, actually, let me back up with this question. I'm going to ask you whether there's anything about this schedule or the length of this trial that would create an undue hardship for you. But first let me preface that a little bit. I have already given you my speech about jury service, and so I will not repeat that. But let me just amplify a bit that for the system to work right, we need to have a group of people to draw from that reflects the depth and breadth and diversity of our community. 10:10:50 10:11:16

So it's very important that everyone who can serve do so.

For some people it can be an inconvenience. I like to say that it's -- jury service is like a lot of other important things in life that maybe you didn't quite plan for, but something comes up and you have to -- I don't want to say you have to do it, but it's something important to do. And so you have to change your plans to free up a few days to be able to do that. 10:11:40

The my story that describes me is I seem to catch every pathogen that comes by. When my oldest -- well, my youngest child is in college now, but when my kids were home it seemed like every germ that passed around that they brought home I got sick. So suddenly I got a sore throat or something and I had to stop for a day or two, or longer, to get over that. And you know what? All the things that I absolutely totally had to do, I couldn't do them because that came up and I had to deal with that. 10:11:58 10:12:18

We all have things like that. They can be other family emergencies. Sometimes our work itself, something comes up that the work we needed to do, we can't do that because of some other emergency. 10:12:33

And we adapt to those things to deal with things that are important. And I ask you to think of jury service as one of those very important things that we make adjustments for to be able to do it. 10:12:51

Now, there are situations, though, in which we can't do it and so then that brings me back to my question for you. For any of you, would this schedule that I have talked about create an undue hardship that would prevent you from serving? If so, please raise your hand and I will ask some follow-up questions. 10:13:12

THE LAW CLERK: Jurors 2, 10, 15, 23, 24, 29, also 21, 35, 37, 39, and 51.

THE COURT: All right. Let's start with Number 2. And please tell us what your hardship is. 10:13:37

PANEL MEMBER (2): Well, my hardship is --

THE COURT: Wait until he gives you a microphone.

PANEL MEMBER (2): Currently both my husband and myself, our paychecks are being garnished. And I do work tomorrow all day from 10:30 in the morning to 10 at night. 10:13:54

THE COURT: All right. Number 10.

PANEL MEMBER (10): As I stated before, I work for a small company and we are on a deadline. And without me there it's going to be tough to meet that deadline.

THE COURT: And I'm sorry. Tell me again your position in the company. 10:14:22

PANEL MEMBER (10): I'm the foreman.

THE COURT: And how many people do you supervise?

PANEL MEMBER (10): Four.

THE COURT: Is there anybody that covers for you at 10:14:41

times when you can't be there in that supervisory role?

PANEL MEMBER (10): No.

THE COURT: All right.

Number 15.

PANEL MEMBER: Mine is income related, and in a more private setting I could explain more detail. 10:14:50

THE COURT: Sure. We'll talk more with you when we take the break.

Number 21.

PANEL MEMBER: Have a couple concerns. Insulin dependent diabetic. And I have to eat at certain times. As long as the breaks are there that shouldn't be a problem. 10:15:10

The other thing is I had a TIA, a mini stroke a couple months ago and I have been having a lot of follow-up testing. I have got -- as long as the trial doesn't go until next week I should be okay. I have got to go see neurology and eye exams. I have got headaches and eye problems I guess from the results of that. 10:15:33

THE COURT: Couple of things. First of all, we can take a break any time you need for whether it's medication or food or whatnot. So that should not be a problem. And I'm confident we will finish by Thursday of this week. 10:15:48

PANEL MEMBER (10): Okay. The one thing you said was no eating. The only way I can determine whether I need to have a snack or not is take my blood sugar. I carry glucometer with 10:16:04

me. Would that be a problem?

THE COURT: Not at all. And if you need you can eat food as you need it as well.

PANEL MEMBER (10): Okay.

THE COURT: Now, you mentioned some other issues. Would those other issues affect your ability to concentrate and understand all the evidence that comes into the trial? 10:16:16

PANEL MEMBER (10): You know, I'm not really sure. It's just I have got constant headaches. I have been living on Tylenol during the day and hydrocodone at night until I get to see neurology next week at the VA. Things are a little slow down there. I think you all read the papers. I have got follow-ups with the eye exams, follow-up with the cardiologist. So I have got appointments the next three weeks. Nothing this week. 10:16:34 10:16:53

THE COURT: Let's talk about how is it -- I mean headaches can be all over the spectrum. Could you describe for us how you are likely to be feeling the next few days?

PANEL MEMBER (10): Well, it's pretty much everything is on the right side. When I had my TIA my right side went numb. I was in the hospital two days at the VA. I figured most of the side effects would go away but they haven't. So my cardiologist started getting a lot of these appointments. I have had a lot follow-up testing. Sometimes it's really bad. That's when I take the Tylenol. Like right now, it's just kind 10:17:11 10:17:31

of a dull ache.

THE COURT: Tell you what. I'm going to ask you a few more questions during the break. Okay?

PANEL MEMBER (10): Okay.

THE COURT: All right. Now, Number 23. 10:17:41

PANEL MEMBER (23): As we speak, my mom is having a heart valve replacement, and I would really like to be there.

THE COURT: All right. And Number 24.

PANEL MEMBER (24): Yes. I'm the caregiver for my youngest son who has a chronic illness. He has an appointment 10:18:04 tomorrow at 1:30 with his cardiologist. He does not drive any longer, hasn't driven for almost two years. I'm the prime caregiver and financial person because he's getting no income. His short-term disability from his job has stopped.

And I have to drive from Globe every day, so I have to 10:18:21 borrow money to get here.

THE COURT: Let's see. Oh, yeah, you are in Globe. Do you have -- where do you have to drive him?

PANEL MEMBER (24): I drive from Globe and that's where I live. And he does have a doctor's appointment in 10:18:37 Globe, but I'm the one -- I'm his driver and the one on his medical for his assistance.

THE COURT: All right. Number 29.

PANEL MEMBER (29): Right now I'm having some financial problems. And my wife works nights and I work days 10:18:58

so we take turns on taking care of the kid.

THE COURT: All right. Number 35.

PANEL MEMBER (35): I'm an elementary school teacher but I just started coaching volleyball for the junior high and
they don't have anybody to -- our season starts this week and 10:19:32
they don't have anybody to replace me.

THE COURT: Tell me what the days are that you would be coaching this week.

PANEL MEMBER (35): This week is Tuesday, Wednesday,
Thursday, and Saturday. 10:19:47

THE COURT: Well, today is Tuesday.

PANEL MEMBER (35): Yes. I'm supposed to coach at 4:00, hopefully.

THE COURT: All right. Number 37.

PANEL MEMBER (37): I'm currently struggling with two 10:20:06
issues. Always with tight deadlines. I work in the research field with -- I'm starting two clinical trials, one actually next Monday. We need to prepare the procedure to writing for strokes and Alzheimer's. We also need to prepare a document I
need to present in San Diego also next week. So that's 10:20:36
something I'm comfortable to talk in this setting.

The other is private. I can talk to you more about that. Basically I have to -- I have already scheduled an appointment my wife has with her lawyer involving her lawsuit.
Pending the decision you are going to give to us later today we 10:20:57

need another day for me to go with her. And I do -- I to speak English to meet with her lawyers.

THE COURT: Do you have any difficulty understanding spoken English?

PANEL MEMBER (37): Not at all. 10:21:15

THE COURT: All right. Number 39.

PANEL MEMBER (39): I will probably just pass.

THE COURT: Number 51.

PANEL MEMBER (51): Hi. Actually when I left to come here today everything was fine for me to do that. However, the 10:21:33 person that I work with, she and I are the only people at our job that schedule the events. We have birthday parties, large scale events and whatnot. She was taken to the emergency room at 4:00 this morning with appendicitis and is having that out shortly. 10:21:53

THE COURT: All right.

PANEL MEMBER (51): Thank you.

THE COURT: Is there anyone else who has a hardship that would create any circumstances that would create an undue hardship if called upon to serve on this jury? 10:22:05

THE LAW CLERK: Juror 6.

THE COURT: Yes. All right.

PANEL MEMBER (6): In addition to being the only loan officer in our company, I also am scheduled to give expert witness testimony in about a week at a trial and I think I have 10:22:27

to prepare for that.

THE COURT: All right.

PANEL MEMBER (6): Or I should.

THE COURT: All right. You should.

Anyone else have a yes answer to that question about having an undue hardship from serving on this jury? 10:22:46

Number 4.

PANEL MEMBER (4): I'm part of the emergency response team for the nuclear plant, so I need to be able to respond there within an hour. And timing from here to the nuclear plant is about an hour and a half. And right now I have someone covering for me but I don't know if I could find anybody for the next two days. 10:23:10

THE COURT: Well, explain to me how that works. Obviously today you do have coverage. 10:23:23

PANEL MEMBER (4): Yes.

THE COURT: But how is that normally done? In fact, doesn't your company provide -- pay for people who are on jury service?

PANEL MEMBER (4): Yes, they provide pay. But I'm the system engineer for the plant if there's an emergency. So if something happens I have to be there within an hour. And right now it's an hour and a half distance. That's not including 20 minutes for them to get ahold of us so that gives me even less time to get there. I also have to have a phone on me at all 10:23:41 10:24:01

times, right now I do not, that they could reach me on. But I do have someone covering for me today.

THE COURT: And about how many times a year do you have that kind of emergency you have to respond to within an hour? 10:24:15

PANEL MEMBER (4): We usually don't have emergencies. But if something does happen then I have to respond.

THE COURT: Okay. Again, does anyone else have a yes answer that question about having an undue hardship if called upon to serve on this jury? 10:24:29

I see no further hands.

Now, some of the questions I ask actually overlap and they duplicate and I apologize for that. You don't ever have to give the same answer twice. So if I ask you a question that really calls for the same answer, you don't have to say it again. 10:24:47 I do this because sometimes coming at a question in more way than one can trigger a response that somebody might not think of the first time.

So are any of you suffering from any type of disability, such as a hearing loss or back problem, that would 10:25:03 make it difficult for you to serve as an alert juror during the trial of this case? That would include taking any medication that might limit your memory or vision or hearing.

THE LAW CLERK: Juror 2.

THE COURT: Please tell us. 10:25:30

PANEL MEMBER (2): Is it the medical condition or the drugs as well?

THE COURT: Tell you what. Let's discuss that with you when we take the break. Okay?

PANEL MEMBER (2): Okay. 10:25:41

THE COURT: Again, same question again. Does anyone else have any disability such as hearing loss or health problem or medication that would affect your ability to serve as an alert juror during the trial of this case?

I see no further hands. 10:26:09

Do any of you have any reasons whatsoever such as physical difficulty, health problem, or home problems that might interfere with your serving as a fair and impartial juror?

All right. I see no further hands. 10:26:25

Do any of you have any difficulty reading or understanding the English language or have any sight or hearing limitations?

I see no hands.

Do any of you currently work at a job that normally requires you to sleep during the day? 10:26:40

All right. Number --

THE LAW CLERK: Juror 42 and 44.

THE COURT: Please tell us what your work situation is. 10:27:02

PANEL MEMBER (42): I work late nights, usually until about 3 in the morning. Usually need to sleep in until about 8. So --

THE COURT: So getting here by 9:00 and then being alert during the day, would that be a problem? 10:27:15

PANEL MEMBER (42): I have a one-year-old so the childcare is even a little bit difficult. It took me about two hours to get in this morning after taking her to her grandmother's.

THE COURT: So if you have to be -- if you are 10:27:28 selected you would be here Thursday -- on Wednesday, and at least part day Thursday.

PANEL MEMBER (42): I do have a gig on Wednesday night. So I would be out until about 3 in the morning. That's when I would get home. Hopefully I would get to sleep by 3:30. 10:27:40

THE COURT: You know, different people handle sleep differently. Would that situation interfere with your ability to be an alert juror in this trial?

PANEL MEMBER (42): It would make it tough to get in here on time, probably. But I'm used to the lack of sleep, I 10:27:56 guess.

THE COURT: Well, you have a one-year-old.

PANEL MEMBER (42): Yeah. Like Daddy Boot Camp.

THE COURT: Right. Right. Seriously, though, we all -- do you think you would be able to be an alert and fair 10:28:11

and impartial juror in this case?

PANEL MEMBER (42): I would be, yeah. I would be able to do it, but it's tough, you know, to get here on time. That's the hard part on Thursday.

THE COURT: All right. Number 44. 10:28:31

PANEL MEMBER (44): Sir, I work 7 p.m. to 7 a.m. three shifts a week. I won't have to go back to work until Friday of this week, sir.

THE COURT: So you are --

PANEL MEMBER (44): This week I'm fine. 10:28:49

THE COURT: Very well. Good.

Anyone else who works a shift that they normally sleep during the day?

I see no further hands.

Now, I will cover this again a little later, but in 10:29:03 the world we live in today, we have constant access to internet resources and looking things up, whether it's on our cell phones or iPads or whatnot. If you are selected to serve as a juror, you are prohibited from conducting any research or gathering any information to decide this case. You have to 10:29:32 decide the case solely on the evidence presented. So during the time that you are on the jury service you cannot use those resources or look at anything that could relate to any of the matters in the trial.

Do any of you think you would have any difficulty in 10:29:49

following that instruction not to do any independent research or information gathering that would relate to the case?

All right.

THE LAW CLERK: Juror 39.

THE COURT: So you just can't control yourself, huh? 10:30:09

PANEL MEMBER (39): Are you still able to have your phone with you for other matters?

THE COURT: Of course you can. You just can't look stuff up. For example, you can't look up one of the lawyers or the parties or witnesses or anything that might relate to the 10:30:23 case.

PANEL MEMBER (39): Okay.

THE COURT: So it's not a problem, right?

PANEL MEMBER (39): It's not a problem.

THE COURT: Again, does anyone else have a yes answer 10:30:34 to that question about whether you would have any difficulty in following the instruction not to do any independent research or investigation about the case.

I see no further hands.

Now, did any of you know any of the others of you 10:30:46 before this morning?

THE LAW CLERK: Juror 39.

THE COURT: All right. I only have one? Oh. Number 9. Okay. Well, Juror 39, I think I know who you know. Tell us who it is and how you know them. 10:31:13

PANEL MEMBER (39): I know Juror 9.

THE COURT: How do you know her?

PANEL MEMBER (39): Long story. She's my step mom's daughter, but like removed. Anyway, we're kind of like family.

THE COURT: Have you lived together? 10:31:29

PANEL MEMBER (39): No.

THE COURT: Let me tell you why I'm asking this question.

If you are selected to serve as a juror in the case you must listen to all of the evidence, consider the views of 10:31:38 your fellow jurors, but every juror is responsible for making her own decision. And if you know someone else on the jury that's fine provided that you are able to make your own decision. You have to consider what every juror thinks but you have to make your own decision. 10:31:59

Would your relationship with Juror Number 9 interfere with your ability to make your own decision if you were both selected to serve on this jury?

PANEL MEMBER (39): No.

THE COURT: Bring microphone down ask the same 10:32:09 question of Juror Number 9.

PANEL MEMBER (9): No.

THE COURT: All right. Of course we ask this question in every case. A couple years ago I had a trial from up in northern Arizona where I had five people who all worked in the 10:32:36

same high school and all knew each other. And there was a lady sitting, I think, where Juror Number 22 is. And when I came to her she said that juror number two rows behind was her husband. So I asked her that question and she said, after 28 years of marriage, of course I can make up my own mind. And when I got to him, he said after 28 years of marriage of course I cannot make up my own mind. So I'm not exaggerating. That was the answer. 10:33:02

And so all right. Now I'm going to read the names of the witnesses who may be called during this trial. And I'm going to ask you if you know or think you may know any of the witnesses. And they are: Special Agent Kathleen Neri, N-E-R-I, of the Internal Revenue Service. And Ms. Morgan is out, correct? 10:33:24

MS. JENNIS: Yes, Your Honor. 10:34:11

THE COURT: And also from the Internal Revenue Service T.W. Lyons, and Jo Lynn Colegrove from the Internal Revenue Service. And Mr. Cowan is out. Arnold Argetsinger, spelled A-R-G-E-T-S-I-N-G-E-R, from the U.S. Postal Inspector's Office.

And is Mr. Nixon out? 10:34:41

MS. JENNIS: No, Your Honor.

THE COURT: Adam Nixon from the Federal Bureau of Investigation. And Mr. Tobias is out, correct?

MS. JENNIS: Yes.

THE COURT: And is Mr. Mashinsky out? 10:34:55

MS. JENNIS: Yes.

THE COURT: And next is Brighton Nicole Jorgenson. Shannon Hall. William Kerr. Dan Hall. And potentially, well, possibly, the defendant.

Again, do any of you know or think you may know any of those potential witnesses. 10:35:24

All right. I see no hands.

And please note that the defendant, the attorneys, and all witnesses have been instructed not to speak to you at any time, either before or during the trial. 10:35:41 Therefore, please do not feel offended if you see any of them outside the courtroom and they do not speak to you.

Now, most people or their family or close friends have been victims of minor crimes, such as burglary, auto theft, or auto accidents involving impaired drivers. 10:35:58 Have you or any members of your family, including brothers, sisters, parents or children or close friends, ever been the victims of serious criminal conduct involving serious property damage or bodily injury?

THE LAW CLERK: Juror 2, 9, 17, 34 and 35 and 38 and 10:36:16 47.

THE COURT: All right. Now, I'm going to ask each of you who the person was who was the victim and what the matter was. And, of course, the question I'm going to ask each of you is whether that experience for the person in your family or 10:36:48

close friend would affect your ability to be a fair and impartial juror in this case.

Let us begin with Juror Number 2.

PANEL MEMBER (2): It was a close friend and co-worker. She was strung out on drugs and ran a red light and hit a shuttle bus and killed a couple people. 10:37:04

THE COURT: So she was actually the person who was charged with the crime rather than being --

PANEL MEMBER (2): Oh, yeah.

THE COURT: Did you have any involvement as a witness or any connection with any court proceedings that arose out of that? 10:37:21

PANEL MEMBER (2): No.

THE COURT: And again, is there anything about that experience with your friend that would affect your ability to be a fair and impartial juror in this case for both sides? 10:37:29

PANEL MEMBER (2): I don't know, because I feel that she deserved the punishment that she was given. So I don't know if that would affect --

THE COURT: Tell you what. Here's what I think -- I realize maybe I should have taken a break by about this time, so here's what I'm going to do. I'm going to take the morning break and I will come back and reask this question for everyone. But Juror Number 2, I'm going to ask you to remain and we'll ask you a few more questions about this during the 10:37:50 10:38:06

break.

So now, let me, again, list the numbers of the people that I have already indicated we would like to talk to, to remain to talk with during the break. And they are Number 6, 15, 21, 37, and 2. 10:38:20

Now, let me give you some instructions applicable during the breaks. Until the trial is over, you are not to discuss this case with anyone including your fellow jurors, members of your family, people involved in the trial, or anyone else, nor are you allowed to permit others to discuss the case 10:38:40 with you. If anyone approaches you and tries to talk to you about the case, please let me know about it immediately.

Again, do not read or listen to any news reports of the trial, and do not do any investigation or research on your own about the trial or any of the matters involved in the trial 10:39:00 or any of the people involved in the trial. And you are reminded, if you are selected to serve as a trial juror in this case, to keep an open mind until all the evidence has been received and you have heard the arguments of counsel, the instructions of the court, and the views of your fellow jurors. 10:39:18 Now, if any of you need to speak with me about anything just give a signed note to the Court clerk to give to me.

Now, I may not -- I will not repeat these instructions each time we take a recess or adjourn, but I will remind you of the them from time to time and they will always apply. 10:39:39

Now, when we take a break we do ask you to leave the courtroom, and the reason is we have to talk with some other people. Also, even when we're in break sometimes the lawyers and clients want to talk with each other and we want to avoid the possibility of a juror overhearing some conversation. So during the breaks I do ask you all to leave the courtroom. 10:39:59

Now, we need to talk with a few people and we need to take a short break also for the court reporter so she can rest her fingers. I think I'd like to take a 40-minute break. Ask you to return at 11:20. And with all -- now, again, those of you I have listed, please remain. 10:40:25

All rise for the jury. You are excused until 11:20.

For those of you who I have asked to remain, we need to talk with you each one at a time. So I ask Juror Number 6 to remain. The rest of you will step outside. We'll call you in one at a time if we need to talk with you. 10:41:35

Let's talk to Juror 6 first.

(Jury out at 10:41 p.m.)

(Individual jurors will be called in one at a time.)

MR. KUNKLE: Your Honor, could we just have a moment, please? 10:42:00

THE COURT: You may.

MR. KUNKLE: I know we were trying to find out who is in the back of the courtroom. Depending on information we get into, and if it is members of the public, I don't know. 10:42:16

THE COURT: You are all -- these are public proceedings which means the public is generally free to attend and anyone who would like to is always welcome. The reason the lawyers are going to talk with you a minute is to make sure you are just -- don't have some connection with the trial. So go ahead. 10:42:36

MS. EDELSTEIN: I just inquired of the two individuals. They are law students from the Arizona Summit Law School observing. The government certainly doesn't have any objections to their presence. 10:42:49

THE COURT: Mr. Kunkle.

MR. KUNKLE: I don't have any objections. They might learn something.

THE COURT: Actually, we see a lot of students from your school here. Pretty common seeing you all here. 10:42:56

MR. KUNKLE: Thank you, Judge.

THE COURT: We're going to give you an exam at the end.

So. All right. Now, Juror Number 6, you had told us you know Mr. Hall. Tell us how you know him. 10:43:06

PANEL MEMBER (6): I believe that Gordon used to have a 24-hour fitness company. And we had a shopping center that we owned. They went out, and we sued on the guarantee and he was a defendant.

THE COURT: Any objection to excusing Juror 6 for 10:43:25

cause?

MS. JENNIS: No, Your Honor.

MR. KUNKLE: No, Your Honor.

THE COURT: Juror Number 6, sorry for keeping you waiting through the whole morning. I just can't take a break every time I have a potential issue. 10:43:34

You are excused at this time. Please report back to the jury assembly room to see if they have further need for you today. Thank you.

Let's bring in Number 2. 10:43:46

(Juror Number 6 out. Juror Number 2 in.)

THE COURT: Juror Number 2, she has the hardship issue, financial issue. And what she just brought up with us, we have got 13 or 14 -- just take a seat anywhere.

You had mentioned the issue of the financial hardship from service. 10:44:27

PANEL MEMBER (2): Yes, sir.

THE COURT: And also we were just talking about crime victims. Ms. Jennis, do you have any questions for Juror Number 2? 10:44:45

MS. JENNIS: I don't, Your Honor.

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, sir.

THE COURT: Could you step out for a minute, please? Don't go away. Just step outside. 10:44:53

(Juror Number 2 out.)

Counsel, any objection to excusing Number 2 for hardship?

MS. JENNIS: No, Your Honor.

MR. KUNKLE: No, Your Honor. 10:45:14

THE COURT: Bring her back in, Cullen. We'll excuse her.

MR. KUNKLE: Your Honor, also, I'm sorry. Your Honor.

THE COURT: Yes.

(Juror Number 2 in.) 10:45:33

THE COURT: Juror Number 2, I will excuse you at this time. Thank you for answering our questions carefully, and thank you for your service so far. Please report back to the jury assembly room to see if they have further need for your help today. 10:45:45

PANEL MEMBER (2): Okay. Thank you.

(Juror Number 2 out.)

THE COURT: Mr. Kunkle.

MR. KUNKLE: Your Honor, there was one thing I made a note of. Juror 39 at one point had asked for the microphone 10:45:51 and then said pass. I didn't know if the Court wanted to follow up or not.

THE COURT: I wasn't going to if she didn't want to.

MR. KUNKLE: Okay.

THE COURT: Sometimes these people, they start hearing 10:46:03

other people's hardships and they realize they don't really have a hardship.

MR. KUNKLE: I took it that way, too. I wasn't sure if you wanted to follow up on that.

THE COURT: Obviously you all can ask questions if you want to get to it. 10:46:14

Let's bring in Number 15.

I didn't -- there's some other people who may have hardships. I didn't ask to come in. But we've got quite a few of them. Got 13. 10:46:41

(Juror Number 15 in.)

THE COURT: Juror Number 15, please take a seat anywhere. You had had potential financial hardship. There were things you wanted to talk about.

PANEL MEMBER (15): Yeah, it's just that between my wife and I, we live on a week-to-week paycheck-to-paycheck. I'm concerned that the loss of income could serve to be detrimental to us. 10:47:03

THE COURT: Any questions, Ms. Settel?

MS. JENNIS: No, Your Honor. 10:47:14

THE COURT: I mean Ms. Jennis.

MS. JENNIS: That's okay.

THE COURT: And Mr. Kunkle?

MR. KUNKLE: No questions, Your Honor.

THE COURT: Okay. Any objection to excusing Number 10:47:26

15?

MR. KUNKLE: No, sir.

MS. JENNIS: No, Your Honor.

THE COURT: Juror Number 15, you are excused. Thank you very much for your service today. Please report back to the jury assembly room to see if they need further help from you today. 10:47:33

PANEL MEMBER (15): Thanks.

MR. KUNKLE: Your Honor, there was also Juror 23 mentioned a hardship. I know they didn't ask to speak in private. He came right out. 10:47:49

THE COURT: He did. Let me tell you, I can talk maybe generally to the extent we are comfortable having people go I'd rather let them go sooner rather than later just for their convenience and we don't have them answering other questions. We have quite a few people who are claiming financial hardship. 10:48:07

MR. KUNKLE: This was the gentleman whose mother was in surgery today.

THE COURT: I have him -- that was number --

MS. JENNIS: 23. 10:48:19

THE COURT: 23. I didn't ask him to stay. I had him on my list to excuse him unless anyone wanted to ask him. If anybody wanted to ask further questions, of course we will. But my sense on a lot of these is that we could excuse them unless any of you want to ask further questions. 10:48:34

MS. JENNIS: I just -- I wanted to point out that he did appear pretty upset.

MR. KUNKLE: That's my thought.

MS. JENNIS: Maybe we could excuse him sooner rather than later. 10:48:47

MR. KUNKLE: I agree. He seemed rather upset and agitated by being here.

THE COURT: Out. I just listed the people who said they wanted to talk further in private but there are a fair number of these that, you know, my general sense if we have 10:49:03 enough people, the people who claim a financial hardship, usually lawyers don't want to have somebody there who doesn't want to be there.

Do you all want to just go through and -- we have 51. We need 33. So we have 18 to spare. We're looking at losing 10:49:19 13 or 14 just on the people who claim hardship.

A few of these, for example, Juror Number 4, I didn't think -- we could save and see if we need her later. But the others my initial thought is that we could let them go.

MS. JENNIS: There was the woman, Juror Number 34, who 10:49:46 had to take her son to the doctor and borrow money to get here.

MR. KUNKLE: Yeah.

MS. JENNIS: I was very concerned about the gentleman, Number 21, he was very candid with us that he does have headaches and -- 10:50:01

THE COURT: Yeah. I have him on the list to ask him further questions, but if you all are agreeable to letting him go without further questions, that's fine with me.

Was that 34 the woman who --

MS. JENNIS: I had 24, Your Honor. And 21 for the gentleman who was diabetic and had some health issues. 10:50:25

THE COURT: Yes.

MR. KUNKLE: Your Honor, for the record, I have no objection if -- you know, to excuse Juror Number 24, I believe, the woman that lives in Globe, is borrowing money to come here. 10:50:43 I might have the number confused. She's the one who indicated she is the caregiver for her youngest kid. I would move for cause at this point.

MS. JENNIS: United States has no objection to excusing either -- well, both 21 and 24. And I believe we're 10:50:55 talking about the same person, the person who lived in Globe.

THE COURT: Mr. Kunkle, Number 21 also.

MR. KUNKLE: Yeah. No objection. That's -- yeah. Juror 21. I almost said his name. Yeah, that's fine.

THE COURT: When we come back we'll Excuse 21, 23, and 10:51:13 24. Was 23 also agreeable to both counsel?

MS. JENNIS: Yes. I think that was the gentleman whose mom sounded like was being operated on as we speak.

THE COURT: That's correct.

MS. JENNIS: That's fine. He looked extremely upset 10:51:31

to me.

THE COURT: All right.

MS. JENNIS: Did we have anyone else stay?

THE COURT: There are two more out there. Well, Number 21, let's bring 21 in and I will excuse him. 10:51:42

MR. KUNKLE: Do you want to bring in 23?

THE COURT: I have 37.

MR. KUNKLE: Does Your Honor want to bring in 23 and cut him loose?

THE COURT: The problem is I didn't ask him to remain. 10:51:56 He's probably not out there.

(Juror 21 in.)

THE COURT: Juror Number 21. We wanted to excuse you, Juror Number 21. We'll excuse you at this time. And please report back to the jury assembly room before you are 10:52:30 discharged.

Only other one I asked to retain was 37.

(Juror Number 21 out.)

Let's bring in Number 37.

MS. JENNIS: I'm sorry, which one? 10:52:56

THE COURT: 37. He is the man who has the work guidelines and work and other --

(Juror Number 37 in.)

THE COURT: Have a seat anywhere, Juror Number 37.

And you had described for us the work demands that you 10:53:11

have that create a hardship. But there was something else you wanted to mention in a more private setting.

PANEL MEMBER (37): Right. So my wife is actually in a lawsuit with her partner in a private dancing school for which she had 25 percent share, sharings. She quitted that school as a manager and went to another school, also a dancing school for teaching. And the Court actually ordered a mediation before the Court, decision by the Court. And actually the lawyer made appointment for today for to meet with our lawyer to discuss what we need to talk about in the mediation. The mediation is, I don't remember the date, January 28, around that time. 10:53:39 10:54:19

THE COURT: What is scheduled for today?

PANEL MEMBER (37): Scheduled today is the meeting with our own lawyer. My wife cannot speak English well. So I have to be with her. 10:54:43

THE COURT: All right. Ms. Jennis, any questions?

MS. JENNIS: No, Your Honor.

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, sir. 10:54:55

THE COURT: Any objection to excusing Number 37?

MS. JENNIS: No, Your Honor.

MR. KUNKLE: No, Your Honor.

THE COURT: Juror Number 37, you are excused. Thank you for your service. Please report back to the jury assembly 10:55:03

room to make sure they don't need other help from you today. Thank you.

PANEL MEMBER (37): Thank you.

(Juror Number 37 out.)

THE COURT: Those are all the people that I asked to remain. If there are some of these others on the hardship list you are both agreeable to excusing without asking questions of them we can narrow the list. But otherwise I give everyone the opportunity to ask these people questions before deciding whether to excuse them. 10:55:15 10:55:33

MS. JENNIS: The only -- Your Honor, if I may, the only other person who it seemed to me to have really a hardship was perhaps the foreman, which is Juror Number 10.

THE COURT: Yes. If either of you would like to question him we'll bring him in and ask questions. We'll do it at the next break. If you are agreeable to excusing him at this time, I will do that. Supervises four people. 10:56:02

MS. JENNIS: There was one other person if we have enough jurors, there was Number 29. He was the person who his wife works days. I don't know. They switch. 10:56:30

THE COURT: They have a child.

MS. JENNIS: Childcare issues.

MR. KUNKLE: He also indicated problems because of the arrangement. That's Juror 29. I have no objection to Juror 29 and, Your Honor, no objection to Juror Number 10. 10:56:42

THE COURT: All right.

MR. KUNKLE: Being excused for cause.

THE COURT: So the people I need to inform are 10, 23, 24, and 29. I will tell them when they return from the break.

Are there any others on this list that -- well, hold on a minute. 10:56:57

The others are Number 4, he's the guy on call for the Palo Verde Nuclear Plant. I didn't think that was an adequate hardship.

MS. JENNIS: I'm hoping that the probability of an emergency at the nuclear plant is remote, Your Honor, for all of us. 10:57:24

THE COURT: I used to represent Arizona Public Service Company. I could always call them. No, they don't even remember me by now. 10:57:38

MS. JENNIS: If he has an emergency maybe we should all leave.

MR. KUNKLE: I was actually thinking I'm more concerned he's sitting here what if there is an emergency. So yeah, I agree with Ms. Jennis. I hope it's a remote possibility. 10:57:48

THE COURT: Number 35 was the volleyball coach. That would be one we might excuse when I feel more comfortable we know we have enough jurors before we excuse her.

MS. JENNIS: Right. Same thing with the co-worker and 10:58:04

the appendicitis. That's all the way back at the end.

THE COURT: Was that 51?

MS. JENNIS: Yes, Your Honor.

THE COURT: And 42 I added to the list. He's the guy sort of ambivalent about working nights. I thought he would be a good one to excuse if we have too many people but if we run up to the wire we might want to keep him. 10:58:14

MS. JENNIS: Sounded like he could make it if necessary.

THE COURT: All right. Okay. Well then we can take a break for 20 minutes. 10:58:30

And I had one recently where I actually ran short. We counted wrong and we were saved because both counsel struck the same juror, so we came out okay. But we could have been terrible. I just counted wrong. 10:58:54

We'll be in recess until 11:20.

(Recess from 10:59 a.m. until 11:25 a.m.)

THE COURT: And I will excuse a few of the panel members at this time, and they are Jurors Number 10, 23, 24, and 29. You are excused at this time and please report back to the jury assembly room to see if they have further need for your help. And I thank the four of you for your service so far today. 11:25:02

PANEL MEMBER (23): 23, you said?

THE COURT: 23 also. 11:25:23

(Excused jurors out.)

THE COURT: Now, the question I had posed, presented to you, was whether your close family members or close friends have been the victim of any serious criminal conduct involving serious property damage or bodily injury. And we had some answers, and I think we were up -- we were up to Juror Number 9. If you could tell us who that person was, what the involvement was. 11:25:47

PANEL MEMBER (9): My uncle, and he was murdered. The guy that did it is on death row right now. 11:26:05

THE COURT: How long ago was that?

PANEL MEMBER (9): Approximately in '97.

THE COURT: Did you have any involvement as a witness or participating in any investigation on the matter?

PANEL MEMBER (9): No. 11:26:17

THE COURT: Would that experience in your life affect your ability to be a fair and impartial juror in this case for both the government and the defendant?

PANEL MEMBER (9): No.

THE COURT: So you could be a fair and impartial juror? 11:26:28

PANEL MEMBER (9): I could. Now it's just a matter of being a victim at this point. Is your question just towards victims? Because my brother also was just released from prison. 11:26:43

THE COURT: I actually have another question I will get to whether you or family members have been charged or convicted. So thank you for being careful. We'll get back to that with everybody.

Number 17. 11:26:54

PANEL MEMBER (17): My father-in-law was killed and he was both a victim and a criminal. He was under investigation with the IRS for committing fraud, and he had a breakdown and was killed by police.

THE COURT: Now how long ago was that? 11:27:28

PANEL MEMBER (17): This was in January 2012.

THE COURT: Now, I need to explore that a couple ways. You say that he was killed by police. Can you tell us very briefly how that came about?

PANEL MEMBER (17): He had a mental breakdown, basically, and went postal and shot a police officer and was then killed. 11:27:49

THE COURT: I will tell you what. I think that's something I think I would like to talk with you when we take the next break. All right? 11:28:07

All right. And now we were up to Juror Number 34.

PANEL MEMBER (34): When my son was 18 he was hit by a drunk driver, and it took them 45 minutes to cut him out of the car and he had to be life flighted.

THE COURT: How long ago was that? 11:28:48

PANEL MEMBER (34): That was in 1994.

THE COURT: And were proceedings brought against the other driver?

PANEL MEMBER (34): Yeah.

THE COURT: And how did it turn out? 11:28:56

PANEL MEMBER (34): I think he had to do some jail time. He was under insured. But I don't really know exactly the extent of his time or maybe service. I really don't know. I was there at the trial or, you know, at the pronouncement, but -- 11:29:12

THE COURT: It would be the sentencing.

PANEL MEMBER (34): Okay. There you go.

THE COURT: And did you have involvement with law enforcement or with any prosecutors on that matter?

PANEL MEMBER (34): No. 11:29:23

THE COURT: Did that leave you with any feeling about -- well, is there anything about that that would affect your -- let me go back. Remind me of your speech. The responsibility of the juror is to evaluate the evidence in a fair and neutral way, to give it the weight it deserves, 11:29:40 without any bias or sympathy either for the government or for the defendant. Would that experience in your life affect your ability to be a fair and impartial juror in this case?

PANEL MEMBER (34): I would be fair.

THE COURT: Are you confident? 11:29:53

PANEL MEMBER (34): I am.

THE COURT: Number 35.

PANEL MEMBER (35): About 30 years ago my brother was stabbed when he was at 7-Eleven. He was 14. Two individuals were robbing 7-Eleven and he was stabbed and injured. I didn't have anything to do with the trial or witnessing any of that. 11:30:08

THE COURT: Was there anything about that experience in your family that would affect -- or would that affect your ability to be a fair and impartial juror in this case?

PANEL MEMBER (35): No. 11:30:27

THE COURT: Are you confident you could be fair?

PANEL MEMBER (35): Yes.

THE COURT: And Number 47.

PANEL MEMBER (47): Hi. I'm requesting to talk to you about this. 11:30:45

THE COURT: Certainly.

PANEL MEMBER (47: Thank you.

THE COURT: And Number 48.

THE LAW CLERK: She doesn't want to answer.

THE COURT: Number 48, again, did you decide you did not have an answer for that question? 11:31:05

PANEL MEMBER (48): I never raised my hand.

THE COURT: I wrote your number down wrong. I'm sorry.

Okay. Again, is there anyone else who has a yes 11:31:16

answer to that question about whether you, family members, or close friends have been the victim of any serious criminal conduct involving serious property damage or bodily injury?

I see no further hands.

Now, I have another question. It's a little bit different. The question is have you or any members of your family including brothers, sisters, parents or children or close friends ever been the victims of any criminal conduct even if not serious such that you would not be a fair and impartial juror in this case? 11:31:36 11:31:57

All right. I see no hands.

And the reason I ask that question separately is because sometimes things affect us. They affect us and it's personal. It's emotional. And it's not necessarily objective. There are things that affect us in a way that would affect our ability to be a fair and impartial juror even if it would not seem like a real important matter. If it affects us, I ask you about that. 11:32:19

Juror Number 40.

PANEL MEMBER (40): Could you repeat the question? 11:32:30

THE COURT: I'm sorry. Could you repeat the question again?

THE COURT: Yes. Again, have you, members of your family, including brothers, sisters, parents, children or close friends ever been the victims of any criminal conduct, even not 11:32:40

serious, that would affect your ability to be a fair and impartial juror in this case?

All right. I see no hands.

Now, here's the question that I have asked before that you anticipated. 11:33:01

Have you or any members of your family ever been investigated for, charged with, or convicted of a criminal offense? I'm excluding traffic minor things. Have you been charged with, investigated for, or convicted of a criminal offense? 11:33:20

THE LAW CLERK: Juror 9, 17, 19, 22, 33, 34, 35, 39, 40, and 25. I missed 25.

THE COURT: All right. Now, let's start with Juror Number 9. And please tell us who the person was and what the investigation or charge or conviction was for. 11:33:46

THE LAW CLERK: Also 3. I missed Juror 3.

THE COURT: All right. Let's start with Juror 3 then.

PANEL MEMBER (3): My aunt and her then husband who is since deceased were charged with kidnapping of his niece. It's kind of a long story. The niece was abused. My aunt was a 11:34:08 criminal defense attorney, thought she knew better, grabbed the kids because the State wasn't going to do anything until they were harmed. Not this state.

THE COURT: How long ago was that?

PANEL MEMBER (3): '90s. And by the time it all came 11:34:32

to light she was older than 18. So they served some jail time but the time it came to court, I think all the charges were dropped. They are wanted by the FBI.

THE COURT: Did you have any involvement as a witness or any participation in any proceeding? 11:34:50

PANEL MEMBER (3): During that time, no. After she was 18, specifically, I did not contact her nor did she contact family members. So we could not be brought in as any kind of witness.

THE COURT: Is there anything about that experience in 11:35:07 your life that would affect your ability to be a fair and impartial juror in this case?

PANEL MEMBER (3): I don't think so.

THE COURT: Number 9.

PANEL MEMBER (9): It was my brother. And he did six 11:35:20 and-a-half years, approximately, in prison for burglary and drugs.

THE COURT: How long ago was that?

PANEL MEMBER (9): He was just released a month ago.

THE COURT: Okay. Now, were you involved as a witness 11:35:34 or did you have any participation in any court proceedings?

PANEL MEMBER (9): Not exactly, no. Well, we also turned him in to the courts, so I guess slightly.

THE COURT: Now, again, is there anything about that that would affect your ability to be a fair and impartial juror 11:35:52

in this case?

PANEL MEMBER (9): Yes. It's possible.

THE COURT: Tell you what. Let me ask you a few more questions about that when we take the break.

PANEL MEMBER (9): Okay. 11:36:04

THE COURT: And Number 17.

PANEL MEMBER (17): This was the question that I should have answered yes to initially. Nothing new.

THE COURT: Actually, let me also remind you, it always happens that I ask a question you don't think of an 11:36:37 answer. We move on, then later on you think oh, maybe I did have an answer to that earlier question. So at any time you can always raise your hand and say, hey, I think I have an answer to your earlier question. So you can always go back to a question you did not think of an answer to before. 11:36:56

Number 22.

PANEL MEMBER (19): You missed 19.

THE COURT: Oh. That's right. 19.

PANEL MEMBER (19): My brother-in-law did five years in federal prison for wire fraud. 11:37:10

THE COURT: How long ago was that?

PANEL MEMBER (19): He was released two years ago.

THE COURT: Did you have any involvement as a witness or any participation in any court proceedings?

PANEL MEMBER (19): No. 11:37:21

THE COURT: Would that experience affect your ability to be a fair and impartial juror in this case?
PANEL MEMBER (19): Possibly.
THE COURT: All right. I will ask you some more questions about that during the next break. 11:37:34
All right. Now Number 22.
PANEL MEMBER (22): Okay. My nephew, he was sentenced to 14 months in county jail for drugs.
THE COURT: How long ago?
PANEL MEMBER (22): Three, four years ago. 11:37:56
THE COURT: Were you involved as a witness or did you have any participation in any --
PANEL MEMBER (22): No. No. No.
THE COURT: Would that affect your ability to be a fair and impartial juror in this case? 11:38:06
PANEL MEMBER (22): No.
THE COURT: Number 33. No. No. 25. 25.
PANEL MEMBER (25): My little brother got arrested for drug charges and then violation of probation. And that was about it. 11:38:22
THE COURT: How long ago?
PANEL MEMBER (25): Four years ago.
THE COURT: Again, were you involved as a witness or did you have any involvement in any proceedings?
PANEL MEMBER (25): No. 11:38:29

THE COURT: Would that affect your ability to be a fair and impartial juror in this case?

PANEL MEMBER (25): No.

THE COURT: Number 33.

PANEL MEMBER (33): Juror 33. Before I was married my husband was arrested for shoplifting. And he pled guilty and went to therapy, and supposedly his record is expunged. 11:38:36

THE COURT: How long ago was that?

PANEL MEMBER (33): Mid '80s.

THE COURT: Would that affect your ability to be a fair and impartial juror in this case? 11:39:07

PANEL MEMBER (33): No.

THE COURT: All right. Number 33.

PANEL MEMBER (34): Juror 34. We adopted a girl at age six. She had a lot of problems, and in 2013 -- she is 37 -- she was discovered to be in a grow house, marijuana. And I don't really know the outcome. She is estranged. We have been raising her son. So she hasn't had anything to do with us for 19 years, 18 years. 11:39:22

THE COURT: Would that affect your ability to be a fair and impartial juror in this case? 11:39:44

PANEL MEMBER (34): No.

THE COURT: Number 35.

PANEL MEMBER (35): 20 years ago my brother was arrested for robbing his own house and trying to commit 11:39:54

insurance fraud, I guess. He was -- it was a first time offense. He was -- he pleaded guilty and just time served and he had community service.

THE COURT: Would that affect your ability to be a fair and impartial juror in this case? 11:40:20

PANEL MEMBER (35): No.

THE COURT: Number 37. I have number 40.

PANEL MEMBER (39): 39. In 2003, 2004, my mom was convicted of DUI and served about five, six months in prison.

THE COURT: Would that affect your ability to be a 11:40:45 fair and impartial juror in this case?

PANEL MEMBER (39): If it involves drugs or alcohol, yes.

THE COURT: Well, this case does not involve any allegation of drugs or alcohol. So again, the bottom line 11:40:55 question is, would that experience in your life affect your ability to be a fair and impartial juror for both the government and the defendant in this case?

PANEL MEMBER (39): Probably.

THE COURT: Probably would affect you? 11:41:10

PANEL MEMBER (39): Yeah.

THE COURT: I will ask you some more questions when we get to the break. You are Number 38, right?

PANEL MEMBER (39): 39.

THE COURT: 39. 11:41:23

Number 40.

PANEL MEMBER (40): In the mid '80s my stepfather robbed a gas station, spent about three years in jail. And mid '90s my sister forged a bunch of checks and stole a bunch of money orders from the grocery store she was working at, wrote them up and cashed them and spent time in jail, about two years for that. 11:41:40

THE COURT: Did you have any involvement as a witness or --

PANEL MEMBER (40): No. 11:41:52

THE COURT: -- any participation?

Would that affect your ability?

PANEL MEMBER (40): I think it may.

THE COURT: It may. All right. I will ask you some more questions when we get to the break. 11:41:59

Now, again let me ask that question to everyone. Does anyone else have a yes answer to that question about whether you or a family member has been investigated for, charged with, or convicted after criminal offense?

38. 11:42:24

PANEL MEMBER (38): My now ex-brother-in-law is in Lewis for 20 years for second degree murder.

THE COURT: And when did he commit that crime?

PANEL MEMBER (38): Just this past year.

THE COURT: Did you have any involvement as a witness 11:42:39

or any participation?

PANEL MEMBER (38): Character witness.

THE COURT: For him?

PANEL MEMBER (38): Against him.

THE COURT: Against him. All right. And I take it then you had dealings with law enforcement and with prosecutors. 11:42:46

PANEL MEMBER (38): Yes.

THE COURT: I want to explore that for a minute. Did that leave you with any feelings about either law enforcement or prosecutors? 11:42:56

PANEL MEMBER (38): No.

THE COURT: Would any of that affect your ability to be a fair and impartial juror to both sides in this case?

PANEL MEMBER (38): No. 11:43:11

THE COURT: Are you confident?

PANEL MEMBER (38): Uh-huh.

THE COURT: Does anyone else have a yes answer to that question about whether you or family members have been investigated for charged with or convicted of a criminal offense? 11:43:20

I see no further hands.

Now, do you or any members of your family have any legal training?

THE LAW CLERK: Juror 8, 28. 11:43:55

THE COURT: Anyone else?

THE LAW CLERK: 2, 3, 7, 34, 50, 32, I got I think.

THE COURT: Anyone else?

THE LAW CLERK: 9.

THE COURT: Let's start with Juror Number 3. Please tell us who the person is and what the legal training was. 11:44:14

PANEL MEMBER (9): My aunt that I referred to earlier, criminal defense attorney. I also have a second cousin who is a business attorney. And his uncle is a real estate attorney.

THE COURT: All right. Number 7, tell us who the person and training is. 11:44:35

PANEL MEMBER (7): Your Honor, my brother-in-law is the assistant Attorney General of the State of Arizona.

THE COURT: What kind of work does he do?

PANEL MEMBER (7): I believe he does fraud. 11:44:58

THE COURT: Civil or criminal or --

PANEL MEMBER (7): I think he does criminal.

THE COURT: Number 8.

PANEL MEMBER (8): My sister-in-law is an attorney in family law in Arkansas. 11:45:11

THE COURT: Number 9.

PANEL MEMBER (9): I may have misunderstood the question. But my husband is in law enforcement.

THE COURT: Actually, I will have another question -- you are ahead of all of my questions -- going exactly to that, 11:45:37

whether people -- you have family members involved in law enforcement. So we'll come back to that.

All right. And you are being very careful with my questions. Thank you.

Number 9. 11:45:50

THE LAW CLERK: That was.

THE COURT: We don't have a 9. You are 9. Okay. Number 28 is the next one.

PANEL MEMBER (28): My niece is a public defender for the Maricopa County. 11:46:12

THE COURT: All right. Number 32.

PANEL MEMBER (32): I spent 14 years as an insurance claims adjuster and so I have been around the civil trial circuit and have several certifications in claims law.

THE COURT: All right. And Number 34. 11:46:34

PANEL MEMBER (34): Well, I hope I'm not saying more than I should about me. But Department of Homeland Security, transportation security officer. I don't know if that qualified it or not. I'm putting it out there.

THE COURT: No. That's fine. 11:47:01

PANEL MEMBER 934): All right.

THE COURT: Number 50.

PANEL MEMBER (50): I'm not an attorney, but I have taken several courses in real estate and contract law.

THE COURT: Is there anyone else who either you or a 11:47:15

family member have any legal training that you have not already told us about?

Number 43.

PANEL MEMBER (43): My brother-in-law is a family law judge in Tennessee. 11:47:30

THE COURT: All right. Now, again, the question I put to all of you, who either directly or indirectly --

THE LAW CLERK: Judge we have one more, Juror 22.

PANEL MEMBER (43): Like her I have a brother-in-law who is a law enforcement officer. 11:47:46

THE COURT: I will come back to that for everyone in a minute.

Those of you who have some legal training, family members with legal training, would any of you, would the training that you or family members have, for any of you would 11:47:57 that affect your ability to be a fair and impartial juror in this case?

I see no hands.

All right. Next question. Have you or any members of your family or close friends -- everybody's got friends in law 11:48:19 enforcement -- any close friends, are you now serving or have they ever served in the capacity of a law enforcement officer? Now, by that, I am including not only police officers but also employees of law enforcement agencies, military police, Immigration and Naturalization Service, Drug Enforcement 11:48:43

Administration, Alcohol Tobacco Firearms Administration, U.S. Department of Justice, Department of Homeland Security, the FBI, and tribal police departments, Arizona Attorney General's Office or any county attorney or city attorney's office or any other government law enforcement or intelligence agency? 11:49:02

First I want to ask you if you have a yes answer to that question, raise your hand and we'll take down your names.

THE LAW CLERK: Juror 3, 1, 3, 4, 7, 9, 11, 12, 17, 18, 22, 27, 28, 30, 31, 34, 35, 36, 40, 44, 45, 47, and 51.

THE COURT: All right. Now, to all of you, I'm going 11:49:43 to ask you in a minute who the person is who has the law enforcement involvement and what their involvement is. But first, everyone please tell us whether the law enforcement training experience of you or the person you are going to tell us about would affect your ability to be a fair and impartial 11:50:01 juror in this case. If so, raise your hand again and I will ask some follow-up questions for that.

I'm seeing no hands. So let us go through and just tell us briefly who the people are with law enforcement involvement and what the involvement is. 11:50:19

Juror Number 1.

PANEL MEMBER (1): I didn't hear you say Department of Corrections. Did you say that?

THE COURT: That's good enough.

PANEL MEMBER (1): My sister. 11:50:27

THE COURT: All right. Number 3.

PANEL MEMBER (3): My grandfather was an MP in the Army.

THE COURT: Number 4.

PANEL MEMBER (4): Brother-in-law was with FBI; uncle with the police department of El Paso; and about eight cousins that are also police department, with the police department in El Paso; and close friend that's a parole officer. 11:50:37

THE COURT: This way for Number 9.

THE LAW CLERK: 7, judge. 11:51:03

THE COURT: Oh. 7. Sorry.

PANEL MEMBER (7): Brother-in-law is a detective with the City of Tempe; good friend is an air marshal; an uncle was a federal investigator.

All right. Number 9. 11:51:21

PANEL MEMBER (9): As I said before, my husband is in law enforcement. He's a police officer. And I would say about 85 percent of my friends are also.

THE COURT: All right. Number 11.

PANEL MEMBER (11): My stepdad is a volunteer sheriff. 11:51:40

THE COURT: Number 12.

PANEL MEMBER (12): I'm not sure if you are considering the Department of Corrections law enforcement.

THE COURT: Yes.

PANEL MEMBER (12): I'm currently a correctional 11:51:59

officer.

THE COURT: Actually we have already -- again, you don't have to tell me again things you have already told me. If you have any doubt tell me again. Don't worry about it. But we don't have to repeat if you know you have already told us things. 11:52:10

Number 17.

PANEL MEMBER (17): My brother-in-law is a police officer. And because my husband is a public servant working for the fire department, about half of our friends are police officers and firefighters. 11:52:37

THE COURT: Number 18.

PANEL MEMBER (18): My brother-in-law is a police officer.

THE COURT: 22. 11:52:49

PANEL MEMBER (22): My brother-in-law is a police officer.

THE COURT: All right. Number 27.

PANEL MEMBER (27): My son-in-law is a police officer.

THE COURT: And 28. 11:53:11

PANEL MEMBER (28): My best friend from high school is a police officer. My brother-in-law is a police officer. My cousin is a police officer.

THE COURT: Number 30.

PANEL MEMBER (30): My cousin works for a SWAT team in 11:53:25

New York. I have been associated with DEA agents and California highway patrolmen and El Centro, California Police Department.

THE COURT: Number 31.

PANEL MEMBER (31): I work with the MCSO. 11:53:44

THE COURT: And 34.

PANEL MEMBER (34): I raised my niece and nephew so they are like a son and daughter to me. My son is a police officer and my daughter was an MP in the Army.

THE COURT: Number 35. 11:54:12

PANEL MEMBER (35): My brother-in-law is a Mesa policeman.

THE COURT: 36.

PANEL MEMBER (36): I have got three nephews. One is a DPS officer and the other two are deputy sheriffs with Pinal 11:54:21 County.

THE COURT: And Number 40.

PANEL MEMBER (40): Public defender friend.

THE COURT: 44.

PANEL MEMBER (44): I work at Florence Correctional 11:54:34 Center.

THE COURT: 45.

PANEL MEMBER (45): Cousin is in the FBI.

THE COURT: 47.

PANEL MEMBER (47): Cousin is a former police officer 11:54:47

and close family friend is a current officer.

THE COURT: And 51.

PANEL MEMBER (51): Close family friend is border patrol.

THE COURT: Again, does anyone else have a yes answer to that question about whether you or family members or close friends are employed in or have been employed by law enforcement? 11:55:06

I see no further hands.

Now, there will be witnesses called during this trial who are members of law enforcement and who may have been in that profession for a number of years. Is there anything about the law enforcement profession or about the witness having been engaged in that profession for a number of years that would cause you either to give greater or lesser weight or credibility to their testimony solely by virtue of their employment in law enforcement? 11:55:20 11:55:49

I see no hands.

Now, have you or members of your family been a party or a witness in any civil court cases, excluding family law or traffic cases and probate matters or in any criminal trial. 11:56:09

Some of you have already touched on this.

THE LAW CLERK: Juror 45.

THE COURT: All right.

THE LAW CLERK: And 19. 11:56:31

THE COURT: Let's start with 19. Please tell us what that involvement was.

PANEL MEMBER (19): It's been civil lawsuits. Over the years as business owners I've probably been involved in 20 to 30 civil suits. 11:56:47

THE COURT: And would that affect your ability to be a fair and impartial juror in this case?

PANEL MEMBER (19): No.

THE COURT: And Number 45.

PANEL MEMBER (45): It was like mid 2000s. I was a witness to a shooting. 11:56:54

THE COURT: Did you actually testify in court proceedings?

PANEL MEMBER (45): Yes, sir.

THE COURT: And did you -- would that affect your ability to be a fair and impartial juror in this case? 11:57:15

PANEL MEMBER (45): No.

THE COURT: Again, does anyone else have a yes answer to that question about you or family members having been a party to civil or criminal lawsuit or witness in a civil or criminal case? 11:57:33

I see no further hands.

Now, have you or anyone close to you been involved in any litigation or disputes with the United States government or one of its agencies? 11:57:53

THE LAW CLERK: Juror 3, 17.

THE COURT: Juror Number 3, please tell us what that dispute was.

PANEL MEMBER (3): Would that include the IRS in that question? 11:58:19

THE COURT: Yes.

PANEL MEMBER (3): My husband is a business owner, and the IRS showed up one day claiming we owed a bunch of money and actually our bookkeeper had filed the papers but for the wrong year. Of course, we had to pay right away but when the dust 11:58:40 settled it took two years to get our money back.

THE COURT: All right. Now, did it turn out the way you thought right or fair at the end?

PANEL MEMBER (3): I don't --

THE COURT: There's no right answer to that question. 11:59:04 I'm just asking you how you feel.

PANEL MEMBER (3): We were paid most of the money back minus fees. So I don't know. I have a hard time answering that with a yes or no. I don't know.

THE COURT: Let me get to the bottom line then. 11:59:22

Would that affect your ability to be a fair and impartial juror in this case either for the government or for the defendant?

PANEL MEMBER: Possibly. I need to think on that.

THE COURT: All right. I will discuss that with you a 11:59:39

little bit further when we take the next break.

And let's see. Number 17.

PANEL MEMBER (17): My father-in-law, his bookkeeper was not remitting payroll withholding taxes for his employees that were being withheld from his paycheck to the tune of close to $2 million over a 10-year span. And what he went through with the IRS investigation and the related garnishments, it destroyed his life. 12:00:16

THE COURT: Tell you what. Let me discuss that with you also when we take the lunch break. That was your father-in-law? 12:00:39

PANEL MEMBER (17): Yep.

THE COURT: All right. Again, does anyone else have a yes answer to that question as to whether you or anyone close to you has been involved in any litigation or disputes with the United States government or one of its agencies. 12:00:58

PANEL MEMBER (19): Yes. Number 19.

It was the actually the City of Phoenix. We sued the City of Phoenix for improperly dispensing public funds to build a privately owned enterprise. That was probably about 15 years ago. Does that count? 12:01:14

THE COURT: I'm just trying to remember if I was the lawyer on that case.

PANEL MEMBER (19): David Ramras.

THE COURT: I know David, but it's not my case. 12:01:27

And let me jump -- I'm going -- I will ask you some more questions but let me jump to the bottom. That was City of Phoenix?

PANEL MEMBER (19): City of Phoenix.

THE COURT: This prosecution is brought by the United States government represented by the United States Attorneys. Would that dispute that you had with the City of Phoenix affect your ability to be a fair and impartial juror in this case to the government equally and to the defendant? 12:01:45

PANEL MEMBER (19): No, it wouldn't influence it. 12:01:59

THE COURT: All right. Anyone else have a yes answer to that question about having been in dispute or litigation with the United States government.

I see no further hands.

Now, have any of you had any negative experiences with law enforcement? Again, you don't have to repeat anything you have already told me. Have you had negative experiences with law enforcement? And I'm not talking about the speeding ticket that I got and deserved. But -- 12:02:23

THE LAW CLERK: Juror 34. 12:02:44

THE COURT: Please tell us what that experience was.

PANEL MEMBER (34): When we were recovering from my son's injuries after he was hit by the drunk driver, we stopped at a pharmacy to fill a prescription on the way back from the hospital. And my husband was circling around the parking lot 12:03:10

waiting for me to run in and get the prescription and come back out. Meanwhile, someone, a citizen female, had called the Gresham, Oregon police department and said that someone was holding an injured person against their will. So my husband noticed these police cars zipping by in the parking lot from different sides and couldn't figure out what was going on. Just about the time I walked out of the pharmacy, all the cars surrounded my husband. They jumped out and had their guns pointed at him and I'm walking out thinking, what did he do now? Anyway, it was just a misunderstanding. But what if my son had been taken hostage by someone I would appreciate that they looked into it. 12:03:37 12:03:56

THE COURT: Is there anything about that experience that would affect your ability to be a fair and impartial juror in this case? 12:04:12

PANEL MEMBER (34): No.

THE COURT: Again, anyone else have a yes answer to that question about anyone having negative experiences with law enforcement?

I see no further hands. 12:04:21

Now, have you had any experience with the Internal Revenue Service, that's the federal taxing authority, whether positive or negative, that would make it difficult for you to sit as a juror in this case or make it difficult for you to be a fair and impartial juror for either side? 12:04:38

THE LAW CLERK: Juror 3.

THE COURT: We're going to talk with you about that. I'm speaking to Juror Number 3.

I see no further hands.

Now, I have already covered that question. 12:04:51

Now, the defendant in this case is charged with two counts of aiding and abetting the making of false instruments and two counts of aiding and abetting using fictitious instruments.

Is there anything about these charges, the nature of these charges that would affect your ability to be a fair and impartial juror? 12:05:16

All right. I see no hands.

Have you read any -- read or written any article or publication concerning prosecution of tax cases that would affect your ability to be fair and impartial in this case? 12:05:42

All right. I see no hands.

Do you belong to any organization or group or donate money to any organization or group that claims the federal income tax system is unconstitutional or otherwise need not be complied with? 12:06:02

All right. I see no hands.

Now, assuming the United States government has met its burden of proof under the law, would any of you nevertheless have any difficulty finding a person guilty because of your own 12:06:22

religious, moral, philosophical, or personal beliefs or because of sympathy for a person's personal circumstances or conditions or merely because it would be an unpleasant task to find someone guilty?

I see no hands. 12:06:43

And if the government's evidence did not persuade you beyond a reasonable doubt that the defendant is guilty, would any of you have any difficulty in finding the defendant not guilty?

THE LAW CLERK: Juror 40. 12:07:10

THE COURT: Maybe my question should be a little more clear. If the evidence did not persuade you that the defendant is guilty beyond a reasonable doubt, would you still have any difficulty in finding the defendant not guilty?

PANEL MEMBER (40): I think it goes back to what we'll 12:07:31 discuss.

THE COURT: We'll talk about that during the break. Thank you.

All right. Do any of you believe that the justice system or judicial process in general is unfair? 12:07:47

THE LAW CLERK: Juror 39.

THE COURT: Go ahead and tell us what your thought is.

PANEL MEMBER (39): I just think that it has a lot -- I'm trying to think how to word it. There's a lot of things that could be corrected in it and a lot of the times it lends 12:08:14

itself to putting people of certain ethnicities behind bars while people not of those ethnicities go free.

THE COURT: Would those feelings affect your ability to be fair or impartial in this case?

PANEL MEMBER (39): I'm not sure. 12:08:37

THE COURT: Tell you what. I'm already going to talk with you during the break, so I will ask you about that as well.

Again, does anyone else have a yes answer to the question about whether you believe that the justice system in general is unfair? 12:08:54

All right. I see no further hands.

Now, in a civil case, the burden of proof is by a preponderance of the evidence. This is a criminal case in which the government must prove guilt beyond a reasonable doubt. That requires proof that leaves you firmly convinced that the defendant is guilty. 12:09:13

Do any of you have any difficulty in holding the government to its burden?

I see no hands. And again, I guess I'm going to repeat what I said before. 12:09:30

If you are firmly convinced that the defendant is guilty, is there anything that would prevent you from voting for a guilty verdict?

I see no hands. And I have already asked the other 12:09:52

side of that question.

Here's some fundamental principles of law. The fact that an indictment has been filed raises no presumption that the defendant is guilty. The United States government must satisfy you beyond a reasonable doubt that the defendant is guilty. The defendant does not have any obligation to testify or to produce any evidence, and you may not draw an adverse inference if the defendant chooses not to testify. 12:10:09

The defendant is presumed to be innocent until and unless his guilt is established beyond a reasonable doubt. You must wait until all the evidence has been presented before making up your minds as to whether the defendant is proven guilty. 12:10:28

Do any of you believe that you will have any difficulty following these principles of law? 12:10:44

I see no hands.

Do any of you believe that a defendant -- do any of you believe that because a defendant has been indicted and accused of a crime, he is probably guilty?

I see no hands. 12:11:02

Do any of you believe that if a defendant does not testify at trial, then he probably has something to hide?

I see no hands.

I will instruct you regarding what the law is at the conclusion of the case. If selected as a juror, you will take 12:11:18

an oath to follow the law.

Do any of you think that you would have trouble following the law as I instruct you on it, even if you disagree with it?

I see no hands. 12:11:34

Do you have any strong feelings regarding any government policies which would prevent you from giving either the government or the defendant a fair trial?

THE LAW CLERK: Juror 17.

THE COURT: I will ask you about that when we talk to 12:11:52 you at the break.

Does anyone else have a yes answer to that question?

50. Juror 50. There he is. Question is whether you have strong feelings regarding any government policies which would prevent you from giving either the government or the 12:12:26 defendant a fair trial. Juror Number 50, do you think you do?

PANEL MEMBER (50): Could I talk to you about it at the break?

THE COURT: Certainly. We'll talk at the break.

All right. Again, does anyone else have a yes answer 12:12:44 to that question about whether you have strong feelings regarding any government policies which would prevent you from giving either the government or the defendant a fair trial in this case?

I see no further hands. 12:13:07

Do you have any strong feelings regarding the criminal justice system in this country that would prevent you from giving either the government or the defendant a fair hearing in this matter?

I see no hands.

Do you have strong feelings about judges or lawyers that would prevent you from giving either the government or the defendant a fair hearing in this matter?

I see no hands.

Do you or any family members or close friends belong to or support any organization or group that advocates that a juror can ignore the instructions of law given to the jury by the Court?

I see no hands.

Do you have any belief, whether religious or philosophical, which makes it difficult for you to sit in judgment of another?

I see no hands.

If you are selected for the jury, would you feel uncomfortable expressing an opinion contrary to the opinions of other jurors?

I see no hands.

Would you have any difficulty deciding each count in the indictment separately and not -- any difficulty in not allowing your verdict on one count to control your verdict on

any other count?

I see no hands.

Now, I have got one last question, and then I will allow counsel to ask some questions. Then when we take the break I will talk with those that we have to while everyone else takes the lunch break. 12:14:52

And my last question is: If you were the attorney for the United States government or the defense attorney, or if you were the defendant in this case, would you be unwilling to have 12 persons with the same frame of mind that you now have sitting as jurors? Would you be unwilling? 12:15:13

I see no hands.

Ms. Jennis, do you have any questions?

MS. JENNIS: No, Your Honor.

THE COURT: Mr. Kunkle? 12:15:26

MR. KUNKLE: No, Your Honor.

THE COURT: Very well then. We'll take the lunch break.

And I have the following people to talk to with some follow-up issues: Number 17, 3, 47, 9, 19, 17, 39, 40, and 50. 12:15:34 That's nine people. And in addition to having those discussions with those nine people we need to take enough of a break so the lawyers and Mr. Hall can have some lunch as well. So that means we need to take a slightly longer break than we would just for all of the jurors. 12:16:10

Counsel, let me -- it's a quarter after 12. If we ask them to return at 1:30, that's an hour 15 minutes. That might not be enough. How about 1:45. Counsel, you think 1:45 would be an appropriate time?

MS. JENNIS: I think that would work, Your Honor. 12:16:30

THE COURT: Very well then. I'm going to recess until 1:45.

Now, this time, I'm going to ask you all to take all your things with you, because when you come back I'm going to ask you all to sit in the back and when we call the numbers of 12:16:43 those who have been selected to serve, we'll set you in the jury box. So that means you have to take your things with you and not leave them here.

Now, again, the jurors for us to remain to talk with further is Number 17, 3, 47, 9, 19, 17, 39, 40, and 51. And 12:16:58 the others are excused for lunch until 1:45. And I remind you of the admonitions I gave you about not discussing the case.

And with that, all rise for the jury.

(Jury out at 12:16 p.m.)

THE COURT: Please be seated. And let us talk with -- 12:18:08 well, why don't we just take people in numerical order. Let's talk with Juror Number 3 first. The rest of you please remain outside and we'll call you in one at a time as we are able to talk with you.

(Juror 3 remains.) 12:18:24

THE COURT: The record will show the other jury panel members have left the courtroom. And Juror Number 3, we have a few things with you, including your IRS dispute. The issue here is -- you know what the issue is.

PANEL MEMBER (3): Impartiality. 12:18:58

THE COURT: The issue is we all have experiences in life that, you know, we're not happy about.

PANEL MEMBER (3): Sure.

THE COURT: Wouldn't affect our ability to look at evidence and judge the consequences without concern about 12:19:09 whether we have a like or dislike for one side or the other. Life is full of that. But we also have experiences that touch us in a way that's too deep, generates emotion that can cloud that independence and judgment. And that's the question we have to ask you to search your own heart that tells which side 12:19:27 of the boundary you are on with respect to your dispute with the IRS.

PANEL MEMBER (3): Sure. I was thinking a little bit about that here at the end, and it's just as someone who has always paid their taxes and might not love it, who knows who 12:19:42 does, something we all need to do, law abiding citizens, it doesn't leave you with a warm fuzzy to have that person sit across the desk and say you owe us this money now. Although it was our mistake, just filed the wrong year, and you have less than 24 hours to get it together and write this check or we are 12:20:06

freezing every asset you own.

THE COURT: 24 hours?

PANEL MEMBER (3): 24 hours. So it just didn't leave us with a warm fuzzy. In the end, minus the penalties and fees, we did get the money back. 12:20:20

THE COURT: So the question --

PANEL MEMBER (3): I'm trying to think in this case I think I could. I just don't necessarily -- it's not a warm fuzzy. But yeah, I think I could.

THE COURT: The charge here in this case has to do 12:20:34 with creating and using false financial instruments in connection with purportedly paying taxes.

PANEL MEMBER (3): And I think you need to pay your taxes. So, yes, I could.

THE COURT: You think you could be fair and impartial? 12:20:48

PANEL MEMBER (3): Sure.

THE COURT: There were a few other things you mentioned. In keeping my notes, I'm not sure I have them all clear. Go ahead. Do you remember the other items? Or counsel, do you remember other matters with Juror Number 3 or 12:21:00 was this the only one?

MS. JENNIS: I believe this was the sole issue that you were going to speak to her.

PANEL MEMBER (3): I had one with an aunt, but that wasn't one that regarded this. 12:21:11

THE COURT: Right. Right.

Any questions, Ms. Jennis?

MS. JENNIS: None from the United States.

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, Your Honor. 12:21:18

THE COURT: Very well. Thank you. Go to lunch. We'll see you at 1:45.

(Juror Number 3 out.)

THE COURT: And let's bring in -- let's see who is next. I think it would be Number 9. I believe Number 9 had a 12:21:32 brother who was convicted and might be partial.

MR. KUNKLE: Your Honor, with respect to Number 9, in a situation like that where she's mentioned family members involved in the cases, I know we don't get into names, but one of the thoughts that came to my mind today was conflict issues. 12:22:02

THE COURT: Conflict?

MR. KUNKLE: I don't know her.

THE COURT: Tell you what. Let me discuss that after we finish with Juror Number 9. Don't forget, all right?

(Juror Number 9 in.) 12:22:14

THE COURT: All right. Juror Number 9, if I can read my notes right you told us about a brother who had a conviction and you thought might be partial. Can you explain that for us or are there a few other things?

PANEL MEMBER (9): I think with everything I have been 12:22:32

through and the whole legal process with him going away and stuff, I have a hard time being impartial towards pretty much a lot of stuff.

THE COURT: Ms. Jennis, any questions?

MS. JENNIS: No, Your Honor. 12:22:49

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, Your Honor.

THE COURT: Any objection to excusing Number 9?

MS. JENNIS: No.

MR. KUNKLE: No. 12:22:54

THE COURT: Juror Number 9, I will excuse you at this time. Thank you very much for the time you have given us and the care you have taken in answering all of our questions. Please report back to the jury room in case they have further need for your help today. 12:23:06

So let's bring in Number -- I think 17. 17 is the next one.

(Juror Number 9 out. Juror Number 17 in.)

THE COURT: Juror Number 17, we had a number of things to talk with you about more in private. 12:23:41 One was your father-in-law about the police and the Internal Revenue Service matter.

PANEL MEMBER (17): Yes, Your Honor.

THE COURT: And you thought you might not be able to be impartial. 12:24:05

PANEL MEMBER (17): Correct. I have a bias against the IRS; just methods, not philosophical against the organization or anything, just methods in execution.

THE COURT: Ms. Jennis, any questions?

MS. JENNIS: No, Your Honor. 12:24:26

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, Your Honor.

THE COURT: Any objection to excusing Number 17?

MR. KUNKLE: No, Your Honor.

MS. JENNIS: No, Your Honor. 12:24:31

THE COURT: Juror Number 17, I will excuse you at this time. Thank you very much for your service today. Thank you for the care you have shown in answering our questions. Please report back to the jury assembly room to see if they have any further need for your help today. 12:24:46

And Number 19 is the next.

(Juror Number 17 out. Juror Number 19 in.)

THE COURT: Juror Number 19, we were talking about, I think it was, your brother-in-law involved in a wire fraud matter and we kind of stopped there. Could you go back and 12:25:17 explain that to us in more detail? You know what we're going to ask you.

PANEL MEMBER (19): Sort of. I wasn't involved in the trial or anything like that, but basically it was a giant Ponzi scheme. They got him and all his partners for wire fraud and 12:25:35

they all did federal time.

THE COURT: How long ago was that?

PANEL MEMBER (19): He got paroled two years ago and some of his partners are still serving time because they were incarcerated after he had been serving a few years. 12:25:49

THE COURT: Do you recall how much the monetary loss was the government charged?

PANEL MEMBER (19): I think around 250 million.

THE COURT: Was that in federal court or state court? Do you recall? 12:26:07

PANEL MEMBER (19): Federal court. It wasn't in the state of Arizona, though.

THE COURT: All right. And again, approximately how long ago did he have this trial or was he sentenced?

PANEL MEMBER (19): Probably about five years ago. 12:26:17

THE COURT: Did you have any involvement either as a witness to events or any participation in the offense or trial?

PANEL MEMBER (19): No, only as a person who lost money.

THE COURT: Okay. Well, do you think you could be a fair and impartial juror in this case notwithstanding that experience in your life? 12:26:34

PANEL MEMBER (19): The only difficulty was is that as a person who lost money in their financial scheme that was one side of it, but also when he went away he had three small 12:26:55

children, two who were special needs. And since he could no longer provide for his family by being sent away, the burden fell to us to care for his family. So on some level I understand he needed to be punished, but really I felt the people that were punished were his children. 12:27:13

THE COURT: Okay. I can understand why there would be strong feeling and emotion about that. The question is, does that emotion, in your experience, would that affect your ability to be a fair and impartial juror in this case? And again, in this case the government is charging the defendant 12:27:31 with aiding and abetting preparation and using of a false financial instrument.

PANEL MEMBER (19): No, I don't think so.

THE COURT: So do you think you could be fair and impartial in this case? 12:27:47

PANEL MEMBER (19): Yeah, because I kind of was on both sides of the case.

THE COURT: Yeah. All right.

Ms. Settel, any questions?

MS. JENNIS: I was just curious what state this 12:27:55 occurred in.

PANEL MEMBER (19): I believe Maryland.

MS. JENNIS: That's all, Your Honor.

PANEL MEMBER (19): You could look it up. It's Four Star Financial. 12:28:05

MS. JENNIS: Thank you.

THE COURT: Mr. Kunkle.

MR. KUNKLE: Hi Juror 19. You are here in court answering questions amongst the staff and everybody. You have heard what the judge told you about what he's charged with, correct? 12:28:19

PANEL MEMBER (19): Correct.

MR. KUNKLE: If you learned during the course of this trial that this also involved his family along the same lines, one of the witnesses here for the government is going to be his daughter, would that affect your fairness testifying -- his daughter coming in to testify against him? If you learned things that happened to Mr. Hall's family much like you just told us happened in your family, would that change your mind about your answer? Because you earlier said it possibly could affect your fairness. I need a little more information. And there's no wrong answer here. 12:28:31 12:28:47

PANEL MEMBER (19): Oh, no. I understand that. No. I don't think that would at all.

THE COURT: Okay. Because you might hear of some tragedy in the family. And I know you are laughing but I'm -- 12:28:59

PANEL MEMBER (19): No. I know.

MR. KUNKLE: I know you are just nervous. Upon hearing that, would that make you think, you know, he's responsible, that perhaps affect your judgment on how you 12:29:13

decide this case? And just, again, the judge had asked you earlier, if you were sitting in his shoes and you were to be the juror would you want you deciding your fate when he's looking at criminal charges like this?

PANEL MEMBER (19): Uh-huh. 12:29:32

MR. KUNKLE: Do you understand what I'm asking?

PANEL MEMBER (19): Absolutely.

MR. KUNKLE: So, I mean, there's other cases you can serve on as a juror. So do you really absolutely positively be fair and say, you know, because this is an important case to 12:29:45 Mr. Hall.

PANEL MEMBER (19): Absolutely.

THE COURT: Do you think you could still be fair?

PANEL MEMBER (19): I do.

THE COURT: Juror Number 19, thank you. Please get 12:29:57 some lunch. We'll see you back here at 1:45.

And let's bring in Number 39.

(Juror Number 19 out.)

THE COURT: 39 is the next one. My notes on 39 are pretty cryptic. All I wrote done was drugs. Counsel remind me 12:30:21 what the issue was with Juror 39.

MR. KUNKLE: Your Honor, she indicated about DUI and somebody sounded like an aggravated DUI in the state of Arizona.

(Juror Number 39 in.) 12:30:34

THE COURT: There she is.

Juror Number 39 -- I do recall -- have a seat anywhere. You had raised a question as to whether you might have some partiality here because of, I think, some views on government policies and some other matters. 12:30:51

Mr. Kunkle, refresh my memory as to what we wanted to discuss with Juror Number 39.

MR. KUNKLE: Your Honor, she had answered yes to the question about whether she could be fair or not that would affect her impartiality. 12:31:07

THE COURT: Could you explain that to us Number 39?

PANEL MEMBER (39): Trying this think how to word it nicely.

I just think the justice system is flawed. I know a lot of people do. So that's why I answered that question. 12:31:25

THE COURT: You know, I just want to explore that briefly.

The question -- well, there's a number of ways to come at it. But one way to put it is do you have views about -- do you think that the criminal justice system is unfair in general? 12:31:43

PANEL MEMBER (39): Yes.

THE COURT: I don't want to cross-examine you, but can you tell us briefly how it is you think the system is unfair.

PANEL MEMBER (39): I think it's unfair towards, like, 12:31:57

minorities. And if you were to have two people of different -- say you have a white person then the minority was charged with the same crime, I just personally feel like maybe the minority would get a bigger sentence or whatever because of the color of their skin. 12:32:17

THE COURT: Do you feel that would affect your ability to be fair and impartial in this case where there was no issues of any minority person involved?

PANEL MEMBER (39): I don't think so. I'm not sure. Probably not. 12:32:36

THE COURT: So I understand your concern that the system is not fair to minorities.

PANEL MEMBER (39): Yes.

THE COURT: Would that affect your ability -- I'm repeating myself -- would that affect your ability to be a fair 12:32:50 and impartial juror in this case where it does not involve any minority people?

PANEL MEMBER (39): I guess not.

THE COURT: Counsel, do we have any witnesses who would be members of any minority? 12:33:13

MS. JENNIS: I don't believe so, Your Honor.

THE COURT: Juror Number 39, I can't say for sure, but we don't think there will be any witnesses. But if any of the witnesses do turn out to be members of any racial or ethnic minority, could that impact your fairness? 12:33:35

PANEL MEMBER (39): No.

THE COURT: Now, I want to cover a few other things. I think there was something else we wanted to talk with Juror Number 39 about. I'm not sure. Do you recall, Ms. Jennis?

MS. JENNIS: The note that I had, and I think it's related to the questions you have already asked her, is that she said something about if the matter involved drugs or alcohol she might not be able to be fair and impartial. 12:33:59

THE COURT: I don't recall that. Could you explain that for us, Number 39? 12:34:17

PANEL MEMBER (39): My mother was -- served time in prison for whatever the highest charge of DUIs is. So if there was a court case involving drugs or alcohol I might be a bit jaded because of my experiences with alcoholics and addicts.

THE COURT: And I don't believe there's any issue of that in this trial. Will there be, counsel? 12:34:38

MS. JENNIS: Excuse me, Your Honor. Possibly, Your Honor.

THE COURT: All right. Ms. Jennis, do you have any questions? 12:35:00

MS. JENNIS: No, Your Honor.

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, Your Honor. But I have a motion.

THE COURT: You have a motion?

MR. KUNKLE: Yeah. 12:35:10

THE COURT: Juror Number 39, will you just step out for a few minutes? Don't leave. We'll call you back in a minute.

(Juror Number 39 out.)

THE COURT: The record will show the juror stepped out. 12:35:30

Mr. Kunkle.

MR. KUNKLE: Your Honor, I'd move Juror 39 for cause.

THE COURT: Ms. Jennis.

MS. JENNIS: That's fine with the United States, Your Honor. 12:35:38

THE COURT: Let's bring her back in and I will -- I kind of thought that's where it was going. But as I said, I really try hard not to embarrass lawyers in front of jurors or embarrass jurors in front of the lawyers. 12:35:49

(Juror Number 39 in.)

THE COURT: Juror Number 39, thank you. I'm going to excuse you at this time. Thank you for your service today and thank you for the great care you have taken in answering our questions. And please report back to the jury assembly room to 12:36:08 see if they need further help from you today.

You are excused.

Let's bring in -- 40 is next.

(Juror Number 40 in.)

THE COURT: Take a seat anywhere. 12:36:18

So Juror Number 40, there are a few things that we wanted to talk with you about further, this issue about your sister was involved in fraudulent checks?

PANEL MEMBER (40): Yeah. She was bouncing checks and she was working at a grocery store, stole a bunch of money orders, cashed them, forged them, turned them in and they caught her. 12:37:04

THE COURT: How long ago was that?

PANEL MEMBER (40): That was in the '90s.

THE COURT: Did you have any involvement as a witness or any connection with the case? 12:37:14

PANEL MEMBER (40): At the same time, I was just getting out of the Marine Corps and she had stole some money from me right before then, right before I got out. My mother gave her my ATM card. And the reason it sort of impacts me because I just -- in the back of my mind I think I have already got a conclusion to the situation here. And also I'm a CPA so when it comes to money, we do a lot of deposits where I work and stuff. We see people try that on a regular basis. 12:37:30

THE COURT: There's something about your stepfather? 12:37:54

PANEL MEMBER (40): He robbed gas stations at a young age.

THE COURT: And also you had a comment about whether the system is unfair in general?

PANEL MEMBER (40): No, that wasn't me. 12:38:06

THE COURT: Oh. That wasn't you.

All right. Now, and again, government's charge in this case is the defendant aided and abetted in the use of what amounts to a false instrument, false financial instrument. Do you think you could be a fair and impartial juror in this case? 12:38:28

PANEL MEMBER (40): I really don't believe so. Again, I do see stuff like this at work, too. And ours are small dollar amounts. A lot of times we write them off and let them go, but I have already got a preconceived --

THE COURT: Ms. Jennis, any questions? 12:38:44

MS. JENNIS: No, Your Honor.

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, sir.

THE COURT: Any objection to excusing Juror Number 40?

MS. JENNIS: No, Your Honor. 12:38:50

MR. KUNKLE: No.

THE COURT: Juror Number 40, I will excuse you at this time. Thank you for your service today and thank you for your care in answering our questions. Please report back to the jury assembly room. 12:38:59

Let's bring in Number 50. I think that's our last one.

(Juror Number 40 out.)

MS. JENNIS: 49.

MR. KUNKLE: I think Number 35 as well, Your Honor, 12:39:05

unless my notes are remiss.

THE COURT: I don't think I asked 35 to remain. The ones I have left are 50. But my notes are slipping because I don't think I asked 35 or 39. Who is the other one?

MR. KUNKLE: I had 35. I looked at the back of my notes. She was the one who had somebody robbed their own house for insurance fraud. I think she answered, according to what I had written down, very tepid. Probably she thought she might be fair. 12:39:36

THE COURT: My mistake. I didn't put her on my list. We don't have her here to question. 12:39:54

THE LAW CLERK: Only jurors outside are 47 and 50.

THE COURT: 47 and 50.

Tell you what. Let's talk to 47 and 50 and see -- the other one, Mr. Kunkle, was 35? 12:40:15

MR. KUNKLE: Yes, Your Honor. My recollection was she was somewhat equivocal on answering the Court's questions on impartiality.

THE COURT: Tell you what. Let's talk with 47 and 50 who are here and talk about whether we can resolve any issues about 35 without having her here to answer more questions. It would be nice if we could resolve everything and you all could proceed to do your strikes. And if we can't, we'll bring them back and talk to them. Let's bring in Number -- oh, yes. 47. 47 was a crime victim. That's right. Let's bring in Number 12:40:28 12:40:46

47.

(Juror Number 47 in.)

THE COURT: All right. Take a seat anywhere.

And Juror Number 47, we had some discussion with you about crime victim and my notes don't remind me who it was. Could you explain that to us again? 12:41:14

PANEL MEMBER (47): It was me.

THE COURT: Could you tell us the timing and what the situation was?

PANEL MEMBER (47): Yeah, in college, it was sexual assault. And I reported it, and it was an athlete so -- well, they said there wasn't enough evidence. But later on he got convicted of assault. And the orange, it is bringing up the last picture I have seen of him. It didn't occur to me until you asked that question. I just didn't want to say that in front of everyone. 12:41:25 12:41:51

THE COURT: How long ago was that?

PANEL MEMBER (47): It was in the early 2000s.

THE COURT: All right. You know, we all have situations where things that are troubling but yet we're able to have objective assessments. But we also have situations where things touch us in a way that cloud that. And that's the question I have to ask you, whether this is this something that you could put aside the emotion and the memory and be a fair and impartial juror to both sides, or is this something that 12:42:04 12:42:28

touches you in a different way that you should not be a juror on?

PANEL MEMBER (47): It's physically impacting me.

THE COURT: Ms. Jennis, any questions?

MS. JENNIS: No, Your Honor. 12:42:38

THE COURT: Mr. Kunkle?

MR. KUNKLE: No, sir.

THE COURT: Juror Number 47, I will excuse you at this time and I thank you for your service. And I thank you for the care you have taken in answering our questions. Please report 12:42:47 back to the jury assembly room.

PANEL MEMBER (47): Thank you.

THE COURT: Juror Number 50.

(Juror Number 47 out. Juror Number 50 in.)

THE COURT: Just take a seat anywhere. 12:43:16

And Juror Number 50, I asked you whether you had any strong views on any government policies that could affect your ability to be a fair and impartial juror in this case. And I think you said yes, or maybe could you explain that to us.

PANEL MEMBER (50): Yes, Your Honor. Part of my job 12:43:33 is that I'm a bit of an efficiency expert. I'm a little bit obsessive compulsive about that kind of thing. If I misuse my equity partners' funds I'm held accountable for that. I have several friends at the IRS who have told me that it's an incredibly poorly-run organization, that money is squandered, 12:43:56

also the reason why some of the scandals that have come out in the news. I just don't have a very high opinion of the IRS, the fact that money is taken out of my check and then those funds are not used as efficiently as they could be is a little irritating to me. 12:44:20

THE COURT: Well, in this case, the government charges that the defendant aided and abetted in creating and using a false financial instrument in connection with tax liabilities. Do you think you could or could not be a fair and impartial juror in this case for both sides? 12:44:38

PANEL MEMBER (50): I think that I would have a hard time being fair and impartial for the IRS.

THE COURT: Ms. Jennis, any questions?

MS. JENNIS: No, Your Honor.

THE COURT: Mr. Kunkle? 12:44:53

MR. KUNKLE: No, sir.

THE COURT: All right. Any objection to excusing Number 50?

MS. JENNIS: No, Your Honor.

MR. KUNKLE: No, Your Honor. 12:44:58

THE COURT: Juror Number 50, I will excuse you at this time. And thank you for your service today. Thank you for your care in answering our questions. And please report back to the jury assembly room.

PANEL MEMBER (50): Thank you, Your Honor. 12:45:08

(Juror Number 50 out.)

THE COURT: Counsel, that's everybody I have asked to remain. Let's see if we can discuss 35 and make any progress without the opportunity to question her further.

Remind me, Mr. Kunkle, what were the issues with that juror. 12:45:26

MR. KUNKLE: She has two, Your Honor. One, she's our volleyball coach this afternoon, number one, hardship. You know, kids could have the parents step up and run a practice perhaps. More than that, my notes I indicated are on the question about when you had asked her point blank about being fair and impartial she was equivocal at best when she was discussing insurance fraud. I believe it was her brother or brother-in-law had robbed her own house. At first when she gave the answer I was curious how he could rob his own house. 12:45:44 12:46:06

THE COURT: He was faking a burglary to get insurance.

MR. KUNKLE: Then you asked her, I believe the record will bear this out, if she thought this would impact her or have any effect on her impartiality and she said probably would. We kind of passed to bring her back later and I think between the two issues she should probably -- 12:46:22

THE COURT: Let me ask, Nick, where do we stand in term of numbers?

We have a margin of four that remain.

MR. KUNKLE: We're okay. There were still some other 12:46:37

people with hardships we hadn't visited. Again, I think it would be better if we could, even after break we could question her again but that's going to push back our challenges.

THE COURT: First of all, counsel, we'll do whatever anybody wants to do. I'm not pressuring anybody to rush the strikes. If we could resolve this one, we could then proceed to do your strikes while the jury is out. 12:46:56

MR. KUNKLE: I don't know if the government's ready. We were also discussing Juror Number 3 as well just to give the Court a heads up. I think there's a joint motion for cause on Number 3. 12:47:17

THE COURT: Let's talk about what may be in play. Number 3?

MR. KUNKLE: I don't know if the government's joining a motion for cause. I mean, she was rather back and forth. 12:47:26

THE COURT: I want to make a list of -- this would include any hardship ones that we have not yet resolved.

In terms of hardship, the ones I have that we have not excused, are --

MS. JENNIS: 4, Your Honor. 12:47:53

THE COURT: Number 4, which the guy who is on call. I didn't think he was a sufficient hardship.

Number 35 is one on our list.

MS. JENNIS: And 42, Your Honor.

THE COURT: 42 works nights. 12:48:13

MR. KUNKLE: Number 51, Your Honor.

MS. JENNIS: 51 whose colleague got taken to the hospital this morning for appendicitis.

THE COURT: Didn't we excuse him?

MS. JENNIS: It was a female. 12:48:27

MR. KUNKLE: No, we did not.

MS. JENNIS: We did not.

THE COURT: That's the guy who can't cover for him now.

MR. KUNKLE: She's an event scheduler who is in a partnership and she, because her partner went to the emergency room this morning at 4 a.m., she doesn't feel like, you know. 12:48:36

THE COURT: In terms of everybody that remains in play, it looks like we have four. Is that correct? Number 35, Number 3, Number 42, and Number 51. 12:48:53

MS. JENNIS: For hardship yes, Your Honor. I have 36 jurors left. Is that correct? I think we excused 15.

THE COURT: We need 32.

MS. JENNIS: Okay.

THE COURT: Nick, double check that, please. 12:49:09

MR. KUNKLE: That's what I have, Your Honor. A moment ago I counted. I had 36 we had left.

THE COURT: Here's my point, is that I understand there are times when one counsel or the other would prefer to have a juror in and they have a right to rehabilitate them and 12:49:27

argue it. Most of the time, it seems to me that neither lawyer wants somebody here who doesn't want to be here. Now, that's not to pressure anybody. But if we have four in play and four left, we could excuse all four of these. We would eliminate what I think is your bias objection, Mr. Kunkle, for you want to argue that for 35 and Number 3. Is that correct? 12:49:50

MR. KUNKLE: I don't know if the government's -- I believe Number 3 should probably be removed for cause. We didn't really handle it when she was still here.

THE COURT: She had a bad experience with the IRS. 12:50:13

MR. KUNKLE: She was back and forth on the IRS issue herself; first fair, maybe unfair. You had an opportunity to observe her. I think she should be gone for cause.

MS. JENNIS: We can join that, Your Honor, for Number 3. 12:50:25

THE COURT: All right. Then we'll excuse Number 3. Frankly, I think that would be a close call, but I can see why there are good reasons why both counsel would prefer to have someone else.

Now, Number 35 is the one who is equivocal who also is 12:50:37 claiming the hardship because -- you know, the volleyball coaching is on the low end of hardship. But --

MS. JENNIS: Your Honor, in terms of scheduling, Your Honor, because our expert is not coming until Thursday, I see tomorrow as a very short day because we just eliminated two of 12:51:00

my witnesses.

THE COURT: Okay. But in terms of the jury, we are down to three remaining in play and we have three to spare. Now, counsel, I'm not twisting anybody's arms. If there's any of these jurors you want to try to hold on to, you can pursue that. But if you are agreeable to letting these three go -- 12:51:25

MR. KUNKLE: Your Honor, I would also, just to not to muddy the waters, I think there's a motion for cause. I'm looking back through additional notes on Number 34.

THE COURT: That's why I asked you who is in play. 12:51:40

MR. KUNKLE: I'm sorry. I think Number 34, I know she said she didn't think it would -- didn't think it would affect her fairness. I think sometimes the answer that comes out of somebody's mouth on a cold record belies their posture and their emotions that are on display before the Court. 12:51:58

THE COURT: Remind me.

MR. KUNKLE: She's the -- she had the adopted son. She was talking about raising the children and the daughter's in the grow house and she was quite worked up about it. Then you asked her could she be fair, and as if on cue she said no. 12:52:22

THE COURT: I want to be sure I'm not confusing her with somebody else's details.

MS. JENNIS: I believe Mr. Kunkle is taking about Number 34 who works for DHS in their transportation service department. My recollection is in response to all your 12:52:41

questions regarding fairness she was unequivocal in her response.

THE COURT: Actually now I'm remembering her and I thought not only was she unequivocal, I didn't see any body language issues either. Tell me again where the bias might be. 12:52:55

MR. KUNKLE: I was sitting about 10 feet, 15 feet from her. I think sometimes they will answer the question, no. I think most people presume they want to be fair so they will say no to the Court's question about whether they could be impartial. 12:53:20

THE COURT: What was her circumstances again that causes you concern?

MR. KUNKLE: She was discussing the daughter who she was estranged from for 19 years. They were raising the kids. She was speaking somewhat angrily about the daughter as then as 12:53:34 if on cue she answered the Court's question. On the record it would be unequivocal no.

THE COURT: What was her daughter's -- I wrote this down but what was her daughter's offense again?

MR. KUNKLE: She was caught in a grow house. They 12:53:50 have been estranged for 19 years. She mentioned she was raising the niece and nephew.

THE COURT: I know but I remember the marijuana.

MR. KUNKLE: Yeah.

THE COURT: Were there any other crimes? 12:53:59

MR. KUNKLE: No. I think that was it, then she mentioned about the negative -- what she perceived to be the negative law enforcement type of situation as well.

MS. JENNIS: She did talk about the time where she had her injured son/nephew in the car and they called the police, if that jogs your memory, Your Honor. 12:54:13

THE COURT: Yeah. And they swooped down and she understood perfectly that they are watching out for people's safety. She didn't seem to be troubled by that.

MS. JENNIS: No, she didn't, Your Honor. 12:54:34

THE COURT: Anything else?

MR. KUNKLE: I think the record is clear, Your Honor.

THE COURT: Your position, Mr. Jennis, on Number 34?

MS. JENNIS: I think she's fine, Your Honor.

THE COURT: I'm satisfied, too, that there is not basis for excuse for cause there. Not only was she firm in her professions of impartiality, I didn't see any problem. 12:54:46

Also, when we ask these people questions, it's very common where you throw something at people trying to be careful and they tell you about something. They don't know if it's a cause -- they are laying it on the table and then when you go through it with them they come to a conclusion. So I didn't really see anything more than that Mr. Kunkle, so I'm going to overrule the objection to Juror Number 34. 12:55:10

That still leaves us with 35, 42, and 51 as the ones 12:55:26

in play with three remaining spares.

MS. JENNIS: Out of those three, Your Honor, the hardship that, to me, seems the most compelling would be the co-worker taken to the emergency room this morning. Because I don't believe they are going to be coming back to work tomorrow 12:55:47 if they had an appendicitis.

THE COURT: That's Number 51?

MS. JENNIS: Yeah. That's the last person. Might not matter. But it seems to me that was a somewhat unexpected circumstance. 12:56:01

THE COURT: Right. Any objection to excusing Number 51 for hardship, Mr. Kunkle?

MR. KUNKLE: No, Your Honor. I have no objection. But I think we also need to take up 35. 35's hardship, I think, doesn't rank as the appendicitis did. 12:56:16

THE COURT: We'll excuse Number 51 for hardship.

I had the same thought about the volleyball coaching, that that would be one that if we needed a juror we would keep her. I'm not sure we're going to need her, though. And Number 42 is the fellow who works nights and was -- he didn't say he 12:56:42 couldn't get here but he did say it would be a challenge.

MR. KUNKLE: Your Honor, the other juror, too, just in terms of hardships was the juror who works the night shift 7 to 7. My notes are Juror 44. She mentioned she works on Friday.

MS. JENNIS: She doesn't work until 7 p.m. on Friday. 12:57:09

THE COURT: She told us she's fine.

I'm thinking that we can -- my primary concern is fairness to both sides in your jury selection. And if neither the defendant nor the government are seeing any desire to have Number 35 or Number 42 on the panel, and if you do see a strategic benefit, then go with it. But if you are not seeing any strategic preference for them over others, I would be inclined to excuse them both for hardship even though their hardships are at the low end of the spectrum. But I would cut any counsel's desire to have the juror against that if any counsel does want to have either of them. 12:57:34 12:57:55

MS. JENNIS: Your Honor, the United States has no objection to striking for the hardship purpose 35 or 42. And then I believe that would leave us with the 32 jurors so there would be -- 12:58:12

THE COURT: Nothing to strike. If anything went wrong after that I would reduce the number of alternates.

MS. JENNIS: Understood.

THE COURT: So Mr. Kunkle.

MR. KUNKLE: Yes, sir. 12:58:22

THE COURT: You have to tell me what decision you want me to make.

MR. KUNKLE: Oh. I have no objection to government's motion, Your Honor, excusing 35 and 42.

THE COURT: Very well then. We'll excuse 35 and 42 12:58:32

for hardship, which leaves us dead on the money and 45 minutes for you all to get lunch.

Oh. Oh. Do your strikes and get lunch.

MR. KUNKLE: Your Honor, the Court --

THE COURT: Go ahead. 12:58:51

MR. KUNKLE: I don't know how the Court does it. I don't recollect. We probably discussed it last Thursday but it's been a along weekend.

THE COURT: Simultaneous strikes, just do them all at the same time. 12:59:05

MR. KUNKLE: I was hoping to hear that the government would strike and then I would strike.

THE COURT: No. That takes way too much time and it's not near as much fun.

MR. KUNKLE: We have 45 minutes, Your Honor, and I think that's the more fair way to do it. 12:59:13

THE COURT: No. I don't do it that way. Under the federal rule both sides do all their strikes at once. We do not do alternating strikes. And you run the risk you might both strike the same person. But I had a jury once with a truly awful juror that got on the jury because both sides thought the other side would strike him. 12:59:36

But so you are both motivated to use your strikes to the right way. Plus, you won't get lunch if I let you do alternates. And the federal rule doesn't provide that. Unless 13:00:00

you stipulate to that I would think it would be error for me to allow it.

Here's what I will do. I'm going to recess. Hand in your strikes as soon as you both have your strikes in. We really won't have any *Batson* issues. 13:00:23

MR. KUNKLE: Your Honor, I think the rule allows for the Court to have us do them separately not jointly, at the same time. I think that's the rule.

THE COURT: Let me read it.

MR. KUNKLE: I stand corrected. 13:01:07

THE COURT: I remember doing it that way in state court. Our way is so much faster.

So unless you can point me to a rule that says otherwise, I'm going to recess and do it that way. Please turn in your strikes and we'll see you back at 1:45. And thank you, 13:01:25 counsel. We'll be in recess until 1:45.

MS. JENNIS: Thank you, Your Honor.

(Recess from 1:01 p.m. until 1:48 p.m.)

THE COURT: The record will show presence of counsel, the defendant, and the absence of the jury panel members. 13:47:58

Mr. Kunkle, something you wanted to say?

MR. KUNKLE: Just briefly, Your Honor.

Your Honor, going forward from here I know the Court's time and the jurors' time is valuable. I just -- I wanted to put on the record that so in case someone else is reading the 13:48:10

transcript, before lunch broke I asked Mr. Hall if he wanted to assist me with picking the jurors, you know, obviously explaining to him their role in deciding his fate here. He asked me why would I need to do that or words to that effect and returned to the cell block to have lunch. So I just wanted to make that clear. There's a little more to it, obviously. But the marshals were present and I believe they weren't in any hurry to take him to the cell block so it wasn't an issue that they needed to go eat their lunch. I believe had he wanted to stay here they would have been accommodated by such and if that meant we needed extra marshals. Just so it's clear he's not necessarily participating with me in his trial. 13:48:29 13:48:46

THE COURT: I had a similar thought I wanted just to remind you that in light of -- Mr. Hall, I hope you will assist your attorney in whatever ways he requests. But in light of the fact, Mr. Kunkle, that Mr. Hall has refused to assist you in the past, I want you to make good notes of what transpires between you and him and of your efforts. And at the right time you may want to put them on the record maybe after verdict or whatever. But the important thing is not so much that you put it on the record here but that you have good notes of your efforts. And in the event this is examined by someone else in the future will ultimately have a good record based on your notes and memory. 13:49:03 13:49:24

Nick, let's bring in the jury. 13:49:45

And I take it there's no *Batson* challenges, right? Kind of hard to figure out how it could be.

(Discussion off the record.)

(Jury in at 1:51 p.m.)

THE COURT: The record will show the presence of the jury panel members. And would the clerk please read the numbers of the jurors who have been selected to serve as trial jurors in this case. And the clerk will direct each of you where to be seated. 13:51:35

THE COURTROOM DEPUTY: Juror Number 1, you are now Juror Number 1 on the jury. Have a seat in the first chair. 13:51:54

Juror Number 4, you are now Juror Number 2.

Juror Number 5, you are now Juror Number 3.

Juror Number 18, you are now Juror Number 4.

Juror Number 20, you are now Juror Number 5. 13:52:24

Juror Number 25, you are now Juror Number 6.

Juror Number 27, you are now Juror Number 7.

Juror Number 30, you are now Juror Number 8.

Ma'am, you can have a seat at this first chair here.

Juror Number 31, you are now Juror Number 9. 13:52:55

Juror Number 32, you are now Juror Number 10.

Juror Number 36, you are now Juror Number 11. 36.

Juror Number 43, you are now Juror Number 12.

Juror Number 44, you are now Juror Number 13.

Juror Number 45, you are now Juror Number 14. 13:53:26

THE COURT: All right. Those members of the jury panel who were not selected as trial jurors are now excused. And I thank you all for your service. Thank you for the care you have taken in answering all of our questions. And I ask you to report back to the jury assembly room to make sure that they don't have other need for your help today. And thank you all. You are excused. 13:53:51

All right. Now, those of you who have been chosen to serve as trial jurors, please stand and be sworn.

(The jury was sworn.) 13:54:40

THE COURT: Please be seated.

Now, we have, under the constitution, we have a jury of 12 persons. As you can see there's 14 of you. The reason is we have two alternates. We don't know who the alternates will be. We select the alternates by drawing lots at the very end of the trial before the jury retires to deliberate. And even -- so we don't know who the alternates will be. Even after the alternates are selected they are not yet released from duty because if it happens that the jury, any of the jurors becomes unable to continue to deliberate we will call back one or necessarily both of the alternates and the jury will begin deliberation from the beginning with the alternates. And when the jury is finally discharged we call the alternates and let them know. 13:55:07 13:55:28

This happened in one of my trials, and one of the 13:55:45

jurors became unable to deliberate so we called one of the alternates. They pulled him off a construction site. He went home, took a shower, put on some clean clothes, came in, and we started all over again. So we will identify the alternates, as I said, by drawing lot at the end. 13:56:03

Now, Ladies and Gentlemen, you are now the jury in this case and I want to take a few minutes to tell you something about your duties as jurors and to give you some preliminary instructions. At the end of the trial, I will give you more detailed instructions that will control your 13:56:21 deliberations.

When you deliberate, it will be your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. To the facts as you find them, you will apply the law as I give it to you whether you agree 13:56:35 with the law or not. You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.

Please do not take anything I may say or do during the 13:56:51 trial as indicating what I think of the evidence or what your verdict should be. That is entirely up to you.

This is a criminal case brought by the United States government. The government charges the defendant with aiding and abetting making and using fictitious instruments. The 13:57:07

charges against the defendant are contained in the indictment. The indictment simply describes the charges the government brings against the defendant, and the indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges and is presumed innocent unless and until the government proves the defendant guilty beyond a reasonable doubt. 13:57:24

In addition, the defendant has the right to remain silent and never has to prove innocence or present any evidence. And you must decide each count in the indictment separately and not allow your verdict on one count to control your verdict on any other count. 13:57:43

The defendant is charged in Counts 1 and 2 of the indictment with aiding and abetting making fictitious instrument, in violation of United States Code. The defendant aids and abets another if the defendant intentionally joins with another person to commit a crime. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt. 13:58:05 13:58:24

First, the defendant drew, printed, processed, produced, or published a false or fictitious instrument, document, or other item identified in the indictment within the United States or attempted to do so.

Second, that the instrument, document, and other item 13:58:42

identified in the indictment appeared, represented, or purported through scheme or artifice to be an actual security or other financial instrument issued under the authority of the United States or any political subdivision of the United States. And third, the defendant did so with the intent to defraud. 13:59:02

A fictitious instrument is a bogus document created to appear to be a financial instrument, although no such genuine financial instrument exists, and the fact of the instrument's non-existence is unknown to the intended recipient. 13:59:18

The government is not required to prove that the false or fictitious instrument, document, or other item appeared to be similar to any actual financial obligation in particular. The item need only appear to be in a class of or bear a family resemblance to, a financial instrument. 13:59:42

To act with intent to defraud means to act with the intent to deceive or cheat. It is not necessary, however, to prove that the United States or anyone else was, in fact, defrauded so long as it is established that the defendant acted with intent to defraud. 13:59:58

The defendant is charged in Counts 3 and 4 of the indictment with aiding and abetting using fictitious instrument in violation of United States Code. A defendant aids or abets another if the defendant intentionally joins with another person to commit a crime. 14:00:17

In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt: First, the defendant passed, uttered, presented, or offered a false or fictitious instrument, document, or other item identified in the indictment within the United States or attempted to do so. 14:00:35

Second, that the instrument, document, or other item identified in the indictment appeared, represented, or purported through scheme or artifice to be an actual security or other financial instrument issued under the authority of the United States or other political subdivision of the United States; and third, the defendant did so with the intent to defraud. 14:00:51

To pass or utter a false or fictitious instrument, document, or other item includes any attempt to spend the item or to otherwise place it in circulation. The government is not required to prove that the false or fictitious instrument, document, or other item appeared to be similar to any actual financial obligation in particular. The item need only appear to be in a class of or bear a family resemblance to financial instruments. 14:01:08 14:01:27

To act with intent to defraud means to act with the intent to deceive or cheat. It is not necessary, however, to prove that the United States or anyone else, in fact, defrauded so long that it is established that the defendant acted with 14:01:45

intent to defraud.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt. 14:02:00

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence or from lack of evidence. If after a careful and impartial consideration of all the evidence you are not 14:02:16 convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty.

On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty 14:02:34 to find the defendant guilty.

The evidence you are to consider in deciding what the facts are consist of, one, the sworn testimony of any witness; two, the exhibits which are received into evidence; and three, any facts to which the parties agree. In deciding the facts in 14:02:52 this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness you may take into account, one, the witness's opportunity and ability 14:03:10

to see or hear or know the things testified to; two, the witness's memory; three, the witness's manner while testifying; four, the witness's interest in the outcome of the case, if any; five, the witness's bias or prejudice, if any; six, whether any evidence contradicted the witness's testimony; 14:03:35 seven, the reasonableness of the defendant's testimony in light of all the evidence; and eight, any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about 14:03:51 it. The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: One, statements and arguments of the attorneys; two, questions and objections of the attorneys; three, testimony that I instruct you to disregard; and four, anything you may see or 14:04:11 hear when the Court is not in session even if what you see or hear is said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. 14:04:33 Circumstantial evidence is indirect evidence. That is, it is proof of one or more facts from which one can find another fact. You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct 14:04:53

or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer would have been. Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

Indeed, sometimes the witness answers the question before I sustain an objection. Any time you hear an answer that I sustain the objection, I won't repeat myself, but you are to disregard the answer if it has come out even before I have sustained the objection.

I will now say a few words about your conduct as jurors. First, keep an open mind throughout the trial and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the

case. Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means via e-mail, text messaging or any internet chat room, blog, website, or other feature. This applies to communicating with your fellow jurors until I give you the case for deliberation. And it applies to communicating with everyone else, including your family members, your employer, the media or press, and people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case. But if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do

any research, such as consulting dictionaries, searching the internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own. The law requires these restrictions to ensure the parties have a fair trial based on the same evidence 14:08:19 that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information please notify the Court immediately. 14:08:39

At the end of the trial you will have to make a decision based on what you recall of the evidence. You will not have a written transcript of the trial. I urge you to pay close attention to the testimony as it is given. If you wish, you may take notes to help you remember the evidence. If you 14:08:59 do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note taking distract you from being attentive. When you leave the Court for recesses, your notes should be left on your chair in the courtroom or in the jury room and no one will read 14:09:17 your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors. 14:09:34

The next phase of the trial will now begin. First, each side may make an opening statement. An opening statement is not evidence. It is simply an outline to help you understand what that party expects the evidence will show. A party is not required to make an opening statement. The government will then present evidence and counsel for the defendant may cross-examine. Then if the defendant chooses to offer evidence, counsel for the government may cross-examine. 14:09:51

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments. After that you will go to the jury room to deliberate open your verdict. 14:10:11

From time to time during the trial it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom or by calling a recess. Most often these conferences will involve determination as to whether evidence is admissible under the rules of evidence. It is appropriate to take these matters up outside the presence of the jury. Should I conclude that a more prolonged discussion is necessary, I may excuse you from the courtroom. 14:10:28 14:10:46

We will do what we can to keep the number and length of these conferences to a minimum. I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any 14:11:03

indication of my opinion of the case or of what your verdict should be.

Now, these preliminary instructions that I have just given you are preliminary. At the end of the trial, I will give you final instructions. Those final instructions will control your deliberations including if they are different in any way from the instructions I have given you now. When I give you the final instructions we'll give each of you a written copy of those final instructions for your use during deliberation.

Now, I'm going to ask the clerk to read the indictment.

MS. EDELSTEIN: Your Honor, if I may, I didn't want to disturb you while you were speaking. With respect to Model Jury Instruction 1.7, credibility of witnesses, as you were reading Number 7, the reasonableness of the witness's testimony, I believe you misspoke and stated "defendant." I just wanted to tell you that for the record in order for a clarification to be made.

THE COURT: Thank you. That's why you have to listen to what I say. I'm perfectly capable of reading one thing and saying another.

Which number was that?

MS. EDELSTEIN: Number 7, Your Honor.

THE COURT: Oh. Indeed. Indeed. That's important.

Let me restate that. Among the considerations factually you may consider in determining what weight, if any, to give to the testimony of a witness, Number 7 is the reasonableness of the witness's testimony in light of all the evidence. And as I already told you, the defendant never has to testify. And if the defendant elects not to testify, you may not draw any inference against the defendant because he has not testified. 14:12:48

All right. Nick, if you will read Counts 1 through 4.

THE COURTROOM DEPUTY: Omitting the formal caption, 14:13:04 Indictment: The Grand Jury charges Counts 1 and 2, on or about January 22, 2013, through and on or about January 28, 2013, in the District of Arizona and elsewhere, Gordon Leroy Hall, with the intent to defraud, drew, printed, processed, produced, published and otherwise made and attempted and caused the same 14:13:48 within the United States a false or fictitious instrument, document, and other item, appearing, representing, purporting, and contriving through scheme and artifice to be an actual security and financial instrument issued under the authority of the United States as set forth in the chart below. 14:14:06

Count 1, issue date, January 24th, 2013, approximate date printed, processed, or produced, January 28, 2013. Face value, $868,397.60. Title of fictitious document: Money order.

Count 2, January 24th, 2013, approximate date printed, 14:14:28

processed, or produced, January 28, 2013. Face value $635,176.26. Title of fictitious document: Money order.

In violation of Title 18, United States Code Sections 514(a)(1) and 2.

Counts 3 and 4, on or about January 22, 2013, on or about January 28, 2013, in the District of Arizona and elsewhere, Gordon Leroy Hall, with the intent to defraud, passed, uttered, presented, offered, brokered, issued, and attempted and caused the same within the United States, a false or fictitious instrument, document, and other item appearing, representing, purporting, and contriving through scheme and artifice to an actual security and financial instrument issued on the authority of the United States as set forth in the chart below. 14:14:51 14:15:12

Count 3, issue date, January 24, 2013, approximate date passed or presented, January 28, 2013. Face value, $868,397.60. Title of fictitious document: Money order. 14:15:29

Count 4, issue date January 24, 2013, approximate date passed or presented, January 28, 2013. Face value, $635,176.26. Title of fictitious document: Money order. 14:16:00

In violation of Title 18, United States Code Sections 514(a)2 and 2.

Signed by the jury -- signed by the foreperson of the Grand Jury dated February 4, 2014.

THE COURT: All right. Ms. Jennis, does the 14:16:17

government wish to make an opening statement?

MS. EDELSTEIN: Yes, Your Honor. Thank you.

Good afternoon, Your Honor, counsel, Mr. Hall, Ladies and Gentlemen of the Jury: This case is about Gordon Leroy Hall's refusal to accept responsibility. It is about two completely fictitious but pretty authentic looking money orders totaling over $1 million that were sent to the Internal Revenue Service, the IRS, in an attempt to make Gordon Hall's tax debts go away. 14:16:56

What the evidence in this case is going to show is that Gordon Hall owed significant taxes to the Internal Revenue Service. For tax years 1996 and '97, he owed more than a million dollars. You are going to hear that the IRS was attempting to get money back from Gordon Hall. The IRS was attempting to collect those outstanding amounts of taxes owed, taxes that Gordon Hall knew he owed. 14:17:11 14:17:32

But instead of paying those debts off, instead of taking care of his responsibilities, Gordon Hall chose a different path. He chose to cheat and defraud the Internal Revenue Service. Instead of sending in legitimate payments to bring himself current for tax years 1996 and '97, Gordon Hall helped conceive of, make, and send in, two completely false and fictitious money orders. 14:17:48

What does fictitious mean? At the end of the government's case you are going to hear from an expert on 14:18:06

fictitious instruments. His name is William Kerr. And Mr. Kerr will tell you exactly what the word fictitious means. But just to give you some context as you hear the evidence and testimony come in through the trial, fictitious basically means that these money orders, one of which you are looking at now, 14:18:24 the financial instrument in this case, while they attempt to look real, 100 percent real, in fact, and authentic, they are, in fact, completely and totally fake. They are not worth a penny more than the paper that they are printed on. In a word, they are completely bogus. 14:18:43

You are going to see that there were two fictitious documents that Gordon Hall helped make and send to the Internal Revenue Service; one for tax period 1996 in the amount that you see listed here, $868,397.60, that you have been looking at, and a second money order, this one for tax period 1997, in the 14:19:04 amount of $635,176.26.

Now, you will be instructed by the Court at the end of the evidence what the law is and what you are to consider as you examine the evidence in this case. But in order to help you follow the evidence and provide a little context of what 14:19:22 the different counts are that you heard the judge describe and also in the reading of the indictment, I'd like to go through what the differences are between Counts 1 and 2 and Counts 3 and 4.

Now, you already know that we are talking about two 14:19:36

different money orders here; one for 1996 and one for 1997. Counts 1 and two of the indictment are violations of Title 18, Section 514, Subsection (a)(1). Well, what is Section (a)(1)? (a)(1) criminalizes the creation of these fictitious money orders. It criminalizes the actual making of these two documents. You will see the elements that are listed in front of you, and you will see that the first one describes that it is a crime to draw, print, process, produce, publish, or otherwise make or attempt to do the same; number two, any fictitious or false instrument, document, in this case, the money order, with the intent to defraud. The last element there is the intent element. 14:19:59 14:20:20

That is as to Counts 1 and 2. The making of the money order for 1996, and the making of the money order for 1997.

What about Counts 3 and 4? How are they different? They are different because, as you can see, they are, the two counts, Count 3 and 4, related to Subsection (a)(2) of Section 514. And what that, what (a)(2) criminalizes is the actual submission or sending in of these particular money orders. As you see they are listed Element 1, which is different from the (a)(1) charge is in (a)(2) is passing, uttering, presenting, offering, brokering, issuing, basically the actual sending in of or attempting to pass these fictitious money orders. 14:20:36 14:20:58

You will also see that Elements 2 and 3 as to Counts 3 and 4 are the same. The only difference is the making in 14:21:19

Counts 1 and 2 and the passing in Counts 3 and 4.

What evidence did you expect to hear about these two money orders that form the basis of these four counts in the indictment? You are going to hear testimony and see evidence of exactly how these money orders were made, how they were sent 14:21:35 to the IRS, and why they were sent. But first let's talk about how they were made.

You will hear from an employee of Gordon Hall's business named Brighton Jorgensen. She's going to describe the process of how these types of fictitious documents were 14:21:53 created. Ms. Jorgensen is going to tell you about how these two specific money orders that you have seen were created and how they were signed by Gordon Hall.

You will hear testimony from other witnesses such as Shannon Hall. She's Gordon Hall's daughter. And she was also 14:22:07 an employee of his business. And she's going to describe how the business operated. She will describe how office staff and employees gathered and maintain client information, including information for Gordon Hall himself, how they used spreadsheets to compile this information, and how they tracked the clients' 14:22:26 information using these spreadsheets and how they communicated amongst each other, the office staff, by e-mails and sharing of these spreadsheets.

You will see an example there of an e-mail from the business and two examples of spreadsheets. And you can see 14:22:40

from the spreadsheets they contain information like an individual's name, social security number, how much they owed the IRS or what debt they owed not connected necessarily to the IRS but what debt they owed. And those -- that type of information is maintained on these spreadsheets. 14:22:58

You will also hear evidence about how these fictitious money orders were actually printed, how they were printed on special paper to make them look real. You will hear evidence about how Brandon Adams, he is an associate employee of Gordon Hall, how he actually printed these money orders on his printer 14:23:17 and sent the money orders to Gordon Hall for his signature and they ultimately went to the IRS.

What you are looking here is a picture of the residence that Brandon Adams, it was rented for Brandon Adams here in Arizona. And you are going to hear evidence of the 14:23:31 printer being found at this location and you are looking at here a picture of this special paper, this heavy card stock and the actual printer. You will hear evidence from FBI agents about how this printer was found.

You will see -- you will also hear about how the money 14:23:48 orders were sent to the IRS. You will hear testimony that all the documents sent from Gordon Hall's company were mailed by registered mail. And these two money orders were no exception. You will see pictures and hear testimony that these two money orders were mailed to Internal Revenue Officer T.W. Lyons on or 14:24:06

about January 28, 2013 by Benton Hall, Gordon Hall's son.

You are going to hear from Ms. Jorgensen that with each document mailed out -- you will see these are several pictures of the mailing of the money orders. And you are going to hear from Ms. Jorgensen that with every document mailed out of Gordon Hall's business there was a document called Affidavit of Service that was also sent. That was the same procedure used for these two particular money orders. 14:24:30

What you are looking at here is an Affidavit of Service for the money order associated with the 1997 tax year. You are going to hear testimony of why this Affidavit of Service was included with the money order. You are going to hear how it was signed and fingerprinted by Ms. Jorgensen and how these documents were kept by the business, Gordon Hall's business, in their files. 14:24:46 14:25:05

You are going to hear about the two specific money orders at issue and the corresponding Affidavit of Service and that they were found, these signed and fingerprinted affidavits, were found at his business. You are looking at now the affidavit associated with the '97 year. The previous one was the '96. 14:25:18

And you are going to hear about the role Gordon Hall played and how these two fictitious money orders ultimately made their way to T.W. Lyons of the Internal Revenue Service. You are going to hear from T.W. Lyons that Gordon Hall 14:25:34

contacted the IRS regarding these so-called payments. You are going to hear from T.W. Lyons that Gordon Hall contacted him directly. You are going to hear that Gordon Hall was very interested in just how much he owed for those two tax years, 1996 and 1997, and requested that specific information from T.W. Lyons. T.W. Lyons will testify about that conversation and the circumstances surrounding that conversation. And you are going to hear that just after the back and forth between Mr. Lyons and Gordon Hall, these two fictitious money orders, in the exact figures provided by Mr. Lyons to Mr. Hall showed up at the IRS office here in Arizona. 14:25:53 14:26:14

And what the evidence will demonstrate is that Gordon Hall assisted in making and sending these money orders the IRS for one purpose and one purpose only, to defraud the Internal Revenue Service, to try and fool the IRS into making his tax debt, his responsibility, his duty, go away. 14:26:33

These are the things to keep in mind as you hear the testimony and you examine the documents presented throughout this trial. At the end of the evidence the government will have an opportunity to speak to you again. And at that time, we will ask you to deliver a verdict consistent with the evidence and find the defendant, Gordon Hall, guilty of all counts. 14:26:48

Thank you.

THE COURT: Mr. Kunkle, do you wish to make an opening 14:27:00

statement at this time?

MR. KUNKLE: Yes, sir.

Good afternoon, Ladies and Gentlemen. My name is Steven Kunkle. You met me earlier in voir dire. I'm Mr. Hall's attorney. 14:28:14

You just heard the government open up their statement, basically lay out their case. Ms. Edelstein said to you, I will show you how it was mailed, how it was produced, how it was made. And she also indicated to you why it was sent.

Now, on your screen in front of you is what you will probably see many times throughout this trial. And please do take a good look at it. Many of us in our own everyday lives are familiar with what a money order may look like and what a money order is. 14:28:34

The government is sparing no expense here to get Mr. Hall -- and we'll get to some of that later. We'll bring in an expert known as Mr. Kerr, former government employee, for many years the Office of the Controller of the Currency and the Department of Treasury, the same department of your government that houses the IRS. 14:28:50 14:29:08

The secretary of the treasury, up until January 25th, 2013, was Timothy Geithner. Look again please at the money order. If you look closely at that money order, you will see something interesting. If you went to the post office and you went and got a money order, or the Safeway, or Western Union, 14:29:28

you pay the post office, Safeway, Western Union, a sum of money. And then they issue you a money order, a money order that has indicia of appearing to be real. You will notice on the bottom of this money order, you will see numbers down there. Many of you are familiar with a bank check. That's otherwise known as a negotiable instrument as well. And when you have a check, you are directing your bank to pay a debt of yours when you create that check. You go into your check tonight and pay a utility bill, pay credit a card statement, you are asking your bank to pay this money. The numbers at the bottom of it are routing numbers. They have your account number and a check number. 14:29:51 14:30:13

These numbers at the bottom of this, while appearing to be what you would see at the bottom of your check, also have significance that you will learn about throughout this trial. 14:30:29

Now, the government, again, sparing no expense, my colleagues at the table to the left of me, you will see agents shuffling in and out. You are going to hear about FBI, IRS, maybe even secret service. This is a case about getting somebody to knuckle under. Now, Ms. Edelstein just told you this was an attempt to cheat the IRS, something we may all like to think about doing but we would do so at our own peril. 14:30:51

Now, how would you cheat the IRS with something that is bogus? How could you intend to defraud a government agency and have them act on something that is so bogus? So either 14:31:19

this government agency, the IRS, is so inept or perhaps they are very vindictive.

THE COURT: Counsel, you may address what the evidence will show.

MR. KUNKLE: Very well. 14:31:35

An intent to defraud, Ladies and Gentlemen, means are you trying to cheat somebody out of something. Somebody sells you a car that doesn't work, they tell you it was driven by the little old lady of Pasadena. What the evidence will show you here about Mr. Hall and his relationship with the IRS that goes 14:31:57 back many years, is Mr. Hall was not intending to defraud them. This is probably the best expression I could think of for you folks is an in your face. Because after repeated attempts to use IRS administrative process, to collect a debt which, whether it's valid or not, and you will hear about how the IRS 14:32:21 goes about collecting a debt, when the tax man can knock on your door can levy a bank account, can seize a home. There are individuals who believe in certain beliefs, if you will, and you will hear some of this later on during this trial, that they don't have to pay the IRS. They can resist the IRS. And 14:32:45 in the end, many of you don't know this, but if you impede the IRS, you obstruct the IRS, they can charge you with a crime. What that crime is is much different than this crime. This crime is a very serious crime. But you would have to believe for a minute that someone at the IRS would look at this money 14:33:10

order or this money order and really believe for a moment that this is a true negotiable instrument, this is a true document that could pay a debt. And what's going on here, Ladies and Gentlemen, is Mr. Hall, and again, I will be respectful of the decorum here of the court, is telling the IRS in so many words to go to hell. 14:33:35

Now, many of you, you sat here throughout voir dire and you were asked about Mr. Hall's appearance. He's wearing orange. That's his choice. You don't have to hold it against him in deciding this case whether it's guilty or innocent. But that's kind of one expression of his sentiment about his process, about the government out to get you. 14:33:57

This money order is directing the Secretary of the Treasury, Timothy Geithner, who served in that position until January 25th, 2013, it's directing him to pay himself at the Secretary of the Treasury. There's my tax bill. That is for the two years, '96 and '97. I dispute it. Pay yourself. 14:34:16

It would be similar to someone coming up to you, perhaps, on the street handing you the deed to Boardwalk or Park Place and some Monopoly money and telling you, give me your car. You could construe it as a joke. You could construe it as a protest. Or as the government asked to you think about it, he's really intending to cheat them and have this processed through the system to pay a debt that he disputes. 14:34:41

And that, Ladies and Gentlemen, in a nutshell is what 14:34:59

this case is all about. Throughout this case, you might hear a little bit about how the IRS works and how they proceed and you are going to hear about what can happen with the IRS and a citizen in this country who refuses to pay a debt. And to just give you some idea of what you are going to hear, Mr. Hall's own daughter will testify against him here, called by the government. 14:35:22

And so Ms. Edelstein said to you he refuses to accept responsibility. You are asked here as jurors to decide whether he's guilty. You don't have to decide on the merits of the tax. You don't have to decide on anything else other than the simple elements of that statute. And we'll get into some more of that later. But keep in mind why you are here, because they want to call this a crime. They want to put someone in prison for this. That's why we're here. 14:35:39 14:35:58

And I would ask you all to keep an open mind throughout this trial and listen very carefully to the evidence. You, as jurors, stand between them and us, the people, you folks. So please, throughout this case, pay attention to what's happening. Keep an open mind. And remember what I told you. If I came up to you and said here's Boardwalk, Park Place, the Reading Railroad, the B&O Railroad, and $50 with a picture of Daffy Duck on it, that's not to going to pay the debt to get the car bought. You wouldn't give me the car. Mr. Hall is doing much the same thing here. It's a 14:36:18 14:36:38

little more involved in that indeed, but that's what this is about. This isn't about trying to get your tax debt erased. If the IRS had processed this, you know, I don't know what we could say about our friends at the IRS but we would have to really wonder what's going on down there. And throughout this trial I would ask you folks while you listen to the evidence ask yourself what's going on. Okay? Thank you. 14:36:57

THE COURT: All right. The government may call its first witness.

MS. JENNIS: United States will call T.W. Lyons. We just need a second to get Sanctions set. 14:37:17

THE COURT: Come right up to the front here and the clerk will swear you.

THE COURTROOM DEPUTY: State your name for the record.

THE WITNESS: Tim Lyons. 14:37:54

THE COURTROOM DEPUTY: Go ahead and spell your last name.

THE WITNESS: L-Y-O-N-S.

(The witness was sworn.)

MS. EDELSTEIN: Your Honor, before the witness begins his testimony, the computer hookup for government counsel's desk appears to not be here. 14:38:18

THE COURT: Did you have it before? Was it working before?

MS. EDELSTEIN: It worked from the podium, Your Honor, 14:38:30

where there was a hookup.

THE COURT: Was it not working at counsel table before?

MS. JENNIS: We didn't have it before hooked up through counsel table, Your Honor. 14:38:39

THE COURT: You did not?

MS. JENNIS: No. We had it hooked up through the podium.

THE COURT: All right. Well, I will ask the clerk to call our technology assistance people to see what they can do. 14:38:49 But is it working, screen working at the podium?

MS. EDELSTEIN: It does work at the podium, Your Honor, if the computer is hooked up to the podium.

THE COURT: Mr. Kunkle, is your screen working?

MR. KUNKLE: My screen was working but I'm not hooked 14:39:15 up.

MS. JENNIS: It's the hookup.

(Discussion off the record.)

T.W. LYONS,

a witness herein, having been first duly sworn by the clerk to speak the truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. JENNIS:

Q. Good afternoon, Mr. Lyons. 14:39:58

A. Good afternoon.
Q. Can you tell the jury what you do for a living?
A. I'm a revenue officer with the Internal Revenue Service.
Q. Can I make sure can everyone hear him? Make sure you speak into microphone. Thank you. 14:40:12
A. Yes, ma'am.
Q. And how long have you been with the Internal Revenue Service?
A. Been with the Internal Revenue Service a little over 11 years. 14:40:21
Q. And can you describe your duties as a revenue officer?
A. A revenue officer essentially assists taxpayers or helps taxpayers with filing tax returns and with trying to make -- to bring them into compliance with paying their taxes as well.
Q. And does someone receive formal training to become a revenue officer? 14:40:37
A. The first year a revenue officer is in training for the entire first year, and then every year after that there's additional training as well as special courses that would be taken from time to time as needed. 14:40:55
Q. And did you attend that training?
A. I did.
Q. And as a revenue officer, were you assigned a file involving an individual by the name of Gordon Leroy Hall?
A. Yes, ma'am. 14:41:09

Q. And approximately when did you receive that file?
A. Approximately July 18th of 2011.
Q. And what were you expected to do with the file?
A. My job was to try to encourage the taxpayer to file any unfiled tax returns that he hadn't filed and to pay the taxes that he currently owed. 14:41:26
Q. And when you are assigned a file that's related to a taxpayer, do you create any kind of a document to record the activity related to that file?
A. The Internal Revenue Service has a system called the Integrated Computer System. And all revenue officers will enter their daily history into that Integrated Computer System, what we refer to as ICS. 14:41:44
Q. So the ICS will keep a history of every -- I mean, can you give us examples? It gives histories of contacts with the taxpayer. What else does it have? 14:42:04
A. It would have all contacts with the taxpayer, all contacts with any third parties that might provide information about the taxpayer; correspondence received from the taxpayer. Documents that the Internal Revenue Service has created would also show up on ICS. 14:42:23
Q. And that's all computerized?
A. I'm sorry?
Q. It's all computerized?
A. Yes, ma'am. It's all on the computer. 14:42:33

Q. So as part of your job as a revenue agent, are you required to keep this Integrated Computer System up to date or to enter into it every time you have either contact with taxpayer or you do something with the file?

A. Yes. It's -- I'm a revenue officer, and the -- yeah. We will enter -- any time we have contact with the taxpayer, either verbal, telephone call, letter, something like that, we'll input the entry into ICS. But also any other work we might do, for example, if we were to be looking for assets or anything else that we were working on the taxpayer that would also be entered into ICS. 14:42:53 14:43:16

Q. So basically your notes and a log of everything that's happened with that file?

A. Yeah. It's essentially a journal for that taxpayer, yes, ma'am. 14:43:30

Q. And when you enter things into -- this Integrated Computer System, is there an acronym for it or do you always walk around calling it Integrated Computer System?

A. We call it ICS. We call it our ICS history.

Q. Does the ICS history contain entries that are made at or near the time of the activity, whether it be the contact with the person or something else? 14:43:45

A. Generally they are made in real time. On a few occasions you might have an incident where a taxpayer comes into the office, maybe just before closing and you would do the input 14:44:02

the next morning, so you wouldn't have time to do it that day. Most of the time it's real time. It's within 5 or 10 minutes of the actual event.

Q. Now, in front of you, you have exhibits. They should be numbered 1 through 7. Could you take a look at that? Do you have those? 14:44:19

A. Yes, ma'am.

Q. Do you recognize those documents?

A. Do you want me to go through all seven exhibits or --

Q. Yes, actually, I'd like you to. 14:44:57

And would you also note for the jury whether each of those documents is certified while you are reviewing them?

A. Exhibit 1 is a certified document, what we call the Blue Ribbon Transcript or Blue Ribbon Certificate of Official Record is the first page. 14:45:19

Q. And who are they official records of?

A. For Mr. Gordon Hall. And the first one is for 1996, and it consists of a money order or a copy of the money order, certified copy.

Q. Who is actually certifying that document? 14:45:47

MR. KUNKLE: I'm sorry. Objection, Your Honor. The exhibit hasn't been admitted in evidence yet. He was just asked if he could identify them.

THE COURT: Well, the question is who certified it. I think it does go to foundation, so overruled. 14:46:02

BY MS. JENNIS:
Q. You may answer the question. Who certified it, not who is it related to?
A. Tiffany Butcher. She's a supervisory investigative analysis -- analyst. 14:46:16
Q. For what organization?
A. For the Internal Revenue Service, I'm sorry. The Internal Revenue Service has authenticated or certified this document, yes, ma'am.
Q. And does it have an official IRS seal on that? It appears you are looking at Exhibit Number 1? 14:46:27
A. Yes, ma'am. I'm looking at Exhibit Number 1, and it does have a seal, Internal Revenue Service seal.
Q. Thank you. And could you look at all the other ones and see if they also have that blue cover and they are certified by the IRS and have an official IRS seal? 14:46:42
A. Exhibits 1 through 7 have the blue cover page and the seal, the Internal Revenue Service seal.
Q. All certified documents?
A. All certified documents, yes, ma'am. 14:47:38
MS. JENNIS: United States would now like to introduce Exhibits 1 through 7, certified copies of the Internal Revenue Service.
MR. KUNKLE: Your Honor, may I just have a brief voir dire of the witness? 14:47:47

THE COURT: No. Is there an objection?

MR. KUNKLE: Just the process of how he knows they are certified by the IRS. He can tell me there's a seal on them, but how that all happens.

THE COURT: Overruled. Exhibits 1 through 7 are admitted. 14:48:01

MS. JENNIS: Thank you.

BY MS. JENNIS:

Q. Now, let's get back to one of your case assignments. So one of your cases is Gordon -- one of the people you are 14:48:11 assigned to, have a case with, is Gordon Leroy Hall. And you stated your job was to try to bring him into compliance. What does that really -- what does that mean? Can you explain that further for the jury?

A. Well, we're trying to encourage the taxpayer to voluntarily 14:48:28 file returns that are not filed. If they do not file those returns, the Internal Revenue Service can file them for them. And we are also trying to convince, or encourage, I guess is a better word, the taxpayer to pay the taxes if they file the wrong returns, and if they don't file the return and we file 14:48:51 them for them, we encourage them to pay those taxes.

Q. So did the IRS determine that Gordon Hall owed a tax?

A. Yes, ma'am.

Q. And were you looking at certain tax years or one tax year that Mr. Hall owed a tax for? 14:49:06

A. The examination division of the Internal Revenue Service opened up an audit for tax years 1996 and 1997.
Q. Now, have you ever had the opportunity to meet Mr. Hall?
A. No, ma'am.
Q. And did you ever have the opportunity to speak with Gordon Hall? 14:49:21
A. Yes, ma'am.
Q. And can you tell me when that occurred?
A. On January 23rd of 2013 -- or January 21st of -- no. January 18th. Yeah. January 18th, I'm sorry. January 18th of 14:49:39 2013, Mr. Hall called my office and left me a message and asked me to return the call. He gave me his phone number and he said he wanted a payoff effective through January 23rd of 2013.
Q. Okay.
A. On January -- 14:50:00
Q. If I may stop you one moment. So did you talk to him in person or did he leave you a voice mail?
A. He left a voice message on my answering machine.
Q. And do you recall what -- did he leave a phone number, I believe you said? 14:50:15
A. Yes, ma'am. He did leave a phone number.
Q. Do you recall what that phone number is?
A. No, ma'am. It is written in my ICS history, the phone number.
Q. Okay. So would looking at the ICS refresh your 14:50:24

recollection?
A. I can give you that phone number if you want from the ICS history which is Exhibit 8, I think, here.
Q. Exhibit 25. If you could take a look at that and refresh your recollection, but please don't read from the exhibit. 14:50:39
A. Don't what?
Q. Don't read from the exhibit. But if you can look at it to refresh your recollection, that would be fine. I think it's about on Page 150.
A. I hate to say this, but these are out of order. 14:51:39
Q. Do you have Exhibit 25 in front of you?
A. Here we go. Okay. I called -- the phone number that he provided for me was (480) 286-3340.
Q. Thank you. So he left a message and he left his phone number. And what did he say on the message? 14:52:20
A. He asked me to give him a payoff through January 23rd of 2013.
Q. Did he say for what years?
A. No, ma'am.
Q. And did you have the opportunity to return his call? 14:52:30
A. Yes, ma'am. On January 22nd, I returned the phone call to Mr. Gordon Hall. I asked to speak to Mr. Gordon Hall. He said that I was speaking to Mr. Gordon Hall. And I did provide him -- or he asked at that time, he said would you give me the payoff to January 28th. And I said, yes, sir, I can. And so I 14:52:51

pulled it up on the ICS computer. I gave him the payoff, which was approximately 1.5 million. And I asked him at that time, I said, sir, would you like to have this broken down by year? And he said, yes, he would. And so I broke it down for 1996 and 1997. I asked him at that time if he would be coming into the office on the 28th so I could meet him, and he said no he would be mailing it. And I thanked him, very courteous, and he hung up. 14:53:13
Q. So you gave him the exact payoff for 1996 taxes that he owed? 14:53:36
A. Yes. Up to the date that he requested for 1996 and 1997.
Q. Do you recall where you were when he left you a message on January 18th, 2013?
A. I believe I was in the field. I was involved in another case that was in court, and I was out in the field taking pictures at that time. 14:54:00
Q. But you weren't in the office that day?
A. No. I wasn't in the office that afternoon.
Q. Do you recall what day of the week that was?
A. I think it was on a Friday. It was a Friday afternoon. 14:54:12
Q. And then you returned the call on January 22nd, so that would have been four days later?
A. That was on a Tuesday, yes, ma'am.
Q. Why did you wait until Tuesday?
A. Monday was Martin Luther King day, so Saturday, Sunday, and 14:54:28

Monday, and I returned the call on Tuesday.
Q. And when you returned the call, did you call that phone number that you mentioned earlier, (480) 286-3340?
A. Yes, ma'am, I did.
Q. And I believe you said that the person who answered the phone identified himself as Gordon Hall? 14:54:44
A. Actually, I asked for Gordon Hall. I said, is Mr. Gordon Hall there? And he says, this is Gordon Hall. Yes, ma'am.
Q. Now, you gave him the payoff, and I believe that you said it was over a million dollars. Is there some -- is there a different process that you go through when you are paying such a large amount than if you were paying a small amount? 14:55:05
A. Well, the internal processing within the Internal Revenue Service changes when the remittance received is greater than a certain amount, yes. 14:55:27
Q. So what about what do you do when it's a larger amount?
A. Any remittance that's greater than a certain amount is required to be remitted to a special mail drop box in Ogden, at the Internal Revenue Service in Ogden, Utah, the same day that it's received in the office. Here in this particular case would be the Mesa post of duty, but any Internal Revenue office. 14:55:45
Q. Is that one of the reasons why you asked Mr. Hall when he was coming in?
A. Yes. I would have like to -- well, if he was bringing in a 14:55:57

check for 1.5 million I would have liked to have been there, and I needed to be there to process it.
Q. So a check for that much money would have to be processed the same day and go to Ogden?
A. Yes, ma'am. It has to be. 14:56:10
Q. So did the IRS ever receive the payment that you discussed with Mr. Hall?
A. On January 29th we received two money orders in the mail from Mr. Hall.
Q. And were you in the office when payment was received? 14:56:23
A. No, ma'am, I was not.
Q. How do you know payment was received that day then?
A. There's a unit secretary at the Mesa post of duty that contacted me and told me that -- she opens the mail. And she let me know that there were two checks in the mail, large 14:56:43 checks, and that I needed to come in and process them.
Q. So you weren't in the office. Were you working from home that day, or how did that work?
A. Yes. I was working at home that day.
Q. So when did you actually get to see the payments? 14:57:00
A. At about what time?
Q. Well, what day?
A. I came right into the office. And usually the mail gets in, let's say, around 11:00 in the morning so probably by 12, 12:30 I had the checks. 14:57:17

Q. So why did you go into the office to get the payment?
A. Well, I have to process those checks. Any checks of a certain size, I have to process them. The unit secretary cannot process those checks. Only I can process them.
Q. Where did you retrieve the payments once you went into the office? 14:57:35
A. They were still in the mail room. Her job is purely to open the mail.
Q. Now, can you take a look at Exhibits 1 and 2. I'd like to publish them. Exhibit 1, we'll start with Exhibit 1. 14:58:01
A. Yes, ma'am.
MR. KUNKLE: Your Honor, for the record, could we have counsel for the government identify how many pages there are in that exhibit, or will it come up during the exam?
THE COURT: Yes, please. Are you presenting this through your computer? 14:58:18
MS. JENNIS: We are.
THE COURT: That's fine. Go ahead.
MS. JENNIS: So how about -- you want to know how many total pages there are? I would have to ask the witness how many total pages do you have in front of you? No, the physical documents. You don't need to look at the screen. 14:58:29
THE WITNESS: You are asking how many total pages are in Exhibit 1?
BY MS. JENNIS: 14:58:48

Q. Yes.
A. It appears to be 10.
Q. Okay? On Page -- let's look at actually the first page of the document, which for the Court's sake it's 001-001. Do you have the original there in front of you of that? 14:59:25
A. Yes, ma'am.
Q. And can you describe -- I mean, because this is not a great copy right in front of us, but you have the original. Can you tell the jury what that is?
A. This is a certified -- I'm sorry -- a registered mail receipt received from an unknown source in Flagstaff addressed to me, received in my office on January 29th. It's stamped. You cannot see it but here is a big stamp that the unit secretary would have stamped when it was received, January 29th. And it says "return receipt requested," right up here at the top. And this is what I received in the mail, yes, ma'am. 14:59:46 15:00:16
Q. And this is Page 001-001 of Exhibit Number 1.
And when you said stamped, so stamped in the middle of that, looks like a manila envelope, is the date it was received at IRS? 15:00:37
A. Yes, ma'am. It's stamped in the middle of the envelope, yes.
Q. And that's the mailing address of your office in Mesa, Arizona?
A. Yes, ma'am. That is the mailing address for my office. 15:00:49

Q. Taking a look at Exhibit Number 1, Page 2. Do you have the original in front of you, I believe, the original check?
A. Yes, ma'am, I do.
Q. And looking at that check, is that the same money order that you got when you were in the office January 29th? 15:01:14
A. This is the money order that I received on January 29th.
Q. Now, could you explain to the jury, and I think you can point and touch the screen, how do you know what year, tax year, this check is for, or money order? You can point to the screen. You can touch it. Never mind. 15:01:35
A. If you were to look at the money order on the bottom left corner of the top portion of the money order, it's for the benefit of, and it says Gordon L. Hall. It provides the social security number. And the tax period is 12-31-1996.
Q. And if you look on your screen, is that where the highlighted portion is? 15:01:59
A. Yes, ma'am.
Q. And to the left of where it says tax period, what does it say?
A. To the left of the tax period is the social security number for Mr. Hall. 15:02:10
Q. And have you verified that is, in fact, his social security number?
A. Yes, ma'am.
Q. Now, let's go to the amount on the check, for $868,397.60. 15:02:23

Is that the amount that you told Mr. Hall when you had a conversation with him on, I believe it was, the 22nd, was that the amount -- payoff amount you gave him for tax year 1996?
A. Yes, ma'am. That's the exact amount I gave him on the phone. 15:02:55
Q. Now, is that piece of paper in front of you, does it appear to be perforated down the middle, the money order? Can you tell? It's in plastic.
A. It actually sort of does. I'm not an expert on that, yeah.
Q. Thank you. On the next -- if you look on the next, 15:03:16 actually Page 4 of Exhibit Number 1 you will see a 1996 form 1040-V?
A. Uh-huh.
Q. Can you tell the jury what that form is?
A. That's a payment voucher form that many taxpayers -- I 15:03:31 guess they can see this? Many taxpayers include with their payment. It identifies the taxpayer, identifies the taxpayer's social security number, and it identifies the tax period that they want the money applied to so that the Internal Revenue Service, when they see this, they don't apply the money to a 15:03:53 period that we don't -- that's the wrong period. So it helps us identify where that check is to go.
Q. And you didn't fill this out, did you?
A. No, ma'am.
Q. This is how you received it? 15:04:07

A. Yes, ma'am.
Q. On Page 5 of Exhibit Number 1, can you take a look at that? It's called an Affidavit of Service, and it has your name on it.
A. Yes, ma'am. 15:04:21
Q. And first, can I just verify your office is in Mesa, Arizona, correct?
A. It is.
Q. And is this something that you normally see?
A. No, ma'am. We don't see this. 15:04:33
Q. And is this anything that you filled out?
A. No, ma'am.
Q. If you could take a look at Exhibit Number 2. Can you tell the jury what Exhibit Number 2 is?
A. This is a copy -- or I mean this is the original envelope that Mr. -- that I received registered, or -- yeah, registered mail, return receipt requested, and stamped into the Internal Revenue Service. The date stamp is January 29th, 2013. 15:05:05
Q. And let the record --
A. It's addressed to me. 15:05:35
Q. Sorry. Let the record reflect this is Page 1 of Exhibit Number 2, and this is similar to Exhibit Number 1. It's a manila envelope and then there were documents inside?
A. Yes, ma'am.
Q. Okay. Let's turn to Page 2 of the of Exhibit Number 2. 15:05:47

Can you tell the jury what Page 2 of Exhibit 2 is?
A. Exhibit 2 is the money order in the amount of $635,176.26. And the bottom left corner, similar to the other one, oh. You can see on that one. Okay. On the bottom left corner gives the name Gordon L. Hall, his social security number, and the tax period of 12-31-1997. 15:06:25
Q. And so is this the payoff amount that you gave Mr. Hall for 1997?
A. Yes, ma'am, it is.
Q. And on Page 4 of Exhibit Number 2, again, we have Form 1040-V? It's similar to Exhibit Number 1. Did you fill out that form? 15:06:41
A. No, ma'am, I did not.
Q. So basically what we're all seeing is how you received the money orders in the mail and its attached documents? 15:07:05
A. Yes, ma'am.
Q. Let's take a look at Exhibit Number 3. Let's start with Exhibit Number 3. And can you tell the jury what that is?
A. Exhibit Number 3 is a certified -- what we call a Certified Blue Ribbon Transcript of the account, or the official record of the assessment and all of the events that have occurred on Mr. Gordon Hall's account for 1996, which if you were to look on your sheet of paper, sort of about three inches down from the top, left-hand side. 15:07:32
Q. So this document shows that Mr. Hall did, in fact, owe a 15:07:59

tax for 1996?
A. This is a certified assessment of the tax for 1996, yes, ma'am.
Q. Take a look at Exhibit Number 4, please. And can you tell the jury what that exhibit is? 15:08:21
A. This is a Certificate of Official Record, a Blue Ribbon Transcript, there again, of the assessment for the tax year 1997 for Gordon Hall.
Q. Let's move on to Exhibit Number 5. Can you tell the jury what that is? 15:08:40
A. This is a certified copy of a form letter 531 that is used by the Internal Revenue Service to notify a taxpayer of the completion of an audit. So when the audit is completed, they will send this letter to the taxpayer, at which time he has a period of time designated in the letter, 90 days from the day 15:09:19 the letter is stamped and would be date stamped up here in the top right and will be date stamped. And he has 90 days to file a petition in tax court if he wants to challenge the statutory notice of deficiency.
Q. And does Exhibit 5 basically tell you what tax is due? 15:09:39
A. Yes, ma'am.
Q. Can you take a look at Exhibit Number 6, please.
A. Yes.
Q. Do you recognize this exhibit?
A. Yes, ma'am. 15:10:07

Q. Can you tell the jury what it is?
A. The previous revenue officer, before I took over the case, sent a notice of levy, and is what they are seeing? I can't tell what that is.
Q. They are seeing Page 1 of Exhibit Number 6. Can you tell the jury what that is? 15:10:28
A. Page 1?
Q. Page 1.
A. What it is?
Q. The envelope? 15:10:37
A. Oh. It's a copy of an envelope.
Q. Actually, let's -- okay. Do you have that? Do you have the envelope?
A. Yeah. It's essentially --
Q. Let's just move to Page 3 of Exhibit Number 6. 15:10:58
A. You want me to go back to --
Q. Exhibit Number 6, Page 3.
A. Okay. All right. Right. What that is is a certified copy. The blue ribbon makes it a certified copy of the levy that was sent to the United States District Court for -- by a 15:11:22 previous revenue officer. And it was sent out on May 18th. If you were to look in the middle right down here, the payments computed through May 18th of 2011 at one point, four million.
Q. And explain to the jury, what is a Notice of Levy?
A. A levy is a demand for payment. 15:11:46

MR. KUNKLE: I'm sorry. Did he say May 2011.
BY MS. JENNIS:
Q. I believe you said April 18, 2011?
A. May 18th.
Q. How do you know this was sent out May 18th? 15:12:02
A. No. No. I'm sorry. It's computed to May 18th.
Q. So that is the amount on Page 3 of Exhibit 6, 1,472,000 plus dollars?
A. Actually mailed on April 18.
Q. Let's start over. So the Notice of Levy was mailed April 18th, 2011, correct? 15:12:23
A. Yes, ma'am.
Q. And it gave the payment due as to what would be due May 18th, 2011?
A. That's correct. 15:12:38
Q. Well, what about this stamp on the top half of the exhibit?
A. This is how -- this is what was received by the Internal Revenue Service from the taxpayer.
Q. Says, "Accept for value return," and there's a signature with a date. Is that something the IRS put on there? 15:12:54
A. No, ma'am.
Q. What is that?
A. I presume it's a stamp that he put on there. I don't know who put it on. It's got his signature on it and I presume that's his thumbprint, at least on my copy. 15:13:09

Q. But that's how the IRS --
A. That's how I received it, or it came into our office, yes, ma'am.
Q. Okay. So the actual form letter went out from the IRS, but what came back from Mr. Hall was the same letter but with a big stamp on it? 15:13:22
A. Yes, ma'am.
Q. Now, can you look at Page 4 of Exhibit Number 6? Does it have that same stamp?
A. Yes, ma'am, it does. 15:13:43
Q. Let me ask you, who is Jennifer Pardue? Was she your predecessor?
A. Yes, ma'am.
Q. So she's the revenue officer who had this case before it was assigned to you? 15:13:54
A. Yes, ma'am.
Q. And looking -- can you take a look at Page 8 of Exhibit Number 6? Can you focus on the top left-hand corner there seems to be a phone number, (480) 286-3340. Doesn't tell you on the bottom the exhibit numbers. Probably not. 15:14:42
A. I don't see it.
Q. It's the UCC financing statement. You can see a picture of it on the screen.
A. Okay.
Q. If you can just look at the screen. 15:15:09

A. Yes, ma'am. I have it here.
Q. Okay.
A. The phone number on the top left corner is (480) 286-3340, Gordon L. Hall.
Q. Is that the same number that Mr. Hall left on your voice mail? 15:15:23
A. Yes, ma'am.
Q. Now, if you could take a look at Page 21 of Exhibit Number 6. And I know it might take you a little while to find it, but it's up on your screen. And the title says, "Privately Registered Setoff Bond." 15:15:37
THE COURT: Which exhibit is this?
MS. JENNIS: Exhibit Number 6, Page 21.
BY MS. JENNIS:
Q. You can just look at the screen. 15:16:28
A. I'm familiar with the document also, yes, ma'am.
Q. Have you seen this before?
A. Yes, ma'am. Yes, I have.
Q. And what do you think that is?
A. I am not sure what it is. But I think the taxpayer believes -- you know, I'm not sure what it is. But it says on there it's a setoff bond. He's trying to -- I believe he's trying to give it to the IRS so that the IRS will accept four and-a-half million dollars in some sort of a payment. 15:16:36
Q. So do you believe this was an attempt to pay off his tax 15:16:58

liability?
A. It is an attempt, yeah. It's an attempt on his part to provide that to the IRS in lieu of payment.
Q. And so it looks like you have had a chance to leaf through all of Exhibit Number 6. This was all mailed to the IRS from Gordon Hall? 15:17:14
A. Yes, ma'am.
Q. How about you take a look at Exhibit Number 7. It's not as long. Can you tell the jury what Exhibit Number 7 is?
A. What's on the screen, it looks like the envelope that -- yeah. This is an envelope that I received, and it's not on the screen right now. But on the right-hand side of it here, it's date stamped into our office on December 7th of 2012. And it is, or contained inside of it, is a privately registered setoff bond for $4,489,940.85, and it's by or through Mr. Gordon Hall. And it gives his social security number. 15:17:52 15:18:30
Q. And did you think this was another attempt to pay off his taxes?
A. Yes, ma'am.
Q. And is this acceptable payment for a tax liability? 15:18:46
A. Is this acceptable? No, this is not an acceptable form of payment. No, ma'am.
Q. And why not?
A. There's no one that will honor it. In other words, I can't take this to a bank or to -- for a bond it would be a surety 15:19:01

company, and there's no surety company listed on here. So I cannot present this to a surety company and have them remit back to the Internal Revenue Service $4.489 million.

Q. So the money orders that you received and are exhibited here before as Exhibits 1 and 2, those aren't acceptable payment, either? 15:19:21

A. No, ma'am, those are not.

Q. Why not?

A. They are not drawn on any bank and they are not in any way -- that cannot -- I can't take them anywhere and do anything with them. 15:19:34

Q. And does Gordon Hall still have an outstanding tax liability for the tax years 1996 and 1997?

A. Yes, ma'am.

MS. JENNIS: Can I have a second, Your Honor? 15:19:48

THE COURT: You may.

MS. JENNIS: I have no further questions.

THE COURT: All right. Mr. Kunkle. I'm planning on taking the afternoon break at 3:30, but you can continue until then, Mr. Kunkle, if you have any cross-examination. 15:20:08

MR. KUNKLE: I do, sir.

CROSS-EXAMINATION

BY MR. KUNKLE:

Q. Good afternoon, Mr. Lyons. How are you?

A. Fine. Thank you. 15:20:30

Q. You don't look like a big, evil a bad tax man. You have a nice smile on your face.
A. Well, thank you.
Q. Prior to coming in here today to testify, you reviewed a number of documents, correct? 15:20:40
A. I reviewed a number of documents?
Q. Yeah.
A. Yes, sir.
Q. When did you do that? Just tell us what you did to get ready to come in here and testify today. 15:20:50
A. I reviewed the ICS history, primarily. I did not review a ton of documents, as you would say.
Q. Did you go through those exhibits?
A. These?
Q. Yes. 15:21:04
A. Yes, sir.
Q. And you met with the government, right?
A. Yes, sir.
Q. When I say "the government" I'm talking about Ms. Jennis and Ms. Edelstein? 15:21:15
A. Yes, sir.
Q. Investigator Neri, right, she's from the criminal division, right?
A. Yes, sir.
Q. How many times did you meet with them? 15:21:22

A. Just once.
Q. Just once. Did you ever see if they took down any reports of anything that you were telling them? Did you ever see them taking notes and writing down what you were telling them?
A. I am not aware if they were taking notes. 15:21:34
Q. Did they ever show you a report?
A. No, sir.
Q. Now, a couple times during your testimony here, you used the term "we," okay, the royal "we." I want to know what you did. Okay? 15:21:57
A. Okay.
Q. Now, I know you are maybe up there speaking loosely and I'm not faulting you for that. But I want to know what you did.
A. Okay.
Q. So you were assigned this case in 2011, correct? 15:22:05
A. Yes, sir.
Q. Now, did you go and read the ICS at that point in time?
A. Did I go and read the ICS, the previous ICS history? Yes, sir, I did.
Q. Did you read it thoroughly? 15:22:17
A. I believe I did, sir.
Q. So you knew who Jennifer Pardue was, correct?
A. Yes, sir.
Q. And she, just so we get this all clear, was the prior revenue officer, right? 15:22:27

A. Yes, sir.
Q. And you read about her efforts to collect this tax debt, correct?
A. Yes, sir.
Q. And just so the jury understands, this tax debt originated from an audit that the IRS performed, right? 15:22:33
A. Yes, sir.
Q. And what year was that audit performed?
A. I'm not positive, but I believe 2004.
Q. And that's on the account transcript. Correct? 15:22:48
A. It would be.
Q. And that's the date that the IRS says, here's our assessment of what you owe. Correct?
A. Yes, sir.
Q. And there's a process to go collect that money, right? 15:22:57
A. Yes, sir.
Q. And it's somewhat of a convoluted process?
A. I'm not sure what you mean by that, so I'm not going to answer.
Q. How about complicated. Let's try that word. 15:23:11
A. It's complicated to collect the tax?
Q. It's complicated the procedures the IRS goes through to collect it, correct? There's certain specific steps you have to take by statute?
A. Okay. 15:23:23

Q. You understand, right?
A. I'm not sure where you are going. I'm not sure they are complicated.
Q. Maybe not to you.
A. Okay. 15:23:34
Q. Let's just walk through this for a few minutes for the members of the jury. Let's not worry about where we're going. I will ask the questions; you give the answers. All right?
A. Yes, sir.
Q. Now, you issued what's called at some point in this process 15:23:45 a notice of a federal tax lien, or there was one issued at some point in this process?
A. Yes, sir.
Q. And that's so the government can step in and have a right to a levy on assets or bank accounts, wherever you can find 15:23:58 money that belongs to the taxpayer, correct?
A. A notice of federal tax lien?
Q. Yes, sir?
A. No, sir. A statutory lien would provide us the authority to levy. The statutory lien would arise on the 11th day after 15:24:14 notice and demand. The notice of federal tax lien puts the public on notice of a tax lien.
Q. And there's requirements about getting notice to that taxpayer, correct?
A. To mailing it to him? 15:24:29

Q. Yes.
A. Yes, sir.
Q. Just so it's clear, you didn't get this case until 2011, right?
A. That's correct. 15:24:36
Q. How many years did Ms. Pardue have this case?
A. I have no idea.
Q. Well, you read the ICS, didn't you?
A. Yes, sir. I didn't memorize when she started it.
THE COURT: I'm going to ask you both to be careful not to speak over each other. It's easy to do that, so I'm going to ask you both to wait until the other is finished asking the question or giving the answer, take one breath in between, and then you can speak. Go ahead. 15:24:46
MR. KUNKLE: My apologies, Your Honor. I should be more careful. 15:25:00
BY MR. KUNKLE:
Q. Mr. Lyons, the IRS is not an infallible organization, correct?
A. No, sir. 15:25:08
Q. It's not perfect, right?
A. No, sir.
Q. You have procedures that you follow in your Internal Revenue manual, right?
A. Correct. 15:25:15

Q. And you have to follow those procedures pretty much by the book to make sure each step in this process get handled correctly, right?
A. Yes, sir.
Q. If there's some mistake made in the process that might impede the ability of the IRS to collect that money, right? 15:25:25
A. It could.
Q. If they didn't get the notice and demand, right? If the taxpayer doesn't get the notice and demand you might lose, right? 15:25:44
A. It's possible, yeah.
Q. Now, when you went back and looked through that history, I'll just make this as succinct as possible, did you recall reading notes from Ms. Pardue in that history?
A. If you are asking did I read Mrs. Pardue's ICS history, yes, sir, I did. 15:26:04
Q. And just so it's clear, that ICS history, when she sits down to make those entries in the computer, she does it the same way you do, correct?
A. I would presume so. I'm not sure what you are asking. But she would enter them on the computer. 15:26:20
Q. You have an ID number, right?
A. Yes, sir.
Q. And every time you make an entry in that computer, you put your ID number in, right? 15:26:32

A. That is correct.
Q. She puts her ID number in, correct?
A. Her computer would put the ID -- her ID number on that ICS history. That is correct.
Q. So when there's her ID number on an entry in that history that's what she inputted into that history, correct? 15:26:43
A. That is correct.
Q. Can somebody else input for you on that history?
A. No, sir.
Q. So your secretary can't go in there and put a note in there about something that has happened on the case? 15:26:55
A. The secretary cannot, no, sir.
Q. Other people can, though, but they would be assigned to their ID number, right?
A. Other people can, like a group manager could. 15:27:13
Q. And this is all by procedure and process, right? You have to follow these rules within the IRS, right?
A. Yes, sir.
Q. I mean, you do follow those rules, correct?
A. Yes, sir. 15:27:24
Q. Now, prior to your coming on to this, you met with Ms. Pardue at one point after you were assigned, right?
A. Yes, sir.
Q. You sat down and you discussed Mr. Hall's case, correct?
A. Probably. I would say yes. It's not necessary. It's not 15:27:47

a requirement, but I probably did.

Q. And when you met with Ms. Pardue, did you have a file like a box or something of documents concerning Mr. Hall's case?

A. I probably did not have the box in front of me. I would not have needed it. At the time there was going to be another, I think, revenue officer that was going to be assigned and it was sent off and then it was brought back into our office. So I don't know that I had that the hard file, if you will, in front of me when I might of talked to Mrs. Pardue. There was still some lingering issues. Mrs. Pardue was still working on the case when it was assigned to me. So you will see an overlap of ICS histories, if that's what you are referring to. But she was doing something completely different than I was doing. 15:28:20 15:28:38

Q. Well, when you say she was doing something completely different, she went out at one point, and this is, again, what you learned from the ICS, right, and met with Mr. Hall, correct? 15:28:52

A. I believe she did.

Q. And they spoke to each other, right? 15:29:03

A. I believe that's correct.

Q. And she made several attempts to speak with Mr. Hall or find Mr. Hall, correct?

A. Yes.

Q. And some of her notes in that history are down to the 15:29:18

mundane describing the house that he may be living in and what kind of income neighborhood it may be, right?
A. I don't recall that.
Q. Well, that's something you would do, correct?
A. Probably not. 15:29:33
Q. Well, let's get real, Mr. Lyons, okay?
THE COURT: Let's take the afternoon break until 10 minutes to 4:00. We'll be in recess until 3:50.
(Recess from 3:30 p.m. until 3:54 p.m.)
THE COURT: The record will show the presence of 15:54:31 counsel, the defendant, and the jury. Mr. Kunkle, you may continue.
Also, let me -- before you do, let me tell the jury, we will probably finish a little bit early tomorrow because the government's last witness is coming in from out of town and 15:54:45 won't get here until Friday morning.
MS. JENNIS: Thursday.
THE COURT: I mean Friday -- whatever the last day is. Thursday. Thursday. All right. You have to listen to what I mean instead of what I say. 15:55:04
Mr. Kunkle, please continue.
BY MR. KUNKLE:
Q. Mr. Lyons, I think before we broke I was asking you about observations that an agent, revenue officer, I should say, would put in the ICS, right? Then I mentioned Ms. Pardue noted 15:55:18

what the value of a house was that she believed Mr. Hall was living in, correct?
A. She may have.
Q. That would be on Page 23 of your ICS there in Exhibit 25. Okay. And likewise, you have references like that, this on would be on Page 186. 15:55:33
MS. JENNIS: Excuse me, Your Honor. That exhibit is not in evidence.
MR. KUNKLE: If you don't remember, I apologize, Your Honor. I will withdraw that. 15:55:49
BY MR. KUNKLE:
Q. Mr. Lyons, you mentioned before you read the ICS, correct?
A. Yes, sir.
Q. The journal or the log. And I trust it's almost 200 pages. You are not familiar with every entry in there, correct? 15:56:03
A. And it was three years ago that I read it.
Q. But the question was, when you are going out to collect a tax, and it's your job to go figure out if a taxpayer has that ability to pay, correct?
A. That is correct. 15:56:21
Q. So one of the things you look at is the house they are living in?
A. That would be correct.
Q. And later on in this case there was some issue that you were involved in whether or not Mr. Hall had purchased a home, 15:56:30

correct?

MS. JENNIS: Objection, Your Honor. I believe this is beyond the scope of direct.

THE COURT: Well, it probably is. However, in my discretion I will allow wide open cross-examination to anything that is otherwise relevant and admissible. So you may continue provided it's relevant. 15:56:42

BY MR. KUNKLE:

Q. Mr. Lyons.

A. Are you asking me if the house he was living in recently or the house that he was living in when Mrs. Pardue had the case? 15:56:56

Q. The house recently, on Presidio Circle.

A. And what is your question about that specific house?

Q. Well, at a certain point in time there was questions whether or not Mr. Hall had bought the vacant lot next door, correct? 15:57:14

A. Yes, sir. Yes, sir. That is correct.

Q. Now, when you mentioned at one point, and when you took this case over for Ms. Pardue, you got a box from her, right?

A. I believe so, yes, sir. 15:57:33

Q. A big box, right?

A. I don't know.

Q. Well, you put it in the SEP room, right?

A. Yes, sir.

Q. What's the SEP room? 15:57:43

A. The SEP room is a Special Exam Projects room that we're allowed to keep files in that are sometimes larger than we would keep in a normal filing cabinet. Files in a normal filing cabinet would be this large. Anything larger than that may go into a box in the SEP room. About an inch. Anything larger than that. I'm not sure what a big box would be, but there was a box. 15:58:01
Q. And this file was bigger than an inch, right?
A. That is correct.
Q. In fact, that description of one inch, that was one of the descriptions Ms. Pardue used in her notes about one of the mailings Mr. Hall had sent her, correct? It was one inch thick. Do you recollect seeing that? 15:58:14
A. No, I do not. Are you saying that she said the mail that she received from Mr. Hall was an inch thick of mail? 15:58:32
Q. Correct.
A. That's possible.
Q. And when you went through that box there were a number of mailings from Mr. Hall to the IRS, correct?
A. That is correct. 15:58:46
Q. Many of those mailings predated your assignment on this case, correct?
A. That is correct.
Q. You read those mailings, correct?
A. Not all of them. Not by any stretch of the imagination. 15:58:54

Q. When you say "not all of them" how many of them were there?
A. I don't recall, but more than, let's say, 10.
Q. More than 10?
A. Yes.
Q. Now, you have looked through what's in front of you today as Exhibits, I believe, 7 and 6. Correct? 15:59:06
A. That's correct.
Q. You put up the envelopes for this jury right here, right?
A. That's correct.
Q. Those are just two of the mailings that you received from Mr. Hall, correct? 15:59:16
A. I received one of those and Ms. Pardue received one of them.
Q. There was others to you, correct?
A. There may have been one or two others to me. I'm not positive but presume there were more. 15:59:27
Q. November 22nd, 2011, it was after you were assigned to this case, right?
A. Correct.
Q. You received a bunch of documents from Mr. Hall, correct? 15:59:52
A. I received documents from Mr. Hall. Okay. You are reading from the ICS history, I'm presuming.
Q. I'm asking you if you remember receiving them.
A. I don't remember that particular date, no, sir. I remember receiving documents from Mr. Hall. 16:00:14

Q. Do you need to refresh your recollection about September 22nd, 2011?
A. If you would like me to.
Q. Page 106, if you would look at it without reading it and I will ask you a few questions. 16:00:28
A. When you say Page 106, are you talking about Exhibit 25, 1 --
Q. 106. Do you have them up there? Do you see it? You can take a moment to read it.
A. 106? 16:00:56
Q. Yes, sir. 106 of Exhibit 25.
A. It just says I received two documents, sir. If I'm reading the same thing you are asking me to read, it says I received two envelopes. It doesn't say I received a bunch of documents.
Q. Does that refresh your memory? You received two envelopes? 16:01:33
A. I received two envelopes, yes, sir.
Q. By the way, in your notes on that day, you use the singular pronoun, "I received them." Right? Those envelopes. Do you see that? That's what you remember?
A. Yes, sir. 16:01:50
Q. Do you open your own mail?
A. No, sir. Not always.
Q. Not always?
A. Not always. Generally, it's opened in the mail room.
Q. So which is it? No, sir, not always, or generally in the 16:02:00

mail room?
A. All of the above. I open a lot of my mail, but a lot of times it is opened in the mail room.
Q. On the this occasion, on September 22nd, 2011, it was a demand from Mr. Hall to return the bond. Do you remember that? 16:02:18
Does that refresh your memory, the mailing list from Mr. Hall? You did review this, right?
A. Yes.
Q. Three years ago you did read this journal of these entries of this taxpayer, right? 16:02:43
A. It is a demand to return the $50,000 bond.
Q. Now, you are familiar with what Mr. Hall was talking about? Yes or no?
A. Yes, sir, I am.
Q. That was a bond, just so it's clear, that the IRS had 16:02:52
levied. Correct?
A. That is correct.
Q. In fact, that was done by Ms. Pardue before you, right?
A. That is correct.
Q. Ms. Pardue, there was maybe an issue about a wrongful levy, 16:03:02
correct?
A. On that bond?
Q. Yes.
A. Not that I'm aware of.
Q. Well, okay. Did you read her notes? Yes or no? 16:03:12

A. I did.
Q. She was ready to, quote, unquote, duke it out over perhaps a wrongful levy. Do you remember that?
MS. JENNIS: Your Honor, I don't see the relevance in this line of questioning. 16:03:27
THE WITNESS: I'm not sure what you are asking me.
THE COURT: Hold on. Your objection?
MS. JENNIS: I would object as to relevance, Your Honor.
MR. KUNKLE: If you would like -- 16:03:35
THE COURT: Just hold on.
MS. JENNIS: I would also like to remind Mr. Kunkle that, again, Exhibit 25 is not in evidence.
THE COURT: I'm maybe even more concerned about that. Come over to sidebar. 16:03:49
**(The following discussion was had at sidebar out of the hearing of the jury:)**
THE COURT: Okay.
MR. KUNKLE: Can I put one thing on the record? We discussed last week about waiving Mr. Hall's presence at 16:04:37 sidebar. I want to put this on the record before we get busy with that. I think -- he's not engaged himself in any way with me during this trial. We haven't had an explicit waiver from him.
THE COURT: Have you discussed it with him and put it 16:04:50

on the table with him?

MR. KUNKLE: No. And I neglected to do that, because I got busy with the plea. But I will tell you, Your Honor, I think at this point, since it's a legal issue, I'm representing him. I feel comfortable he has not made any assertive effort with me to indicate he wanted to be up here. And on this objection, I don't need him up here. I'd rather not have him up here, all the marshals moving, everything else. 16:05:03

THE COURT: I take that as Mr. Hall not making any request to be present as a practical waiver. 16:05:26

MR. KUNKLE: Just so it's clear, he's been sitting here today with his eyes closed, down. It's like he's acting like he could care less. I'm up here. I feel comfortable saying I would waive his presence for sidebar.

MS. JENNIS: I don't believe this line of questioning is relevant. And also, there's a lot of reading coming from an exhibit that's not in evidence, particularly Exhibit 25. 16:05:47

THE COURT: So I --

MS. EDELSTEIN: Just for foundational purposes, it's already been established this is a document created by two separate individuals. So it's unclear -- 16:06:00

THE COURT: Look. I'm -- absent some reason, I'm disposed to sustain the objection for reading from a document that's not in evidence. Might be easy to get it into evidence. I think we're going to -- we may run into other issues if you 16:06:22

get it into evidence. What's the broader relevance of that?

MR. KUNKLE: Your Honor, when the government admitted two exhibits and asked the witness were these attempts to defraud the IRS, I think it's very relevant that this is two among dozens of these mailings, and I will summarize them with Ms. Pardue rather than going into date and time specifics. But with respect to Mr. Lyons, they call these mailings from Mr. Hall, among other words in the ICS, indiscernible frivolous garbage. One inch thick. They didn't use any BS. But the point being I think it's relevant for this jury to understand that if this witness is going to sit there on the stand and say these were attempts to pay a debt, this goes to whether Mr. Hall was really intending to defraud the IRS. Just impeding administration of the IRS, just being a pain in the ass, excuse my French.

THE COURT: The question was specific and had to do with some property next door.

MS. JENNIS: Had to do with levies and unlawful levies which I don't see as relevant questions.

THE COURT: What's the relevance? First of all, where are you going with the property next door? I will figure out if it's relevant.

MR. KUNKLE: Because later on after this case, commenting on -- to describe the weaknesses in the civil suit the IRS may have in any efforts to collect at that house. So I

think it goes to that witness's bias in terms of calling these fictitious documents, attempt to defraud the IRS when they had problems with the collection deadlines and whether they could even get this money. I'm trying to establish this isn't an intent to defraud, maybe an intent to impede. Like I said, he's a nuisance, but this goes to show why the government would bring this criminal case, show that this is being done for improper purposes and that isn't being done on the level of the intent to defraud. These two funny money orders, Exhibits 1 and 2 -- 16:08:08 16:08:29

THE COURT: That broader issue I'm not disposed to make broader here but give a specific ruling. And on the issue of whether there is some procedural vulnerable execution strikes me as being classic Rule 403 getting into complexity, little or no benefit, and with risking confusion of issues for the jury. So what if he has a lawsuit against the wrong levy. It's hard to see how that matters if, in fact, he submitted some documents to support the levy. So I'm concerned about wasting time and confusing the jury. 16:08:52

MR. KUNKLE: I understand the Court's ruling. I will be more concise in trying to summarize the different mailings, that this was an ongoing process. That's where I was trying to go with this. 16:09:14

THE COURT: I understand your argument. And I'm not at all excluding your argument that this was so bogus it was 16:09:26

ridiculous.

MR. KUNKLE: So the Court does understand.

THE COURT: I understand your defense. I'm not interfering that -- we'll take these objections one at a time on a specific context. 16:09:42

MR. KUNKLE: Ms. Jennis's point is well taken. I sometimes get astray and I forget this is just a recorded recollection document. It shouldn't come into evidence. I will be more careful in forming my questions.

THE COURT: All right. 16:09:56

(In open court.)

THE COURT: That objection is sustained but you may rephrase the question.

MR. KUNKLE: Thank you.

BY MR. KUNKLE: 16:10:11

Q. Mr. Lyons, perhaps let me put it to you this way: You received numerous mailings from Mr. Hall, correct?

A. Yes, sir.

Q. I might stand corrected. In that box were dozens of these mailings, correct? In Mr. Hall's file, the box you put in the SEP room, dozens of these mailings, correct? 16:10:30

A. Approximately a dozen. Maybe more.

Q. Some to Ms. Pardue?

A. Yes, sir. Some to both of us.

Q. And some just to you, correct? 16:10:43

A. Correct.
Q. And so I will just try to keep this clear. September 22nd, 2011, you received a package from Mr. Hall, correct, addressed to you?
A. I received two envelopes. 16:11:00
MS. JENNIS: If I may, Your Honor. Excuse me. The witness has Exhibit 25 in front of him and put on his glasses to read. If I could ask that to be moved to the side.
THE COURT: Move what to the side?
MS. JENNIS: Exhibit 25. 16:11:12
THE COURT: I don't understand your request.
MS. JENNIS: It appears the witness is reading from Exhibit 25 and because it's not in evidence --
THE COURT: He can read it to himself but he cannot read it out loud unless it's admitted in evidence. 16:11:24
Do you understand?
THE WITNESS: Yes, sir.
THE COURT: Go ahead.
BY MR. KUNKLE:
Q. I think I got astray there asking about opening your mail 16:11:31 because you gave us three alternatives, correct? You open it or someone else opens it but not always. Do you remember answering that?
A. Yes, sir.
Q. So on September 22nd, 2011, you received a mailing from Mr. 16:11:42

Hall, correct?
A. That's correct.
Q. And just to summarize that mailing, it was a Notice of Default and Opportunity to Cure. Does that sound familiar?
A. Yes, sir. 16:12:03
Q. And it was a Default in Dishonor and a Consent to Judgment, right?
A. Yes, sir.
Q. And a Notice of an Administrative Judgment, right? Does that sound correct, Mr. Lyons? 16:12:19
A. Yes, sir.
Q. And you also received more of those mailings throughout 2011, is that correct, the end of 2011?
A. I can go through this and see if I received more, if that's your question. 16:12:51
Q. Do you not remember, Mr. Lyons?
A. I don't recall. No, sir.
Q. Do you need to look at something to refresh your recollection?
A. I can look at this if you want and tell you. But -- 16:12:57
Q. I will specifically refer you, Mr. Lyons, to December 16, 2011. That's Page 112, if you could just look at that and then I will ask you a question.
A. Okay. Yes, sir. I received mail from the taxpayer on December 16th of 2011. 16:13:25

Q. And those mailings all had the same documents in them, correct?
A. All three of those envelopes contained the exact same documents in each of the three envelopes, yes, sir.
Q. As you sit here today in your mind's eye, let's think back to the end of 2011. Did you conceive in your mind that any of those mailings were attempting to pay a debt to the IRS? Yes or no, Mr. Lyons? I see you are looking down at something to read it. The answer is not going to be there. I'm asking a very straightforward question. 16:13:45 16:14:12
As you sit here today, going back to 2011, those mailings that you got from Mr. Hall, do you think those were attempts to pay off that debt?
A. Yes, sir.
Q. Now, what about a Notice of a Default and Dishonor would have paid that debt? 16:14:23
A. What about it would?
Q. Yeah.
A. I don't think anything would, sir.
Q. Okay. So wait a minute. Let me get this straight. You are telling us you don't think it would, but you are saying it's attempting to pay a debt. Can you tell me which answer you want to go with right now? 16:14:32
A. I think they are both a fine answer. I think that I have no idea what he was trying to do. I think he was trying to pay 16:14:46

the debt, and your question to me was do I think it was a valid attempt to pay the debt. My answer is no, I don't think it was when I looked at it. But I think he was trying to.
Q. Mr. Lyons, this might be a good time to go into this moment. You don't know what he's thinking, do you? 16:15:06
A. No, sir.
Q. So where I can go is what you think.
A. We can go with the papers that he sent me when he filed the bonds. Those are certainly attempts to pay the debt.
Q. In your experience of 11 years, Mr. Lyons -- 16:15:20
A. Yes, sir.
Q. -- how many times have taxpayers come in with a bond to pay the IRS?
A. It's very rare.
Q. How rare? Tell me an instance. Is it perhaps so rare it doesn't happen? 16:15:32
A. No. It happens.
Q. So someone can come in and sign over, say, a treasury bond to the IRS? Here's my treasury coupon. It's due in 30 years.
A. I have never seen that, no, sir. But I have seen the bonds similar to what Mr. Hall sent in. 16:15:54
Q. The bonds that he sent in. Now those would be privately registered setoff bonds, correct?
A. Yes, sir. I have seen some of those before.
Q. Issued in the Republic of Arizona, correct? 16:16:09

A. That I don't know. They could be issued in many places.
Q. Okay. Mr. Lyons, was some of these mailings from Mr. Hall, you referred him to the frivolous filing unit, didn't you?
A. Yes, sir, I did.
Q. Now, this might be a good time to explain to the jury what the frivolous filing unit is up in Ogden, Utah. Do you know what it is? 16:16:26
A. Yes, sir.
Q. Now, the IRS is part of the Department of Treasury, right?
A. Yes, sir. 16:16:37
Q. IRS has branches all over the country, right?
A. Yes, sir.
Q. Service centers?
A. Yes, sir.
Q. Philadelphia? 16:16:42
A. Yes, sir.
Q. Austin, Kansas City, Ogden, right?
A. Yes, sir.
Q. All over. Big, big, big entity, the IRS, right?
A. Yes, sir. 16:16:53
Q. Ogden, Utah, has the frivolous filing program, right?
A. That is correct, sir.
Q. FRP, Frivolous Return Program. Right?
A. Yes, sir.
Q. And a taxpayer who chooses to send in a return that the IRS 16:17:04

deems frivolous can get referred to the FRP in Ogden, Utah, correct?
A. That is correct.
Q. What do you take frivolous to mean?
A. Frivolous would be arguments that have been established by the Internal Revenue Service. And it's a guideline that's fairly comprehensive. And the unit will then look at the documents that are provided by the taxpayer and they will make the determination. I certainly do not make it. 16:17:19
Q. What you are saying is the unit in Ogden will say this is frivolous, right? 16:17:37
A. Ogden, Utah, will make the decision. I do not have anything to do with that.
Q. Well, you do have something to do with it because you sent it to Ogden, Utah, right? 16:17:52
A. That's for them to review, yes, sir.
Q. So you might think it's frivolous because otherwise you didn't just put it in the garbage can, right?
A. I don't throw any of it away. But if I thought it was frivolous I would forward to them for them to loom at, yes, sir. 16:18:04
Q. And if someone sends in a return like that, the IRS can assess them a $5,000 penalty, correct?
A. That is correct.
Q. And they could possibly face criminal prosecution, correct, 16:18:12

well, one --
A. I presume that they can, yes, sir.
Q. You are familiar with Section 7212, correct?
A. Yes, sir.
Q. That's impeding the IRS, right? 16:18:25
A. Yes, sir.
Q. July 24th, 2012, you received another set of documents from Mr. Hall, correct? If you don't remember I will tell you where to look in a second.
A. Tell me where to look. 16:18:45
Q. Do you remember receiving documents in July 2012?
A. No, sir.
Q. July 24th, 2012, you received a set of documents from Mr. Hall with biblical references in them, didn't you?
A. I don't know, sir. If you will tell me what page I will look at it and see. 16:18:57
Q. If you don't remember, you can look at Page 132 to refresh your recollection. Read it and I will ask you some questions.
A. Would you say that page again, please?
Q. Page 132, sir. If you can look at that at the top of the page, see if that refreshes your recollection. Then you can put that aside and I will ask you some more questions. 16:19:22
A. I do not believe that I wrote that. If you look at the ID history, created by, is that me? You are saying it is.
THE COURT: Is this Exhibit 25? 16:19:51

MR. KUNKLE: Yes, sir.
THE WITNESS: I believe it's written by an advisor.
BY MR. KUNKLE:
Q. Let me ask you this then, Mr. Lyons.
A. So I didn't write it. 16:20:02
Q. The question is: You are the revenue officer on the case at that point, right?
A. Yes, sir.
Q. You received a package on or about July 24th with biblical references, correct? 16:20:12
A. Sir, there is no indication whatsoever that I received a package on July 24th of 2012. Am I not seeing something --
Q. We'll go on.
A. -- that you are wanting me to see?
Q. July 13th, 2012. I apologize again. There's many packages 16:20:38
Mr. Hall sent correct? Let me just ask you this, Mr. Lyons. Okay?
A. Okay.
Q. Not all these packages came to you. Is that fair to say?
A. Okay. To answer your first question, I did not receive any 16:20:53
packages or information from Mr. Hall on July 13th of 2012.
Q. Okay. Let's go to August 3rd, 2012. You received a package that day, correct? Mr. Lyons, if you don't remember, you can just say I don't remember right now.
A. Okay. I do not remember. 16:21:27

Q. If you want to look at Page 135, see if that refreshes your memory about that package.
A. On August 3rd, I did receive information or a correspondence from the taxpayer. That's correct.
Q. And that correspondence you received had a reference to the Arizona State Northeast Region Court District. Do you remember seeing that in the package you got from him? 16:21:42
A. Yes, sir, I did.
Q. Do you know of an Arizona State Northeast Court Region?
A. No, sir, I do not. 16:22:01
Q. And now we're up to where you have in front of you document 6, or Exhibit 6. Correct?
A. Yes, sir.
Q. Do you have that in front of you?
A. Yes, sir. 16:22:25
Q. It's about, what, half-inch thick, would you say, Mr. Lyons?
A. Okay.
Q. Yeah. That's in evidence, right?
A. Yes, sir. 16:22:34
Q. Going through there, and the jury can look at this later, Page 6 of that, you have a reference in the upper left-hand corner to the Arizona Republic, Maricopa County, without the United States. Do you see that?
A. Yes, sir. 16:22:58

Q. Are you familiar with anything called the Arizona Republic other than the newspaper?

THE COURT: I'm sorry. Which page is this, Mr. Kunkle?

MR. KUNKLE: Page 6, Your Honor. 16:23:07

THE COURT: Of which?

MR. KUNKLE: Exhibit 6. 006 of 006.

BY MR. KUNKLE:

Q. Do you see that in the upper corner, Mr. Lyons?

A. Yes, sir. 16:23:16

Q. Now, you have seen stuff like this before, have you not?

A. I don't recall ever seeing anything quite like this, no, sir. And I certainly don't recall Arizona Republic, Maricopa County. So I'm not familiar.

Q. Earlier you testified you thought you knew what the 16:23:38 taxpayer believed, then you said you didn't know what the taxpayer believed. Do you want to clarify that answer right now?

A. As to whether I thought he was paying his taxes with those bonds? I believe he felt he was. 16:23:52

Q. With the bonds or the money orders?

A. The bond first and the money order last.

Q. That's what you think he believed, right?

A. I do believe that, yes, sir.

Q. And every one of these packages you would get or most of 16:24:02

them you would send to the frivolous return program, right?
A. I'm required to, yes. Yes, sir.
Q. Frivolous. You know what that means, right?
A. Yes, sir.
Q. Garbage, right? Garbage? 16:24:14
A. We don't believe that it's a valid payment if that's what you are asking.
Q. Right. Now, you had mentioned before about these procedures when you have a big payment. Right?
A. Yes, sir. 16:24:35
Q. That's part of the Internal Revenue manual?
A. I believe it is part of the -- it could be either the Internal Revenue manual or procedures set up by the Internal Revenue Service. But I can't quote you the IRN specifically for handling large remittances. But I believe that we can 16:24:57 certainly find it if you need it. But it's a standard policy.
Q. This standard policy --
A. Uh-huh.
Q. -- how many people work at the Mesa Field Office on 1818 East Southern? 16:25:18
A. I would assume maybe up to 100 people.
Q. So if I understand you correctly, if somebody sends in a check for a million dollars, only you can put that in the bank?
A. If they send a check to me, my client, or my taxpayer, sends a check to me for over a certain -- for a million dollars 16:25:41

as you have suggested, yes. I'm the one that needs to process those funds.
Q. And that's in your manual?
A. The answer to that is I don't have to. A group manager could certainly do it as well. But the secretary cannot do it. 16:25:56
Q. Okay.
A. So I am notified to come in, that there's a large remittance, and I did come in.
Q. I know you want to talk to me about -- I'm asking you in general here. 16:26:14 What's the amount that triggers your personal responsibility on behalf of the 100 employees of this field office to come in and process a check or money order? What's the amount? What's the threshold?
A. The threshold would be $100,000 or greater.
Q. How often do you get $100,000 payments? 16:26:28
A. Two or three times a year.
Q. So those two or three times a year, you have to go and do it. Is that what you are telling this jury?
A. Those two or three times a year I would go in and do it. I don't have to. A group manager could do it. 16:26:43 But if it comes in and it's my taxpayer then it's my job to process it. It's my job.
Q. Okay. But someone else could process it?
A. Another revenue officer could. But it has to be done that same day. 16:26:57

Q. Hold on. Hold on. Your boss is called a group manager, right?
A. That's correct.
Q. But now you are telling me another revenue officer could do it? 16:27:06
A. If I was on vacation, of course, someone would have to do it.
Q. Okay. So now -- and don't take this the wrong way, Mr. Lyons. I think you are all right. I like you. But if you were laid up in the hospital somewhere for a few weeks what 16:27:17 happens to the $100,000 sitting on your desk?
A. It has to be processed the same day it came in.
Q. The same day?
A. Yes, sir.
Q. By you? 16:27:26
A. Yes, sir.
Q. But you are sick in the hospital.
A. Yes, sir.
Q. So now it's your group manager?
A. Group manager can do it. 16:27:33
Q. Another revenue officer?
A. Another revenue officer can do it.
Q. How many revenue officers work at Mesa?
A. 15, maybe, 20. 15.
Q. So the universe of people now who can put this check for 16:27:46

over $100,000, if it comes in the door, can be you or 15 to 20 other revenue officers?
A. It could be, yes, sir.
Q. So it doesn't have to be you?
A. It doesn't have to be me, but it is my responsibility. 16:28:00
Q. Now, who is Jo Lynn Colegrove?
A. Jo is the unit secretary for the unit in Mesa post of duty.
Q. She knows what the -- I suppose as an employee of the IRS, she knows what to do when she finds a big money order, right?
A. That is correct. 16:28:22
Q. And she would know these policies and procedures, right?
MS. JENNIS: Objection, Your Honor. Calls for hearsay, or speculation, Your Honor.
THE COURT: Overruled. You can answer.
THE WITNESS: Yes, sir. She does know the procedures. 16:28:44
BY MR. KUNKLE:
Q. And the package that you received on December 7, 2012, okay, that's Exhibit 7 in front of you?
A. Yes, sir.
Q. You could take a look at that. That's in evidence. You can pick it up. 16:29:12
A. Okay.
Q. Do you know who Pamela LaRue is? That's Page 2 of Exhibit 7. Do you know who she is?
A. What's your question again? 16:29:26

Q. Do you know who Pamela LaRue is on Page 2 of Exhibit 7?
A. No, sir, I do not.
Q. Do you know if there's a chief financial officer for the Internal Revenue Service?
A. No, sir. I do not know that information. 16:29:45
Q. Do you know who your boss is, the commissioner of the Internal Revenue Service?
A. Yes, sir.
Q. Who is that?
A. Was Timothy Geithner at the time. 16:29:52
Q. Maybe I need to correct you. Timothy Geithner is the secretary of the treasury.
A. Yes, sir.
Q. He's your ultimate boss, right?
A. He's the ultimate boss. 16:30:06
Q. Well, Barack Obama --
MR. KUNKLE: Sorry, Your Honor.
THE COURT: Don't step on each other.
THE WITNESS: I don't recall his name.
BY MR. KUNKLE: 16:30:14
Q. The boss of the IRS?
A. The boss of the IRS, yes, sir.
Q. The commissioner?
A. Yes, sir.
Q. So the name Pamela LaRue doing business as the chief 16:30:19

financial officer, you never heard of her, right?
A. No, sir.
Q. And in Exhibit 7 which you received on December 7th, there was a bunch of paper, correct?
A. Yes, sir. 16:30:40
Q. And this is along the same lines of the dozens of other packages that you or Ms. Pardue had received from Mr. Hall, correct?
A. Of this registered bond?
Q. I didn't ask about the registered bond. I asked if this package was similar to many of the other packages you received from Mr. Hall. 16:30:54
A. Basically, yes, sir. I guess so. Some of them were a little different, but essentially, they were -- a lot of them were the same. Some were different. 16:31:08
Q. By the way, this came in in reference to Mr. Hall. You don't know who sent it in, right?
A. I do not know who sent it in.
Q. This one on the envelope has a return address at the top of Brighton Nicole Jorgensen. Do you see that? 16:31:24
A. Yes, sir.
Q. And it has an interesting reference there under Mesa, Arizona, says non-domestic without the U.S. Do you see that?
A. Yes, sir.
Q. And that 's the envelope that was addressed to you, right? 16:31:36

A. Yes, sir.
Q. Now in there on Page 6 in Exhibit 7 is this privately registered setoff bond, right?
A. Yes, sir.
Q. I will put it up on the screen there. Can you see that at the top right? Do you see that? If we could have that published to the jury, Your Honor? 16:31:48
THE COURT: You may display to the jury any exhibit that has been admitted in evidence without need to ask for specific permission to do so. But do make a clear record what you are showing the jury. 16:32:05
MR. KUNKLE: Just so record is clear, I'm showing him Page 6. This is what's known as the privately registered setoff bond from Exhibit 7.
BY MR. KUNKLE: 16:32:20
Q. Do you see that in front of you, Mr. Lyons?
A. Yes, sir.
Q. Now, the day this came in the mail addressed to you, did you open up this envelope?
A. I did not, no. 16:32:26
Q. Do you know if Ms. Colegrove opened the envelope?
A. No, sir.
Q. Do you know a Gloria Ross?
A. I believe that might have been a unit secretary that we had in the office. I may be wrong. But we had a Gloria there but 16:32:42

I don't know her last name.
Q. You do recognize the name Gloria Ross, right?
A. No, sir. I recognize the name Gloria.
Q. How many unit secretaries do you have?
A. There may be as many as five or six in the building. 16:33:10
Q. To serve 20 revenue officers? Five or six secretaries?
A. In addition to 20 revenue officers, is that what you said?
Q. Yes.
A. Or did you say they serve --
Q. I asked you how many revenue officers were out in Mesa. 16:33:26 You said 15 to 20.
A. You said how many employees, I believe you asked me.
Q. That answer was 100.
A. 100, so they service the 100 employees.
Q. Not just the revenue officers? 16:33:37
A. We only have one unit secretary for the revenue officers, yes, sir.
Q. And in 2013, was that Jo Lynn Colegrove?
A. Yes, sir.
Q. And you do know the name Gloria Ross, right? 16:33:47
A. I know a person named Gloria that was a unit secretary, sir. I'm sorry. I don't know all their last names.
Q. Let's go back to December 7, 2012. That was the day you got this package from Mr. Hall, correct?
A. Yes, sir. 16:34:02

Q. Privately registered setoff bond. Do you see that up at the top?
A. Yes, sir.
Q. Did anybody try to deposit that?
A. No, sir. 16:34:15
Q. Did you try to deposit that?
A. No, sir, I did not.
Q. Yeah, you didn't because you know it's garbage, right?
A. I presume that it's not a valid bond.
Q. Well, wait a minute. You presume or you know? 16:34:25
A. Well, okay. I honestly believe it's not a real bond.
Q. Right. And why do you look at that and think it's not a real bond? Do you want to tell this jury?
A. There doesn't appear to be a bonding company listed on this bond. There's no surety company listed. 16:34:43
Q. In fact, he's saying give that bond to Timothy Geithner. Right?
A. That's what he does say, yes, sir.
Q. He says he's the underwriter of the bond. Right?
A. Yes, sir. 16:34:57
Q. Do you know what the exemption ID is under his name? Do you know what that means, exemption ID? Do you see that number?
A. No, sir. I have no idea what that means.
Q. You recognize the number, right? 16:35:10

A. Could you tell me where it is, please, sir.
Q. At the bottom under the signature and the thumbprint.
A. Okay. The exemption ID is the social security number.
Q. Right.
A. Yes, sir. 16:35:25
Q. And you see again down there at the bottom Mesa, Arizona Republic, right?
A. Yes, sir, I do.
Q. This document that came in to your office was also sent registered mail, correct? 16:35:43
A. I believe it was, sir.
Q. And that one you believe that directed you to --
A. No, sir, it was not. It was sent in the normal mail.
Q. And that exhibit which came in on December 7, 2012, wants the IRS to communicate with Benton Tyler Thomas Hall. Do you 16:36:09 remember that?
A. I'm sorry. Say that again.
Q. Well, you are ID Number 26072343, right?
A. Right.
Q. And you believed that those documents directed you to 16:36:27 communicate with Benton Tyler Thomas Hall at a postal office drop box in Mesa. Do you recollect that when you read those documents?
A. If my memory is correct, and I can find it in here, I think these documents instruct me on Page 3 of 4 to correspond with 16:36:46

that person, yes, sir.
Q. Yeah, wants the IRS to talk to this person Benton Tyler Thomas Hall, right?
Well, if you don't remember what you just said in your answer you can look at Page 145 of Exhibit 25 if that refreshes your memory. 16:37:05
A. What are you asking me?
Q. I asked you, Mr. Lyons, if you remembered after you looked at those documents -- you read through them that day, right?
A. Yes, sir. 16:37:17
Q. You didn't run to the bank with them. Right?
A. No, sir.
Q. By the way, when you get something like this if there were a real check in there, or even $50 cash, you do get cash at the IRS, right? 16:37:28
A. On very rare occasions. I think once in 11 years.
Q. But if somebody brought in a 100 dollar bill with Ben Franklin's picture on it, where do you take it?
A. I believe -- I haven't done it in over 10 years. I believe we take it to Bank of America. 16:37:43
Q. That's where the IRS has their checking?
A. That's where we process cash payments.
Q. Where do you process check payments?
A. All check payments are processed in Ogden, Utah, sir.
Q. And to process that you physically take the check and mail 16:37:56

it to Ogden, Utah?
A. We put it in an envelope and overnight it to Ogden, Utah, sir.
Q. What do you put in that envelope?
A. A check. 16:38:06
Q. Just a check?
A. And an invoice or certain documents that identify the taxpayer.
Q. I love the --
A. Form letter. 16:38:12
Q. I love the IRS. You have a document number for everything. What's the document you put in with the check to mail to Ogden, Utah, do you know?
A. Form 795.
Q. Good. So your answer is a Form 795 and only you can fill that out, right? 16:38:23
A. No, sir.
Q. Any revenue officer, right?
A. A revenue officer can fill that out, yes, sir.
Q. So with this one on December 7, Exhibit 7, nobody filled out a form 795 or mailed this up to Utah to get it processed, right? 16:38:31
A. That is correct.
Q. Because it's garbage, right?
A. Well, it's not processable. I'm not going to use your 16:38:41

words, but it's not processable.

Q. I'm not sure processable is a word.

Now, let's go to January 28th, 2013.

A. Okay, sir.

Q. You have reviewed that date and what happened then right when you -- prior to coming in to testify today, right? 16:38:58

A. Yes, sir.

Q. And on that date you got notified, right?

A. I think it was January 29th, but I may be wrong. I think I was expecting the check on January 28th, but I don't think it came in until January 29th. 16:39:17

Q. January 29th you were flexing is what you told us. Right?

A. Yes, sir.

Q. And as part of your job at the government, what, every other Friday you are allowed to work at home? 16:39:31

A. I don't have a set schedule to work at home. I can work at home whenever it's necessary.

Q. How far is home from the office?

A. About 15 to 17 minutes.

Q. That day, you are flexing at home? 16:39:43

A. Yes, sir.

Q. You said -- you testified a few moments ago when Ms. Jennis was asking you questions, you said you were notified. Correct?

A. Yes, sir.

Q. You had to come in, right? 16:39:54

A. Yes, sir.
Q. Because you told us before on direct, you personally needed to be there to process two very large checks?
A. Yes, sir.
Q. Not money orders, right? 16:40:07
A. Well, I didn't know what they were at the time. They were just two large checks is what I received in a note from the secretary. So I needed to come in and process them.
Q. So you are at home. You are not wearing a jacket. You are not wearing a tie, right? You work in casual clothes when you 16:40:24 are at home?
A. Yes, sir.
Q. Maybe even your pajamas, right?
A. Well, I don't. But that's okay.
Q. I like you, Mr. Lyons. You might be in your pajamas at 16:40:34 home. But you get a call. They call you?
A. Yes.
Q. They called you?
A. They sent me an e-mail or an electronic message. We have a variety of electronic messages. They told me there were two 16:40:45 checks in there, two large checks.
Q. Who is they?
A. Jo.
Q. Jo.
A. Jo did, yes, sir. Unit secretary. 16:40:53

Q. She e-mailed you?
A. Yes, sir.
Q. Where is the e-mail?
A. Well, she sent me what's called an OC. It's an electronic transmission. 16:41:02
Q. Okay. Whatever you want to call it. Where is it?
A. They don't save those. It's like an IM.
Q. They don't save those?
A. It's not saved on the system, no, sir.
Q. So you get this message from -- 16:41:11
A. I just get a note, a little thing that pops up on the screen saying you've got two large checks.
Q. Okay. So let's go through this then.
A. Okay.
Q. Jo Lynn Colegrove sent that to you? 16:41:23
A. Yes, sir.
Q. You remember that?
A. Yes, sir.
Q. How do you remember that?
A. Well, you don't see that many large checks come in. She's 16:41:28 only done it maybe three, four times ever.
Q. Did you make a note, Jo Lynn Colegrove e-mailed me today about two large checks?
A. Yes, sir.
Q. You wrote that down? 16:41:42

A. Yes, sir.
Q. And this is an OC, you are calling it?
A. This is --
Q. Called an OC?
A. That's what we refer to it as, electronic message. 16:41:48
Q. Is this an internal message system on the IRS computer?
A. Yes, sir.
Q. And what did that message say? Do you remember?
A. Not exactly, only what I put in the ICS history that the unit secretary called or e-mailed me and so -- 16:42:03
Q. Do you want to take a look at Page 150 and refresh your memory about what it said before you answer any more questions?
A. What page, please, sir.
Q. Page 150 to 151, sir, in Exhibit 25.
A. 150? You are talking about Page 151 then? 16:42:34
Q. Exhibit 25. And it starts over on the bottom of Page 150, sir.
A. Yes, sir.
Q. That is your ID at the bottom of Page 150, right?
A. That's correct. 16:42:58
Q. That is your note, right?
A. Yes, sir.
Q. Does that refresh your memory?
A. Yes, sir.
Q. Okay. So you received an e-mail that day. Right? 16:43:02

A. That's what I wrote in the history.
Q. Is that different from an OC?
A. It is.
Q. Because I want to get this accurate, because these money orders, I want to talk about those in a minute. But you got an e-mail, right? 16:43:15
A. I got an OC, apparently, because I can't find the e-mails. I'm assuming it came by OC.
Q. So you wrote e-mail but you meant an OC?
A. Yes, sir. 16:43:30
Q. Okay. From who?
A. From the unit secretary.
Q. Which one?
A. In this particular case it was Jo Colegrove because she opened the mail. 16:43:38
Q. And you remember that part, right?
A. Yes, sir.
Q. And she opened the mail?
A. Yes, sir.
Q. So this envelope comes in. There's no special instructions 16:43:43 for handling these envelopes from Mr. Hall, right?
A. No, sir.
Q. Just another mailing coming in from Mr. Hall, right? By the way, you were expecting that mailing, right?
A. I was expecting it, yes, sir. 16:43:56

Q. In the dates preceding you wrote notes, didn't get the check. Didn't get the check. Right?
A. That is correct.
Q. Because you got this call from this phone number, somebody identifying themselves as Gordon Hall, saying I'm going to send you those checks, right? 16:44:06
A. That is correct.
Q. And then on that date, you get an e-mail. You don't have that e-mail, right?
A. No, sir. 16:44:15
Q. So Jo Lynn Colegrove, whoever sent you this e-mail, that's lost to history?
A. Yes, sir.
Q. Do you remember what the e-mail said?
A. It said that there are two checks. 16:44:24
Q. Said two checks or two money orders?
A. It probably said two checks.
Q. You better look again at that note in your log there.
A. Says two large money orders.
Q. Two large money orders. That's different from a check, right? 16:44:36
A. Yes, sir.
Q. Said had been received. Doesn't say who they were received by, right?
A. That is correct. 16:44:46

Q. Do you want to take a look at defense Exhibit Number 100, please? Just take a look at it and open that up see if you -- just take a look at it.

A. Okay, sir.

Q. Now, want to take a look at Exhibit 1, please? 16:45:15

A. Okay, sir.

Q. Do you have Exhibit 1 in front of you?

A. Yes, sir.

Q. Now, with respect to Exhibit 1, that came registered mail, right? 16:45:44

A. Yes, sir.

Q. On that front envelope that's in evidence there's a number there, right?

A. In Exhibit 1?

Q. Yeah. That number is RA 26108915, right? 16:45:55

A. That is correct.

Q. Let's take a look at Exhibit 2, please. By the way, that number on there, that's a registered mail stamp from the US Postal Service, correct?

A. That is correct. 16:46:13

Q. Okay. Let's go to Exhibit Number 2. You can look at the envelope on that one.

Do you see a registered mail receipt up there at the top?

A. Yes, sir. 16:46:37

Q. That one was says RA 261089801 U.S. Right?
A. Yes, sir.
Q. Let's go back to defense Exhibit Number 100 and take a look at that a second. I apologize. It's a photocopy. Take a good look at that first page on there, Mr. Lyons. 16:47:04
A. Go ahead.
Q. Do you recognize the two numbers there?
A. Yes, sir.
Q. Same numbers, correct?
A. Yes, sir. 16:47:15
Q. What does that appear to be? Says it right on the bottom.
A. That would be sender's complete this section, return receipt to be sent back to the sender.
Q. Of the registered mail?
A. Of the registered mail. 16:47:30
Q. And just like the IRS, the Postal Service loves its forms. That's a Form 3811, right?
A. That's what it says, yes, sir.
Q. And those appear to be the receipts that match those two registered mailing envelopes, right? 16:47:43
A. Yes, sir.
Q. Now, those receipts wouldn't be in IRS custody because they went back to the sender, right?
A. That is correct.
Q. Presumably Brighton Nicole Jorgensen, the presenter, from 16:47:52

Exhibit 1 and Exhibit 2?

A. Yes, sir.

Q. And there's a name there both printed and signed on those two receipts, right?

A. Yes, sir. 16:48:09

Q. Do you recognize that name?

A. That's Gloria Ross.

Q. You recognize the other name on those receipts, right, stamped? That would be your name?

A. Oh. As the person that it's addressed to, yes, sir. 16:48:20

Q. Right.

MR. KUNKLE: I move defense Exhibit 100 into evidence, Your Honor.

MS. JENNIS: No objection.

THE COURT: Exhibit 100 is admitted. 16:48:30

BY MR. KUNKLE:

Q. Who signed that receipt for the certified mail?

A. Gloria Ross.

Q. Did she open the package?

A. I don't have any idea if she did or not. 16:48:41

Q. Did Jo Lynn Colegrove open the package?

A. I assume Joe Colegrove opened it. It would have just been put into my in box.

Q. So we're going to assume it was Jo Lynn Colegrove who opened it? 16:48:57

A. Yes, sir.
Q. What happened to the package?
A. It was put back in my mailbox after she opened it and saw that there were two money orders there. She put it back in the mail slot. 16:49:05
Q. You are assuming that.
A. Yeah. Well, it was back in the mail slot.
Q. Somehow it got opened and put back in your mail slot?
A. Right.
Q. By whom we don't know? 16:49:14
A. That's correct. I guess.
Q. Gloria Ross signed the receipt.
A. Gloria Ross could have opened it, I presume, or left unopened, put it in my mailbox and Jo could have opened it.
Q. So you are at home flex timing it. You get this -- it was 16:49:27 an either an e-mail or OC. We don't know, right?
A. Uh-huh.
Q. Is that yes?
A. Yes, sir.
Q. We don't know if it came from Ms. Colegrove or Ms. Ross, 16:49:36 right?
A. The OC?
Q. Yeah.
A. It had to come from Jo Colegrove, because I didn't have OC with Gloria Ross. 16:49:46

Q. Okay. Could it have come from someone else?
A. No.
Q. You are shaking your head no. Before you were presuming now it had to have come from Ms. Colegrove you don't know who it came from? 16:49:59
A. I said the unit secretary, so it's the unit secretary for collection which is the unit that I'm in.
Q. Okay.
A. So I think it's fairly clear.
Q. That's the answer you want to stick with? 16:50:08
A. Yes, sir.
Q. Okay. And so you then left home and went down to the office?
A. Yes, sir.
Q. Because you had to process these? 16:50:16
A. It was my case, and I did process these.
Q. Okay.
A. I process my cases, yes, sir, unless I'm in the hospital.
Q. So only you could go in and do this Form 795?
A. No, sir. 16:50:34
Q. Anybody could?
A. I did do it.
Q. And why did you go in?
A. Because it was my case.
Q. No, it wasn't your case, was it? You went in because there 16:50:42

was a chance, right, that someone might deposit it or post them?
A. It was my case. Gordon Hall was my case.
Q. Mr. Lyons --
A. And I was concerned that someone might deposit the money orders. You are correct. 16:50:57
Q. Okay. You put in your note that day there was a chance.
A. That's what I said. Yes. There was a chance someone might deposit that check if I didn't come in. It had to be processed. 16:51:13
Q. Had to be?
A. Uh-huh.
Q. Is that a yes?
A. Because of the size.
Q. By you? 16:51:19
A. It was my case, and I did process it. If I was in the hospital like you just said, somebody else could have processed that check and it was very likely that it would have been processed and sent to Ogden, Utah.
Q. You just used the word "check." 16:51:34
A. Money order.
Q. There's a difference, right?
A. Yes, sir.
Q. Okay. So let's just get something clear. If everybody is going to follow procedures down there, there's 15 to 20 16:51:43

different revenue officers that could have given these money orders to, correct?
A. Yes.
Q. And a group manager who could have processed it, right?
A. There is one group manager, yes, sir. 16:51:56
Q. But you went in, right?
A. Yes, sir.
Q. On the chance that somebody could have posted it?
A. I went in on the chance that somebody could post it and that it was my job to go in and post large remittances on my 16:52:12 cases, unless I can't.
Q. We have already talked about the large remittances. We looked at these money orders, Exhibit 1 and 2?
A. Yes, sir.
Q. How long did you look at them? 16:52:30
A. Maybe five minutes each.
Q. Five minutes each?
A. Maybe.
Q. Do you know how long five minutes is? You really sat there and read them for five minutes? 16:52:39
A. I read them thoroughly.
Q. Thoroughly. And so 10 minutes you spent looking at those two money orders. Is that right?
A. Maybe. Yes, sir.
Q. Well no. No. No. No. No. We don't get a maybe now. 16:52:49

This is important.
A. I understand that.
Q. You see him sitting there. This is important. How long did you look at them?
A. Five minutes. 16:52:58
Q. Did you recognize the person who was supposed to pay the bill on those money orders?
A. Yes, sir.
Q. Who was it?
A. Gordon Hall. 16:53:04
Q. Was it Gordon Hall? You are a revenue officer, right?
A. Yes, sir.
Q. Who is the drawee on those money orders?
A. Who are they being --
Q. Who is the money order being directed to to pay that sum of money? 16:53:15
A. I have no idea.
Q. Timothy Geithner, right?
A. I could look at it and see if you want me to.
Q. We'll put it up on the screen if you would like. 16:53:30
A. Okay. The drawee is Timothy Geithner, yes, sir.
Q. Do you know what the drawee means, right?
A. Yes, sir.
MR. KUNKLE: This is Exhibit 1, Your Honor, Page 2.
BY MR. KUNKLE:

Q. See down there it says drawee?
A. Yes, sir.
Q. Who is that?
A. That's the Secretary of the Treasury.
Q. Timothy Franz Geithner, right? 16:54:03
A. Yes, sir.
Q. Department of the Treasury, right?
A. Yes, sir.
Q. Is that located at 1500 Pennsylvania Avenue?
A. Yes, sir. 16:54:17
Q. Now, you studied this for five minutes. Right?
A. I read the entire document, yes, sir.
Q. So you read that paragraph?
A. Front and back.
Q. You read that paragraph that says pay this for a private offset account number. Do you see that in that little small paragraph over here? 16:54:24
A. Yes, sir.
Q. Do you recognize that private offset account number?
A. Yes, sir. 16:54:37
Q. What's that number?
A. That's a social security number for Mr. Hall.
Q. So you studied this for five minutes and quickly determined it was fake?
A. Yes, sir. 16:54:46

Q. By the way, when did you write your note to your ICS that day? Before or after you went to the office?
A. Probably after.
Q. Well, okay. Yeah. Maybe. Probably. I assume. Do you know? 16:55:01
A. I assume it was. If I wrote -- I can certainly tell by looking at it.
Q. If that would refresh your memory.
A. I would have written it after I got back from the office.
Q. So you went back home to write the note in the ICS? 16:55:23
A. That's correct.
Q. So you have authorized access to an IRS computer from your home?
A. Yes, sir.
Q. Okay. So you spent a half an hour driving back and forth to home, right? 16:55:33
A. Yes, sir.
Q. You remember this was a Friday afternoon, I think you said this happened?
A. I believe it was, yes, sir. 16:55:45
Q. And you wanted to make sure nobody put that payment, that money order into the bank. Right?
A. That's correct, sir.
Q. Or into the mail to Ogden, Utah?
A. Yes, sir. 16:55:55

Q. Because somebody might have looked at that and thought that was real?
A. Yes, sir.
Q. Now, you were quite familiar at that point with Mr. Hall and his history at the IRS, right? 16:56:03
A. Yes, sir.
Q. For one second of your existence on January 29th, 2013, did you really think for a minute that he was sending you in a real money order?
A. I will be honest with you and tell you, yes, I did. 16:56:17
Q. You are going to be honest with me and tell me you think he did?
A. I thought he might actually pay it.
Q. You thought he was going to pay it after how many years of trying to collect? 16:56:29
A. Probably nine years.
Q. Nine years. He's going to cough up a money order all of a sudden, right?
A. Yes, sir.
Q. All those other mailings you got, kind of the in your face I'm in the Mesa, Arizona Republic without the U.S. He's going to -- 16:56:40
A. I actually thought that he might pay it. He was very cordial on the phone. He was very friendly. And I thought he actually might pay it. 16:56:56

Q. And you looked at this and ran right to the bank, right?
A. No, sir.
Q. Jo Lynn Colegrove looked at this. Was she going to go to the bank with it?
A. I have no idea. 16:57:04
Q. Yeah, because if she did she wouldn't be following procedures. Right?
A. She wouldn't have gone to the bank but she might have given it to the group manager to post or something like that if I was in the hospital. 16:57:15
Q. And who was the group manager that day?
A. Jeannie Sovereign, probably. I don't know who the group manager that was that day. There may have been an acting group manager. Jeannie Sovereign is the group manager for the collection group in Mesa. 16:57:29
Q. Now you looked at these and determined they were fake, right?
A. Yes, sir.
Q. And you told this jury before Ms. Jennis asked you that this was an attempt to pay his debt? 16:57:41
A. Yes, sir, I believe it was.
Q. That's what you believe, right?
A. Yes, sir.
Q. You are sure about that?
A. Yes, sir. 16:57:48

Q. That's not a maybe?
A. Yes, sir.
Q. This is a gentleman who sent you how many mailings over the years and you think that's what that was going to do was pay that debt? 16:57:59
A. I thought he was trying to pay the debt.
Q. Do you recognize the numbers on the bottom of that money order?
A. The 06, are you talking about those set of numbers across the bottom? 16:58:14
Q. Yeah. There's a bunch of them. Let's talk this first set. Do you recognize those?
A. No, sir. Are you asking if I recognize what bank it would be drawn on or financial organization?
Q. Yeah. 16:58:23
A. No, sir. I don't recognize.
Q. Do you recognize that number right there?
A. Social security number.
Q. Right. Now let me ask you something. You testified briefly when you were on direct about you thought you knew that 16:58:35 Mr. Hall was trying to pay that off. Do you remember saying that on direct examination with Ms. Jennis about an hour ago here?
A. Yes.
Q. Yeah? So are you aware of people who have bank accounts 16:58:48

that are tied to their social security number at the Treasury?
A. You are asking me if I thought he was going to pay it off before and I agreed with you I did think he might pay it off. But am I aware of somebody with a social security number in the bottom? 16:59:05
Q. Account --
A. The answer would be no, I'm not aware of that.
Q. You have heard of that before, though, right?
A. No, sir. I have never ever seen somebody put a social security number on the bottom of a money order. 16:59:14
Q. But you are aware of why people believe that that is an account that they have, right, Mr. Lyons?
A. I'm aware of why somebody would put the social security number on the bottom of a money order?
THE COURT: It's 5:00. We'll recess until 9:00 in the morning. And I ask everyone to be here a little bit early so we can seat the jury at 9:00. 16:59:28
And as I said, I think we may finish a little early tomorrow.
MR. KUNKLE: With the Court's indulgence -- well, we can come back tomorrow. I was going to say I could probably wrap up in a few minutes. 16:59:44
THE COURT: You know, thank you, but I really don't want to hold the jury after 5.
So again, I remind you of all the admonitions. Do not 16:59:58

do any research about the case. Do not discuss it with anyone. Do not allow anyone to discuss it with you. Keep your minds open until you have heard all the evidence. With that we'll be in recess until 9:00 in the morning.

All rise for the jury. 17:00:13

(Jury out at 5:00 p.m.)

THE COURT: The record will show the absence of the jury.

Mr. Lyons, you may step down.

Just a few things counsel. 17:00:51

MR. KUNKLE: Thank you, Your Honor. I'm sorry.

THE COURT: You said you are just about done?

MR. KUNKLE: Your Honor, I thought I might have like 5, 10 more minutes. It's fine.

THE COURT: Nothing personal here, but you are running 17:01:31 in circles. You are asking the same questions over and over and over again. And if I am noticing it the jury is noticing it. And so the government doesn't have to object to spare you from irritating the jury, but I don't want to waste their time.

Now, listen, a couple things. 17:01:49

MR. KUNKLE: Your Honor, Mr. Hall left the courtroom. I don't know why. He wasn't done.

THE COURT: Why is that? Where's the marshals? Tell them to bring him back.

MR. KUNKLE: They are bringing him right back out, 17:02:16

Your Honor.

THE COURT: We'll wait.

The record will show the defendant has returned to the courtroom.

Ms. Jennis, what's your estimate of witness time for tomorrow? 17:03:04

MS. JENNIS: Mine or Mr. Kunkle's?

THE COURT: Yours.

MS. JENNIS: Mine is really not long, Your Honor. All my witnesses are short, very short, except for I'm just trying 17:03:16 to think of the timing. You know the time I spent with Mr. Lyons today, I would say that the vast majority of the rest of the witnesses would take less time. Maybe one would take more. That is why I thought we would be ending early. I'm not sure how long my direct was, but other than some technical problems 17:03:45 I don't think it was that long.

THE COURT: I'm not sure. I think it was maybe 20 minutes. Maybe more.

MS. JENNIS: So if I had to aggregate everybody's testimony -- 17:04:02

MS. EDELSTEIN: Your Honor, honestly with looking through our list, I think the majority of our witnesses save for Brighton Nicole Jorgensen, which we do anticipate will face significant cross-examination, I believe most of the witnesses other than the expert for Thursday morning will be 20 minutes 17:04:20

on direct.

THE COURT: How many are there?

MS. EDELSTEIN: There are an additional -- tomorrow there will be eight witnesses, Your Honor.

MS. EDELSTEIN: Six. 17:04:31

MS. JENNIS: Oh. Yeah. Six, Your Honor. We had one today, not including Mr. Lyons. So we have Mr. Lyons, the remainder. My redirect will be brief.

THE COURT: Okay.

MS. JENNIS: Six witnesses. And then we have the 17:04:45 expert who actually might take a little time, I gather, Thursday morning.

THE COURT: This could take the whole day tomorrow, which is fine. We have the whole day. I just don't want to go beyond that. All right. 17:05:01

MS. JENNIS: It certainly could, Your Honor. It depends upon the cross-examination. The direct will be brief.

THE COURT: Unfortunately, I have now created an expectation with the jury so it will incentivize all of you not to frustrate them. 17:05:18

All right. Now, one other thing. On the instructions I have been looking at the -- I read your instructions to the jury, and you have also submitted in addition to the substantive instructions on Counts 1 and 2 and 3 and 4 you submitted and aiding and abetting instruction. However, it 17:05:36

appears to me the way you have crafted the instructions on the two counts covers the aiding and abetting. And I'm wondering whether we need a separate aiding and abetting instruction. Now, there may be good reason. But perhaps you all have specifically discussed that and maybe not. 17:06:00

So why do we need a separate aiding and abetting instruction when the principal instructions are already cast in terms of aiding and abetting and they define aiding and abetting in the first sentence of the paragraph. Take a minute and look at them. 17:06:16

MS. JENNIS: While we're looking for that, Your Honor, if I may, I think we neglected initially to have the 311 count which is the you must decide each count separately.

THE COURT: The which?

MS. JENNIS: For which? That is for -- to be read to 17:07:08 the jury, just a standard model instruction. It's called 311, separate consideration of multiple counts for a single defendant.

THE COURT: I actually did touch on that in the preliminary instruction in the first paragraph, but we may want 17:07:21 to do a separate instruction on the final. But that was in my preliminary. But I guess I'm not sure about your point.

MS. JENNIS: Well, it's just a standard instruction to give, Your Honor, that we neglected to put in in the beginning.

THE COURT: You are right. That should be there. We 17:07:42

can do the standard one. But let's go back to my question. Is the government's theory -- well --

MS. EDELSTEIN: Your Honor, the defendant essentially, because of the way the indictment was written, it was written to charge aiding and abetting as to each defendant for each of 17:08:01 Counts 1, 2, 3 and 4. Because the evidence in this case will be that while Mr. Hall did not actually physically print off these checks or physically take them to the post office to mail them to the Internal Revenue Service that he aided and abetted his co-defendants and others, uncharged individuals, with the 17:08:24 both charges. To that extent the singular line of aiding and abetting within the charged conduct itself seems sort of sparse in some ways, Your Honor, which is why we included the more thorough 5.1 aiding and abetting which outlines -- which is based on the model rule, Your Honor, and outlines much more of 17:08:47 the specifics of that particular Title 18 Section 2 charge.

THE COURT: Well, here's the issue. As I think I commented earlier, these instructions are really very much open to the risk of jury confusion. So I want to think this through so that we don't have overlapping duplicative instructions, 17:09:10 that we have instructions that are each an integrated whole. Now, to some extent this is going to turn on what exactly the government is going to stand up and tell the jury the facts prove. We don't need to have instructions to cover hypothetical possibilities. We need instructions to cover the 17:09:33

facts you are actually going to tell them happened.

So what's that going to be?

MS. EDELSTEIN: Your Honor, the facts will be that the defendant aided and abetted the making.

THE COURT: What did he do? I don't want legal words. I want empirical words. 17:09:45

MS. EDELSTEIN: Your Honor, we'll have testimony, we have had testimony, from Mr. Lyons that Mr. Hall was the individual who contacted him to get the specific information. We will have testimony from employees and Mr. Hall's own daughter who was an employee of the business regarding Mr. Hall's association with this particular -- the process by which these money orders were created, how they were conceived and when they began being used. 17:09:59

We'll have testimony from Ms. Jorgensen that Mr. Hall signed these particular documents in her presence. 17:10:15

THE COURT: These two -- you know, if he signed these you don't even need aiding and abetting, right?

MS. EDELSTEIN: Well, Your Honor, (a)(1) criminalizes the passing -- I'm sorry -- the making of, which arguably the signing of it could be construed as the making of. But if you were to read the statute at its pure word, it seems to be criminalizing the actual production of, meaning the printing off, physically creating this document which our evidence will show that his co-defendant, Brandon Adams, actually did. 17:10:31 17:10:52

With regard to (a)(2), the passing of, it seems to criminalize the actual physical submitting in some form. We have another individual who actually submitted these.

THE COURT: Right.

MS. EDELSTEIN: Benton Hall. 17:11:09

THE COURT: By the way, what's she going to say?

MS. EDELSTEIN: I'm sorry?

THE COURT: I'm sorry. You have Brighton Nicole Jorgensen listed as a witness. What is she going to say?

MS. EDELSTEIN: Your Honor, she was an employee. She 17:11:22 was there --

THE COURT: With respect to the mailing of these documents to the IRS.

MS. EDELSTEIN: Sure, Your Honor. She does not specifically recall -- she knows that she was the presenter. 17:11:31 She knows she filled out the affidavit of service. She recognizes her signature and fingerprint. She does not recall being the one that physically took them down to the post office. She will be providing testimony that the office maintained copies of these registered mailing receipts in their 17:11:45 office themselves. They didn't have to physically go get them at the post office when they mailed them, that other individuals sometimes mailed when another person was listed as a presenter.

But she does not recall, from our conversations with 17:12:00

her, specifically mailing these. And our evidence does demonstrate, we'll bring in through the postal inspector witness as well as the photos that we have taken that we will try to submit to evidence that it was Benton Hall who physically mailed these two registered mail pieces to the Internal Revenue Service. 17:12:17

THE COURT: So Mr. Kunkle, how do you feel about the instruction on aiding and abetting? And my concern is clarity. I must tell you, every time I see a confusion or an ambiguity, and the lawyers don't want to clear it up, I get a question 17:12:40 from the jury. They always figure it out and they always ask about it. I say always, I can say three or four times in the last three or four years. So I just -- I'm not hostile to giving that instruction, I just want to make sure it's not just slap dashing a couple forms together without thinking how they 17:13:07 mesh together. So I'm not accusing you all of anything. I just want to think it all through.

So you are okay with the model instruction, Mr. Kunkle?

MR. KUNKLE: Your Honor, I just -- I think that the 17:13:18 aiding and abetting instruction should remain in there. I believe the aiding and abetting instruction should remain in there because that's -- there's going to be a lot of different actors this jury is going to hear about. And I know the Court's expressed the view that because Mr. Hall's signature, 17:13:36

what purports to be his signature appears on that money order that they don't need an aiding and abetting, but there's other witnesses going to be testifying about what the government's theory is on the case.

THE COURT: Well, that's okay. Well, where is it. 17:13:52
Well, the way this instruction -- it's written just for making -- well, no, you have it written to cover all four counts. All right. That's -- that looks better to me. Isn't the crux of this someone else committed the crime and they have to find someone else committed the crime and that he helped 17:15:19
them?

MS. EDELSTEIN: Your Honor, there's actually very little guidance with regard to the 514(a)(1) and (a)(2) charges. There's simply not that many cases. The predominant cases that are available in different circuit courts address 17:15:36
specifically the (a)(2), the actual passing of. There's very little -- I struggled to find anything with regard to the (a)(1), the making of any specific definitions as to that.

THE COURT: It strikes me that however far down the process of creating paper you go, signing it has got to be 17:15:54
sufficient for making it.

MS. EDELSTEIN: I would agree, Your Honor, although I wasn't able to find any specific interpretation of that particular interpretation in any of the case law in the circuit. 17:16:11

THE COURT: Is there anything to the contrary or that would cast doubt on it?

MS. EDELSTEIN: I don't want to answer definitively, Your Honor. I would have to go back and review the cases that I pulled. But in my recollection I don't recall seeing any specific -- I don't recall any factual situation where a defendant was charged with making by virtue of signing alone. 17:16:22

THE COURT: Doesn't it -- again, I'm not burdened with any experience with the statute either. But it looks like the paradigm is the guy who the -- forger who has a fancy printing press who prints a treasury bond or something. That would be the paradigm, right? 17:16:46

MS. EDELSTEIN: Your Honor, I do know from reading some of the commentary with regard to the passage of these particular statutes, this statute was designed to do something other than -- it was an addition to the counterfeit laws. It was put in place to criminalize a different thing which was attempting to make completely false documents appear to be legitimate. 17:17:04

THE COURT: I see your point. 17:17:20

MS. EDELSTEIN: Versus, like I say, a counterfeit.

THE COURT: On the other hand, the overlap is at least it has to appear.

MS. EDELSTEIN: And the *Howick* case in the Ninth Circuit is very clear on that, that this charge relates to 17:17:30

documents that have a family resemblance to something that could be a financial instrument, even though they are completely unauthentic.

THE COURT: Doesn't have to be a good forgery or a good counterfeit. 17:17:45

MS. EDELSTEIN: That's correct.

THE COURT: The appearance would seem to be closely connected with the requirement of intent to deceive.

MS. EDELSTEIN: That's correct, Your Honor. And there will be testimony from the government's expert with regard to 17:17:56 specific definitions of fictitious, the specific definitions that are laid out in this statute.

THE COURT: Well, if we do this instruction once to cover all four counts, that's a principal concern I have. I don't want to be doing repetitive aiding and abetting 17:18:26 instructions. But you have written it that way, haven't you?

MS. EDELSTEIN: Your Honor, the singular aiding and abetting defined is meant as a clarification and there's a single line in each of the substantive counts which Your Honor read in preliminary and I anticipate Your Honor will read those 17:18:43 again in final instructions. There's only the singular line in there that says -- defines the aiding and assisting. The indictment that was read to them, to the jury today, very clearly lists that it is also a aiding and abetting. The 18 U.S.C. 2 is listed specifically in the counts. 17:19:05

THE COURT: All right. Under the statute, 18 United States Code Section 514(a), appears that your Counts 1 and 2 are drawn on Subsection 1 of Section A, and your Counts 3 and 4 are based on Subsection 2. That's the draws versus passes. Although I don't read the section numbers to the jury because it's meaningless to them. But I think -- I hope that we can go back to that aiding and abetting instruction and tweak it a bit so that it's broad enough to cover aiding and abetting a violation of either at one or two so we don't have to repeat it once, say it once for one and all over again for two with the differences. 17:20:54 17:21:26

MS. EDELSTEIN: Your Honor, what might make that simplified in 5.1 is to simply add in a little clip that says, in the first line there, the defendant may be found guilty of making and using fictitious instruments in violation of Title 18, United States Section 524(a)(1) as charged in Counts 1 and 2 and Section (a)(2) as charged in Counts 3 and 4. 17:21:49

THE COURT: I think I'd like you all to sit down and go through this again with an eye to having it clear and usable for the jury and that when you argue this it will track well with the government's presentation, the defendant's presentation. And the way you have, in 5.1 and the paragraph titled "second," this is a difficult because it's blending together the reference to (a)(1) and (a)(2) whereas they are distinct crimes. That's how you charge them, as distinct 17:22:09 17:22:57

crimes. So --

MS. EDELSTEIN: Would Your Honor be amenable to adding just that description of, as charged in Count 1 and 2 and as charged in Count 3?

THE COURT: That might solve the problem. We are still going to have the problem that -- 17:23:16

MS. EDELSTEIN: Your Honor, I note throughout the proposed instructions there is a significant typo. It says 524.

THE COURT: I caught that, too, so we can fix that. 17:23:34

And then if we go back to the principal instructions, they talk about aiding and abetting in the first paragraph with one sentence statement of it and we have this elaboration.

MS. EDELSTEIN: It may be unnecessary, Your Honor, to have that specific line in there, a defendant aids and abets 17:24:21 another if the defendant intentionally joins wit another person to commit a crime if we essentially give the aiding and abetting instruction in its full as we discussed in 5.1 and followed that up with the two individual instructions that were given in preliminary for the separate charges. Three 17:24:40 instructions without the need to keep restating aiding and abetting.

THE COURT: Part of the challenge, though, is if we work off the two substantive instructions and then the aiding and abetting, the substantive instructions are talking about 17:24:58

the primary crimes. And somehow we need to make clear what we're talking about, that if you want the broader sweep of aiding and abetting, fine. But we need to make clear what the initial sweep is, how that stands, and then the broader sweep of aiding and abetting. So it requires some particular crafting. It may not be many words, but it has to be thought about that way. So I don't want to try to write something right now. It's late. We're all tired. But this may be something to work on tonight or get up early in the morning. I'd like to have you come at this with these questions in mind as to how to craft these instructions. And I think I understand the government's theory to Counts 3 and 4 are satisfied even if he hadn't signed the money orders, even if he just found them lying on the floor with no knowledge once he picked them up and caused them to be sent. That's the use. I understand that.

MS. EDELSTEIN: Your Honor, the evidence that we're going to have is that there was a business set up in place that was -- they had clients for which they were attempting to set off debts. They had one instrument that they used before and then it switched. And these two money orders were the first two of that switch. And they were specifically for the benefit of Gordon Hall for these two specific years. So there will be testimony with respect to his business, his involvement, his specific role in all of it.

THE COURT: I don't want to find ourselves at the end of the evidence with the jury waiting and we're still trying to figure out how to write these instructions.

MS. EDELSTEIN: Yes, Your Honor. I will speak to Mr. Kunkle and work out a way to modify and/or combine those three particular instructions or to make them cleaner ahead of conversation tomorrow. 17:27:23

THE COURT: And the way the verdict forms are written, they are written just in terms of aiding and abetting. They are not written in terms of guilt for the primary offense under (a)(1) or (a)(2). So -- 17:27:47

MS. EDELSTEIN: Your Honor, I apologize. I don't have the proposed verdict form in front of me.

THE COURT: Well, I can't remember if we wrote them or we worked off your draft, but we took it off -- if we wrote it I'm sure we took it off of your form of instructions. I thought we had sent a revision to you, or you sent us some revisions of what we sent you all. We can get another copy shortly if you want. 17:28:14

MS. JENNIS: We have a copy, Your Honor. 17:28:28

THE COURT: All right. Well, all right. Maybe the way to come at it is the way we have done it in other cases where we define in the abstract the elements of the offense under (a)(1). We define in the abstract the elements under (a)(2), which, by the way, would mean editing this so we cannot 17:28:59

be referring to the documents as alleged in the indictment. We would be stating the nature of the offense in the abstract. And then we have another instruction about aiding and abetting that you are also guilty if you aided and abetted, and here's what aiding and abetting means. So that we have the logical 17:29:19 progression clearly laid out; here's the crime, here's the second crime; and you can also be guilty if you aid and abet either one. That shouldn't be many words changed at all.

MS. JENNIS: In essence, you are trying to say here's the crime. You can be guilty of this crime directly or you can 17:29:41 be guilty of this crime if you aided and abetted the crime.

THE COURT: Right.

MS. JENNIS: Correct? Okay.

THE COURT: And we could craft it charged -- actually, let me look at the indictment again. The indictment is not 17:29:54 cast in terms of aiding and abetting at all. My recollection is you don't have to, right?

MS. EDELSTEIN: It's charged in the caption.

MS. JENNIS: Of course not. Your Honor, aiding and abetting is always assumed in an indictment so you can prove 17:30:55 guilt several different ways. Like if this was a *Pinkerton* theory case you can prove guilt, again, a 924(c) count with a *Pinkerton* theory. What I would usually tell the jury in that case is the defendant can be guilty of this crime in more than one way: You can find direct evidence of guilt or it was 17:31:14

reasonably foreseeable that someone else would commit the crime if it was *Pinkerton*, or in this case it was he's guilty if he aids and abets.

THE COURT: The indictments are just the crimes straight out, and the verdict form that I think we wrote takes aiding and abetting because that's how the instructions were written. So it seems to me that we need to take out aiding and abetting from the verdict forms and just state the crimes, Counts 1 through 4, and the instruction we'll deal with the substantive liability under aiding and abetting. 17:31:30 17:31:45

MS. JENNIS: Yes. That would work, Your Honor. That's always assumed, the aiding and abetting.

THE COURT: All right. I think that's about as good as I can do right now in terms of giving you my thoughts. Now, we have to have something that makes sense to all of us. So the thoughts I have given you end up not making sense. I want to have something back from you all. When can we have a revision? I know you're busy when you are in trial. But if we're going to be beginning with the government's expert Thursday morning and go right into instructions and argument we need to have closure on this tomorrow, which means you need to have this language. What I think I'm going to do is ask you all to get some language to me before we start trial so that it's done, and then we can talk about it maybe at lunch or whatnot after I have had a chance to look at it. Maybe we talk 17:32:06 17:32:28 17:32:51

about it at the end of the day. But I'd rather talk about it before the end of the day so that I can have something ready to go before we start Thursday morning. How about you all -- I don't care whether you meet tonight or early in the morning, exchange some drafts, take a crack at it. 17:33:12

I think, Ms. Jennis, it's your case so maybe you should take the first crack at a revision to send to Mr. Kunkle. And just have something to me by 8:30. And the reason I want it by then is I want you all to have time to get here by 9:00. So and then I will -- also, I will -- if I have it here by 8:30 I will have read it before we begin a little before 9:00. 17:33:33

Okay. I think that was everything on my list of what I want to talk about. Counsel, anything else before we break?

MS. JENNIS: No, Your Honor. 17:33:47

MR. KUNKLE: No, Your Honor.

THE COURT: All right. Very well then. We'll be in recess until a little before 9:00.

(Proceeding recessed at 5:33 p.m.)

C E R T I F I C A T E

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 7th day of September, 2015.

s/Laurie A. Adams
________________________________
Laurie A. Adams, RMR, CRR